# In the United States Court of Federal Claims

### No. 13-227L
### July 30, 2015

```
* * * * * * * * * * * * *
```

| | |
|---|---|
| **DEBRA JONES, et al.,** | * |
| | * **Motion to Dismiss; Lack of** |
| **Plaintiffs,** | * **Subject Matter Jurisdiction;** |
| **v.** | * **Failure to State a Claim;** |
| | * **Exhaustion of Administrative** |
| **UNITED STATES,** | * **Remedies; Issue Preclusion;** |
| | * **1868 Ute Treaty; "Bad Men"** |
| **Defendant.** | * **Provision.** |
| | * |

```
* * * * * * * * * * * * *
```

     **Frances C. Bassett**, Fredericks Peebles & Morgan LLP, Louisville, CO, for plaintiffs. With her were **Sandra L. Denton** and **Todd K. Gravelle**, Fredericks Peebles & Morgan LLP, Louisville, CO.

     **Jody H. Schwartz**, Trial Attorney, Environment and Natural Resources Division, Department of Justice, Washington D.C., for defendant. With her were **Kenneth D. Rooney**, Trial Attorney, Environment and Natural Resources Division, and **John C. Cruden**, Assistant Attorney General, Environment and Natural Resources Division, Department of Justice.

## O P I N I O N

**HORN, J.**

### FINDINGS OF FACT

     On April 1, 2013, plaintiffs filed their complaint in the United States Court of Federal Claims.[1] Plaintiffs allege that on April 1, 2007, "Utah State Trooper Dave Swenson sent

---

[1] The plaintiffs are "Debra Jones and Arden C. Post, individually and as the natural parents of Todd R. Murray; Debra Jones, as personal representative of the Estate of Todd R. Murray, deceased, for and on behalf of the heirs of Todd R. Murray, and the Ute Indian Tribe of the Uintah and Ouray Reservation." Plaintiffs Jones and Post are the biological parents of Todd R. Murray, a 21-year old member of the Ute Indian Tribe, whose death is the basis for the above captioned case, filed against the United States for violation of

a radio dispatch from his patrol car advising the Utah central Police Dispatch that he was pursuing a car containing 'two tribal males' for a speeding violation." Trooper Swenson later testified[2] that the vehicle was traveling 74 miles per hour in a 65 mile an hour zone. The driver of the vehicle was 17-year-old Uriah Kurip, and his lone passenger was the decedent, 21-year-old Todd Murray. The alleged speeding violation occurred just outside the boundary of the Ute Tribe's Uncompahgre Reservation in Utah. In what Trooper Swenson later testified he viewed as an attempt to evade police pursuit, Mr. Kurip turned off U.S. Highway 40, onto State Road 88, an intersection located more than two miles outside the boundary of the Uncompahgre Reservation. Although Trooper Swenson began his pursuit off the Uncompaghre Reservation, the pursuit carried into the Uncompaghre Reservation, land held by the Ute Indians, and ended 25 miles south of the intersection of U.S. 40 and State Road 8 at the intersection of Seep Ridge Road and Turkey Track Road, an intersection also inside the boundary of the Uncompaghre Reservation. Once stopped, Mr. Kurip and Mr. Murray exited their vehicle and stood on either side of the vehicle. The amended complaint reflects that Trooper Swenson testified that he exited his vehicle with his gun drawn and ordered the two to the ground.  Mr. Kurip and Mr. Murray exchanged looks and Trooper Swenson repeated the command two or three times, after which Mr. Kurip and Mr. Murray ran from their vehicle in opposite directions. Trooper Swenson pursued Mr. Kurip on foot and quickly apprehended him.

Responding to Trooper Swenson's earlier radio dispatch requests for help, off-duty Vernal City police officer Vance Norton was next to arrive on the scene, dressed in street clothes and driving his personal vehicle. Officer Norton set off on foot in pursuit of Mr. Murray. Utah Highway Patrol Trooper Craig Young and Uintah County Deputy Anthoney Byron subsequently joined in the search. Officer Norton later testified he eventually encountered Mr. Murray as Mr. Murray was rounding a hill. According to the amended complaint, Officer Norton testified he saw Mr. Murray before Mr. Murray saw him. Officer Norton allegedly raised his gun and shouted, "POLICE—GET TO THE GROUND." (capitalization in original). Also, according to the amended complaint, Officer Norton recalled seeing something in Mr. Murray's hand, but admitted that he could not tell what was in Mr. Murray's hand. Defendant indicates in its motion to dismiss that it was later determined Mr. Murray was carrying an illegally purchased .380 caliber handgun. Further, according to plaintiffs' amended complaint, Officer Norton indicated Mr. Murray raised his hand and fired shots, and Officer Norton, in turn, fired two rounds at Mr. Murray. The amended complaint states that "Norton alleges that Murray then turned the gun on himself and pulled the trigger. Officer Norton contacted dispatch, advised that shots had been fired and that Murray had shot himself." "At the time of the shooting, Officers Byron and Young state they were approaching from the south with their firearms drawn. Officers Byron and Young worked together to handcuff Murray." Plaintiffs contend that Trooper

the Ute treaties and federal statutes and breach of trust in violation of the Ute treaties federal statutes.

[2] Although the amended complaint repeatedly refers to "testimony" by multiple individuals, the amended complaint does not indicate how or under what circumstances the "testimony" was taken.

Swenson, Officer Norton, "Defendant" Byron, and "Defendant" Young[3] are not cross-deputized by the federal government or the Ute Tribe to exercise law enforcement powers over Native Americans inside the Ute Tribe's Reservation.[4]

After the shooting, a number of other officers arrived at the scene, including Special Agents Rex Ashdown and David Ryan with the Federal Bureau of Investigation (FBI) and various officials from the Bureau of Indian Affairs (BIA). In their amended complaint, plaintiffs allege that the FBI and BIA officers "ostensibly assumed jurisdiction of the scene" because "the shooting scene was in Indian Country," yet "[t]he FBI and BIA officers on the scene were complicit in the State officers' improper assertion of jurisdictional authority over the shooting site." Plaintiffs further allege that Raymond

_____

[3] Although plaintiffs refer to Officers Young and Bryon as "defendants" in the amended complaint, the only proper defendant in the United States Court of Federal Claims is the United States. See Rule 10(a) of the Rules of the United States Court of Federal Claims (RCFC) (2014) ("The title of the complaint must name all the parties . . . , with the United States designated as the party defendant."). The United States Supreme Court has indicated that for suits filed in the United States Court of Federal Claims and its predecessors, "[i]f the relief sought is against others than the United States the suit as to them must be ignored as beyond the jurisdiction of the court." United States v. Sherwood, 312 U.S. 584, 588 (1941) (citation omitted) Slattery v. United States, 635 F.3d 1298, 1321 n.1 (Fed. Cir.), aff'd, 710 F.3d 1336 (Fed. Cir.), cert. denied, 134 S. Ct. 1276 (2014); May v. United States, 80 Fed. Cl. 442, 444 ("Jurisdiction, then, is limited to suits against the United States."), aff'd, 293 F. App'x 775 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2008). Stated differently, "the only proper defendant for any matter before this court is the United States, not its officers, nor any other individual." Stephenson v. United States, 58 Fed. Cl. 186, 190 (2003) (emphasis in original); see also United States v. Sherwood, 312 U.S. at 588; Brown v. United States, 105 F.3d 621, 623 (Fed. Cir. 1997); Hover v. United States, 113 Fed. Cl. 295, 296 (2013) ("As an initial matter, it is well settled that the United States is the only proper defendant in the United States Court of Federal Claims."); Warren v. United States, 106 Fed. Cl. 507, 510-11 (2012) ("It is well settled that the United States is the only proper defendant in the Court of Federal Claims."). Therefore, the court only refers to the United States as the defendant in the above captioned case.

[4] Plaintiffs amended the complaint after defendant filed a motion to dismiss the complaint. Plaintiffs allege in the amended complaint:

> Murray was shot after being pursued at gun-point by two Utah state Highway Troopers, a Uintah County Sheriff's Deputy, and an off-duty Vernal City, Utah, police officer. The pursuit took place over tribal trust lands more than 25 miles inside the northern boundary of the U&O Reservation. The four shooting-involved officers had no criminal jurisdiction over Indians inside the U&O Reservation. The officers also had no probable cause to believe that Todd Murray had committed any crime.

(internal citation omitted).

Wissiup, a member of the Ute Tribe and a certified law enforcement officer was excluded from the scene. In addition, plaintiffs contend that the law enforcement officers did not segregate, question, or search the officers involved in Mr. Murray's shooting, nor properly process their firearms.

At 11:30 a.m., immediately following the shooting, "Officer Norton contacted dispatch, advised that shots had been fired and that Murray had shot himself." Plaintiffs allege that an ambulance did not arrive on the scene until 12:02 p.m., and further allege that prior to its arrival, Mr. Murray was alive, but no state or federal officer provided him medical aid. According to the amended complaint, when the ambulance arrived on the scene, Mr. Murray's "breathing was labored, his limbs were twitching, and he was unconscious. There was a copious amount of blood around his head." The ambulance transported Mr. Murray to Ashely Valley Medical Center, where he was pronounced dead at 1:19 p.m. According to the amended complaint, the "FBI and the BIA officers then allowed the Utah state, county and municipal officers to transport Murray's body to the Thomson-Blackburn Vernal Mortuary (Mortuary) in Vernal, Utah, for holding overnight until the body could be transported to the Utah State Medical Examiner's office for an autopsy the next day."

Plaintiffs contend that the FBI and BIA officers "took no action to secure Todd Murray's remains or the crime scene itself." Plaintiffs also assert that "municipal officers present at the medical center proceeded to violate Murray's dignity and to tamper with the physical evidence." While at the hospital, plaintiffs allege that Mr. Murray's body was unnecessarily and inappropriately disrobed, manipulated, and photographed. Officer Byron was allegedly photographed with his finger inserted in Mr. Murray's head wound. Plaintiffs assert that BIA Officer Kevin Myore was present at the medical center and "condoned and participated in, or failed to prevent, the illegal and unethical desecration of Mr. Murray's remains and the spoliation of critical evidence." Plaintiffs also claim that "Special Agent Ashdown took no action to secure and preserve Mr. Murray's body at the Mortuary" and instead was "complicit in the additional acts of horrific desecration and evidence tampering that took place at the Mortuary." Further, plaintiffs claim that the Vernal City Police Chief Gary Jensen "admits" to inserting a needle into Mr. Murray to draw blood, and allege that "Chief Jensen then allegedly directed a mortuary employee to make an unauthorized incision to Murray's jugular vein, from which two vials of blood were purportedly drawn, although neither the Utah state nor the federal law enforcement officers have ever accounted for the blood vials drawn from Murray's body at the Mortuary." Plaintiffs also contend, "[n]either the Mortuary, nor any law enforcement officers, obtained the permission of Mr. Murray's next of kin to desecrate Todd Murray's remains in this manner."

The amended complaint states that Mr. Murray's body was next transported to the Utah Office of the Medical Examiner. The Utah Office of the Medical Examiner allegedly "elected to forego an autopsy and to perform only a simple external examination of Mr. Murray's body." Plaintiffs indicate that:

> OME's [Utah Office of the Medical Examiner's] final pathological diagnosis
> was that the entrance wound on Mr. Murray's head was on the lateral *left*
> scalp and the exit wound was on the upper posterior right scalp. Thus, the
> gunshot wound that killed Todd R. Murray entered on the left side of Mr.
> Murray's head and exited on the right side of Mr. Murray's head.

(emphasis in original). Plaintiffs further note that the Utah Office of the Medical Examiner
reported that Mr. Murray arrived with his hands "bagged" and that no soot was found on
either of Mr. Murray's hands, his left hand was clean and free of any debris or blood, and
his right hand was bloody. Moreover, plaintiffs allege that "the FBI officers and the BIA
officers allowed the Utah Medical Examiner's Office to list the cause of Todd Murray's
death as a suicide, when the Medical Examiner himself later testified that he could not
rule out the possibility that Todd Murray was shot in the back of his head execution style."
Plaintiffs, therefore, challenge Officer's Norton version of events and state that "Todd
Murray did <u>not</u> shoot himself execution-style in the back of his head." (emphasis in
original).

In addition, plaintiffs contend that "all of the evidence the FBI and BIA officers were
responsible for—and that would have been of a dispositive nature in this case—has been
destroyed or altered," and that, throughout, the FBI and BIA officers disregarded proper
investigatory procedure and preservation of evidence. Specifically, plaintiffs contend that
the firearm that Mr. Murray allegedly fired during his encounter with Officer Norton was
destroyed by the FBI and not forensically tested and that Mr. Murray's person or clothing
were never forensically tested. Plaintiffs contend the same regarding preservation and
forensic testing of Officer Norton's firearm, personal vehicle, person, and clothing.
Plaintiffs further contend that Officer Norton was not sequestered, but was allowed free
access to the scene of the shooting, thereby giving Officer Norton the "opportunity to
tamper with the physical evidence." Plaintiffs also allege other failures, including lack of
documentation of the scene, failure to administer medical aid to Mr. Murray, improper
handling of, and tampering with, Mr. Murray's body at the medical center, mortuary, and
Utah Office of the Medical Examiner, resulting in "significantly altered and potentially
destroyed critical evidence," and failure by the Utah Office of the Medical Examiner to
perform an autopsy of Mr. Murray's body.

According to the complaint, "[t]hree weeks after the shooting, members of Todd
Murray's family met with FBI Agent Ashdown." Plaintiffs allege that "[t]he family members
explained to Agent Ashdown that Todd Murray was a right-handed individual; they told
Ashdown it would have been impossible for Murray to shoot himself in the back of the
head, above and behind his left ear."[5] Mr. Murray's family urged Special Agent Ashdown
to investigate and revisit the circumstances of Mr. Murray's death. According to plaintiffs,
Special Agent Ashdown "promised the family members that the FBI would conduct a full
investigation" yet despite this promise, the United States has never conducted a civil or

---

[5] According to the amended complaint, "Agent Ashdown admitted to the family members
that it would be impossible for a right-handed individual to shoot himself in the back of the
head, above and behind his left ear."

criminal investigation into "the actions of any single individual" involved in the circumstances surrounding Mr. Murray's death, nor of the investigatory and preservation procedures immediately following. Plaintiffs contend that Special Agent Ashdown later admitted under oath that he conducted no investigation into the shooting of Mr. Murray largely because of his long-standing relationship with Officer Norton.

On July 17, 2009, Debra Jones, individually, as the natural parent of Todd Murray, and as personal representative of the Estate of Todd R. Murray for and on behalf of Mr. Murray's heirs, and Arden Post, individually and as the natural parent of Todd Murray, filed suit in the Uintah County Court regarding the death of Mr. Murray. See Jones et al. v. Norton et al., 3 F. Supp. 3d 1170 (D. Utah 2014).[6] The plaintiffs brought suit in the District Court and asserted civil rights claims under 42 U.S.C. § 1983 (2006) and 42 U.S.C. § 1985 (2006) against Uintah County and the City of Vernal, and against law enforcement officers, in their individual, as well as in their official, capacities. Plaintiffs sought upwards of $3,000,000.00 in damages. "In their § 1983 claims against the Individual Defendants, the Plaintiffs allege illegal seizure, excessive force, and failure to intervene to prevent the officers' unconstitutional acts. Under § 1985, they allege conspiracy to obstruct justice and conspiracy to violate Mr. Murray's civil rights based on racial animus." Jones et al. v. Norton et al., 3 F. Supp. 3d. at 1177. Plaintiffs alleged additional numerous causes of action, including illegal seizure, use of excessive force, assault/battery, and wrongful death. Subsequently, the suit was removed to the United States District Court for the District of Utah on August 20, 2009.

On March 12, 2013, while the District Court case was pending, plaintiffs mailed a letter to senior officials at the United States Department of the Interior, giving notice of their intent to file suit against the United States. The letter was titled "Notice of Claim concerning the April 1, 2007 Shooting Death of Todd Murray, Ute Indian tribal member." The letter states:

> Dear Messrs. Toulou, Smith, and Washburn and Secretary of the Interior:
>
> Our law firm represents the Ute Indian Tribe of the Uintah and Ouray Reservation ("Tribe" or "Ute Tribe"). We also represent tribal members Debra Jones and Arden Post who are the parents of Todd Murray, a tribal member who was shot to death in an encounter with Utah state and local police on the Uintah and Ouray Indian Reservation in Utah ("U&O Reservation") in 2007. Please accept this letter as our notice of claim to your respective agencies of our intent to file a complaint against the United States based on breaches of the 1863 and 1868 Ute Treaties and the United States' violation of its trust obligations to the Ute Tribe and its members.
>
> We plan to file suit in the Federal Court of Claims and allege that the Federal Bureau of Investigation (FBI) and the Bureau of Indian Affairs (BIA), by and through their employees, committed wrongs upon the person or property of

---

[6] The Ute Indian Tribe was not a party to the District Court litigation.

the Indians, namely decedent Todd Murray his family and the Ute Indian Tribe as a whole. Included with our letter are the Plaintiffs' (i) Third Amended Complaint, (ii) motion for default judgment on liability based on tampering [sic] destruction of critical evidence, and (iii) motion for summary judgment under Counts 1, 3 and 5 filed in the parents' private cause of action, DEBRA JONES, *et al.,* v, VANCE NORTON, *et al.,* Civil Case No. 2:09-cv-00730, U.S. District Court, District of Utah, Central Division.

The attached filings give an overview of the sequence of events that transpired on April 1, 2007 as well as a clear indication of the egregious actions of the law enforcement officers who participated in this "investigation." The FBI and the BIA representatives who were present on April 1, 2007 and who participated in the "investigation" contributed to the travesties by (1) failing to protect the Ute Tribe's interests as a sovereign in the crime scene, (2) failing to properly preserve and protect evidence from being tampered with and destroyed, and (3) failing to conduct their own independent investigation into the death of Todd Murray. As a result of the aforementioned failures, the Murray family and the Ute Indian Tribe are seeking damages from the United States in the amount of $10 million, as well as reimbursement of litigation costs and attorney fees.

Attached to this letter is a summary of the relevant Treaty obligations that have been violated by the actions and inactions of the United States in this case. Under Article 6 of the 1863 Treaty, the Ute Indian bands agreed to forego "private revenge or retaliation" for injuries suffered by the Tribe and individual tribal members as the result of the "misconduct of individuals." In return the United States guaranteed the Tribe and individual tribal members a right to legal redress for "any robbery violence, or murder" committed "on an Indian or Indians" belonging to the Ute Indian bands. Article 6 of the 1868 Treaty promised that any person violating the territorial integrity of the Reservation and causing harm to the Tribe or its tribal members would be "punished according to the laws of the United States." In violation of these treaty obligations, the United States has failed to investigate or to prosecute the individuals involved in the shooting death of 21 year-old Todd Murray in April 2007, and the subsequent conspiracy to suppress, alter, and destroy critical evidence.

Please feel free to contact our office should you require any additional information regarding this forthcoming claim.


Sincerely,

Sandra L. Denton

7

(footnote omitted). The March 12, 2013 letter attached almost four hundred pages of exhibits, including filings in the District Court such as the plaintiffs' third amended complaint, the motion for summary judgment, and plaintiffs' motion for allegedly the tampering and destruction of critical evidence.

On March 7, 2014, the District Court granted the defendant's motion for summary judgment, and denied plaintiffs' cross motion. See Jones et al. v. Norton et al., 3 F. Supp. 3d 1170. On April 1, 2014, plaintiffs appealed the District Court's decision to the United States Court of Appeals for the Tenth Circuit. See Jones et al. v. Norton et al., No. 14-4040 (10th Cir. appeal docketed Apr. 1, 2014). On November 18, 2014, plaintiffs filed another appeal to the United States Court of Appeals for the Tenth Circuit, appealing the Distric Court's amended judgment. See Jones et al. v. Norton et al., No. 14-4144 (10th Cir. appeal docketed Nov. 18, 2014).[7] To date, the Tenth Circuit has not issued a decision on plaintiffs' appeal.

In the District Court case, the Court considered whether Mr. Murray was "seized" for 4th Amendment purposes.[8] Most relevant to the above captioned case, "[t]he Plaintiffs contend that Detective Norton seized Mr. Murray when he (1) fired shots at Mr. Murray; and (2) according to Plaintiffs, shot Mr. Murray in the head." Jones et al. v. Norton et al., 3 F. Supp. 3d at 1189. The District Court determined that "[t]he record does not support their claim and no reasonable jury could find against Detective Norton," and that "[t]he evidence clearly shows that Mr. Murray shot himself." Id. at 1189, 1190. The District Court also determined:

> [T]he Plaintiffs' evidence is sparse, circumstantial, subject to more than one interpretation, and, at times, very speculative. Moreover, evidence to the contrary is strong and is consistent with a self-inflicted gunshot wound. Deputy Byron testified that he did not see Detective Norton next to Mr.

---

[7] On October 15, 2014, the District Court amended its judgement "to reflect the award of costs" to the defendants. See Jones et al. v. Norton et al., No. 2: 09–CV–730–TC, 2014 WL 909569 (D. Utah Oct, 15, 2014).

[8] As indicated by the District Court:

> The Plaintiffs contend that officers Norton, Young, Byron, and Swenson seized Mr. Murray on the Reservation and so a violation of Mr. Murray's Fourth Amendment rights necessarily occurred. They focus on the following events: (1) Trooper Swenson's order to Mr. Kurip and Mr. Murray to stop after the car chase ended and the men got out of the car; (2) the forming of a police perimeter to entrap Mr. Murray; (3) Detective Norton firing at Mr. Murray twice; (4) when Detective Norton's bullet allegedly entered Mr. Murray's head; and (5) Deputy Byron handcuffing Mr. Murray while Trooper Young pointed his gun as cover for Deputy Byron.

Jones et al. v. Norton et al., 3 F. Supp. 3d at 1186 (footnotes omitted).

Murray when Mr. Murray dropped to the ground. Detective Norton testified that he was up on a hill when he saw Mr. Murray shoot himself.

The Deputy Chief Medical Examiner Dr. Edward Leis, who conducted the physical examination of Mr. Murray's body, concluded in his report that the wound was caused by a gun shot "in close proximity to the skin surface when it was discharged." He based his conclusion on "abundant soot at the inferior margin of the defect [the wound] and some marginal abrasion is also noted at the inferior margin." In his testimony, he elaborated on his conclusion that the gun was in contact with Mr. Murray's head when it was fired:

> At the perimeter, there are several triangular shaped tears of the wound. That's a result of the gun being pressed up against the skin surface when it's discharged and gases causing the scalp to be separated from the underlying skull. When the scalp lifts up, it stretches and it tears and gets its characteristic stellae appearance.

The smaller wound on the right side of Mr. Murray's head was, in Dr. Leis' opinion, the exit wound. After Dr. Leis certified that Mr. Murray's death was a suicide resulting from a gunshot wound to the head, he added an additional cause of death (based on results from testing of Mr. Murray's bodily fluids). Because the tests showed the presence of drugs and alcohol in Mr. Murray's system, Dr. Leis issued an amended death certificate which added "Acute alcohol intoxication; recent methamphetamine use" as contributing to Mr. Murray's death.

Detective Norton was more than 100 yards away when Mr. Murray was shot. Dr. Leis testified that there was no evidence that the wound could have been caused by a shot coming from that far away. Plaintiffs maintain that Detective Norton was not 100 yards away, but was right next to Mr. Murray and so he had the capability of inflicting the contact wound. But the actual evidence in the record (that is, testimony by Detective Norton and Deputy Byron) shows that Detective Norton was not right next to Mr. Murray when the fatal shot was fired.

Id. at 1190-91 (footnotes omitted).

The District Court noted that plaintiffs also alleged the defendant conspired to cover up the killing of Mr. Murray, stating, "[s]ummed up, Plaintiffs' argument is that Defendants engaged in '[a] conspiracy to cover up a killing.' Plaintiffs' theory is that Detective Norton shot and killed Mr. Murray, and that the rest of the Defendants conspired to cover-up that killing and protect Detective Norton." Id. at 1197 (footnotes omitted). Addressing the plaintiffs' alleged conspiracy, the court stated: "The focus of the Plaintiffs'

conspiracy theory is the failure to give aid and their spoliation argument about the destruction of evidence." Id. at 1202.

Turning to plaintiffs' claims of the defendants' failure to give medical aid to Mr. Murray, and the defendants' "interference with Mr. Murray's due process right of access to courts via the failure to preserve critical evidence and the affirmative destruction of critical evidence," the District Court determined,

> [n]one of that testimony could allow a reasonable jury to conclude that Individual Defendants were deliberately indifferent to Mr. Murray's situation, or that they knew that there was a substantial risk of significant harm to Mr. Murray if they did not provide first aid. If anything, the evidence shows that at least three of the Individual Defendants (Young, Davis, and Slaugh) were concerned that attempts to provide any kind of aid to Mr. Murray would do more harm than good.

Id. at 1210. The District Court stated: "[i]n sum, there is no evidence before the court to support a finding that the inaction by each individual defendant was part of a conspiracy to let Mr. Murray die." Id. at 1203. The District Court also determined that, "[b]ased on the facts as detailed and explained in its spoliation order, the court concludes that no reasonable jury could conclude that Defendants conspired to 'effectively eliminate[ ] all probative evidence' and 'clean the closet of evidence that would have allowed Plaintiffs to build their case.'"[9] Id. at 1204 (quoting various plaintiffs' briefs; omissions in original; footnote omitted). Therefore, the District Court concluded that "the Defendants did not violate Mr. Murray's civil rights for failing to provide medical aid, nor did the Defendants fail to preserve evidence."[10] Id. at 1210 (footnote omitted).

_____

[9] In relation to plaintiffs' claim that defendants' conspired to violate Mr. Murray's civil rights, the District Court explained that the plaintiffs asked "the court to infer the existence of such a conspiracy (much like they asked the court to infer racial animus) from a handful of facts and the Plaintiffs' speculative characterization of those facts as so 'brazen and flagrant' and 'unjustifiable and irrational' that they support a finding of conspiracy." Jones et al. v. Norton et al., 3 F. Supp. 3d. at 1201 (footnote omitted).

[10] The defendants' alleged failure to preserve evidence was discussed in detail in the District Court's spoliation order. See Jones et al. v. Norton et al., No. 2: 09–CV–730–TC, 2014 WL 909569. For instance, the plaintiffs argued that "critical evidence was lost because Mr. Murray's hands were not bagged properly and Mr. Murray's body was not properly preserved because the body bag was incorrectly sealed." The District Court, however, determined, that:

> There is no evidence to show that Mr. Murray's hands were bagged improperly. Plaintiffs argue that Mr. Murray's hands must have been improperly bagged because some photographs showed his hands bagged and others did not, but there is no evidence to show who, when, and where

On April 1, 2013, approximately three weeks after plaintiffs mailed the March 12, 2013 letter to the Department of the Interior officials, giving notice of their intent to file suit in this court, and exactly six years after Todd Murray's death, plaintiffs filed suit in this court. Plaintiffs' suit in this court was consistent with the information submitted in the March 12, 2013 letter.

In response, defendant filed a motion to dismiss, pursuant to RCFC 12(b)(1) and RCFC 12(b)(6), alleging lack of subject matter jurisdiction and failure to state a claim. Notably, defendant argued that "[i]n addition to the various individuals identified in the Complaint, Plaintiffs aver that the FBI, BIA, the State of Utah, Unitah County, Vernal city, and various non-federal enforcement agencies are 'bad men' as that term is used in the treaties." According to defendant, "[t]he federal government and various state enforcement agencies, however, cannot be 'bad men' as that term is used in the treaties."

Plaintiffs subsequently moved to amend the complaint, and in support of their motion stated:

> The Plaintiffs' proposed amendments [sic] correct the pleading deficiencies cited by the United States in its motion to dismiss the complaint. The amendments include additional factual allegations to make clear the substance of the Plaintiffs' allegations, and to make clear that Plaintiffs sought administrative review of Todd Murray's shooting death before filing this action. The amendments also make clear that Plaintiffs' claims are based on the actions and inactions of individual federal officers, not the actions or inactions of the federal agencies employing those officers, i.e., the Federal Bureau of Investigation and the Bureau of Indian Affairs.

The court granted plaintiffs' motion, after which plaintiffs filed an amended complaint. Plaintiffs' amended complaint, which asserts numerous claims for relief, alleges that the United States committed cognizable wrongs upon Mr. Murray and the Ute Tribe. According to plaintiffs' amended complaint, the United States, by and through the conduct of the FBI and BIA, violated the guarantees of two Ute Treaties, entered into and signed in 1863 and 1868. Plaintiffs also advance a breach of trust claim for the same alleged violations and injustices. For these alleged injuries, plaintiffs seek compensatory damages in the amount of $10,000,000.00, as well as costs, attorney's fees, "and all other damages permitted by the Treaties with the Utes, and such other and further relief as this Court deems proper."

Specifically, plaintiffs' claims for relief, set forth in the amended complaint, are: "I. VIOLATION OF THE UTE TREATIES AND OTHHER [sic] FEDERAL LAWS," and "I. [sic]

---

Mr. Murray's hands were bagged, or when the bags were removed. And there is no evidence to show that the body bag was sealed.

Id. at *11.

BREACH OF TRUST IN VIOLATION OF THE UTE TREATIES AND OTHER FEDERAL
LAW." (capitalization in original). Within the alleged "VIOLATION OF THE UTE
TREATIES AND OTHHER [sic] FEDERAL LAWS," (capitalization in original) plaintiffs
allege:

> By their actions and inactions, the FBI and BIA officers committed wrongs
> to Todd Murray, the Murray family and the Ute Tribe *(i)* by acting in concert
> with state/county/municipal officers, expressly or impliedly, in concocting, or
> permitting to be concocted, a false story that Todd Murray shot himself in
> the back of his head, execution style, above and behind his left ear; *(ii)* by
> failing to take custody of Murray's body and to secure the body against
> desecration and spoliation of evidence; [sic] *(iv)* by participating in, tacitly
> allowing, or failing to prevent, the desecration of Murray's body and the
> spoliation of critical evidence both at the shooting scene and afterwards at
> the Medical Center, Blackburn Mortuary, and at the Utah OME; *(v)* the
> failure to insure that a proper autopsy was performed on Murray's body; *(vi)*
> by failing to conduct any kind of investigation into Todd Murray's murder;
> and *(vii)* by failing to protect the territorial integrity of the Tribe's reservation
> boundary and the Tribe's sovereign interests in the crime scene where
> Murray was shot.[11]

(emphasis in original).

Regarding the "BREACH OF TRUST IN VIOLATION OF THE UTE TREATIES
AND OTHHER [sic] FEDERAL LAW," (capitalization in original) plaintiffs claim that "[i]n
violation of federal law and its treaty obligations, the United States has failed to investigate
or prosecute the individuals involved in the shooting death of 21 year-old Todd Murray on
April 1, 2007, or the subsequent conspiracy to suppress, alter, and destroy critical

---

[11] The court notes that preceeding the list of allegations in plaintiffs' amended complaint,
plaintiffs also claim:

> In April 2007, Todd Murray, Todd Murray's family, and the Ute Indian Tribe
> suffered "injuries" at the hands of "bad men" as those terms are used in the
> Ute Treaties of 1863 and 1868. These injuries include (*i*) the extra-territorial
> police pursuit, assault upon and murder of Todd Murray, (*ii*) the conspiracy
> to cover up Todd Murray's murder, (*iii*) the failure of federal officers to take
> custody of Murray's body and to secure the body against desecration and
> spoliation of evidence; (*iv*) the desecration of Murray's body and the
> spoliation of critical evidence both at the shooting scene and afterwards at
> the Medical Center, Blackburn Mortuary, and at the Utah OME; (*v*) the
> failure to insure that a proper autopsy was performed on Murray's body;
> [sic] (*vii*) failure of federal officers to conduct any kind of investigation into
> Todd Murray's murder; and *(vi)* the failure of federal officers to protect the
> territorial integrity of the Tribe's reservation boundary and the Tribe's
> sovereign interests in the crime scene where Murray was shot.

evidence related to the shooting death." Plaintiffs claim that "[b]y failing to investigate Todd Murray's death and by taking no action to promote justice in Indian Country, Special Agent Rex Ashdown and David Ryan and BIA Officers James Beck, Terrance Cuch and Kevin Myore breached their duties to the Ute Tribe, to Todd Murray, and to Murray's family under the Ute Treaties of 1863 and 1868. . . ."

Plaintiffs further allege:

The United States has also breached its trust obligations to the Tribe and Murray's family by failing to protect the territorial integrity of the Tribe's reservation and the Tribe's sovereign interest in the shooting site, thus allowing unauthorized persons to trespass on the Ute homeland and cause harm to tribal members with complete impunity. The Defendant's breach of its trust and treaty obligations has resulted in substantial loss to the Tribe. Todd Murray was a registered tribal member and a lineal descendant of Ute blood. The Ute Tribe is a small tribe with less than 4,000 members. Unremitting tribal membership is an integral part of the Tribe's ability to sustain its lineage and culture. The Defendant is liable in damages for such loss.

In response to the amended complaint, defendant, again, filed a motion to dismiss both counts pursuant to RCFC 12(b)(1) and RCFC 12(b)(6), for lack of subject matter jurisdiction, and failure to state a claim, respectively. For count one, defendant contends that the violation of the Ute Treaties should be dismissed "for lack of jurisdiction and for failure to state a claim." Defendant argues that "[p]laintiffs have not complied with the terms of the Treaty and have not exhausted the administrative remedies required by the express terms of the Treaty." Defendant contends that even if the court found jurisdiction under the "bad men" provision[12] of the 1868 Treaty with the Utes, "plaintiffs do not state a cognizable claim under the 'bad men' provision." For count two, defendant contends that, "[p]laintiffs' breach-of-trust claims are barred by the United States' sovereign immunity because plaintiffs did not allege the violation of a specific statutory or regulatory money-mandating duty," and that the Treaties involved "do not impose a nondiscretionary fiduciary duty upon the United States to prosecute alleged 'bad men' without exercising its prosecutorial discretion."

## DISCUSSION

## Background of the Ute Treaties

Many of the plaintiffs' claims center on particular provisions of two treaties executed, and ratified, in the mid-19th century. The first treaty was concluded on October 7, 1863. See Treaty with the Utah Tabeguache Band, October 7, 1863, 13 Stat. 673

---

[12] Both defendant and plaintiffs use the phrases "bad men" provision and "bad men" clause, in their filings.  For simplicity, unless quoting directly, the court adopts the phrase "bad men" provision.

(referred to by the parties as the 1863 Treaty).[13] Through the 1863 Treaty, the Tabeguache Band of Ute Indians ceded their rights and interest to vast tracts of land in the Western United States. See id. Article 1 of the 1863 Treaty states: "It is admitted by the Tabeguache band of Utah Indians that they reside within the territorial limits of the United States, acknowledging their supremacy, and claim their protection. The said band also admits the right of the United States to regulate all trade and intercourse with them." Article 2 of the 1863 Treaty states, in part: "Said Tabeguache band of Utah Indians hereby cede, convey, and relinquish all of their claim, right, title, and interest in and to any and all of their lands within the territory of the United States, wherever situated, excepting that which is included within the following boundaries. . . ." Id. In return: "[f]or the period of ten years the said band shall receive, annually, by such distribution as the Secretary of the Interior may direct, ten thousand dollars' worth of goods, and also ten thousand dollars' worth of provisions." Id.

Article 10 of the 1863 Treaty provides:

Each family that shall announce through its head to the agent of the band a willingness and determination to begin and follow the pursuits of agriculture, by farming or raising stock and growing wool, upon such lands and according to such regulations as the Secretary of the Interior may prescribe, shall receive the following donations of stock to aid them in their endeavor to gain a livelihood by such new pursuits, viz.:

Of cattle, one head annually during five years, beginning with the ratification of this treaty.

Of sheep, ten head annually during the first two years after the ratification of this treaty, and five head annually during the three years thereafter.

The Secretary of the Interior may also direct that their share of annuity goods and provisions shall be of a character suited to such change of life: *Provided, however*, That such stock shall only be donated as long as such family shall in good faith keep and use the same for the purpose indicated in this article.

All the Indians of said band who may adopt and conform to the provisions of this article shall be protected in the quiet and peaceable possession of their said lands and property.

Id. (emphasis in original).

---

[13] On March 25, 1864, the United States Senate advised ratification, with amendments, which were assented to by the Tribe on October 8, 1864.  See 13 Stat. 673. The 1863 Treaty was then signed by President Lincoln on December 14, 1864.  See id.

In March of 1868, the United States concluded another treaty with the Ute. <u>See</u> Treaty with the Ute, March 2, 1868, 15 Stat. 619 (referred to by the parties as the 1868 Treaty).[14] As noted in the preamble and Article 1 of the 1868 Treaty:

> Articles of a treaty and agreement made and entered into at Washington City, D.C., on the second day of March, one thousand eight hundred and sixty-eight, by and between Nathaniel G. Taylor, Commissioner of Indian Affairs, Alexander C. Hunt, governor of Colorado Territory and ex-officio superintendent of Indian affairs, and Kit Carson, duly authorized to represent the United States, of the one part, and the representatives of the Tabaquache[15], Muache, Capote, Weeminuche, Yampa, Grand River, and Uintah bands of Ute Indians, (whose names are hereto subscribed,) duly authorized and empowered to act for the body of the people of said bands, of the other part, witness:

> Article I. All the provisions of the treaty concluded with the Tabequache band of Utah Indians, October seventh, one thousand eight hundred and sixty-three, as amended by the Senate of the United States and proclaimed December fourteenth, one thousand eight hundred and sixty-four, which are not inconsistent with the provisions of this treaty, as hereinafter provided, are hereby reaffirmed and declared to be applicable and to continue in force as well to the other bands, respectively, parties to this treaty, as to the Tabequache band of Utah Indians.

<u>Id.</u> Article 2 of the 1868 Treaty states, in part:

> [T]he United States now solemnly agree that no persons, except those herein authorized so to do, and except such officers, agents, and employes [sic] of the Government as may be authorized to enter upon Indian reservations in discharge of duties enjoined by law shall ever be permitted to pass over, settle upon, or reside in the Territory described in this article, except as herein otherwise provided.

<u>Id.</u> Art. 2. The 1868 Treaty reaffirmed and incorporated the provisions of the 1863 Treaty, but also created new guarantees and promises. For example, Article 5 the 1868 Treaty established how to resolve "depredation on person or property":

> The United States agree that the agents for said Indians, in the future, shall make their homes at the agency buildings; that they shall reside among the

---

[14] On July 25, 1868, the United States Senate advised ratification, with amendments, which were assented to by the Tribe in August and September 1868.  <u>See</u> 15 Stat. 619. The 1868 Treaty was then signed by President Johnson on November 6, 1868.  <u>See</u> <u>id.</u>

[15] Although the 1868 Treaty uses the spelling "Tabaquache" in the preamble, all other spellings of the Tribe are "Tabequache."

Indians, and keep an office open at all times for the purpose of prompt and diligent inquiry into such matters of complaint by and against the Indians, as may be presented for investigation under the provisions of their treaty stipulations, as also for the faithful discharge of other duties enjoined on them by law. In all cases of depredation on person or property, they shall cause the evidence to be taken in writing and forwarded, together with their finding, to the Commissioner of Indian Affairs, whose decision, subject to the revision of the Secretary of the Interior, shall be binding on the parties to this treaty.

Id. Art. 5. Article 6 states in full:

If bad men among the whites or among other people, subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will, upon proof made to the agent and forwarded to the Commissioner of Indian Affairs at Washington City, proceed at once to cause the offender to be arrested and punished according to the laws of the United States, and also reimburse the injured person for the loss sustained.

If bad men among the Indians shall commit a wrong or depredation upon the person or property of any one, white, black, or Indian, subject to the authority of the United States and at peace therewith, the tribes herein named solemnly agree that they will, on proof made to their agent and notice to him, deliver up the wrongdoer to the United States, to be tried and punished according to its laws, and in case they wilfully refuse so to do the person injured shall be reimbursed for his loss from the annuities or other moneys due or to become due to them under this or other treaties made with the United States.

Id. Art. 6. This provision is often referred to by courts and litigants as the "bad men" provision. "Bad men" provisions are common in Native American treaties of this time period, and appear to have been fairly standard in Native American treaties during the 19th century. As explained by the United States Court of Appeals for the Federal Circuit in Tsosie v. United States, 825 F.2d 393 (Fed. Cir. 1987):

The treaty in question [the Navajo Treaty] is one of nine made in 1868, by and between commissioners representing the United States and chiefs of various previously hostile Indian tribes. The treaties were all duly ratified, proclaimed, and published in volume fifteen of the Statutes at Large. All say that peace is their object and all contain "bad men" articles in similar language.

Id. at 395; see also Elk v. United States, 87 Fed. Cl. 70, 81 & 81 n.16 (2009) (noting that other 1868 treaties "contain 'bad men' clauses identical to that in the Sioux Treaty, citing the Najavo Treaty and noting the earlier 1868 Ute Treaty), appeal dismissed, 449 F. App'x 1 (Fed. Cir. 2010); Garreaux v. United States, 77 Fed. Cl. 726, 734 (2007).

As noted above, in the "bad men" provision of the 1868 Ute Treaty, the United States promised:

> If bad men among the whites or among other people, subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will, upon proof made to the agent and forwarded to the Commissioner of Indian Affairs at Washington City, proceed at once to cause the offender to be arrested and punished according to the laws of the United States, and also reimburse the injured person for the loss sustained.

Plaintiffs allege that on April 1, 2007, Todd Murray was "wronged" by "bad men," under the terms of the 1868 Ute Treaty. Further, plaintiffs contend that "[t]he United States agreed to protect and reimburse the Ute Indians for all harm, injury, unjust, or unmerited treatment inflicted upon any tribal member or tribal property by non-whites on the reservation," but that the United States failed to honor its obligations under the 1868 Treaty by not investigating and prosecuting the alleged wrongdoers.

## Jurisdiction

Defendant argues that this court lacks jurisdiction over plaintiffs' case because plaintiffs have not complied with the terms of the 1868 Ute Treaty, and further argues that plaintiffs have not stated a cognizable claim under the "bad men" provision. It is well established that "'subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived.'" Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006) (quoting United States v. Cotton, 535 U.S. 625, 630 (2002)). "[F]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press." Henderson ex rel. Henderson v. Shinseki, 562 U.S. 428, 434 (2011); see also Gonzalez v. Thaler, 132 S. Ct. 641, 648 (2012) ("When a requirement goes to subject-matter jurisdiction, courts are obligated to consider *sua sponte* issues that the parties have disclaimed or have not presented."); Hertz Corp. v. Friend, 559 U.S. 77, 94 (2010) ("Courts have an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it." (citing Arbaugh v. Y & H Corp., 546 U.S. at 514)); Special Devices, Inc. v. OEA, Inc., 269 F.3d 1340, 1342 (Fed. Cir. 2001) ("[A] court has a duty to inquire into its jurisdiction to hear and decide a case." (citing Johannsen v. Pay Less Drug Stores N.W., Inc., 918 F.2d 160, 161 (Fed. Cir. 1990))); View Eng'g, Inc. v. Robotic Vision Sys., Inc., 115 F.3d 962, 963 (Fed. Cir. 1997) ("[C]ourts must always look to their jurisdiction, whether the parties raise the issue or not."). "Objections to a tribunal's jurisdiction can be raised at any time, even by a party that once conceded the tribunal's subject-matter jurisdiction over the controversy." Sebelius v. Auburn Reg'l Med. Ctr., 133 S. Ct. 817, 824 (2013); see also Arbaugh v. Y & H Corp., 546 U.S. at 506 ("The objection that a federal court lacks subject-matter jurisdiction . . . may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment."); Cent. Pines Land Co., L.L.C. v. United States, 697 F.3d 1360, 1364 n.1 (Fed. Cir. 2012) ("An objection to a

court's subject matter jurisdiction can be raised by any party or the court at any stage of litigation, including after trial and the entry of judgment." (citing Arbaugh v. Y & H Corp., 546 U.S. at 506–07)); Rick's Mushroom Serv., Inc. v. United States, 521 F.3d 1338, 1346 (Fed. Cir. 2008) ("[A]ny party may challenge, or the court may raise sua sponte, subject matter jurisdiction at any time." (citing Arbaugh v. Y & H Corp., 546 U.S. at 506; Folden v. United States, 379 F.3d 1344, 1354 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1127 (2005); and Fanning, Phillips & Molnar v. West, 160 F.3d 717, 720 (Fed. Cir. 1998))); Mata v. United States, 118 Fed. Cl. 92, 95-96 (2014), recons. denied, 2015 WL 1000820 (Fed. Cl. Mar. 4, 2015); Pikulin v. United States, 97 Fed. Cl. 71, 76, appeal dismissed, 425 F. App'x 902 (Fed. Cir. 2011). In fact, "[s]ubject matter jurisdiction is an inquiry that this court must raise sua sponte, even where . . . neither party has raised this issue." Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings, 370 F.3d 1354, 1369 (Fed. Cir.) (citing Textile Prods., Inc. v. Mead Corp., 134 F.3d 1481, 1485 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir.), cert. denied, 525 U.S. 826 (1998)), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. granted in part sub. nom Lab. Corp. of Am. Holdings v. Metabolite Labs., Inc., 546 U.S. 975 (2005), cert. dismissed as improvidently granted, 548 U.S. 124 (2006); see also Avid Identification Sys., Inc. v. Crystal Import Corp., 603 F.3d 967, 971 (Fed. Cir.) ("This court must always determine for itself whether it has jurisdiction to hear the case before it, even when the parties do not raise or contest the issue."), reh'g and reh'g en banc denied, 614 F.3d 1330 (Fed. Cir. 2010), cert. denied, 131 S. Ct. 909 (2011).

Pursuant to the RCFC and the Federal Rules of Civil Procedure, a plaintiff need only state in the complaint "a short and plain statement of the grounds for the court's jurisdiction," and "a short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(1), (2) (2014); Fed. R. Civ. P. 8(a)(1), (2) (2015); see also Ashcroft v. Iqbal, 556 U.S. 662, 677–78 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–57, 570 (2007)). "Determination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." Holley v. United States, 124 F.3d 1462, 1465 (Fed. Cir.) (citing Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1 (1983)), reh'g denied (Fed. Cir. 1997); see also Klamath Tribe Claims Comm. v. United States, 97 Fed. Cl. 203, 208 (2011); Gonzalez-McCaulley Inv. Grp., Inc. v. United States, 93 Fed. Cl. 710, 713 (2010). "Conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim." Bradley v. Chiron Corp., 136 F.3d 1317, 1322 (Fed. Cir. 1998); see also McZeal v. Sprint Nextel Corp., 501 F.3d 1354, 1363 n.9 (Fed. Cir. 2007) (Dyk, J., concurring in part, dissenting in part) (quoting C. Wright and A. Miller, Federal Practice and Procedure § 1286 (3d ed. 2004)). "A plaintiff's factual allegations must 'raise a right to relief above the speculative level' and cross 'the line from conceivable to plausible.'" Three S Consulting v. United States, 104 Fed. Cl. 510, 523 (2012) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 555), aff'd, 562 F. App'x 964 (Fed. Cir.), reh'g denied (Fed. Cir. 2014). As stated in Ashcroft v. Iqbal, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' 550 U.S. at 555. Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Ashcroft v. Iqbal, 556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 555).

When deciding a case based on a lack of subject matter jurisdiction or for failure to state a claim, this court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) ("In addition, when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555–56 (citing Swierkiewicz v. Sorema N. A., 534 U.S. 506, 508 n.1 (2002)))); Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) ("Moreover, it is well established that, in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader."), abrogated on other grounds by Harlow v. Fitzgerald, 457 U.S. 800 (1982), recognized by Davis v. Scherer, 468 U.S. 183, 190 (1984); United Pac. Ins. Co. v. United States, 464 F.3d 1325, 1327–28 (Fed. Cir. 2006); Samish Indian Nation v. United States, 419 F.3d 1355, 1364 (Fed. Cir. 2005); Boise Cascade Corp. v. United States, 296 F.3d 1339, 1343 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2002); cert. denied, 538 U.S. 906 (2003). If a defendant or the court challenges jurisdiction or plaintiff's claim for relief, however, the plaintiff cannot rely merely on allegations in the complaint, but must instead bring forth relevant, competent proof to establish jurisdiction. McNutt v. Gen. Motors Acceptance Corp. of Ind., 298 U.S. 178, 189 (1936); see also Land v. Dollar, 330 U.S. 731, 735 n.4 (1947); Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 747 (Fed. Cir. 1988); Catellus Dev. Corp. v. United States, 31 Fed. Cl. 399, 404–05 (1994).

The Tucker Act grants jurisdiction to this court as follows:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1) (2012). As interpreted by the United States Supreme Court, the Tucker Act waives sovereign immunity to allow jurisdiction over claims against the United States (1) founded on an express or implied contract with the United States, (2) seeking a refund from a prior payment made to the government, or (3) based on federal constitutional, statutory, or regulatory law mandating compensation by the federal government for damages sustained. See United States v. Navajo Nation, 556 U.S. 287, 289–90 (2009) (Navajo Nation II);[16] United States v. Mitchell, 463 U.S. 206, 216 (1983) (Mitchell II);[17] see also Greenlee Cnty., Ariz. v. United States, 487 F.3d 871, 875 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2007), cert. denied, 552 U.S. 1142 (2008); Palmer v. United States, 168 F.3d 1310, 1314 (Fed. Cir. 1999).

---

[16] The decision in Navajo Nation II was preceded by the Supreme Court decision in United States v. Navajo Nation, 537 U.S. 488 (2003) (Navajo Nation I).

[17] The decision in Mitchell II was preceded by the Supreme Court decision in United States v. Mitchell, 445 U.S. 535 (1980) (Mitchell I).

"Not every claim invoking the Constitution, a federal statute, or a regulation is cognizable under the Tucker Act. The claim must be one for money damages against the United States . . . ." Mitchell II, 463 U.S. at 216; see also United States v. White Mountain Apache Tribe, 537 U.S. 465, 472 (2003); Smith v. United States, 709 F.3d 1114, 1116 (Fed. Cir.), cert. denied, 134 S. Ct. 259 (2013); RadioShack Corp. v. United States, 566 F.3d 1358, 1360 (Fed. Cir. 2009); Rick's Mushroom Serv., Inc. v. United States, 521 F.3d at 1343 ("[P]laintiff must . . . identify a substantive source of law that creates the right to recovery of money damages against the United States."). In Ontario Power Generation, Inc. v. United States, the United States Court of Appeals for the Federal Circuit identified three types of monetary claims for which jurisdiction is lodged in the United States Court of Federal Claims. See Ontario Power Generation, Inc. v. United States, 369 F.3d 1298, 1301 (Fed. Cir. 2004). The court wrote:

> The underlying monetary claims are of three types. . . . First, claims alleging the existence of a contract between the plaintiff and the government fall within the Tucker Act's waiver. . . . Second, the Tucker Act's waiver encompasses claims where "the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum." Eastport S.S. [Corp. v. United States, 178 Ct. Cl. 599, 605–06,] 372 F.2d [1002,] 1007-08 [(1967)] (describing illegal exaction claims as claims "in which 'the Government has the citizen's money in its pocket'" (quoting Clapp v. United States, 127 Ct. Cl. 505, 117 F. Supp. 576, 580 (1954)) . . . . Third, the Court of Federal Claims has jurisdiction over those claims where "money has not been paid but the plaintiff asserts that he is nevertheless entitled to a payment from the treasury." Eastport S.S., 372 F.2d at 1007. Claims in this third category, where no payment has been made to the government, either directly or in effect, require that the "particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum." Id.; see also [United States v. ]Testan, 424 U.S. [392,] 401-02 [(1976)] ("Where the United States is the defendant and the plaintiff is not suing for money improperly exacted or retained, the basis of the federal claim-whether it be the Constitution, a statute, or a regulation-does not create a cause of action for money damages unless, as the Court of Claims has stated, that basis 'in itself . . . can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'" (quoting Eastport S.S., 372 F.2d at 1009)). This category is commonly referred to as claims brought under a "money-mandating" statute.

Ontario Power Generation, Inc. v. United States, 369 F.3d at 1301; see also Twp. of Saddle Brook v. United States, 104 Fed. Cl. 101, 106 (2012).

To prove that a statute or regulation is money-mandating, "the statute and regulations must be such that they '"can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained."'" Roberts v. United States, 745 F.3d 1158, 1162 (Fed. Cir. 2014) (quoting United States v. White Mountain Apache Tribe, 537 U.S. at 472 (quoting United States v. Testan, 424 U.S. 392, 400 (1976))); see also

Navajo Nation II, 556 U.S. at 290; United States v. White Mountain Apache Tribe, 537 U.S. at 472; Mitchell II, 463 U.S. at 217; Blueport Co., LLC v. United States, 533 F.3d 1374, 1383 (Fed. Cir. 2008), cert. denied, 555 U.S. 1153 (2009). The source of law granting monetary relief must be distinct from the Tucker Act itself. See Navajo Nation II, 556 U.S. at 290 (The Tucker Act does not create "substantive rights; [it is simply a] jurisdictional provision[] that operate[s] to waive sovereign immunity for claims premised on other sources of law (e.g., statutes or contracts)."). "'If the statute is not money-mandating, the Court of Federal Claims lacks jurisdiction, and the dismissal should be for lack of subject matter jurisdiction.'" Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin., 525 F.3d 1299, 1308 (Fed. Cir. 2008) (quoting Greenlee Cnty., Ariz. v. United States, 487 F.3d at 876); Fisher v. United States, 402 F.3d 1167, 1173 (Fed. Cir. 2005) (The absence of a money-mandating source is "fatal to the court's jurisdiction under the Tucker Act."); Peoples v. United States, 87 Fed. Cl. 553, 565–66 (2009).

If a defendant or the court challenges jurisdiction or a plaintiff's claim for relief, however, the plaintiff cannot rely merely on allegations in the complaint, but must instead bring forth relevant, competent proof to establish jurisdiction. See McNutt v. Gen. Motors Acceptance Corp. of Ind., 298 U.S. 178, 189 (1936); see also Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 747 (Fed. Cir. 1988). Therefore, although the court must assume that the undisputed facts alleged in the complaint are true for the purposes of the motion to dismiss and draws all reasonable inferences in the plaintiffs' favor, the facts alleged in the complaint must be plausible and not merely naked assertions devoid of a factual basis. See Ashcroft v. Iqbal, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); see also McZeal v. Sprint Nextel Corp., 501 F.3d 1354, 1363 n.9 (Fed. Cir. 2007) (mere allegations of law and conclusions of fact are insufficient to support a claim); SUFI Network Servs., Inc. v. United States, 102 Fed. Cl. 656, 660 (2012) (plaintiff "must provide more than mere 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555 (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)))); Rack Room Shoes v. United States 718 F.3d 1370, 1376 (Fed. Cir.) reh'g and reh'g en banc denied, (Fed. Cir. 2013) cert. denied, 134 S. Ct. 2287 (2014); Kam-Almaz v. United States, 682 F.3d 1364, 1367-68 (Fed. Cir. 2012) ("[A] court is '"not bound to accept as true a legal conclusion couched as a factual allegation."'" (quoting Twombly, 550 U.S. at 555 (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)))).

"It is well established that, in addition to the complaint itself and exhibits thereto, the court 'must consider . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" Bell/Heery v. United States, 106 Fed. Cl. 300, 307-08 (2012) (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007) (citing 5B Wright & Miller § 1357 (3d ed. 2004 and Supp. 2007))), aff'd, 739 F.3d 1324 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2014); see also Fredericksburg Non-Profit Housing Corp. v. United States, 113 Fed. Cl. 244, 255 n.19 (2013) (citing 5B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1357); Bristol Bay Area Health Corp. v. United States, 110 Fed. Cl. 251, 262 (2013). As also discussed further below, the "bad men" provision of the 1868 Ute Treaty provides a basis for jurisdiction in this court.

**Administrative Exhaustion**

Defendant argues that administrative exhaustion is a "jurisdictional prerequisite" to judicial review. The defendant relies on language in the 1868 Ute Treaty, which reads:

> In all cases of depredation on person or property, they shall cause the evidence to be taken in writing and forwarded, together with their finding, to the Commissioner of Indian Affairs, whose decision, subject to the revision of the Secretary of the Interior, shall be binding on the parties to this [1868] treaty.

1868 Treaty, Art. 5. Defendant contends that this language mandates full administrative review, allowing the Department of the Interior an opportunity to issue a "binding decision" before a plaintiff can seek relief from the courts. Defendant states that "throughout the six years following Mr. Murray's death, Plaintiffs have had every opportunity to present a 'bad men' claim to the Department of the Interior ('DOI'), as agreed upon by both the Tribe and the United States. See Treaty with the Ute Indians, 15 Stat. 619 (1868). Plaintiffs have not." (internal citation omitted). According to defendant, "plaintiffs have not complied with the terms of the Treaty and have not exhausted the administrative remedies required by the express terms of the Treaty." As a consequence, defendant argues,

> DOI has not been provided with an opportunity to "cause the evidence to be taken in writing and forwarded, together with [the government agent's] finding, to the Commissioner of Indian Affairs, whose decision, subject to the revision of the Secretary of the Interior, shall be binding on the parties to this treaty." Art. 5, 1868 Treaty. Having failed to exhaust their administrative remedies, Plaintiffs' Amended Complaint should be dismissed.

(alterations in original). Defendant urges this court to dismiss plaintiffs' claims in the United States Court of Federal Claims for lack of subject matter jurisdiction.

In response, plaintiffs argue they have satisfied the exhaustion requirements of the treaty by way of their March 12, 2013 letter to Department of the Interior officials, placing the Department of the Interior on notice of plaintiffs' intention to file suit in this court. Plaintiffs allege that the court "has previously analyzed this specific bad men treaty clause and has held that the only prerequisite required before suit is filed is that a notice of claim must be sent to the agency and a copy be sent to the Commissioner of Indian Affairs in Washington." Moreover, plaintiffs argue that the exhaustion requirement is non-jurisdictional, maintaining that any requirement to exhaust administrative remedies is purely prudential and, therefore, subject to the court's discretion.

"The doctrine of exhaustion of administrative remedies is one among related doctrines—including abstention, finality, and ripeness—that govern the timing of federal-court decision making." McCarthy v. Madigan, 503 U.S. 140, 144 (1992), superseded by statute as recognized in Garrett v. Hawk, 127 F.3d 1263 (10th Cir. 1997). The Supreme

Court has held "'that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted.'" McKart v. United States, 395 U.S. 185, 194 (1969) (quoting Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 50—51 (1938)); see also Woodford v. Ngo, 548 U.S. 81, 88 (2006); Sandvik Steel Co. v. United States, 164 F.3d 596, 599 (Fed. Cir. 1998) (The general rule is that "no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted."); Burlington N. R.R. Co. v. United States, 752 F.2d 627, 629 (Fed. Cir. 1985).

"Exhaustion of administrative remedies serves two main purposes." Woodford v. Ngo, 548 U.S. at 89; In re DBC, 545 F.3d 1373, 1378 (Fed. Cir. 2008). As described by the United States Supreme Court, the first, and primary, purpose is the development of a proper factual background:

> A primary purpose is, of course, the avoidance of premature interruption of the administrative process. The agency, like a trial court, is created for the purpose of applying a statute in the first instance. Accordingly, it is normally desirable to let the agency develop the necessary factual background upon which decisions should be based. And since agency decisions are frequently of a discretionary nature or frequently require expertise, the agency should be given the first chance to exercise that discretion or to apply that expertise.

McKart v. United States, 395 U.S. at 193–94; see also Kappos v. Hyatt, 132 S. Ct. 1690, 1692 (2012) (noting that "'the avoidance of premature interruption of the administrative process'" is the "primary purpose" of the doctrine of administrative exhaustion). Under this theory, "[t]he administrative agency is created as a separate entity and invested with certain powers and duties. The courts ordinarily should not interfere with an agency until it has completed its action, or else has clearly exceeded its jurisdiction." McKart v. United States, 395 U.S. at 194. "Exhaustion gives an agency 'an opportunity to correct its own mistakes with respect to the programs it administers before it is hauled into federal court,' and it discourages 'disregard of [the agency's] procedures.'" Woodford v. Ngo, 548 U.S. at 89 (quoting McKart v. United States, 395 U.S. at 195) (alteration in original); In re DBC, 545 F.3d at 1378; see also Kentucky v. United States, 62 Fed. Cl. 445, 453 (2004) ("'When administrative remedies have not been exhausted, "judicial review of administrative action is inappropriate," since it is "a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice."'" (quoting Sandvik Steel Co. v. United States, 164 F.3d at 599 (quoting Sharp Corp. v. United States, 837 F.2d 1058, 1062 (Fed. Cir. 1988))), aff'd, 424 F.3d 1222 (Fed. Cir. 2005); see also McCarthy v. Madigan, 503 U.S. at 145 ("Correlatively, exhaustion principles apply with special force when 'frequent and deliberate flouting of administrative processes' could weaken an agency's effectiveness by encouraging disregard of its procedures." (quoting McKart v. United States, 395 U.S. at 195)).

The second purpose for requiring exhaustion of administrative remedies is judicial economy. "And of course it is generally more efficient for the administrative process to go

forward without interruption than it is to permit the parties to seek aid from the courts at various intermediate stages." McKart v. United States, 395 U.S. at 194. "Claims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court. In some cases, claims are settled at the administrative level, and in others, the proceedings before the agency convince the losing party not to pursue the matter in federal court." Woodford v. Ngo, 548 U.S. at 88; see also McCarthy v. Madigan, 503 U.S. at 145 ("When an agency has the opportunity to correct its own errors, a judicial controversy may well be mooted, or at least piecemeal appeals may be avoided."). "And it can serve judicial efficiency by promoting development of an agency record that is adequate for later court review and by giving an agency a full opportunity to correct errors and thereby narrow or even eliminate disputes needing judicial resolution." Itochu Bldg. Products v. United States, 733 F.3d 1140, 1145 (Fed. Cir. 2013); Kentucky v. United States, 62 Fed. Cl. at 459; Forest Products Nw., Inc. v. United States, 62 Fed. Cl. 109, 122 (2004), aff'd, 453 F.3d 1355 (Fed. Cir. 2006); see also Weinberger v. Salfi, 422 U.S. 749 (1975) (the doctrine of administrative exhaustion may allow an agency "to compile a record which is adequate for judicial review").

"Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." Woodford v. Ngo, 548 U.S. at 90-91; see also Arctic Slope Native Assoc., Ltd. v. Sebelius, 583 F.3d 785, 793 (Fed. Cir. 2009) ("Statutory time restrictions on the submission of administrative claims are a part of the requirement that a party must satisfy to properly exhaust administrative remedies."), reh'g and reh'g en banc denied (Fed. Cir.), cert. denied, 131 S. Ct. 144 (2010); Kellogg Brown & Root Servs., Inc. v. United States, 115 Fed. Cl. 46, 51 (2014); Paradigm Learning, Inc. v. United States, 93 Fed. Cl. 465, 473 (2010). "The fact that the administrative remedy was provided by a regulation rather than by a statute does not make the exhaustion doctrine inapplicable or inappropriate." Sandvik Steel Co. v. United States, 164 F.3d at 600; see also Itochu Bldg. Products v. United States, 733 F.3d at 1145 n.1 ("Failure to exploit an available agency remedy, even if not specifically required, can constitute a failure to exhaust in appropriate circumstances." (citing Corus Staal BV v. United States, 502 F.3d 1370, 1379 (Fed. Cir. 2007) ("The exhaustion requirement in this context is therefore not simply a creature of court decision, as is sometimes the case, but is a requirement explicitly imposed by the agency as a prerequisite to judicial review."))).

The facts of a particular case, however, can call for an exception to otherwise requiring administrative exhaustion. See, e.g., McKart v. United States, 395 U.S. at 197 ("We cannot agree that application of the exhaustion doctrine would be proper in the circumstances of the present case."). "'[A]dministrative remedies need not be pursued if the litigant's interests in immediate judicial review outweigh the government's interests in the efficiency or administrative autonomy that the exhaustion doctrine is designed to further.'" McCarthy v. Madigan, 503 U.S. at 146 (quoting West v. Bergland, 611 F.2d 710, 715 (8th Cir.1979), cert. denied, 449 U.S. 821 (1980)); see also Shalala v. Illinois Council on Long Term Care, Inc., 529 U.S. 1, 13, reh'g denied, 529 U.S. 1095 (2000) ("Doctrines of 'ripeness' and 'exhaustion' contain exceptions, however, which exceptions permit early review when, for example, the legal question is 'fit' for resolution and delay means

hardship, or when exhaustion would prove 'futile[.]'" (citing <u>McCarthy v. Madigan</u>, 503 U.S. at 147–48)) (other citations omitted).

"Where the issue of exhaustion of administrative remedies is not governed by a particular statutory provision or an overall statutory scheme, the decision whether to require exhaustion in a particular case is a matter committed to the discretion of the trial court." <u>Corus Staal BV v. United States</u>, 502 F.3d at 1381; <u>Bernklau v. Principi</u>, 291 F.3d 795, 801 (Fed. Cir. 2002).

Plaintiffs allege the exhaustion requirement has been satisfied by the notice of their intent to file suit against the United States indicated in the March 12, 2013 letter addressed to senior officials at the Department of the Interior. The March 12, 2013 letter states:

Dear Messrs. Toulou, Smith, and Washburn and Secretary of the Interior:

Our law firm represents the Ute Indian Tribe of the Uintah and Ouray Reservation ("Tribe" or "Ute Tribe"). We also represent tribal members Debra Jones and Arden Post who are the parents of Todd Murray, a tribal member who was shot to death in an encounter with Utah state and local police on the Uintah and Ouray Indian Reservation in Utah ("U&O Reservation") in 2007. Please accept this letter as our notice of claim to your respective agencies of our intent to file a complaint against the United States based on breaches of the 1863 and 1868 Ute Treaties and the United States' violation of its trust obligations to the Ute Tribe and its members.

We plan to file suit in the Federal Court of Claims and allege that the Federal Bureau of Investigation (FBI) and the Bureau of Indian Affairs (BIA), by and through their employees, committed wrongs upon the person or property of the Indians, namely decedent Todd Murray his family and the Ute Indian Tribe as a whole. Included with our letter are the Plaintiffs' (i) Third Amended Complaint, (ii) motion for default judgment on liability based on tampering [sic] destruction of critical evidence, and (iii) motion for summary judgment under Counts 1, 3 and 5 filed in the parents' private cause of action, DEBRA JONES, *et al.,* v, VANCE NORTON, *et al.,* Civil Case No. 2:09-cv-00730, U.S. District Court, District of Utah, Central Division.

The attached filings give an overview of the sequence of events that transpired on April 1, 2007 as well as a clear indication of the egregious actions of the law enforcement officers who participated in this "investigation." The FBI and the BIA representatives who were present on April 1, 2007 and who participated in the "investigation" contributed to the travesties by (1) failing to protect the Ute Tribe's interests as a sovereign in the crime scene, (2) failing to properly preserve and protect evidence from being tampered with and destroyed, and (3) failing to conduct their own independent investigation into the death of Todd Murray. As a result of the aforementioned failures, the Murray family and the Ute Indian Tribe are

seeking damages from the United States in the amount of $10 million, as well as reimbursement of litigation costs and attorney fees.

Attached to this letter is a summary of the relevant Treaty obligations that have been violated by the actions and inactions of the United States in this case. Under Article 6 of the 1863 Treaty, the Ute Indian bands agreed to forego "private revenge or retaliation" for injuries suffered by the Tribe and individual tribal members as the result of the "misconduct of individuals." In return the United States guaranteed the Tribe and individual tribal members a right to legal redress for "any robbery violence, or murder" committed "on an Indian or Indians" belonging to the Ute Indian bands. Article 6 of the 1868 Treaty promised that any person violating the territorial integrity of the Reservation and causing harm to the Tribe or its tribal members would be "punished according to the laws of the United States." In violation of these treaty obligations, the United States has failed to investigate or to prosecute the individuals involved in the shooting death of 21 year-old Todd Murray in April 2007, and the subsequent conspiracy to suppress, alter, and destroy critical evidence.

Please feel free to contact our office should you require any additional information regarding this forthcoming claim.

Sincerely,

Sandra L. Denton

(footnote omitted). As noted above, the March 12, 2013 letter attached almost four hundred pages of exhibits, including filings in the District Court such as the plaintiffs' third amended complaint, plaintiffs' motion for summary judgment, and plaintiffs' motion for tampering and destruction of critical evidence.

In Elk v. United States, 70 Fed. Cl. 405 (2006), the United States Court of Federal Claims addressed a similar issue of exhaustion as is raised by defendants in the current case under review by this court, albeit under a different treaty, and found no jurisdictional requirement to exhaust administrative remedies. In Elk v. United States, a member of the Oglala Sioux Tribe brought suit after she was sexually assaulted by a United States Army recruiter in a remote area of the reservation. See id. at 406. The "bad men" provision of the 1868 Sioux treaty, served as the legal basis for the plaintiff's complaint. As in the present action, the Elk plaintiff claimed to have been "wronged" by "bad men" and sought reimbursement from the United States. Id. at 405. The government in Elk moved to dismiss plaintiff's claim, arguing that the treaty required "proof" to be "made to the agent and forwarded to the Commissioner of Indian Affairs at Washington City," and that this, as a textual matter, plainly suggested a jurisdictional requirement to exhaust administrative remedies. See id. While recognizing the requirements that the language imposed, the court ultimately held that the plaintiff did not have to await a formal

administrative decision from the agency before bringing suit. See id. at 407. After careful review of the relevant provisions of the 1868 Sioux treaty, the Elk court held that formal administrative exhaustion was not a prerequisite to bringing suit, concluding that "nothing in the Sioux Treaty indicates that a claimant must await a decision from Interior before filing suit." Id. The Elk court determined that "under well established principles, a statute or other Congressional enactment creates an independent duty to exhaust only when it contains 'sweeping and direct' statutory language indicating that there is no federal jurisdiction prior to exhaustion, or the exhaustion requirement is treated as an element of the underlying claim." Id. Because the 1868 Sioux Treaty at issue contained no such language, the Elk court declined to require exhaustion as a prerequisite to judicial jurisdiction.[18]

A predecessor court to the Court of Federal Claims previously found, under the specific facts of the case, that exhaustion of administrative remedies was a jurisdictional requirement when specific treaty language both (1) unmistakably mandates administrative review by an executive agency and (2) sets forth a procedure for so doing. See Begay v. United States, 219 Ct. Cl. 599 (1979); see also Tsosie v. United States, 11 Cl. Ct. 62 (1986), aff'd and remanded, 825 F.2d 393 (Fed. Cir. 1987). In Begay, the parents of female boarding school students administered by the BIA brought suit after discovering that their daughters had been sexually assaulted by some of the faculty. Id. at 600. Plaintiffs claimed that the sexual assault was a "wrong" inflicted by "bad men" and, therefore, sought reimbursement from the United States. The "bad men" provision of the

---

[18] The court notes that defendant in the above captioned case, like the defendant in Elk, cites to the unpublished opinion in Zephier v. United States, No. 03-768L (Fed. Cl. Oct. 29, 2004). The Elk court wrote as follows:

The other case cited by defendant, the unpublished opinion in *Zephier, et al. v. United States,* No. 03–768L (Fed. Cl. Oct. 29, 2004), concerned a situation in which the plaintiff did not file a claim with Interior under the Sioux Treaty before filing suit. This court dismissed the complaint for lack of jurisdiction, finding that "the courts either have found that the plain language of the treaties mandates exhaustion of administrative remedies or have accepted without question that such remedies are available." *Id.* at 13. But, with all due respect, the latter statement does not flow from the analysis that precedes it, which, *inter alia,* overlooks several key distinctions. For example, while the court noted the significant differences between the Navajo and Sioux treaties, *id.* at 12 n.4, it freely cited cases involving the former as precedent for construing the latter—a *non sequitur.* And while it suggested that *Begay II* is not precedential, *id.* at 11, but rather only persuasive, *id.* at 11 n.3, it, nonetheless, proceeded to apply that case as if it had resolved definitively the precise issue before the court, doing so largely without further independent analysis of the exhaustion issue.

Elk v. United States, 70 Fed. Cl. at 411. Therefore, the Elk court determined, "[a]t best, then, *Zephier* is inapposite; at all events, its analysis is unpersuasive. Id.

Navajo Treaty of 1868, served as the legal basis for the plaintiffs' complaint. After careful review of the treaty's provisions, the court suspended litigation and granted the Department of Interior a period of ninety days to issue a decision on the matter. Id. at 602-03. In making this determination, the court relied on a passage in the Navajo Treaty of 1868, which provided:

> [T]he President may prescribe such rules and regulations for ascertaining damages under this article as in his judgment may be proper; but no such damage shall be adjusted and paid until examined and passed upon by the Commissioner of Indian Affairs.

Treaty with the Navajo, June 1, 1868, 15 Stat. 667, Art. 1.

The Begay court found this provision to be particularly dispositive. In light of the clear and unambiguous language, which withheld damages until "examined and passed upon" by the agency, the court found the requirement of exhaustion to be jurisdictional, and, therefore, the Begay court declined to assert jurisdiction over a "bad men" claim "in view of the specific references in [the treaty] to administrative consideration . . . ." Begay v. United States, 219 Ct. Cl. at 602. Likewise, in Tsosie v. United States, 11 Cl. Ct. 62, the court in reviewing the "bad men" provision of the Navajo Treaty of 1868 concluded that "there must first be an administrative decision by the Department of the Interior," before submitting a claim to the judiciary. Id. at 75 (citing Begay v. United States, 219 Ct. Cl. at 602).

When comparing the Sioux and the Navajo Treaties side by side, the treaties differ with respect to an exhaustion requirement, as reflected in the decisions discussed above. Compare Elk v. United States, 70 Fed. Cl. at 407, with Begay v. United States, 219 Ct. Cl. at 602, and, Tsosie v. United States, 11 Cl. Ct. at 75. The court in Elk addressed the differences, ultimately concluding that the Navajo Treaty is unique in precluding the payment of damages until the claim is "thoroughly examined and passed upon" by the agency. See Elk v. United States, 70 Fed. Cl. at 407.[19] The Sioux Treaty contains no such limitation. Id. Furthermore, the court in Elk observed that the Sioux Treaty "neither specifies the particulars of the proof that should be supplied [to the agency] nor indicates that the claimant must wait any particular time for an agency to respond to her claim." Id.

---

[19] The court notes that the Elk court observed that:

> [T]he court in Begay I, **denied** its motion to dismiss the plaintiffs' complaint and retained jurisdiction while ordering the Assistant Secretary of Interior to render an opinion within 90 days. Id. at 603. The Begay orders thus hardly stands [sic] for the proposition that a claimant must obtain an actual decision from Interior before bringing suit under the Tucker Act.

Elk v. United States, 70 Fed. Cl. at 411 (emphasis in original).

The language of the 1868 Ute Treaty more closely resembles the language of the Sioux Treaty than the Navajo Treaty. The Ute Treaty also contains no "sweeping and direct language," requiring administrative exhaustion. Unlike the Navajo Treaty, the Ute Treaty does not withhold damages until "passed upon" by the Department of the Interior. See Elk v. United States, 70 Fed. Cl. at 407. Nor does the Ute Treaty specify the manner and means for bringing a claim in court. Article 5 of the Ute Treaty states only:

> In all cases of depredation on person or property, they shall cause the evidence to be taken in writing and forwarded, together with their finding, to the Commissioner of Indian Affairs, whose decision, subject to the revision of the Secretary of the Interior, shall be binding on the parties to this treaty.

As noted above, although the 1868 Ute Treaty requires evidence of any depredation or wrong "to be taken in writing and forwarded together with their finding to the Commissioner of Indian Affairs," 1868 Treaty, Art. 5, forwarding such evidence is the "only prerequisite to suit required by the treaty." Hebah v. United States, 428 F.2d 1334, 1340, 192 Ct. Cl. 785 (1970) (Hebah I).

In the March 12, 2013 letter, plaintiffs specifically identified the 1868 Ute Treaty, and indicated "[p]lease accept this letter as our notice of claim to your respective agencies of our intent to file a complaint against the United States based on breaches of the 1863 and 1868 Ute Treaties and the United States' violation of its trust obligations to the Ute Tribe and its members." The March 12, 2013 letter also indicated, "[a]ttached to this letter is a summary of the relevant Treaty obligations that have been violated by the actions and inactions of the United States in this case."

In addition, the March 12, 2013 letter identified the wrong plaintiffs alleged, with plaintiffs' counsel indicating "[w]e also represent tribal members Debra Jones and Arden Post who are the parents of Todd Murray, a tribal member who was shot to death in an encounter with Utah state and local police on the Uintah and Ouray Indian Reservation in Utah (U&O Reservation) in 2007." Plaintiffs identified the agencies which allegedly had committed the improper acts, and stated that the "Bureau of Investigation (FBI) and the Bureau of Indian Affairs (BIA), by and through their employees, committed wrongs upon the person or property of the Indians, namely decedent Todd Murray." The March 12, 2013 letter, while not providing additional details about the death of Mr. Murray, included as attachments selected filings from the District Court litigation, which, as plaintiffs indicated, "give an overview of the sequence of events that transpired on April 1, 2007 as well as a clear indication of the egregious actions of the law enforcement officers who participated in this 'investigation.'"

Although plaintiffs' counsel could have provided more narrative detail about the death of Mr. Murray in the March 12, 2013 letter to more fully amplify on the "proof" requirement, the court believes the letter labelled "notice of claim" sent to the Department of Interior, together with the exhibits attached to the letter, satisfied the plaintiffs' exhaustion requirements under the specific facts presented in the above captioned case. Moreover, the United States was aware of the death of Mr. Murray in 2007, and the record

reflects that no criminal prosecutions of Special Agent Rex Ashdown and David Ryan of the FBI or the various officials present at the scene from the BIA occurred, suggesting the decision not to prosecute reflects the view of the United States. There was a "federal criminal matter involving the [Mr. Murray's] firearm," in which "[t]he purchaser pled guilty in federal court to a charge of making a false statement in connection with the purchase of the firearm." Jones et al. v. Norton, et al., 2014 WL 909569, at *4. In addition, on February 1, 2011, one of the attorneys from plaintiffs' counsel's firm sent the Department of Justice, specifically, the Director of the Office of Tribal Justice and the Chief of the Civil Rights Division, a letter titled: "The Shooting Death of Todd Murray, Ute Indian tribal member Jones v. Norton, et al., Case No. 2:09-cv-00730 U.S. District Court for the District of Utah, Central Division And The Continued Violation of Criminal Law Enforcement Jurisdiction on the Uintah and Ouray Indian Reservation, and the Continued Harassment, Racial Targeting, and Violation of Tribal Members' Civil Rights by Utah State, County, and Local Law Enforcement Officers." The letter provided background information to the Department of Justice about Mr. Murray's death and noted that "no officer-involved shooting investigation was conducted by the Federal Bureau of Investigation, the State of Utah, the County of Uintah, Vernal City, or any disinterested party." The letter concluded:

> In summary, by this letter we are requesting that the Department of Justice conduct an investigation into the actions of Utah state/county/local law enforcement agencies and officers for violations of the Ute Treaty of 1868 and any other applicable federal law. Unfortunately, this is not the Tribe's first request for a federal investigation. See attached letters dated February 14, 2011, and March 18, 2011. In the year since these letters were sent, the conduct of Utah state, county and local police has only gotten worse. I would appreciate communication from your respective offices on our investigation requests.

(internal citation omitted).

Even when exhaustion requirements have not been met, the United States Supreme Court has found exceptions to the exhaustion doctrine in "at least three broad sets of circumstances in which the interests of the individual weigh heavily against requiring administrative exhaustion." See McCarthy v. Madigan, 503 U.S. at 146.[20] The United States Court of Appeals for the Federal Circuit, in Wilson ex rel. Estate of Wilson v. United States, summarized the three exceptions articulated by the United States Supreme Court, as follows:

> The [United States Supreme] Court went on to explain three sets of circumstances in which the interests of the individual weigh heavily against requiring administrative exhaustion: (1) where there is an unreasonable or

---

[20] The Supreme Court, noted, however "this Court has declined to require exhaustion in some circumstances even where administrative and judicial interests would counsel otherwise." McCarthy v. Madigan, 503 U.S. at 146.

indefinite timeframe for administrative action; (2) where there is some doubt as to whether the agency is empowered to grant effective relief; and (3) where the administrative body is shown to be biased or has otherwise predetermined the issue before it.

Wilson ex rel. Estate of Wilson v. United, 405 F.3d 1002, 1011 (Fed. Cir. 2005). The determination of when and how to apply an exception to the general exhaustion doctrine is highly case specific and emphasizes practicality, keeping in mind the overall balance of "'the interest of the individual in retaining prompt access to a federal judicial forum,'" with "deciding when exhaustion is demanded in order to protect 'institutional interests.'" See Itochu Bldg. Products v. United States, 733 F.3d at 1145 (quoting McCarthy v. Madigan, 503 U.S. at 146 ("In determining whether exhaustion is required, federal courts must balance the interest of the individual in retaining prompt access to a federal judicial forum against countervailing institutional interests favoring exhaustion. . . . Application of this balancing principle is 'intensely practical,'" (quoting Bowen v. City of New York, 476 U.S. 467, 484 (1986))); Rollock Co. v. United States, 115 Fed. Cl. 317, 322 (2014); Elk v. United States, 70 Fed. Cl. at 408.

"First, exhaustion may not be required when exhaustion of the administrative remedy may prejudice the plaintiff," such as "'from an unreasonable or indefinite timeframe for administrative action.'" See Itochu Bldg. Products v. United States, 733 F.3d at 1145 (quoting McCarthy v. Madigan, 503 U.S. at 147). "Even where the administrative decisionmaking schedule is otherwise reasonable and definite, a particular plaintiff may suffer irreparable harm if unable to secure immediate judicial consideration of his claim." McCarthy v. Madigan, 503 U.S. at 147. In Gibson v. Berryhill, 411 U.S. 564, 575 n.14 (1973), although discussing state administrative remedies, the United States Supreme Court wrote: "State administrative remedies have been deemed inadequate by federal courts and hence not subject to the exhaustion requirement . . . [m]ost often . . . because of delay by the agency . . . ." Such delay is not characterized by any specific time limit in which to respond to claims. See, e.g., Walker v. Southern Ry. Co., 385 U.S. 196, 198 (1966), reh'g denied, 385 U.S. 1020 (1967) (holding that plaintiffs are not required to wait ten years or more on the administrative board to decide their claim); Smith v. Illinois Bell Tel. Co., 270 U.S. 587, 591–592 (1926) (finding that an injured public service company "is not required indefinitely to await a decision of the rate-making tribunal before applying to a federal court . . . .").

"Second, an administrative remedy may be inadequate 'because of some doubt as to whether the agency was empowered to grant effective relief.'" McCarthy v. Madigan, 503 U.S. at 147 (quoting Gibson v. Berryhill, 411 U.S. at 575 n.14); Elk v. United States, 70 Fed. Cl. at 408; see also McNeese v. Bd. of Ed. for Cmty. Unit Sch. Dist. 187, 373 U.S. 668, 675 (1963) (finding that student plaintiffs did not have to exhaust administrative remedies when the school superintendent did not have authority to grant the requested relief).

"Third, an administrative remedy may be inadequate where the administrative body is shown to be biased or has otherwise predetermined the issue before it." McCarthy v. Madigan, 503 U.S. at 148; Maggitt v. West, 202 F.3d 1370, 1377 (Fed. Cir. 2000); Rollock Co. v. United States, 115 Fed. Cl. at 322; Elk v. United States, 70 Fed. Cl. at 408; White

& Case LLP v. United States, 67 Fed. Cl. 164, 171, recons. denied, 2005 WL 6124102 (2005). For example, the United States Supreme Court in Houghton v. Shafer held that it would be futile to require the petitioner to exhaust the administrative remedy of appeal to the Attorney General of Pennsylvania, or another officer, in light of the Attorney General's submission that the rules were "validly and correctly applied to petitioner" and "strictly enforced throughout the entire correctional system . . . ." See Houghton v. Shafer, 392 U.S. 639, 640 (1968); see also Aldrich v. United States, 31 Fed. Cl. 554, 557 (1994) (holding that "the interests of the individual 'weigh heavily against requiring administrative exhaustion' . . . where the administrative body is shown to have predetermined the issue." (quoting McCarthy v. Madigan, 503 U.S. at 140)), aff'd, 56 F.3d 83 (Fed. Cir. 1995). In such a circumstance, continuing with the agency process is often termed "futile." See Itochu Bldg. Products v. United States, 733 F.3d at 1146 ("For example, a party often is permitted to bypass an available avenue of administrative challenge if pursuing that route would clearly be futile, i.e., where it is clear that additional filings with the agency would be ineffectual." (citing Corus Staal BV v. United States, 502 F.3d at 1378–79 (futility applies in situations where plaintiffs "'would be "required to go through obviously useless motions in order to preserve their rights"'" (quoting Walsh v. United States, 151 Ct. Cl. 507, 511 (1960)))))).

Plaintiffs only urge the first exception to the exhaustion doctrine would apply if plaintiffs did not otherwise meet the exhaustion requirements, based on when there is an unreasonable or indefinite timeframe for administrative action. Plaintiffs argue that "it is clear that Plaintiffs would be unduly prejudiced by having to embark upon an ill-defined administrative process with a potentially indefinite timeframe for action." Plaintiffs claim that the "events in question occurred more than seven years ago, and what little evidence was not spoliated by federal/state/local law enforcement officers is in danger of disappearing as memories fade with the passage of time. Plaintiffs have been litigating for years in an effort to get their day in court and they would be unduly prejudiced by an administrative decision that could take years and might get them no closer to a remedy than where they are today." Plaintiffs also allege that "it is questionable whether the Department of the Interior can adequately grant effective relief in this case in light of the complex and multiple constitutional issues that are play in the case." (internal citation omitted).

Defendant responds that "Plaintiffs' extensive litigation in the district court of Utah, where Plaintiffs fully, fairly, and forcefully presented their case, further ameliorates any concern that additional time spent adjudicating this matter before DOI may prejudice Plaintiffs. Indeed, Plaintiffs have not explained what they would present here that they have not already presented to that court." Defendant also claims that the plaintiffs' argument that this case is complex and has multiple constitutional issues "does not square with their request for relief that is far more straightforward than the premise of their argument suggests: They seek monetary damages pursuant to the 'bad men' clause of the 1868 Treaty." The court agrees with defendant that plaintiffs' claims in this court do not involve "complex and multiple constitutional issues." There is no certainty as to how long the Department of the Interior might take in responding to plaintiffs' claims. Plaintiffs' lengthy litigation history, however, does not mean a further delay at the Department of the Interior would not have a negative impact on plaintiffs. Plaintiffs' exhaustion

requirements may well have been met under the 1868 Treaty by virtue of the March 12, 2013 letter. Even, however, for the sake of argument, if the exhaustion requirements were not met, because the facts of the case stem from the April 1, 2007 death of Mr. Murray, and because the previous litigation has continued since 2009, the court concludes that a requirement to force plaintiffs now to exhaust administrative remedies at the Department of the Interior presents a further unreasonable or "indefinite timeframe for administrative action." Therefore, this court concludes that, on one or both grounds, the exhaustion doctrine does not preclude this court from taking jurisdiction over plaintiffs' claims.

## "Bad Men" Provision

Defendant argues in its motion to dismiss that "Plaintiffs' do not state a cognizable claim under the 'bad men' provision." Plaintiffs allege in their complaint that "Todd Murray, Todd Murray's family, and the Ute Indian Tribe suffered 'injuries' at the hands of 'bad men' as those terms are used in the Ute Treaties of 1863 and 1868." As indicated above, the "bad men" provision at issue in the 1868 Treaty provides:

> If bad men among the whites, or among other people subject to the authority of the United States, shall commit any wrong upon the person or property of the Indian, the United States will, upon proof made to the agent and forwarded to the Commissioner of Indian Affairs at Washington City, proceed at once to cause the offender to be arrested and punished according to the laws of the United States, and also reimburse the injured person for the loss sustained.

1868 Treaty, Art. 6. Defendant contends that many of plaintiffs' alleged wrongs are not contemplated by the terms of the treaty and, therefore, plaintiffs fail to state a claim with respect to the "bad men" provision.

In examining what must be pled in order to state a claim, under both RCFC 8(a)(2) and Rule (8)(a)(2) of the Federal Rules of Civil Procedure, a plaintiff need only state in the complaint "a short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(2); Fed. R. Civ. P. 8(a)(2) (2015); see also Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The United States Supreme Court stated:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, [Conley v. Gibson, 355 U.S. 41, 47 (1957)]; Sanjuan v. American Bd. of Psychiatry and Neurology, Inc., 40 F.3d 247, 251 (7th Cir. 1994), a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, see Papasan v. Allain, 478 U.S. 265, 286 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Factual allegations must be enough to raise a right to relief above the speculative level, see 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-36 (3d ed. 2004) (hereinafter Wright & Miller) ("[T]he pleading must contain something more . . . than . . . a

statement of facts that merely creates a suspicion [of] a legally cognizable right of action"), on the assumption that all the allegations in the complaint are true (even if doubtful in fact), see, e.g., Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508, n.1 (2002); Neitzke v. Williams, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"); Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely") . . . . [W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.

Bell Atl. Corp. v. Twombly, 550 U.S. at 555–56, 570 (footnote and other citations omitted; omissions in original); see also Ashcroft v. Iqbal, 556 U.S. at 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555–57, 570); A&D Auto Sales, Inc. v. United States, 748 F.3d 1142, 1157 (Fed. Cir. 2014); Bell/Heery v. United States, 739 F.3d 1324, 1330 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2014); Kam-Almaz v. United States, 682 F.3d 1364, 1367 (Fed. Cir. 2012) ("The facts as alleged 'must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).'" (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 557)); Totes-Isotoner Corp. v. United States, 594 F.3d 1346, 1354–55 (Fed. Cir.), cert. denied, 131 S. Ct. 92 (2010); Bank of Guam v. United States, 578 F.3d 1318, 1326 (Fed. Cir.) ("In order to avoid dismissal for failure to state a claim, the complaint must allege facts 'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief." (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 557)), reh'g and reh'g en banc denied (Fed. Cir. 2009), cert. denied, 561 U.S. 1006 (2010); Cambridge v. United States, 558 F.3d 1331, 1335 (Fed. Cir. 2009) ("[A] plaintiff must plead factual allegations that support a facially 'plausible' claim to relief in order to avoid dismissal for failure to state a claim." (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)); Cary v. United States, 552 F.3d 1373, 1376 (Fed. Cir.) ("The factual allegations must be enough to raise a right to relief above the speculative level. This does not require the plaintiff to set out in detail the facts upon which the claim is based, but enough facts to state a claim to relief that is plausible on its face." (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555, 570)), reh'g denied (Fed. Cir.), cert. denied, 557 U.S. 937 (2009); Vargas v. United States, 114 Fed. Cl. 226, 232 (2014); Fredericksburg Non-Profit Housing Corp. v. United States, 113 Fed. Cl. 244, 253 (2013), aff'd, 579 F. App'x 1004 (Fed. Cir. 2014); Peninsula Grp. Capital Corp. v. United States, 93 Fed. Cl. 720, 726–27 (2010), appeal dismissed, 454 F. App'x 900 (Fed. Cir. 2011); Legal Aid Soc'y of New York v. United States, 92 Fed. Cl. 285, 292, 298, 298 n.14 (2010).

As when deciding a case based on a lack of subject matter jurisdiction, when deciding a case for failure to state a claim, this court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) ("In addition, when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555-56 (citing Swierkiewicz v. Sorema N. A., 534 U.S. at 508 n.1))); Scheuer v. Rhodes, 416 U.S. at 236 ("Moreover, it is well established that, in passing on a motion to dismiss,

whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader."), abrogated on other grounds by Harlow v. Fitzgerald, 457 U.S. 800 (1982), recognized by Davis v. Scherer, 468 U.S. 183, 190 (1984); United Pac. Ins. Co. v. United States, 464 F.3d 1325, 1327–28 (Fed. Cir. 2006); Samish Indian Nation v. United States, 419 F.3d at 1364; Boise Cascade Corp. v. United States, 296 F.3d 1339, 1343 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2002), cert. denied, 538 U.S. 906 (2003).

The "bad men" provision of the 1868 Ute Treaty, if applicable, provides a basis for jurisdiction in this court, as it is money mandating. The plaintiff in Garreaux v. United States, 77 Fed. Cl. at 734, argued that "[t]he 'bad men' provision should be construed to allow a private right of action by individual Indians against the United States," noting that jurisdiction has been found "under 'bad men' provisions of this or similar treaties, including: Tsosie v. United States, 11 Cl. Ct. 62 (1986) (Tsosie I); Tsosie v. United States, 825 F.2d 393 (Fed. Cir. 1987) (Tsosie II); Hebah v. United States, 192 Ct. Cl. 785, 428 F.2d 1334 (1970) (Hebah I); Hebah v. United States, 197 Ct. Cl. 729, 456 F.2d 696 (1972) (Hebah II); Begay v. United States, 219 Ct. Cl. 599, 1979 WL 10173 (1979) (Begay I); Begay v. United States, 224 Ct. Cl. 712, 650 F.2d 288 (1980) (Begay II); and Elk v. United States, 70 Fed. Cl. 405 (2006)." Garreaux v. United States, 77 Fed. Cl. at 734. The court notes, however, that the 1863 Ute Treaty, standing alone, is not money mandating and cannot provide an alternate basis for jurisdiction in this court over plaintiffs' claims.

Specifically, to state a cognizable claim under the "bad men" provision of a treaty, the plaintiffs must clear several hurdles. "At least two inquiries are required to determine whether a claim fits within the 'bad men' provision: [(1)] whether the man is a 'bad man' within the meaning of the treaty; and [(2)] whether he committed a 'wrong' within the meaning of the treaty." Garreaux v. United States, 77 Fed. Cl. at 736 (citing Hebah v. United States, 456 F.2d 696, 702, 197 Ct. Cl. 729, cert. denied, 409 U.S. 870 (1972) (Hebah II)); see also Hernandez v. United States, 93 Fed. Cl. 193, 200 (2010) (citing Ex parte Kan-gi-shun-ca, 109 U.S. 556, 567–68 (1883) ("[I]n order to constitute a cause of action under this provision, 'bad men' must have 'committed a wrong' within the sense of the treaty."). A "wrong," as defined by the 1868 treaty, encompasses affirmative criminal acts, but not omissions or acts of negligence. See Garreaux v. United States, 77 Fed. Cl. at 736 (discussing the Fort Laramie Treaty of April 29, 1868 between the United States and Sioux); Hernandez v. United States, 93 Fed. Cl. at 200 ("In order to bring action under the Fort Laramie Treaty a Native American must be a victim of an affirmative criminal act, and the person committing the act must be a specific white man or men.").

The first question for the purposes of the motion to dismiss is whether the individual defendants named in the amended complaint by plaintiffs qualify as "bad men." To properly bring a "bad men" claim, the plaintiff first must identify particular individuals as "bad men." See Garreaux v. United States, 77 Fed. Cl. at 737. The most recent decision by the Federal Circuit on "bad men" provisions, Richard v. United States, interpreting the Fort Laramie Treaty of 1868, concluded that the "bad men" provisions "are not limited to 'an agent, employee, representative, or otherwise acting in any other capacity for or on behalf of the United States.'" Richard v. United States, 677 F.3d 1141, 1153 (Fed. Cir.

2012).[21] Federal agencies, however, are not "bad men" under the language of the treaty. See id. In Garreaux, an elderly Indian tenant brought suit against the Department of Housing and Urban Development (HUD) for the negligent supervision and administration of a Mutual Help and Occupancy Agreement, alleging that the HUD's negligence caused her to lose her home Garreaux v. United States, 77 Fed. Cl. at 734. Because it was "not a claim against specified white men, but against the federal government or HUD as an entity," the court declined to hear the tenant's claim. Id. at 737. The court explained that the "plaintiff ha[d] not alleged sufficient facts stating who the 'bad men' are." Id. In light of this and other deficiencies, the Garreaux court granted the defendant's motion to dismiss. See id.

In specifically naming the allegedly responsible parties, plaintiffs pass the first hurdle. The plaintiffs' complaint names FBI agents Rex Ashdown and David Ryan, BIA officials James Beck, Terrance Cuch, and Kevin Myore, and all of the Utah state/county/municipal law enforcement officers involved in the events of April 1, 2007,[22] as "bad men." Plaintiffs further name the owners and employees of the Thomson-Blackburn Vernal Mortuary, the State of Utah, Uintah County, and Vernal City as "bad men." Excepting the mention of the State of Utah, Uintah County, and Vernal City, the plaintiffs successfully identify specific individuals as alleged "bad men," and, therefore, satisfy the first phase of the analysis.

As to the second hurdle, accepting the facts of the complaint as true for the purpose of defendant's motion to dismiss, plaintiffs allege possible cognizable "wrongs," if properly proven, as to certain allegations, but not as to others. Plaintiffs allege a host of injuries, encompassing both actions and omissions, as follows:

By their actions and inactions, the FBI and BIA officers committed wrongs to Todd Murray, the Murray family and the Ute Tribe *(i)* by acting in concert with state/county/municipal officers, expressly or impliedly, in concocting, or

---

[21] The Federal Circuit in Richard noted that the Fort Laramie Treaty "'is one of nine made in 1868. . . . The treaties were all duly ratified, proclaimed, and published in volume fifteen of the *Statutes at Large.* All say that peace is their object and all contain "bad men" articles in similar language.'" Richard v. United States, 677 F.3d at 1142 n.2 (quoting Tsosie v. United States, 825 F.2d at 395) (emphasis in original). One of the 1868 treaties is the 1868 Ute Treaty. As identified in Elk, the Choctaw treaty "contained a host of other provisions like those found in the 1867–68 Indian Peace Commission treaties, including the Fort Laramie treaty with the Sioux. Indeed, all of the latter treaties [including the Ute 1868 Treaty] contain 'bad men' clauses identical to that in the Sioux Treaty." Elk v. United States, 87 Fed. Cl. at 80-81.

[22] As noted in the District Court litigation, the Utah officials include: Vernal City Police Officer Vance Norton, Vernal City, Vernal City Police Department, the Utah Highway Patrol, the State of Utah, Blackburn Mortuary, Uintah County, State Troopers Dave Swenson, Craig Young, Rex Olsen, and Jeff Chugg, Uintah County Sherriff's Sergeant Bevan Watkins and Deputy Troy Slaugh, and Utah Division Wildlife Officer Sean Davis.

36

permitting to be concocted, a false story that Todd Murray shot himself in the back of his head, execution style, above and behind his left ear; *(ii)* by failing to take custody of Murray's body and to secure the body against desecration and spoliation of evidence; [sic] *(iv)* by participating in, tacitly allowing, or failing to prevent, the desecration of Murray's body and the spoliation of critical evidence both at the shooting scene and afterwards at the Medical Center, Blackburn Mortuary, and at the Utah OME; *(v)* the failure to insure that a proper autopsy was performed on Murray's body; *(vi)* by failing to conduct any kind of investigation into Todd Murray's murder; and *(vii)* by failing to protect the territorial integrity of the Tribe's reservation boundary and the Tribe's sovereign interests in the crime scene where Murray was shot.

Defendant argues that "[t]he Bad men clause is limited to affirmative criminal acts." In Hebah II, the Court of Claims construed "wrong" according to its common or plain meaning. See Hebah II, 456 F.2d at 704, 197 Ct. Cl. 729. In Hebah II, the Court of Claims addressed the death by shooting of plaintiff's husband by tribal policeman Norman Moss. Id. at 699.[23] With the help of a dictionary, the court defined a wrong as "[a]ction or conduct which inflicts harm without due provocation or just cause; serious injury wantonly inflicted or undeservedly sustained; unjust or unmerited treatment." Id. Plaintiffs in the above captioned case argue that this definition is particularly broad and encompasses omissions of the sort alleged in the amended complaint. The court notes, however, that defendant in Hebah II argued that "the plain language of the Treaty of 1868 requires that no reimbursement be made to one who sustains a loss while violating the laws of the United States, and that deceased was violating the laws of the United States when he suffered his 'loss.'" Id. at 705. Defendant in Hebah II also argued that the shooting officer "committed no wrong upon deceased because the arrest attempt was lawfully made and, under the circumstances, the shooting of deceased was justified," and the court agreed that it "was regrettable but reasonable for Moss to shoot to kill decedent. Having determined that the killing of deceased was reasonable under the circumstances herein, it follows that the killing was with reason or just cause. Therefore, Moss did not commit a "wrong" within the meaning of the Treaty of 1868 [between the United States and the Eastern Band of Shoshonees and the Bannack Tribe of Indians]." Id. at 705, 710.

In Garreaux v. United States, 77 Fed. Cl. at 736, however, the United States Court of Federal Claims narrowed its understanding of the term, "wrong." The court observed a long line of precedent in which bad men claims were "rooted" in behavior that was

---

[23] The Court of Claims further explained, the "Decedent returned to Apartment 18 at Tigee Village about midnight on March 13, 1968. He was drunk, angry and carrying a one pint bottle and a one-half pint bottle of whisky," and "[s]hortly after going to bed, Mr. Hebah started to choke Mrs. Hebah," who eventually fled to a neighbor's house who called Wind River Reservation police station. Hebbah II, 456 F.2d at 699. "Mrs. Hebah explained to Officer Moss that her husband was drunk, armed with a rifle, had plenty of ammunition, that he had chased her brother and son out of the apartment, that he had threatened her with bodily harm, and that she and her daughter had fled from the apartment." Id. at 700.

"criminal in nature." <u>Id.</u> The <u>Garreaux</u> court emphasized its unwillingness to "stretch the bounds of the 'bad men' provision to encompass not a criminal claim, but a claim for negligence," and noted that the "primary intent" of the provision was to "guard against affirmative criminal acts." <u>Id.</u> Furthermore, the court in <u>Garreaux</u> observed that the punishment for inflicting a "wrong" is arrest and prosecution. <u>See id.</u> at 734.

In <u>Hernandez v. United States</u>, 93 Fed. Cl. at 199, this court again adopted a narrow interpretation of the term "wrong," resolving the ambiguity in light of the treaty's overall purpose. In <u>Hernandez</u>, a tribal prisoner at the Tecumseh State Correctional Facility in Nebraska brought suit, claiming, <u>inter alia</u>, that the United States violated the guarantees of the bad men provision by "fail[ing] to arrest suspected 'wrongdoers'" <u>Id.</u> at 198. The <u>Hernandez</u> court observed that the provision, typically, is only applied to affirmative criminal acts and not omissions. Ultimately, the court rested its determination on the "primary intent" of the "bad men" clause, which "was to keep the peace between Native Americans and non-Native Americans." <u>Id.</u> "[A]s such, the Fort Laramie Treaty has been applied to affirmative criminal acts and not mere acts of negligence." <u>Id.</u> Because arresting and criminally prosecuting individuals for civil wrongs does not logically follow, "wrongs," as defined by the 1868 Treaty, are only allegations of criminal wrongs. A more expansive interpretation would render the remedy provided for inappropriate. Thus, in order for the provision to maintain its coherence, the court concludes that "wrongs" is limited to criminal wrongs. In sum, the 1868 Treaty language and the relevant case law supports a narrow understanding of what constitutes a "wrong," one that encompasses only affirmative criminal acts.

Applying an affirmative acts test, most of the plaintiffs' alleged wrongs fail to state a cognizable claim under the "bad men" provision of a treaty. While, as plaintiffs note, it is doubtless true that "a person can be wronged by the inaction of another," inaction is not a recognized harm under the 1868 Treaty. Since allegations (ii), (v), (vi), and (vii) allege only omissions, they do not qualify as "wrongs" for purposes of a "bad men" claim under the provision of the 1868 Treaty. Accordingly, allegations (ii), (v), (vi), and (vii), therefore, are dismissed for failure to state a claim.

Nevertheless, accepting plaintiffs' allegations as true, allegations (i) and (iv) qualify as potential, cognizable "wrongs" under the 1868 Treaty. In fact, in <u>Hebah II</u> the court explicitly recognized that "the killing of an Indian without just cause or reason would be a wrong within the meaning of the Treaty of 1868." <u>Hebah II</u>, 456 F.2d at 704, 197 Ct. Cl. 729. Therefore, because plaintiffs allege that the FBI and BIA, "by acting in concert with state/county/municipal officers, expressly or impliedly, in concocting, or permitting to be concocted, a false story that Todd Murray shot himself in the back of his head, execution style, above and behind his left ear," and "by participating in, tacitly allowing, or failing to prevent, the desecration of Murray's body and the spoliation of critical evidence both at the shooting scene and afterwards at the Medical Center, Blackburn Mortuary, and at the Utah OME," the court denies the defendant's motion to dismiss as to allegations (i) and (iv) of the amended complaint. The court also notes, however, that defendant is correct that the "bad men" provision "does not include, as plaintiffs, suggest the universe of off-reservation activities that would have occurred 'but for' the initial conduct on the

reservation." Therefore, to the extent allegation (iv), which includes "the desecration of Murray's body and the spoliation of critical evidence both at the shooting scene and afterwards at the Medical Center, Blackburn Mortuary, and at the Utah OME," includes the desecration of Mr. Murray's body and spoliation of critical evidence that did not take place on the reservation, but at the medical center and mortuary, those allegations are not covered by the "bad men" provision of the 1868 Treaty. For example, as explained in the District Court's spoliation order, "[a]fter the completion of the federal criminal matter involving the [Mr. Murray's] firearm, the judge hearing the case signed, on November 14, 2008, an order forfeiting the firearm to the government. Shortly thereafter, the firearm was destroyed. Agent Ryan did not notify any of the Defendants that the firearm would be destroyed." Jones et al. v. Norton et al., 2014 WL 909569, at *4 (footnote omitted). Therefore, the destruction of Mr. Murray's weapon did not take place not on Tribal lands.

Although the court recognizes allegations (i) and (iv) qualify as potential cognizable wrongs under the 1868 Treaty, implicit in Hebah II, is the conclusion that, as defendant argues, "actions permissibly taken by law enforcement officers are not 'wrong' and cannot support a finding of liability under the 'bad men' provision."[24] See Hebah II, 456 F.2d at 708, 710, 197 Ct. Cl. 729. As noted above, the record does not reflect any criminal prosecutions of Special Agent Rex Ashdown and David Ryan of the FBI or the various officials present from the BIA, suggesting that the decision not to prosecute indicates the actions taken by the federal officers were considered permissible by the appropriate authorities. The court, however, cannot infer from the absence of prosecutions that all the FBI and BIA actions were taken permissibly. Therefore, the court addresses allegations (i) and (iv) of the amended complaint.

## Issue Preclusion

Accepting the plaintiffs' factual allegations as true and that parts of allegations (i) and (iv) in plaintiffs' complaint qualify as potentially cognizable "wrongs," defendant, nevertheless, argues that "[t]he doctrine of issue preclusion prevents the re-litigation of Plaintiffs' only cognizable claim for relief under the Bad Men clause." Defendant argues:

> The district court of Utah entered an order in Plaintiffs' lawsuit against the state law enforcement officers and mortuary that rejects with finality the keystone of Plaintiffs' argument that they constructed over the course of five years of litigation: that the state defendants allegedly trespassed on tribal lands, executed Mr. Murray, and subsequently engaged in a conspiracy to thwart any investigation into his murder.

Therefore, defendant contends that "[p]laintiffs' lawsuit in the Court of Federal Claims does not provide them with an additional opportunity to litigate the ultimate facts of this

---

[24] Defendant further argues that "[t]he text and history of the treaty also indicates that the United States and the tribe were primarily concerned with criminal acts that injured either the individual tribal members or their property, such as robbery, assault, and murder," and, therefore, not claims of conspiracy to destroy evidence.

central thesis that the Utah district court concluded was without merit." (internal citation omitted). "This is no less true," defendant argues, "even though Plaintiffs' appeal to the Tenth Circuit remains pending." Defendant argues there is no question that "the issues currently at stake are identical, were actually litigated in the Utah district court, and that Plaintiffs had a full and fair opportunity to litigate those issues. That Plaintiffs' bring different claims is immaterial. The fundamental point of contention—Mr. Murray's cause of death—has been resolved." In response, plaintiffs argue that "[i]ssue preclusion/collateral estoppel does not apply to Plaintiffs' action in the Court of Claims because Plaintiffs have challenged the district court's purely legal rulings on appeal. Accordingly, not only does [sic] the Utah district court's rulings lack finality, but, more importantly, the Plaintiffs have not been afforded a full and fair opportunity in which to conclusively litigate their claims in <u>Norton</u>."

The rule of issue preclusion precludes a party from re-litigating an issue that was "litigated and resolved in a valid court determination essential to the prior judgment." <u>New Hampshire v. Maine</u>, 532 U.S. 742, 748-49 (2001). In addition, "[u]nder collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." <u>Allen v. McCurry</u>, 449 U.S. 90, 94 (1980); <u>see</u> <u>also</u> <u>United States v. Mendoza</u>, 464 U.S. 154, 158 (1984) ("Under the judicially-developed doctrine of collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision is conclusive in a subsequent suit based on a different cause of action involving a party to the prior litigation."). "When an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." <u>Ashe v. Swenson</u>, 397 U.S. 436, 443 (1970). The United States Supreme Court has explained that issue preclusion guards against "the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." <u>Montana v. United States</u>, 440 U.S. 147, 153–54 (1979) (footnote omitted). The Supreme Court has indicated clearly that:

> Issue preclusion bars successive litigation of "an issue of fact or law" that "is actually litigated and determined by a valid and final judgment, and . . . is essential to the judgment." Restatement (Second) of Judgments § 27 (1980) (hereinafter Restatement). If a judgment does not depend on a given determination, relitigation of that determination is not precluded. <u>Id.</u>, § 27, Comment h.

<u>Bobby v. Bies</u>, 556 U.S. 825, 834 (2009).[25]

The United States Court of Appeals for the Federal Circuit has directed that:

---

[25] The Supreme Court has explained that "[i]ssue preclusion refers to the effect of a judgment in foreclosing relitigation of a matter that has been litigated and decided. This effect also is referred to as direct or collateral estoppel." <u>Migra v. Warren City Sch. Dist. Bd. of Educ.</u>, 465 U.S. 75, 77 n.1 (1984).

Collateral estoppel is generally appropriate if "(1) an issue is identical to one decided in the first action; (2) the issue was actually litigated in the first action; (3) the resolution of the issue was essential to a final judgment in the first action; and (4) the party defending against issue preclusion had a full and fair opportunity to litigate the issue in the first action."

Biafora v. United States, 773 F.3d 1326, 1333 (Fed. Cir. 2014) (quoting Shell Petroleum, Inc. v. United States, 319 F.3d 1334, 1338 (Fed. Cir. 2003)). The Federal Circuit, however, has indicated that "[o]n procedural issues not unique to this circuit's exclusive jurisdiction, we apply the law of the regional circuit. . . ." Dana v. E.S. Originals, Inc., 342 F.3d 1320, 1323 (Fed. Cir. 2003); see also Aspex Eyewear, Inc. v. Zenni Optical Inc., 713 F.3d 1377, 1380 (Fed. Cir. 2013). Because the District Court's decision is from the District of Utah, the court applies the law of the Tenth Circuit.

The Tenth Circuit has explained that "[c]ollateral estoppel, or issue preclusion, is designed to prevent needless relitigation and bring about some finality to litigation." Moss v. Kopp, 559 F.3d 1155, 1161 (10th Cir. 2009) (footnote omitted). The Tenth Circuit has determined along the same lines that issue preclusion applies when:

(1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party, or in privity with a party, to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

Park Lake Res. Ltd. Liab. Co. v. United States Dep't of Agric., 378 F.3d 1132, 1136 (10th Cir. 2004); see also Stan Lee Media, Inc. v. Walt Disney Co., 774 F.3d 1292, 1297 (10th Cir. 2014); Bushco v. Shurtleff, 729 F.3d 1294, 1301 (10th Cir. 2013); Murdock v. Ute Indian Tribe of Uintah and Ouray Reservation, 975 F.2d 683, 687 (10th Cir. 1992) ("In the Tenth Circuit, collateral estoppel requires that four elements be met: (1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.") (internal quotations omitted), cert. denied, 507 U.S. 1042 (1993). The Tenth Circuit also has held that "[i]ssue preclusion "bars a party from relitigating an issue once it has suffered an adverse determination on the issue, even if the issue arises when the party is pursuing or defending against a different claim." Bushco v. Shurtleff, 729 F.3d at 1301; see also Moss v. Kopp, 559 F.3d at 1161; Burrell v. Armijo, 456 F.3d 1159, 1172 (10th Cir. 2006), cert. denied, 549 U.S. 1167 (2007). Quoting the United States Supreme Court, the Tenth Circuit has indicated, "'once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to

the prior litigation.'" Estate of True v. Comm'r, 290 F.3d 1210, 1222 (10th Cir. 2004) (quoting Montana v. United States, 440 U.S. at 153).

Both parties agree that the decisions from the Tenth Circuit govern the collateral estoppel inquiry. Both parties further agree on the Tenth Circuit's four part standard for determining the applicability of collateral estoppel: (1) an issue is identical to one decided in the first action; (2) the prior action has been finally adjudicated on the merits; (3) the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication, the resolution of the issue was essential to a final judgment in the first action; and (4) the party defending against issue preclusion had a full and fair opportunity to litigate the issue in the first action. See, e.g., Park Lake Res. Ltd. Liab. Co. v. United States Dep't of Agric., 378 F.3d at 1136. Finally, both parties agree that collateral estoppel is available as a defense by the United States, even though the United States was not a party to the original suit, assuming the party who will be bound by the preclusion had a full and fair opportunity to litigate the precluded issue.[26]

Defendant claims that the decision of the United States District Court for the District of Utah in Jones et al. v. Norton et al., 3 F.Supp.3d 1170 is a valid and final judgment as to Mr. Murray's cause of death, one that precludes re-litigation.[27] Plaintiffs respond that "Collateral estoppel can only apply if all four requirements are met," and according to plaintiffs, "[t]hat is not the case here. Three out of the four collateral estoppel factors are not satisfied. Plaintiffs acknowledge, however, that the third requirement for collateral estoppel is met, because they were parties to the district court adjudication in Norton."

Regarding the first element of collateral estoppel, whether an issue is identical to one decided in the first action, plaintiffs argue that there is "no identity of issues" between

---

[26] Because the United States was not a party to the Norton suit in the United States District Court for the District of Utah, but the plaintiffs were, the use of collateral estoppel would be defensive, non-mutual issue preclusion. See Parklane Hoisery Co. v. Shore, 439 U.S. 322, 326 n.4 (1979). Relatedly, the parties agree that 28 U.S.C § 1500 (2012) does not apply to the above captioned case, because the District Court case was not against the United States or an agent of the United States, even though this case was filed after the District Court was filed. See United States v. Tohono O'Odham Nation, 131 S. Ct. 1723, 1727-28 (2011). Further, the parties also agree that doctrine of law of the case is inapplicable here as this case is distinct from the Norton case and was filed in a different court.

[27] Defendant also argues that "Plaintiffs likewise miss the mark with their argument that the supposed 'mass spoliation of critical evidence' deprived them of a full and fair opportunity to litigate. As an initial matter, their argument goes to the underlying investigation. And the matter of spoliation was intensely litigated over the course of five years in the district court of Utah, with extensive discovery, briefing, and an evidentiary hearing." Defendant also argues, "[t]hat Plaintiffs disagree with Judge Campbell's conclusion is clear. But this lawsuit provides them with no occasion to rely on the same evidence or introduce new evidence in an attempt to reach a different result."

the present suit and the one litigated in the United States District Court for the District of Utah. Plaintiffs also claim that the issues before the District Court related to allegations of illegal seizure, excessive force, and conspiracy, whereas the issue before this court involve the breach of federal treaties, the "wrongs" of various law enforcement officials and trust obligations. Defendant argues that the "issues currently at stake are identical," and the "identity of issues in both cases is similarly made apparent in the Utah district court's rejection of Plaintiffs' conspiracy theory, that is, that the individuals involved in that day's events engaged in a conspiracy to cover up Mr. Murray's 'execution.'" Defendant states "[i]ndeed, Plaintiffs' suggestion that this Court 'review the same evidence and come to a different conclusion,' highlights the very necessity of issue preclusion: to prevent needless relitigation and bring about some finality to litigation." (internal citation omitted). Defendant also points to plaintiffs' response to the motion to dismiss to support their point:

> The difference between the original Complaint and the proposed First Amended Complaint is that the Amended Complaint makes explicit what is only implicit in the original Complaint. The Utah state, county, and municipal officers committed a wrong by pursuing Murray at gunpoint without jurisdiction and without probable cause, by shooting Murray execution-style, and by then conspiring to cover-up the execution-style shooting and to obstruct justice.

(emphasis in original).

On March 7, 2014 the District Court of Utah granted the defendant's motion for summary judgment, and denied plaintiffs' cross motion. See generally Jones et al. v. Norton et al., 3 F. Supp. 3d 1170. On April 1, 2014, plaintiffs appealed the District Court's decision to the United State Court of Appeals for the Tenth Circuit. See Jones et al. v. Norton et al., No. 14-4040 (10th Cir. appeal docketed Apr. 1, 2014).[28] The District Court in Norton concluded that "[t]he evidence clearly shows that Mr. Murray shot himself." Id. at 1190. This conclusion comes up in several contexts in the Distrct Court case, including whether Mr. Murray was "seized" for Fourth Amendment purposes by the defendants. Plaintiffs in the District Court action argued Mr. Murray was seized, and further claimed that Detective Norton shot Mr. Murray execution style. The District Court, however, determined:

> the Plaintiffs' evidence is sparse, circumstantial, subject to more than one interpretation, and, at times, very speculative. Moreover, evidence to the contrary is strong and is consistent with a self-inflicted gunshot wound. Deputy Byron testified that he did not see Detective Norton next to Mr. Murray when Mr. Murray dropped to the ground. Detective Norton testified that he was up on a hill when he saw Mr. Murray shoot himself.

---

[28] As noted above, on November 18, 2014, plaintiffs filed another appeal to the United State Court of Appeals for the Tenth Circuit, appealing the amended judgment entered by the District Court. See Jones et al.  v. Norton et al., No. 14-4144 (filed 10th Cir. Nov. 18, 2014).

The Deputy Chief Medical Examiner Dr. Edward Leis, who conducted the physical examination of Mr. Murray's body, concluded in his report that the wound was caused by a gun shot "in close proximity to the skin surface when it was discharged." He based his conclusion on "abundant soot at the inferior margin of the defect [the wound] and some marginal abrasion is also noted at the inferior margin." In his testimony, he elaborated on his conclusion that the gun was in contact with Mr. Murray's head when it was fired:

> At the perimeter, there are several triangular shaped tears of the wound. That's a result of the gun being pressed up against the skin surface when it's discharged and gases causing the scalp to be separated from the underlying skull. When the scalp lifts up, it stretches and it tears and gets its characteristic stellae appearance.

The smaller wound on the right side of Mr. Murray's head was, in Dr. Leis' opinion, the exit wound. After Dr. Leis certified that Mr. Murray's death was a suicide resulting from a gunshot wound to the head, he added an additional cause of death (based on results from testing of Mr. Murray's bodily fluids). Because the tests showed the presence of drugs and alcohol in Mr. Murray's system, Dr. Leis issued an amended death certificate which added "Acute alcohol intoxication; recent methamphetamine use" as contributing to Mr. Murray's death.

Detective Norton was more than 100 yards away when Mr. Murray was shot. Dr. Leis testified that there was no evidence that the wound could have been caused by a shot coming from that far away. Plaintiffs maintain that Detective Norton was not 100 yards away, but was right next to Mr. Murray and so he had the capability of inflicting the contact wound. But the actual evidence in the record (that is, testimony by Detective Norton and Deputy Byron) shows that Detective Norton was not right next to Mr. Murray when the fatal shot was fired.

Id. at 1190-91 (footnotes omitted). Therefore, the District Court concluded that "[a]ll of the direct evidence presented by the Defendants, including Dr. Leis' testimony and report, supports the conclusion that Mr. Murray shot himself. Plaintiffs offer no more than speculation and no reasonable jury could find that Detective Norton shot Mr. Murray in the head at point-blank range." The District Court also determined that Mr. Murray's death was a suicide. See id. at 1191. The District Court stated, "[b]ased on the facts as detailed and explained in its spoliation order, the court concludes that no reasonable jury could conclude that Defendants conspired to 'effectively eliminate[ ] all probative evidence' and 'clean the closet of evidence that would have allowed Plaintiffs to build their case.'" Id. at 1204 (quoting various plaintiffs' briefs; omissions in original; footnote omitted).

Addressing plaintiffs' conspiracy theory, the District Court indicated, "[s]ummed up, Plaintiffs' argument is that Defendants engaged in '[a] conspiracy to cover up a killing.' Plaintiffs' theory is that Detective Norton shot and killed Mr. Murray, and that the rest of the Defendants conspired to cover-up that killing and protect Detective Norton." Id. at 1197 (footnotes omitted). Explaining the conspiracy, the court noted that, "[t]he focus of the Plaintiffs' conspiracy theory is the failure to give aid and their spoliation argument about the destruction of evidence." Id. at 1202. Turning to plaintiffs' claims of the defendants' failure to give medical aid to Mr. Murray, and the defendants' "interference with Mr. Murray's due process right of access to courts via the failure to preserve critical evidence and the affirmative destruction of critical evidence," the District Court determined "[n]one of that testimony could allow a reasonable jury to conclude that Individual Defendants were deliberately indifferent to Mr. Murray's situation, or that they knew that there was a substantial risk of significant harm to Mr. Murray if they did not provide first aid. If anything, the evidence shows that at least three of the Individual Defendants (Young, Davis, and Slaugh) were concerned that attempts to provide any kind of aid to Mr. Murray would do more harm than good." Id. at 1210. The court determined, "[i]n sum, there is no evidence before the court to support a finding that the inaction by each individual defendant was part of a conspiracy to let Mr. Murray die." Id. at 1203.

The thoroughness of the District Court's findings and decision, after years of discovery and multiple briefings, demonstrates a comprehensive review of the circumstances of the death of Mr. Murray and the actions of the officials in the aftermath of his death. Nonetheless plaintiffs claim that:

> The district court's statements and rulings concerning the manner of Murray's death, the desecration of Murray's body, the sufficiency of evidence showing a conspiracy, the extra-jurisdictional pursuit of Murray, and the handcuffing of Murray are not preclusive in this action because the issues to be litigated here—whether the actions and omissions of the Utah and federal law enforcement officers violated the 1863 and 1868 Ute Treaties—are not identical to the issues adjudicated by the district court in that court's dispositive rulings.

The court agrees with defendant that the issues identified in the amended complaint filed in this court, namely the allegations that officials committed "a wrong by pursuing Murray at gunpoint without jurisdiction and without probable cause, by shooting Murray execution-style, and by then conspiring to cover-up the execution-style shooting and to obstruct justice," presents identical issues with those decided in the District Court litigation.

Regarding the second element of the collateral estoppel test, whether the prior action has been finally adjudicated on the merits, defendant contends that the District Court's "order on summary judgment is final for purposes of issue preclusion, even though Plaintiffs' appeal remains pending." In response, plaintiffs declare that the decisions by the District Court "have not been conclusively adjudicated on the merits because those rulings are being challenged on appeal and are currently pending *de novo* review by the

Tenth Circuit." (emphasis in original). The Tenth Circuit has made clear that "[t]he appealability of a judgment, however, does not hinder its preclusive effect." MACTEC, Inc. v. Gorelick, 427 F.3d 821, 832 (10th Cir. 2005) (citing 15A Charles Alan Wright et al., Federal Practice and Procedure § 4433, at 78–85 (2d ed. 1992)), cert. denied, 547 U.S. 1040 (2006). Wright & Miller emphasize that, as a general rule, a final judgment from a lower court carries res judicata effect even though it is still subject to review by an appellate court. See 15A Charles Alan Wright et al., Federal Practice and Procedure § 4433, at 78–85; see also Leo v. Garmin Int'l, Inc., 464 F. App'x 737, 740 (10th Cir.) (unpublished), cert. denied, 133 S. Ct. 484 (2012). Moreover, as noted by the United States Court of Appeals for the Federal Circuit, prior adjudications are considered final when they are "sufficiently firm to be accorded conclusive effect." Dana v. E.S. Originals, Inc., 342 F.3d at 1323 (quoting Restatement (Second) of Judgments § 13 (1982)) (applying 11th Circuit law).[29] The District Court's decision in Jones et al. v. Norton et al., 3 F. Supp. 3d 1170, was issued after years of discovery and more than four and a half years after the case was removed to Federal Court. The District Court judge issued a spoliation order and a 71 page decision granting the defendant's motion for summary judgment, which fully reviewed the factual circumstances and legal issues raised in the case.

Plaintiffs also allege that "to be considered adjudicated on the merits, the previous issues adjudicated must have been necessary to the judgment." As determined when considering the first element of collateral estoppel, all of the issues defendant raises as bearing on estoppel were necessary to the District Court's decision to grant summary judgment to the defendant. The District Court carefully considered the allegations of murder, as well as the spoliation claims in determining that there were no constitutional violations by the officials. Each were a necessary element of the summary judgment decision. Therefore, for purposes of collateral estoppel, the careful and thorough summary judgment decision issued by the District of Utah should be considered a final judgment on the issue adjudicated on its merits by this court.[30]

Regarding the third element of the collateral estoppel test, whether the party against whom the doctrine is invoked was a party or was in privity with a party to the prior adjudication, "Plaintiffs acknowledge that the third requirement for collateral estoppel is

---

[29] The Federal Circuit has interpreted this to mean decisions that are "adequately deliberated" in which the "parties were fully heard in the prior proceeding." Dana v. E.S. Originals, Inc., 342 F.3d at 1323.

[30] Although not clearly established by the Tenth Circuit, other federal appellate courts have made clear that issue preclusion applies to summary judgment decisions, and the summary judgment decision by the District Court in Norton thorough and detailed on the relevant issues. See Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp., 421 F.2d 1313, 1319 (5th Cir. 1970); see also Shoup v. Bell & Howell Co., 872 F.2d 1178, 1181 (4th Cir. 1989); Hubicki v. ACF Indus., Inc., 484 F.2d 519, 524 (3rd Cir. 1973); 18A Charles Alan Wright et al., Federal Practice and Procedure § 4444.

met, because they were parties to the district court adjudication in <u>Norton</u>." Therefore, the third element is not in dispute.[31]

Finally, for the fourth element of the collateral estoppel test, whether the party defending against issue preclusion had a full and fair opportunity to litigate the issue in the first action, defendant contends that "[t]he district court provided Plaintiffs with a full and fair opportunity to litigate the matters involved in <u>Norton</u>." Plaintiffs respond that they have not been afforded a full and fair opportunity to litigate the issue in the first action as "Plaintiffs have not yet been heard on appeal." Plaintiffs also argue that "[c]ritical in this case is that the Plaintiffs, through no fault of their own, were deprived of crucial evidence in <u>Norton</u> due to the mass spoliation of critical evidence that occurred as a result of the State and federal officers' intentional tampering with, destruction and/or loss of, and failure to collect and preserve evidence."

For a full and fair opportunity, the Tenth Circuit has indicated "as to the '"inquiry into whether a party had a full and fair opportunity to litigate an issue . . . [we] focus on whether there were significant procedural limitations in the prior proceeding, whether the party had the incentive to litigate fully the issue, or whether effective litigation was limited by the nature or relationship of the parties."'" <u>Burrell v. Armijo</u>, 456 F.3d at 1172 (quoting <u>Murdock v. Ute Indian Tribe of Uintah & Ouray Reservation</u>, 975 F.2d 683, 689 (10th Cir. 1992) (internal citations omitted)). As noted above, plaintiffs originally filed their case in <u>Norton</u> with the Uintah County Court on July 17, 2009, and then the case was removed to the United States District Court for the District of Utah on August 20, 2009. The District Court, more than four and a half years after the removal to federal court, after issuing a spoliation order, issued a 71 page decision, granting the defendant's motion for summary

---

[31] The Court notes that the Ute Tribe was not a party to the District Court action. No one, however, has suggested to the court that the plaintiffs are in privity with the Tribe. Moreover, the court notes that the Ute Tribe, independent of the other plaintiffs, cannot sustain a claim under the "bad men" provision of the 1868 Treaty. Article 6 of the Treaty states:

> If bad men among the whites or among other people, subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will, upon proof made to the agent and forwarded to the Commissioner of Indian Affairs at Washington City, proceed at once to cause the offender to be arrested and punished according to the laws of the United States, and also reimburse the <u>injured person</u> for the loss sustained.

<u>Id.</u> Art. 6 (emphasis added). The Tribe is not an "injured person," Mr. Murray was the injured person, and his parents brought suit on his behalf. <u>See</u> <u>Hernandez v. United States</u>, 93 Fed. Cl. at 200 ("In order to bring action under the Fort Laramie Treaty <u>a Native American</u> must be a victim of an affirmative criminal act, and the person committing the act must be a specific white man or men.") (emphasis added). The Tribe alone cannot prosecute a claim under the "bad men" provision of the 1868 Treaty.

judgment. As noted by defendant, in the District Court litigation, "Plaintiffs' expert report summarize[ed] the nearly 1,000 pages of documents then available, including an extensive list of depositions." Although plaintiffs argue they "have not yet been heard on appeal," this court determines that plaintiffs have not demonstrated a proper reason to prevent preclusion following the District Court's final judgment. Nor, in the court's view, does the existence of an appeal speak to the plaintiffs' ability to have had a full and fair opportunity to litigate the facts of what occurred before the federal District Court, which it appears plaintiffs have been afforded.

Regarding the argument that plaintiffs "were deprived of crucial evidence in Norton due to the mass spoliation of critical evidence that occurred," defendant argues that "[a]s an initial matter, their argument goes to the underlying investigation, not the district court proceeding. The matter of spoliation was intensely litigated over the course of five years in the district court of Utah, with extensive discovery, briefing, and an evidentiary hearing." The District Court determined, "[b]ased on the facts as detailed and explained in its spoliation order, the court concludes that no reasonable jury could conclude that Defendants conspired to 'effectively eliminate[ ] all probative evidence' and 'clean the closet of evidence that would have allowed Plaintiffs to build their case.'" Jones et al. v. Norton et al., 3 F. Supp. 3d at 1204 (footnote omitted; omissions in original). The District Court concluded that there was no failure on the part of the defendants to preserve evidence. Plaintiffs appear to be arguing that the District Court's decision was wrong and that demonstrates plaintiffs did not have a full and fair opportunity to litigate. As discussed above, the District Court's decision was thorough and comprehensive. Plaintiffs had a fair and full opportunity to litigate the spoliation issues.[32]

As all four elements of the collateral estoppel test have been met, plaintiffs are estopped from litigating the factual circumstances of Todd Murray's death, and the allegations of the destruction of evidence. Therefore, for allegation (i), that the FBI or the BIA officers committed wrongs to Todd Murray, the Murray family and the Ute Tribe "by acting in concert with state/county/municipal officers, expressly or impliedly, in concocting, or permitting to be concocted, a false story that Todd Murray shot himself in the back of his head, execution style, above and behind his left ear," plaintiffs have failed to state a claim. Likewise, for allegation (iv), that the FBI or the BIA officers committed wrongs to Todd Murray, the Murray family and the Ute Tribe "by participating in, tacitly allowing, or failing to prevent, the desecration of Murray's body and the spoliation of

---

[32] Although the District Court decision addressed only the state and local officers named in the suit, in the District Court's spoliation order, the District Court noted that "[t]he State Defendants and Uintah County Defendants had no responsibility to ensure that Detective Norton's firearm was tested. . . . As part of his investigation, Agent Ashdown possibly should have taken Detective Norton's firearm to have necessary tests performed. But Agent Ashdown is not a named Defendant." Jones et al. v. Norton, et al., 2014 WL 909569, at *7. As determined above, however, only affirmative acts trigger the "bad men" provision of the 1868 Treaty. Plaintiffs offer no claims as to what affirmative action by federal officials took place on Tribal lands which would implicate the "bad men" provision of the 1868 Treaty.

critical evidence both at the shooting scene and afterwards at the Medical Center, Blackburn Mortuary, and at the Utah OME," plaintiffs have failed to state a claim. The remaining portions of plaintiffs' allegations (i) and (iv) in the amended complaint for violation of the 1863 and 1868 Treaties and other federal laws are dismissed for failure to state a claim.[33]

**Breach of Trust**

Regarding Count II of plaintiffs' amended complaint, "BREACH OF TRUST IN VIOLATION OF THE UTE TREATIES AND OTHER FEDERAL LAW defendant argues that this court lacks subject matter jurisdiction. (capitalization in original).

The plaintiffs' amended complaint states, in part:

By failing to investigate Todd Murray's death and by taking no action to promote justice in Indian Country, Special Agent Rex Ashdown and David Ryan and BIA Officers James Beck, Terrance Cuch and Kevin Myore breached their duties to the Ute Tribe, to Todd Murray, and to Murray's

---

[33] As noted above, plaintiffs also included a separate, additional list of allegations in the amended complaint against the defendant claiming:

In April 2007, Todd Murray, Todd Murray's family, and the Ute Indian Tribe suffered "injuries" at the hands of "bad men" as those terms are used in the Ute Treaties of 1863 and 1868. These injuries include (*i*) the extra-territorial police pursuit, assault upon and murder of Todd Murray, (*ii*) the conspiracy to cover up Todd Murray's murder, (*iii*) the failure of federal officers to take custody of Murray's body and to secure the body against desecration and spoliation of evidence; (*iv*) the desecration of Murray's body and the spoliation of critical evidence both at the shooting scene and afterwards at the Medical Center, Blackburn Mortuary, and at the Utah OME; (*v*) the failure to insure that a proper autopsy was performed on Murray's body; [sic] (*vii*) failure of federal officers to conduct any kind of investigation into Todd Murray's murder; and *(vi)* the failure of federal officers to protect the territorial integrity of the Tribe's reservation boundary and the Tribe's sovereign interests in the crime scene where Murray was shot.

The court notes that of these additional claims, numbers (ii), (iii), (iv), (v), (vi), and (viii), overlap with the allegations in the amended complaint addressed above. For claim (i), from the separate list of claims, "the extra-territorial police pursuit, assault upon and murder of Todd Murray," the extra-territorial pursuit also is not covered by the "bad men" provision of the 1868 Treaty. For the remaining elements of claim (i) from the separate, additional list of claims, "assault upon and murder of Todd Murray," the United States District Court for the District of Utah determined that the Mr. Murray's injury is consistent with a self-inflicted gunshot wound, and, in this court, plaintiffs are estopped from claiming otherwise. Therefore, if the court were to consider the additional claims, additional claim (i) also fails to state a claim.

family under the Ute Treaties of 1863 and 1868 and under the various federal laws listed under Paragraph 10 above.[34]

. . .

In violation of federal law and its treaty obligations, the United States has failed to investigate or prosecute the individuals involved in the shooting death of 21 year-old Todd Murray on April 1, 2007, or the subsequent conspiracy to suppress, alter, and destroy critical evidence related to the shooting death.

The United States has also breached its trust obligations to the Tribe and Murray's family by failing to protect the territorial integrity of the Tribe's reservation and the Tribe's sovereign interest in the shooting site, thus allowing unauthorized persons to trespass on the Ute homeland and cause harm to tribal members with complete impunity.

---

[34] The federal laws listed in paragraph include "the Treaty of Guadalupe Hidalgo in 1848, including, without limitation, the Indian Country Crimes Act, 18 U.S.C. §§ 1151, 1152; the Major Crimes Act, 18 U.S.C. §§ 1153, 2343; the Assimilative Crimes Act, 18 U.S.C. § 13; Public Law 280, U.S.C. §1162; the Indian Civil Rights Act, 25 U.S.C. §§ 1301, 1302, 1321; and 42 U.S.C. §§ 1981, 1983, 1985." Plaintiffs do not explain how any of the citations listed establish money-mandating statutes to invoke jurisdiction in this court. Moreover, this court specifically does not have jurisdiction under the Civil Rights Acts inclusive of 42 U.S.C. §§ 1981, 1983, 1985. See Pikulin v. United States, 97 Fed. Cl. 71, 77 (2011). Furthermore, the Federal Circuit has held that the Indian Civil Rights Act "does not impose duties upon the federal government or its officials." Wopsock v. Natchees, 454 F.3d 1327, 1333 (Fed. Cir. 2006). In addition, to the extent plaintiffs seek to raise claims based on tortious behavior by invoking these or other statutes separate from their claims of violations of the 1863 and 1868 Treaties, this court lacks jurisdiction to adjudicate those claims. The Tucker Act expressly excludes tort claims, including those committed by federal officials, from the jurisdiction of the United States Court of Federal Claims. See 28 U.S.C. § 1491(a) ("The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."); see also Keene Corp. v. United States, 508 U.S. 200, 214 (1993); Rick's Mushroom Serv., Inc. v. United States, 521 F.3d at 1343. Moreover, to the extent, plaintiffs seek to raise claims of criminal behavior by invoking these or other statutes, separate from their claims of violations of the 1863 and 1868 Treaties, this court also lacks jurisdiction to adjudicate those claims. See Joshua v. United States, 17 F.3d 378, 379 (Fed. Cir. 1994); see also Cooper v. United States, 104 Fed. Cl. 306, 312 (2012) (holding that "this court does not have jurisdiction over [plaintiff's] claims because the court may review neither criminal matters, nor the decisions of district courts.") (internal citations omitted); Mendes v. United States, 88 Fed. Cl. 759, 762, appeal dismissed, 375 F. App'x 4 (Fed. Cir. 2009); Hufford v. United States, 87 Fed. Cl. 696, 702 (2009) (holding that the United States Court of Federal Claims lacked jurisdiction over claims arising from the violation of a criminal statute).

Plaintiffs contend that the 1863 and 1868 Ute Treaties created, and impose, specific fiduciary duties on the United States, namely to protect Indian lands from "unauthorized state intrusion" and to prosecute and "punish any 'bad man' that commits any wrong upon the person or property of the Indians." Plaintiffs claim that the United States "promised" these guarantees to the Ute people, and allege that in failing to prevent trespass onto tribal lands and in neglecting to investigate and prosecute the alleged "bad men," the United States has breached its duties under the treaty agreement.

As noted above, the Tucker Act grants jurisdiction to this court as follows:

The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). As interpreted by the United States Supreme Court, and as discussed above, the Tucker Act waives sovereign immunity to allow jurisdiction over claims against the United States (1) founded on an express or implied contract with the United States, (2) seeking a refund from a prior payment made to the government, or (3) based on federal constitutional, statutory, or regulatory law mandating compensation by the federal government for damages sustained. See Navajo Nation II, 556 U.S. at 289–90; Mitchell II, 463 U.S. at 216; see also Greenlee Cnty., Ariz. v. United States, 487 F.3d at 875; Palmer v. United States, 168 F.3d at 1314.

To prove that a statute or regulation is money-mandating, a plaintiff must demonstrate that an independent source of substantive law relied upon "'can fairly be interpreted as mandating compensation by the Federal Government.'" Navajo Nation II, 556 U.S. at 290 (quoting United States v. Testan, 424 U.S. at 400); see also United States v. White Mountain Apache Tribe, 537 U.S. at 472; Mitchell II, 463 U.S. at 217; Blueport Co., LLC v. United States, 533 F.3d at 1383. The source of law granting monetary relief must be distinct from the Tucker Act itself. See Navajo Nation II, 556 U.S. at 290 (The Tucker Act does not create "substantive rights; [it is simply a] jurisdictional provision[] that operate[s] to waive sovereign immunity for claims premised on other sources of law (e.g., statutes or contracts).").

As explained by the Supreme Court in Navajo Nation II:

Neither the Tucker Act nor the Indian Tucker Act creates substantive rights; they are simply jurisdictional provisions that operate to waive sovereign immunity for claims premised on other sources of law (e.g., statutes or contracts). United States v. Testan, 424 U.S. 392, 400, 96 S. Ct. 948, 47 L.Ed.2d 114 (1976); United States v. Mitchell, 445 U.S. 535, 538, 100 S. Ct. 1349, 63 L.Ed.2d 607 (1980) (Mitchell I). The other source of law need not explicitly provide that the right or duty it creates is enforceable through a

51

suit for damages, but it triggers liability only if it "'can fairly be interpreted as mandating compensation by the Federal Government.'" Testan, supra, at 400, 96 S. Ct. 948 (quoting Eastport S.S. Corp. v. United States, 178 Ct. Cl. 599, 607, 372 F.2d 1002, 1009 (1967)); see also United States v. Mitchell, 463 U.S. 206, 218, 103 S. Ct. 2961, 77 L.Ed.2d 580 (1983) (Mitchell II); Navajo I, 537 U.S., at 503, 123 S. Ct. 1079.

> As we explained in Navajo I, there are thus two hurdles that must be cleared before a tribe can invoke jurisdiction under the Indian Tucker Act. First, the tribe "must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties." Id., at 506, 123 S. Ct. 1079. "If that threshold is passed, the court must then determine whether the relevant source of substantive law 'can fairly be interpreted as mandating compensation for damages sustained as a result of a breach of the duties [the governing law] impose[s].'" Ibid. (alteration in original). At the second stage, principles of trust law might be relevant "in drawing the inference that Congress intended damages to remedy a breach." United States v. White Mountain Apache Tribe, 537 U.S. 465, 477, 123 S. Ct. 1126, 155 L.Ed.2d 40 (2003).

Navajo Nation II, 556 U.S. at 290-91; see also Mitchell II, 463 U.S. at 216. The Supreme Court in Mitchell II also noted that the existence of "a general trust relationship between the United States and the Indian people" is undisputed. See Mitchell II, 463 U.S. at 225. In the Navajo Nation I, the Supreme Court noted that

> To state a claim cognizable under the Indian Tucker Act, Mitchell I and Mitchell II thus instruct, a Tribe must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties. See 463 U.S., at 216–217, 219, 103 S. Ct. 2961. If that threshold is passed, the court must then determine whether the relevant source of substantive law "can fairly be interpreted as mandating compensation for damages sustained as a result of a breach of the duties [the governing law] impose[s]." Id., at 219, 103 S. Ct. 2961. Although "the undisputed existence of a general trust relationship between the United States and the Indian people" can "reinforc[e]" the conclusion that the relevant statute or regulation imposes fiduciary duties, id., at 225, 103 S. Ct. 2961, that relationship alone is insufficient to support jurisdiction under the Indian Tucker Act. Instead, the analysis must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions. Those prescriptions need not, however, expressly provide for money damages; the availability of such damages may be inferred.

Navajo Nation I, 537 U.S. at 506; see also Round Valley Indian Tribes v. United States, 97 Fed. Cl. 500, 510 (2011) (quoting Navajo Nation I, 537 U.S. at 490) ("The 'general

trust relationship between the United States and the Indian people' alone . . . is insufficient to establish jurisdiction" in the Court of Federal Claims.).

In describing the "two hurdles, the Navajo Nation court explained that "[f]irst, the tribe 'must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties.'" Id. at 290 (quoting United States v. Navajo Nation, 537 U.S. at 506). Regarding the second hurdle, the Navajo Nation II court noted

> "If that threshold is passed, the court must then determine whether the relevant source of substantive law 'can fairly be interpreted as mandating compensation for damages sustained as a result of a breach of the duties [the governing law] impose[s].'" Ibid. (alteration in original). At the second stage, principles of trust law might be relevant "in drawing the inference that Congress intended damages to remedy a breach." United States v. White Mountain Apache Tribe, 537 U.S. 465, 477, 123 S. Ct. 1126, 155 L.Ed.2d 40 (2003).

Navajo Nation II, 556 U.S. at 290-91. Specifically, "[t]he Government . . . is not a private trustee." United States v. Jicarilla Apache Nation, 131 S. Ct. 2313, 2323 (2011). As such, the Indian trust relationship "is defined and governed by statutes rather than the common law," id. and "[t]he Government assumes Indian trust responsibilities only to the extent it expressly accepts those responsibilities by statute." Id. at 2325. The Supreme Court in Jicarilla Apache Nation, determined, therefore, "Congress may style its relations with the Indians a 'trust' without assuming all the fiduciary duties of a private trustee, creating a trust relationship that is 'limited' or 'bare' compared to a trust relationship between private parties at common law." Id. at 2323 (quoting Mitchell I, 445 U.S. at 542). The trust relationship, therefore, is limited to the management of tribal lands and assets.

In its motion to dismiss, defendant contends that the plaintiffs' breach of trust claim "fail[s] to identify a substantive source of law that establishes specific fiduciary duties." Defendant argues that "a fiduciary duty only arises if it is plain from the relevant statutes or regulations that the government has accepted such a responsibility." Defendant contends that because plaintiffs' claims have no foundation in any substantive body of law, it fails to acquire subject-matter jurisdiction under the Tucker Act and therefore warrants dismissal pursuant to RCFC 12(b)(1).

Plaintiffs correctly note that the Supreme Court has held that "any ambiguities in the language of an Indian treaty must be resolved in favor of the Indians and courts must endeavor to 'give effect to the terms as the Indians themselves would have understood them.'" (quoting Mille Lacs Band of Chippewa Indians v. Minnesota, 526 U.S. 172, 196-203 (1999)). Defendant argues, however, "Plaintiffs fail to identify any specific, unambiguous language in the Treaties that impose a fiduciary duty on the United States to guard against the assertion of state criminal jurisdiction." Plaintiffs respond that Article 10 of the 1863 Treaty and Article 2 and Article 6 of the 1868 Treaty confer upon the Ute tribe the substantive source of law that establishes specific fiduciary or other duties.

53

Article 10 of the 1863 Treaty provides:

Each family that shall announce through its head to the agent of the band a willingness and determination to begin and follow the pursuits of agriculture, by farming or raising stock and growing wool, upon such lands and according to such regulations as the Secretary of the Interior may prescribe, shall receive the following donations of stock to aid them in their endeavor to gain a livelihood by such new pursuits, viz.:

Of cattle, one head annually during five years, beginning with the ratification of this treaty.

Of sheep, ten head annually during the first two years after the ratification of this treaty, and five head annually during the three years thereafter.

The Secretary of the Interior may also direct that their share of annuity goods and provisions shall be of a character suited to such change of life: *Provided, however*, That such stock shall only be donated as long as such family shall in good faith keep and use the same for the purpose indicated in this article.

All the Indians of said band who may adopt and conform to the provisions of this article shall be protected in the quiet and peaceable possession of their said lands and property.

1863 Treaty, Art. 10 (emphasis in original). Plaintiffs also contend generally that the United States, "due to its absolute jurisdiction and control over Indian lands . . . has a specific fiduciary duty to protect the reservation from the imposition of state criminal jurisdiction over tribal members." Plaintiffs, however, only cite to Navajo Tribe of Indians, 624 F.2d at 989, and 25 U.S.C. § 200 (2012), which requires "a report or record" be submitted to the superintendent of the reservation whenever an Indian is confined or imprisoned on lands held in reserve. Plaintiffs do not elaborate how this creates the existence of specific fiduciary duties between the United States and the Ute Indians, or any duties that are money-mandating regarding the alleged imprisonment or confinement. Moreover, Article 10 only addresses the land allotment for the Ute Indians who wish to "begin and follow agricultural or pastoral pursuits by farming or raising stock and growing wool, upon such lands and according to such regulations as the Secretary of the Interior may prescribe" Id. Article 10 of the 1863 Treaty does not provide a specific fiduciary money mandating duty.

Plaintiffs also allege that Article 2 of the 1868 Ute Treaty establishes a duty to prevent trespass. In relevant part, Article 2 reads:

[N]o persons, except those authorized so to do, and except such officers, agents, and employes [sic] of the Government as may be authorized to

enter upon Indian reservations in discharge of duties enjoined by law shall
ever be permitted to pass over, settle upon, or reside in the Territory
described in this article, except as herein otherwise provided.

1868 Treaty, Art. 2. Defendant, notes, however, that "[p]laintiffs admit that 'some courts
have held that the duty of the United States to ensure the quiet enjoyment of reservation
lands does not make the government liable for general trespasses by third parties.'"
Moreover, defendant notes that "[c]onspicuously absent in the events that constitute the
alleged trespass of state law enforcement officials on the Reservation is the presence of
any federal law enforcement officer." In the amended complaint, the plaintiffs specifically
identify state officers, but not the federal officers, as having no right to be on the
reservation. The amended complaint states: "Murray was shot after being pursued at gun-
point by two Utah state Highway Troopers, a Uintah County Sheriff's Deputy, and an off-
duty Vernal City, Utah, police officer. The pursuit took place over tribal trust lands more
than 25 miles inside the northern boundary of the U&O Reservation. The four shooting-
involved officers had no criminal jurisdiction over Indians inside the U&O Reservation."
For each of the four state officers, the amended complaint also alleges they are "not
cross-deputized by the federal government or the Ute Tribe to exercise law enforcement
powers over Native Americans inside the Ute Tribe's Reservation." The plaintiffs, do not,
however, make a cross-deputized claim against any of the federal officials.

Finally, according to plaintiffs, the United States' failure to prosecute the bad men
who murdered Mr. Murray and conspired to cover up the murder on April 1, 2007
represents a breach of trust. Article 6 of the 1868 Treaty promises that "the United States
will . . . proceed at once to cause the offender to be arrested and punished according to
the laws of the United States." 1868 Treaty, Art. 6. Plaintiffs argue that

The "bad men" clause of the 1868 Treaty, further expands the duty of the
U.S. to protect not only the Ute Tribe as a whole in its quiet possession of
the reservation lands, but also the individual Ute Indians against "any
wrong" perpetrated on them by any non-Indian.

Defendant contends that the 1868 Ute Treaty provision is not trust-creating, but
rather bestows discretionary power upon the United States to prosecute bad men.
Moreover, defendant states "[w]e do not question that the Treaty requires payment to
individuals under the 'Bad Men' clause, if the requirements of the Treaty are met. The
Treaties, however, impose a duty upon the government to only pay individual members,
not the Tribe, in the event that unauthorized persons cause harm to person or property."
(emphasis in original). Moreover, for count one, this court did not find the United States
had violated the "bad men" provision as a result of the actions involving Mr. Murray's
death, and for count two, plaintiffs' claims are repetitive of count one, as they specifically
repeat and re-allege the claims in count two.

None of the citations to the 1863 and 1868 Treaties provide a source of jurisdiction
for the breach of trust claims alleged by plaintiffs.  Furthermore, none of the plaintiffs'
breach of trust claims identify any substantive law containing the "express language of a

trust." See Samish Indian Nation v. United States, 419 F.3d at 1368. Moreover, plaintiffs have not demonstrated how "[t]he United States has also breached its trust obligations to the Tribe and Murray's family by failing to protect the territorial integrity of the Tribe's reservation and the Tribe's sovereign interest in the shooting site, thus allowing unauthorized persons to trespass on the Ute homeland and cause harm to tribal members with complete impunity," or that "[t]he Defendant's breach of its trust and treaty obligations has resulted in substantial loss to the Tribe." The court agrees with defendant that, "[i]n fact, Plaintiffs have not identified any 'specific right-creating or duty-imposing statutory or regulatory prescriptions' that establish 'specific fiduciary or other duties' that the United States allegedly has failed to fulfill" as part of its trust duties. (quoting Navajo I, 537 U.S. at 506).

The court also agrees with defendant that "authority to institute both civil and criminal litigation on behalf of the United States is committed to the discretion of the Attorney General." (citing 28 U.S.C. § 516 (2012). The defendant further argues that "[t]he Attorney General's exercise of his discretion to file litigation on behalf of the United States is 'presumptively immune from judicial review.'" (quoting Shoshone Bannock Tribes v. Reno, 56 F.3d 1476, 1480 (D.C. Cir. 1995)). Article 6 of the 1868 Treaty provides that the United States will "reimburse the injured person for the loss sustained," however, payment is contingent on the "bad men" "offender" being "arrested and punished according to the laws of the United States. . . ." 1868 Treaty, Art. 6. As noted above, the record does not reflect any prosecutions were initiated against any individuals named by the plaintiffs in the above captioned case. Moreover, the decision issued by the United States District Court for the District of Utah did not find any culpability on the part of any individual accused by plaintiffs in the death of Mr. Murray, further suggesting no reimbursement to the plaintiffs is warranted. For the foregoing reasons, defendant's motion to dismiss plaintiffs' breach of trust claims for lack of subject-matter jurisdiction is granted.

## CONCLUSION

Because plaintiffs have failed to state a claim and have not demonstrated jurisdiction is proper in this court, defendant's motion to dismiss is **GRANTED**. Plaintiffs' amended complaint is **DISMISSED**. The Clerk's Office shall enter **JUDGMENT** consistent with this opinion.

**IT IS SO ORDERED**.

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**