# In the United States Court of Federal Claims

No. 13-227L

Filed: January 6, 2020

---

**DEBRA JONES and ARDEN C. POST individually and as the natural parents of Todd R. Murray;**

**DEBRA JONES as personal representative of the Estate of Todd R. Murray, deceased, for and on behalf of the heirs of Todd R. Murray; and**

**UTE INDIAN TRIBE OF THE UINTAH AND OURAY RESERVATION,**

　　　　　　　*Plaintiffs,*

**v.**

**UNITED STATES,**

　　　　　　　*Defendant.*

Keywords: Sanctions, Spoliation, Adverse Inference

---

*Jeffrey S. Rasmussen*, Fredericks, Peebles & Morgan, LLP, Louisville, Colorado, for the plaintiffs.

*Kristofor R. Swanson* with *Terry Petrie*, Natural Resources Section, Environment & Natural Resources Division, U.S. Department of Justice, for the defendant. *Christopher R. Donovan*, Office of the General Counsel, Federal Bureau of Investigation and *James W. Porter*, Office of the Solicitor, U.S. Department of the Interior, of counsel.

## MEMORANDUM OPINION AND ORDER

***HERTLING*, Judge**

　　This case returns to the Court on remand from the U.S. Court of Appeals for the Federal Circuit. *Jones v. United States*, 846 F.3d 1343 (Fed. Cir. 2017). The plaintiffs, the parents, estate, and tribe of deceased Ute Tribe-member Todd R. Murray, claim that the United States is liable to compensate them for Mr. Murray's death on the Tribe's reservation under an 1868-treaty provision requiring the United States to compensate the victims and the Tribe for the acts of "bad men." To establish the United States' liability for Mr. Murray's death under the bad-men provision, the plaintiffs must prove that Mr. Murray's death by a gunshot wound to the head—ruled a suicide by the Federal Bureau of Investigation ("FBI")—amounts to a prosecutable, arrestable crime under the "laws of the United States" committed by a non-tribe-

member against a tribe member, starting on the reservation.[1] *Jones v. United States*, 846 F.3d at 1360-61.

Now that their complaint has survived the United States' motion to dismiss, the plaintiffs have renewed their motion for sanctions against the defendant for its spoliation of evidence.  In their renewed motion, the plaintiffs allege that the United States destroyed or failed to preserve the physical evidence that could have proven that Mr. Murray's death was an officer-involved shooting by off-duty Vernal City, Utah, police officer Larry "Vance" Norton, rather than a suicide.  (ECF 137.)  As a sanction for this alleged spoliation, the plaintiffs request that the Court hold the United States liable for Mr. Murray's death.

## I.   BACKGROUND

The apparent facts of Mr. Murray's death are described in a federal district court decision granting summary judgment for the local officers involved in a federal civil rights case. *Jones v. Norton*, 3 F. Supp. 3d 1170, 1178 (D. Utah 2014), *aff'd*, 809 F.3d 564 (10th Cir. 2015).  Those facts, as they relate to the United States, are summarized in this Court's earlier opinion dismissing this case and the Federal Circuit opinion reversing that dismissal. *See Jones v. United States*, 122 Fed. Cl. 490 (2015) (Horn, J.), *vacated and remanded*, 846 F.3d 1343 (Fed. Cir. 2017).

For the purpose of deciding the plaintiffs' motion for spoliation sanctions against the United States, the Court primarily draws its factual findings from the parties' Joint Stipulations Regarding Spoliation (ECF 77), the transcript of the district court's evidentiary hearing on spoliation, (ECF 77-1), and the Supplemental Joint Appendix of documents from the district court litigation (ECF 127).  The parties also agreed to submit as evidence the depositions of their respective experts (ECF 144).  The Court references the plaintiffs' allegations from the Amended Complaint (ECF 17) for contextual facts that are not covered by the Stipulations or testimony in the district court hearing transcript.[2]

On April 1, 2007, a Utah state trooper radioed the state Central Police Dispatch advising that he was pursuing a car containing "two tribal males" for a speeding violation.  (ECF 17 ¶ 21.)  Mr. Murray was the passenger in the vehicle being pursued.  (ECF 77 ¶ 5.)  The vehicle eventually stopped within the boundaries of the Ute reservation, where Mr. Murray and the driver exited and stood on either side of the vehicle.  (ECF 17 ¶ 26.)  The trooper approached the driver and Mr. Murray, ordering them to the ground multiple times.  (*Id.* ¶ 26.)  Mr. Murray and

---

[1] The Federal Circuit's decision in this case left open the issue of whether the bad-men provision is geographically limited, holding only that any limit this Court finds must include "off-reservation[] activities that are a clear continuation of activities that took place on-reservation." *Jones v. United States*, 846 F.3d 1343, 1360 (Fed. Cir. 2017).

[2] Although the Court characterizes some contextual facts as "allegations," those facts may be supported by testimony or other documents found within the district court record filed in this case as the Revised Joint Appendix (ECF 117-122).

the driver ran away in opposite directions.  (*Id.* ¶ 26.)  The trooper pursued and apprehended the driver.  (*Id.*)

As the trooper returned to his patrol car with the handcuffed driver, off-duty Vernal City police officer Norton arrived on the scene wearing plain clothes and driving his personal car. (*Id.* ¶ 27.) The trooper asked Officer Norton to pursue Mr. Murray.  (*Id.*).  Another state trooper and county deputy arrived next and joined the search for Mr. Murray.  (*Id.* ¶ 29.)  The parties stipulated that none of the state, county, or municipal officers involved could lawfully exercise authority over Mr. Murray on the Ute reservation.  (*See* ECF 77 ¶¶ 8-10.)

Officer Norton testified that, after a foot chase, Mr. Murray fired at Officer Norton.  (*Id.* ¶ 21).  Officer Norton testified that he then fired two shots back at Mr. Murray with a .40-caliber handgun before turning around and running back up a hill to a location where he believed Mr. Murray could not shoot him.  (*Id.* ¶ 22.)  Officer Norton testified that "Murray put a gun to his head as Officer Norton shouted at Mr. Murray to put it down, that Mr. Murray then pulled the trigger, and [that Mr. Murray] collapsed."  (*Id.* ¶ 23.)  Officer Norton was the only witness to the gunshot that killed Mr. Murray.  (*See* ECF 77-1 at 251.)

## A.     Federal Investigation

The FBI had jurisdiction to investigate Mr. Murray's death on the reservation.  (*Id.* ¶ 25.) Agent Rex Ashdown of the FBI's Vernal Resident Agency arrived on the scene after an ambulance had transported Mr. Murray to a hospital.  (*Id.* ¶¶ 13, 24.)  The parties' stipulated version of Agent Ashdown's investigation of the shooting scene is described first, followed by the handling and examination of Mr. Murray's body.

### 1.     The Shooting Scene

Agent Ashdown testified that, on his arrival at the scene of the shooting, someone he only remembered as a "senior supervisory officer" told him that Mr. Murray had shot himself.  (ECF 77 ¶ 26.)  Agent Ashdown documented the scene and collected evidence.  The parties stipulated that "some or all of" the evidence collected was ultimately entered into the FBI Salt Lake City Division's evidence room.  (*Id.* ¶ 37.)  The parties further stipulated that the collected evidence included photographs and GPS coordinates documenting the scene and the relative location of its elements, a .380 handgun found near Mr. Murray's body, two spent .380-caliber shell casings found near the .380-caliber handgun (".380 handgun"), and two spent .40-caliber shell casings found 113 yards from the location of Mr. Murray's body (*Id.* ¶ 34).

#### a.     *Documenting the Scene*

Agent Ashdown "took photographs of various angles of the scene[,] . . . identified photos, marked exhibits, and photographed the exhibits in place from various positions, . . . collected those items he believed had evidentiary value[,] . . . [and] placed yellow evidence placards . . . to mark [at least some of] the evidence he observed for later purposes to identify what he was looking at."  (*Id.* ¶¶ 27-28.)  Agent Ashdown "marked and photographed some of the blood and blood splatter that could be identified as blood."  (*Id.* ¶ 29.)  Agent Ashdown took GPS measurements of the location of found shell-casings and Mr. Murray's body.  (*Id.* ¶ 33.)

        b.      *.380 Handgun*

Agent Ashdown collected as evidence a .380 handgun found next to Mr. Murray's body. (*Id.* ¶¶ 29-30.) Agent Ashdown photographed a spent shell-casing "jammed" inside the .380 handgun that apparently had failed to eject properly. (*Id.* ¶ 36.) The FBI retained possession of the .380 handgun. (*Id.* ¶ 31.) Agent Ashdown did not request a test fire of the .380 handgun, later testifying that the only purpose of test firing it would have been to confirm that it functioned and that it had been fired. (*Id.* ¶ 35.)

        c.      *Shell Casings*

Agent Ashdown testified that he also collected two spent .380 shell casings from the ground from within the expected ejection-radius of the .380 handgun's location. The FBI retained possession of the .380 shell casings. (*Id.* ¶ 34.)

Agent Ashdown also photographed and collected Officer Norton's two .40-caliber shell casings approximately 113 yards from where Mr. Murray's body had been. (*Id.* ¶ 32.)

        d.      *Officer Norton's Gun, Person, Clothes, and Vehicle*

The parties stipulated that Agent Ashdown "testified that he did not perform or request any testing of Officer Norton's clothing because he did not observe anything on Officer Norton's body and did not see any blow back blood or blood splatter type evidence on the clothes." (*Id.* ¶ 48.) Officer Norton's supervisor, Chief Gary Jensen of the Vernal City Police Department, also testified to not seeing any blood or tissue on Officer Norton when Chief Jensen arrived at the scene. (ECF 77-1 at 215-16.)

Chief Jensen testified that he took custody of Officer Norton's .40-caliber handgun at the scene and saw no blood or tissue on the gun. (*Id.* at 215-16.) The weapon was later returned to Officer Norton. (*See id.* at 238.) When the district court asked about his motivation for believing that it was not necessary to test Officer Norton's gun or clothing, Chief Jensen responded:

> The motivation is that, with all due respect, Vance Norton was a very good Detective. Vance Norton was involved in a situation. He described the situation. The scene appeared to be as he described it. It appeared to be a suicide and it was believable. I didn't feel it was necessary.

(*Id.* at 222.)

        e.      *Reliance on Officer Norton's Account*

Agent Ashdown testified that he spoke with Officer Norton at the scene to arrange an interview and the conversation ended after Officer Norton stated that he would want an attorney present. (ECF 77-1 at 159-60.) Agent Ashdown did not remember receiving an account directly from Officer Norton at the scene. (*Id.* at 158-59.) Agent Ashdown testified that his partner later

conducted an interview with Officer Norton and his attorney while Agent Ashdown was out of town.  (*Id.* at 159-60.)

Agent Ashdown testified that he had a professional but not a personal relationship with Officer Norton and that he "knew him to be a credible officer in all of the interactions I ha[d] during the past 10 years prior to this, and I had no reason to discount the story I had been given as I approached that scene."  (*Id.* at 157.)

During the district court's spoliation hearing, Agent Ashdown was asked if he had neglected to document the location of various elements at the scene of Mr. Murray's death to a degree that would allow a recreation of that scene due to reliance on Officer Norton's account. Agent Ashdown testified that he had not, stating:

> Because I took the information received regarding what Officer Norton had reported. I had gone down to the crime scene, reviewed the crime scene and everything had been consistent with what I had been told. There was nothing inconsistent that I could see, and it had been determined at that time it was a suicide, and the FBI office and the FBI lab don't have the resources or does any department have the resources to take a suicide investigation to an Nth degree to prove something that we already know.

(*Id.* at 164.)

## 2.    Handling of Mr. Murray's Body

After Mr. Murray was shot, while he was still alive, officers handcuffed him.  (ECF 17 ¶ 33; ECF 139 at 4.)  The plaintiffs allege that, half an hour after Mr. Murray was reported shot, an ambulance arrived and took Mr. Murray—who was still alive—to a hospital, where he was declared dead shortly after arriving.  (ECF 17 ¶¶ 39, 41.)

At the hospital, the plaintiffs allege, state, county and municipal officers removed Mr. Murray's clothes, unnecessarily photographed and manipulated his nude remains, and photographed one officer "sticking a finger into Murray's head wound."  (*Id.* ¶ 42.)  U.S. Bureau of Indian Affairs Officer Kevin Myore was allegedly also present at the hospital.  (*Id.*)

State, county, and municipal officers then transported Mr. Murray's body to a mortuary to store it overnight until it could be transported to the state medical examiner's office the next day.  (*Id.* ¶ 43.)  At the mortuary, the plaintiffs allege, the officers drew two vials of blood from Mr. Murray's body by inserting a needle into Mr. Murray's heart and asking a mortuary employee to make an incision in Mr. Murray's neck.  The plaintiffs allege that Agent Ashdown arrived at the mortuary and was "informed that a sample of Mr. Murray's blood had been drawn earlier at the [hospital]," but did nothing to stop the officers from drawing more blood.  (*Id.* ¶ 44.)

### 3.   Examination of Mr. Murray's Body

The next day, Mr. Murray's body was moved to the state medical examiner's office in a body bag.  (ECF 17 ¶ 48; *see* ECF 77-1 at 54.)

a.   *Mr. Murray's Hands*

The plaintiffs alleged that Mr. Murray's hands were not constantly protected with bags to preserve trace evidence because his hands were bagged in some photos but not in others.  (ECF 137 at 12.)  The medical examiner reported that Mr. Murray's remains arrived with hands bagged.  (ECF 17 ¶ 52.)  He found no soot on either hand.  (*Id.*)  Mr. Murray's left hand was "clean and free of any debris or blood."  (*Id.*)  Mr. Murray's right hand was "caked in blood."  (*Id.*)

Agent Ashdown testified that he did not request a gunshot-residue test of Mr. Murray's or Officer Norton's hands because the FBI laboratory had ceased doing gunshot residue tests prior to the April 1, 2007, investigation because the tests were inherently unreliable with too many false positives and false negatives.  (ECF 77 ¶ 45.)

b.   *Failure to Conduct Autopsy*

The FBI requested that the medical examiner perform an autopsy.  (ECF 77 ¶ 43.)  The state medical examiner performed an external examination of Mr. Murray but did not conduct an autopsy.  (*Id.* ¶ 44.)  In the district court the medical examiner later testified that the decision of what type of examination is conducted is the responsibility of the examining physician and is made on a case-by-case basis.  (*Id.*)  The medical examiner testified that he considered the lack of any indication of a struggle, the contact gunshot wound, and the relative position between the two individuals in deciding to perform only an external examination and not an autopsy.  (ECF 77-1 at 88.)

The medical examiner concluded that the bullet had entered Mr. Murray's head on the left side and exited on the right side.  (ECF 17 ¶ 50.)  The plaintiffs allege that Mr. Murray was right-handed.  (*Id.* ¶ 51.)  The medical examiner listed Mr. Murray's cause of death as suicide.  (*Id.* ¶ 56.)

c.   *Mr. Murray's Clothing*

The medical examiner testified that he did not test clothing but would bag it and provide it to a requesting party.  (ECF 77 ¶ 49.)  Agent Ashdown testified that he did not request that any testing be performed on Mr. Murray's clothing because, based on the information given to him at the scene and his observations, there was no information inconsistent with a suicide and he did not expect to find anything on Mr. Murray's clothing except Mr. Murray's blood.  (*Id.* ¶ 47.)

### 4.   Notice of Claims and Destruction of the .380 Handgun

After Agent Ashdown's May 2007 retirement, FBI Special Agent David Ryan took over the investigation of Mr. Murray's death.  (ECF 77 ¶ 14.)  Agent Ryan investigated the purchase of the .380 handgun and assisted in the criminal prosecution of the handgun's straw purchaser.

(*Id.* ¶¶ 14, 38.)  This investigation linked the gun to the driver of the vehicle in which Mr. Murray was a passenger.  (*See* ECF 118-6 at JONES0018324-25) (FBI memorandum recording straw purchaser's account that a man he later knew as the driver of the car in which Murray had been a passenger before his death had asked the straw purchaser to purchase a handgun for him).

The .380 handgun's straw-purchaser was indicted in January 2008, and the indictment contained a notice of intent to seek forfeiture of the gun.  (ECF 77 ¶ 38.)

On March 2, 2008, plaintiff Debra Jones sent a "Notice of Claims" to the Vernal City police department, state highway patrol, county sheriff, Uintah County, and Officer Norton.  *See Jones v. Norton*, No. 2:09-CV-730-TC, 2014 WL 909569, at *4 (D. Utah Mar. 7, 2014) (describing the Notice).  Officer Norton testified that he received the Notice on April 1.  (ECF 77-1 at 240.)  The Notice summarized the facts of Mr. Murray's death from the police pursuit to the examination of Mr. Murray's body.  (*Id.*)  The Notice indicated that Ms. Jones intended to bring claims against the recipients for violations of Fourth Amendment protections against unreasonable search and seizure, Fourteenth and Fifth Amendment guarantees of due process, the Fourteenth Amendment guarantee of equal protection, and the Fifth Amendment right not to be compelled to be a witness against oneself, violation of the equivalent state constitutional provisions, assault and battery, intentional and/or negligent infliction of emotional distress, negligence, and wrongful death.  *Jones v. Norton*, 2014 WL 909569, at *4-5.  The first paragraph of the Notice provided "[t]his notice should not be deemed to waive any cause of action that Debra Jones may have against any individual or entity, governmental or otherwise, who may later be determined to be ultimately responsible for the damages she has sustained."  *Id.*

The .380 handgun's straw purchaser pleaded guilty and the district court entered a preliminary forfeiture order in May 2008.  (ECF 77 ¶¶ 38-40.)  Pursuant to this preliminary forfeiture order, the United States published a notice on www.forfeiture.gov for anyone to claim an interest in the gun within 30 days.  (*Id.* ¶ 40.)

An FBI memorandum dated September 17, 2008, recommended closing the investigation of Mr. Murray's death, describing it as a suicide, and reporting the completed prosecution of the .380 handgun's straw purchaser.  (ECF 118-3 at JONES0010902.)  It further reported that "[t]he firearm recovered from Murray after he shot himself has been forfeited" and continued "[d]ue to an active civil suit involving [redacted] and the [Vernal City Police Department], items IBl - 1B4 have been removed from FBI evidence and provided to VPD.  No other items remain in FBI evidence."[3]  (*Id.*)

On November 14, 2008, the district court found that adequate notice had been given and no one had claimed an interest in the .380 handgun.  (ECF 77 ¶ 41.)  The court ordered the .380 handgun forfeited to the United States to be "disposed of according to law."  (*Id.*)

---

[3] The Court understands "items IB1-1B4" to refer to the two .40-caliber and two .380-caliber shell casings that the FBI had collected at the shooting scene.  (*See* ECF 77 ¶ 34.)

The FBI took the .380 handgun "out of evidence" on November 26, 2008 (*id.* ¶ 42), and provided it to the U.S. Marshals Service on December 2, 2008. The Marshals Service destroyed the handgun, as is its routine practice.

The FBI turned over the two .380-caliber shell casings and two .40-caliber shell casings to a Vernal City police detective on December 15, 2008, "because of the Utah District Court litigation." (*Id.* ¶ 34.)

### B.     Litigation

In July 2009, the individual plaintiffs and the estate filed federal-law civil rights claims in state court against Uintah County, Vernal City, the state troopers, the county sheriff deputies and Officer Norton, along with state-law "assault and battery" and wrongful death claims against Officer Norton individually. In August 2009, the defendants removed the case to the United States District Court for the District of Utah. (ECF 117-2 at JONES001018-87.) The plaintiffs argued that Officer Norton killed Mr. Murray by shooting him in the head at point-blank range either with Officer Norton's own gun or with the .380 handgun found near Mr. Murray's body and that the state, county, and municipal officers spoliated the evidence of Officer Norton's act. *Jones v. Norton*, 3 F. Supp. 3d at 1191.

While the district court litigation was still pending, the plaintiffs, in February 2012, notified the Bureau of Indian Affairs and the Department of Justice of Mr. Murray's death. (ECF 17 ¶ 75.) They sent a Statement of Claim for damages, typically a required precursor to filing suit under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346, in March 2013. (*Id.* ¶ 76.) The plaintiffs never pursued a FTCA action for Mr. Murray's death.

The plaintiffs, on April 1, 2013, filed suit against the United States in this court. (*See* ECF 1.)

In 2014, the district court granted summary judgment for the defendant state, county, and municipal officers and Vernal City, holding that there was insufficient evidence for a reasonable jury to conclude that Officer Norton shot Mr. Murray in the head at point-blank range. *Jones v. Norton*, 3 F. Supp. 3d at 1192, 1213. In a separate decision denying spoliation sanctions against the defendants in that case, the district court found that certain elements of spoliation were met as to some evidence, but, in part because the FBI had the jurisdiction to investigate Mr. Murray's death, the state, county and municipal defendants did not have a duty to preserve the allegedly spoliated evidence. *See Jones v. Norton*, 2014 WL 909569, at *8 ("None of the named Defendants [except possibly Vernal City] can be held liable for these alleged misdeeds, because Agent Ashdown and Keith Campbell were in charge of the investigation."); *Jones v. Norton*, 2014 WL 4825894, at *1 n.6 (D. Utah Sept. 25, 2014) (noting that the district court denied the motion for spoliation sanctions against Vernal City after the opportunity for additional briefing). The plaintiffs appealed. *Jones v. Norton*, 809 F.3d at 568.

While the plaintiffs' appeal was still pending at the U.S. Court of Appeals for the Tenth Circuit, this Court granted the United States' motion to dismiss for failure to state a claim. 122 Fed. Cl. at 490, 522, 529-30. This Court held that the United States could only be liable for "affirmative" criminal acts committed on the reservation and that the plaintiffs were collaterally

estopped from relitigating "the factual circumstances of Todd Murray's death, and the allegations of the destruction of evidence." *Id.*

The plaintiffs appealed, and the Court of Appeals for the Federal Circuit vacated the decision and remanded the case.  846 F.3d at 1364.  The Federal Circuit agreed that federal liability under the bad-men treaty provision is limited to crimes but rejected this Court's reasons for limiting the liability to affirmative acts on the reservation.  *See id.* at 1355-57.  The Federal Circuit further found that the plaintiffs had not identified the alleged omissions with specific crimes and left this Court to reconsider the provision's application to omissions in the context of specific crimes in the event that any of the alleged omissions could be established by the plaintiffs as cognizable crimes under the "laws of the United States." *Id.*  The Federal Circuit left this Court to determine, "in the first instance, whether any of the[] off-reservation acts demonstrate the alleged continuation of on-reservation acts so as to be cognizable under the bad men provision." *Id.* at 1361.

The Federal Circuit also held that the plaintiffs were not collaterally estopped from litigating whether Mr. Murray shot himself and whether evidence was spoliated.  "The culpability of the federal officers for spoliation has never been decided."  The Federal Circuit instructed:

> If the [Court of Federal Claims ("CFC")] concludes on remand that spoliation sanctions are not appropriate, or that the appropriate sanctions would not change the evidentiary landscape for particular issues, the CFC may reconsider the application of issue preclusion. If it determines that sanctions are appropriate and do change the evidentiary landscape, the CFC should independently consider Jones's substantive allegations of bad men violations.

*Id.* at 1363-64.

Accordingly, the Court now considers the plaintiffs' Renewed Motion for Spoliation Sanctions.[4]

### C.     Spoliation Allegations

The plaintiffs allege that the defendant's destruction of the .380 handgun found near Mr. Murray's body and the federal agents' failure to collect other forensic evidence in their investigation of Mr. Murray's death breached—either intentionally or with gross negligence—the United States' duty to preserve relevant evidence.  The federal agents, the plaintiffs allege, should have known that the plaintiffs would need this evidence in litigation over Mr. Murray's death, and that such litigation was reasonably foreseeable.

---

[4] After the Federal Circuit remanded the case, it was reassigned to this judge.  (ECF 131.)

The plaintiffs allege that they were "extremely prejudiced by the United States' spoliation of evidence" in 11 respects:

1. The firearm Defendant alleges Mr. Murray fired during his encounter with Vance Norton was destroyed by law enforcement, and the firearm was not forensically tested before it was destroyed;

2. The firearm Defendant alleges Vance Norton fired during the incident was never taken into evidence and was not forensically tested;

3. Neither Todd Murray's person nor his clothing were ever subjected to forensic testing;

4. Neither Vance Norton's person nor his clothing were ever subjected to forensic testing;

5. Law enforcement officers on the scene did not sequester Officer Norton but, astonishingly, allowed Norton to roam freely around the shooting site in possession of the alleged murder weapon for over half an hour; giving him ample opportunity to destroy and tamper with the physical evidence;

6. Even though Norton was permitted to return to his personal vehicle (which he had driven to the on-Reservation scene) and to other locations unaccompanied after he admittedly was involved in a shooting, Norton's vehicle was never searched, processed, or preserved by law enforcement;

7. The scene of the shooting that makes up the subject matter of this civil action was not adequately documented;

8. Law Enforcement officers improperly handled and tampered with Mr. Murray's body in the Emergency Room of Ashley Valley Medical Center, and these actions significantly altered and potentially destroyed critical evidence;

9. Law Enforcement officers improperly handled and tampered with Mr. Murray's body at Blackburn Mortuary, and these actions significantly altered and potentially destroyed critical evidence;

10. Mr. Murray's body was improperly handled by the Utah Office of the Medical Examiner, and the improper handling potentially altered and/or destroyed critical evidence; and

11. The Utah Office of the Medical Examiner failed to perform an autopsy on Mr. Murray's body, and this failure constitutes spoliation of critical evidence.

(ECF 137 at 1-11.)  More generally, the plaintiffs allege that Agent Ashdown's investigative decisions were influenced by his "friendship" with Officer Norton.  (*Id.* at 25.)

To simplify its analysis, the Court groups the plaintiffs' 11 separate allegations of spoliation in terms of their alleged relevance as proof of the plaintiffs' theory that Officer Norton murdered Mr. Murray.  The plaintiffs allege that the federal agents should have:

1.  Forensically tested or preserved for the plaintiffs to test Officer Norton's gun, clothing, person, or vehicle for blood and tissue "blowback" from Mr. Murray's wound because evidence from these sources could have proven that Officer Norton shot Mr. Murray at close range.

2.  Forensically tested or preserved for the plaintiffs to test Mr. Murray's person or clothing for gunpowder residue and blowback because such testing could have supported or undercut the claim that Mr. Murray pulled the trigger.

3.  More thoroughly documented the blood patterns at the shooting scene.

4.  Disclosed to the federal court handling the criminal case for the straw-purchase of the .380 handgun that that handgun, found near Mr. Murray's body, was relevant to then-noticed claims for damages before a judge ordered its forfeiture authorizing the U.S. Marshals Service to destroy it.  The FBI thus failed to preserve the gun for fingerprint testing that could have revealed whether Officer Norton or Mr. Murray held it or for testing for blowback that could have revealed whether this gun inflicted the fatal wound at close range.

5.  Examined Mr. Murray's body with an autopsy because it could have shown signs that Officer Norton made physical contact with Mr. Murray before his death.

The plaintiffs supplement their spoliation allegations with expert testimony that the forensic evidence, had it been preserved, would have been probative of their theory that Officer Norton killed Mr. Murray.  Even if the spoliated evidence would not have conclusively proven murder, the plaintiffs argue, it might have contradicted Officer Norton's account of Mr. Murray's shooting, diminishing Officer Norton's credibility as the only witness to the shooting.  The defendant responds with expert testimony that forensic phenomena like blowback in a gun's barrel do not always occur with contact-gunshot wounds.

## II.   SPOLIATION STANDARD

Potential litigants must preserve evidence that is in their control when litigation is reasonably foreseeable and the evidence is relevant to a potential claim.[5]  Breaching this duty to preserve evidence with a culpable state of mind is spoliation.  *See Jandreau v. Nicholson*, 492 F.3d 1372, 1375 (Fed. Cir. 2007).  Federal courts have inherent authority to sanction spoliation by parties before them to "ensure that [the party] does not benefit from its misdeeds; to deter future misconduct; to remedy, or at least minimize, the evidentiary or financial damages caused

---

[5] "Preserve" is used as an umbrella term that includes preventing the destruction or material alteration of evidence and preserving it for another party's use.  *See Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1320 (Fed. Cir. 2011).

by the spoliation; and . . . to preserve the integrity of the judicial process and its truth-seeking function." *United Med. Supply Co. v. United States*, 77 Fed. Cl. 257, 263 (2007); *see Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-56 (1991) (affirming federal courts' inherent authority to sanction). The United States, like any other litigant, is subject to spoliation sanctions. *M.A. Mortenson Co. v. United States*, 996 F.2d 1177, 1183–84 (Fed. Cir. 1993).

Some circuits, when considering culpability, require a finding of bad-faith intent to deprive other parties of the use of the evidence before finding spoliation. *United Med. Supply*, 77 Fed. Cl. at 265-271 (surveying cases). The Federal Circuit has required "bad faith" when applying the law of other circuits in patent cases but has not addressed the issue in its own right. This Court has not required bad faith before finding spoliation. *See id.* (rejecting a strict requirement of bad faith for a finding of spoliation and holding that "repeated acts of gross negligence, particularly if accompanied by inaccurate representations to the court that serve to mask and perpetuate the spoliation, can be met with the same or a more severe sanction than a single act of bad faith"). Finding (1) control over the destroyed evidence, (2) the reasonable foreseeability of litigation, (3) relevance of the evidence, and (4) a culpable (but not necessarily bad faith) intent establishes spoliation.

Generally, the courts sanction a spoliator by inferring that the spoliated evidence, if considered, would have proven facts adverse to the spoliator—"an adverse inference." Courts might also require the spoliator to pay other parties' discovery costs and attorneys' fees resulting from the spoliation. For particularly egregious spoliation, courts may either dismiss the spoliator's claim or grant default judgment against the spoliator. *Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1328 (Fed. Cir. 2011). The form and severity of the sanction depend on "'(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future.'" *Id.* at 1329 (quoting *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3d Cir.1994)).

## III.   DISCUSSION

This Court must decide whether the following evidence was spoliated: Murray's person and clothing, Officer Norton's gun, clothing, person and vehicle, other uncollected items at the shooting scene, and the .380 handgun.

The Court, first, analyzes whether any of the evidence was spoliated considering which evidence federal agents controlled, when litigation was reasonably foreseeable, whether the evidence is relevant to the plaintiffs' claims in this case, and the federal agents' culpability. The Court then considers the appropriate sanction considering the degree of culpability, the degree of prejudice to the plaintiffs, and the effectiveness of lesser sanctions.

As explained more fully below, the Court finds spoliation of the .380 handgun, but no other evidence. The Court determines that the gross mishandling of Mr. Murray's body does not amount to spoliation because the officer's actions did not affect evidence relevant to determining Mr. Murray's cause of death. The Court finds that the government did not control Officer Norton's gun, clothing, person and vehicle, or other uncollected items at the shooting scene.

These items were not spoliated.  The .380 handgun, however, was spoliated because it was relevant to foreseeable litigation and was negligently destroyed by the United States. Accordingly, the Court limits the United States' use of the .380 handgun as a sanction.[6]

### A.      The mishandling Mr. Murray's body is not an independent basis for spoliation sanctions.

The local officers' mishandling of and tampering with Mr. Murray's body in the hospital emergency room and at the mortuary were grossly inappropriate.  These actions support a factual finding that the federal agents did not preserve Mr. Murray's hands and clothing for forensic testing.

The mishandling and mistreatment of Mr. Murray's remains—while grossly inappropriate—did not otherwise affect evidence relevant to the plaintiffs' claims about the cause of Mr. Murray's death.  Nothing in the record suggests that the local officers' insertion of fingers into Mr. Murray's head wound affected the observable characteristics of the wound. Similarly, it is unclear how a local officer drawing blood from Mr. Murray's heart and neck could have affected later-performed toxicology tests.  Toxicology was not at issue in determining the cause of Mr. Murray's death.  The mishandling and mistreatment of Mr. Murray's remains, however wrong, are not an independent basis for spoliation sanctions because they did not affect evidence relevant to the plaintiffs' claims.

### B.      Except for the .380 handgun, the allegedly spoliated evidence was not in the United States' "control."

Sanctions are appropriate against a party who, in control of the evidence, allows that evidence to be discarded.  *See K-Con Bldg. Sys., Inc. v. United States*, 106 Fed. Cl. 652, 664 (2012) ("If a party having control over evidence allows that evidence to be discarded, then the disposal of that evidence is attributable to that party, regardless of who actually discarded the evidence.").

In this case, neither side disputes that the .380 handgun found near Mr. Murray was evidence and that the federal agents controlled it.  The federal agents possessed the gun after the shooting.  Had they continued to possess it undisturbed, the plaintiffs could have tested it for blowback and fingerprints.  The United States bears responsibility for the disposal of the .380 handgun. As for the other possible evidence—Officer Norton's gun, clothing, person or vehicle, Mr. Murray's person or clothing, and the shooting scene—nothing in the record suggests that

---

[6] The duty to preserve evidence has traditionally been enforced against parties to litigation as a sanction or, in some jurisdictions, against non-parties through a separate state-law tort action.  While neither federal nor Utah law recognizes a cause of action in tort by which the duty to preserve evidence might be enforced against a third party, the lack of an independent enforcement mechanism in tort against non-parties is not implicated in the narrow set of circumstances when the non-party is now a party, litigation was reasonably foreseeable at the time of the spoliation, and another doctrine (like collateral estoppel) does not preclude the claim to which the spoliated evidence is relevant.

federal agents ever possessed the other allegedly-spoliated shooting-scene elements in the same way they possessed the .380 handgun. Officer Norton's gun was seized by his superior, but federal agents never took possession of it. Nothing in the record suggests that federal agents examined Officer Norton's person. Agent Ashdown testified that he did not see a need to seize Officer Norton's clothes because he did not see blood on them. Mr. Murray's body was handled by local officials and brought to a state medical examiner before being turned over to Mr. Murray's family.

### 1.      Power to investigate is not control.

The plaintiffs argue that the federal agents' duty to preserve evidence extended beyond evidence the United States actually possessed to evidence the agents had "a legal right to control or obtain." (ECF 137 at 21 (citing *Chapman Law Firm, LPA v. United States*, 113 Fed. Cl. 555, 610 (2013), *aff'd*, 583 F. App'x 915 (Fed. Cir. 2014).) Federal agents, the plaintiffs argue, had the legal right to obtain or control all of the allegedly spoliated evidence because they had exclusive authority to investigate Mr. Murray's death on the reservation.

The United States responds that practicality is an element of control, and that the federal agents' decisions to collect or not to collect certain kinds of evidence in their investigation of Mr. Murray's death were discretionary—and therefore fall outside of any spoliation-related duty to preserve evidence.

This Court has found that a party's legal right to obtain or control the destroyed evidence that it did not possess was sufficient to impose on that party a duty to preserve the documents. For instance, a contractor was found to have had control over its employees' emails when it allowed the third party that maintained the server to reuse the server without preserving the emails stored on the server. *Chapman*, 113 Fed. Cl. at 610, 612. Similarly, a government contracting officer had control over documents that a non-government-employee witness asked to see and then unilaterally discarded. *K-Con Bldg. Sys.*, 106 Fed. Cl. at 657, 664. The fact that the contracting officer had not examined the documents was held not to have diminished her control over them. *Id.*

In both *Chapman* and *K-Con Building Systems*, however, the spoliators had a property-like right to obtain or control the destroyed evidence independent of its character as evidence. The contractor in *Chapman* (through its employees) created the email messages on the server, used the server, and had presumably paid the possessor of the server to operate it for the firm. *See Chapman Law Firm*, 113 Fed. Cl. at 612 ("[The CEO] recognized his rights to control the email server when he testified with respect to the [provider's] use of the email server for another purpose: 'He converted my property to his use.'"). The document-destroying witness in *K-Con Building Systems* specifically asked the contracting officer if he could "look at" the documents and "take them with him," suggesting that his access to the documents was subject to the contracting officer's control. *K-Con Bldg. Sys.*, 106 Fed. Cl. at 657.

In this case, the plaintiffs' argument that federal agents had a right to obtain or control items, including Officer Norton's gun, clothing, person or vehicle, Mr. Murray's person or clothing, and the shooting scene itself conflates the federal agents' limited authority to investigate and collect evidence of a crime with the property-like right-to-control sufficient to

14

find spoliation in *Chapman* and *K-Con Building Systems*.  The plaintiffs have failed to identify a source of the legal duty they seek to impose on the defendant.

In this case, federal agents exercised law enforcement authority on the Ute Tribe's reservation.  In this sense, as compared to the municipal or state officers who lacked this authority, the federal agents had "jurisdiction" over the shooting scene.  (*See* ECF 77 ¶ 25.)  While investigating whether Mr. Murray's death was a crime, the federal agents could have searched or collected elements of the shooting scene.  Subject to constitutional requirements and limits, they could have seized Officer Norton's gun and clothes for testing and searched Officer Norton's vehicle for Mr. Murray's blood.  They might even have detained Officer Norton to prevent him from tampering with other shooting-scene elements.

Any right-to-control the federal agents had over this allegedly-spoliated evidence was dependent on agents suspecting that Mr. Murray's death was a crime and on the item's character as a piece or source of evidence of that crime.  The federal agents had a right to obtain or control evidence of a suspected crime precisely because it was evidence of a suspected crime, not for any independent reason.  The federal agents' investigative jurisdiction over the shooting scene did not impose on them a duty to collect a particular piece or source of evidence for its own or another party's use in foreseeable civil litigation.

Taken to its limit, the plaintiffs' conflation of the authority to investigate a crime with control over certain evidence of a crime yields a circular result that renders *any* potential evidence of the cause of Mr. Murray's death evidence controlled by the government merely *because it is* evidence.  Under such a rule, the plaintiffs need only offer expert testimony to identify elements that, if tested or collected might have shown that Officer Norton killed Mr. Murray, call those shooting-scene elements "evidence," and argue that the federal agents investigating the event controlled them as part of the scene and failed to preserve them for the plaintiffs' use.  Such a broad definition of "control" and "evidence" transforms spoliation-doctrine's duty-to-preserve into an open-ended duty for law enforcement to investigate to future litigants' standards.  This Court will not define "control" so broadly as to transform federal agents' *power* to investigate crimes into a mandatory *duty* to investigate crimes and collect and preserve relevant evidence that would be enforceable by civil plaintiffs.  To do as the plaintiffs urge would stretch the judicial role too far.

## 2.  Federal investigators had no legally enforceable duty to collect particular evidence.

Implicit in the plaintiffs' arguments is the point that all items at the scene should have been collected—and thus preserved—because the federal government has a duty to investigate.  This duty to investigate, they argue, creates a duty to preserve all possible relevant evidence.  The Court disagrees.

This Court's refusal to equate the federal agents' power to investigate with a generally enforceable duty to collect particular evidence is consistent with the Supreme Court's refusal to "impos[e] on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution" when the Supreme Court held that Due Process only prohibits the *bad faith* failure to preserve

exculpatory evidence in a criminal prosecution. *See Arizona v. Youngblood*, 488 U.S. 51, 58 (1988); *Tchatat v. O'Hara*, 249 F. Supp. 3d 701, 709 (S.D.N.Y. 2017), *objections overruled,* No. 14 CIV. 2385 (LGS), 2017 WL 3172715 (S.D.N.Y. July 25, 2017), *aff'd sub nom. Tchatat v. City of New York*, No. 18-404, 2019 WL 6998892 (2d Cir. Dec. 20, 2019) (applying *Youngblood* to limit the application of spoliation sanctions to law enforcement in a civil case).

Allegations that law enforcement's noncollection of evidence might be punishable as spoliation have mostly arisen in criminal cases. Courts have rejected the spoliation allegations by concluding that the investigators' failure to collect the evidence might have been negligent, but nevertheless did not show the bad faith intent that other circuits' spoliation or *Youngblood*'s Due Process standard requires. *See, e.g., United States v. Greenberg*, 835 F.3d 295, 303 (2d Cir. 2016).

One Sixth Circuit decision, however, emphasizes the conceptual and legal distinction between a failure to preserve evidence that was collected, which would be spoliation, and investigators' discretionary choices not to collect evidence. The Sixth Circuit rejected the argument of a person convicted of bribery that the government's failure to show more direct evidence of his bribes entitled him to an adverse inference. The Sixth Circuit concluded that "this is not a spoliation-of-evidence case. A *failure to collect evidence that may or may not have been available* for collection is very different from the intentional destruction of evidence that constitutes spoliation." *United States v. Greco*, 734 F.3d 441, 447 (6th Cir. 2013) (emphasis added).

The few courts that have squarely considered in follow-on civil litigation whether spoliation-doctrine's duty to preserve evidence limited police discretion in an earlier criminal investigation have denied spoliation sanctions. Courts find no bad-faith destruction of evidence or refuse to use spoliation sanctions to impose on law enforcement a duty to collect evidence.

For example, when prison officials were accused of finding an inmate in the process of hanging himself and letting him die, the Tenth Circuit affirmed the trial court's holding that the prison officials' next-day cleaning and repainting of the inmate's cell did not constitute intentional destruction of evidence that could be sanctioned as spoliation. *Estate of Trentadue ex rel. Aguilar v. United States*, 397 F.3d 840, 861-62 & n.15 (10th Cir. 2005) ("Although we agree with the district court that the government's handling of evidence in this case deviated from standard investigative practices, on the evidence before us we cannot conclude that the court erred in finding that prison officials did not intentionally destroy relevant evidence.")

When a man was arrested for but then acquitted of robbery, the court hearing the man's later civil rights suit against the arresting officers held that the Supreme Court's limits on law enforcement's *Brady* obligations in *Youngblood* precluded the court from finding a spoliation-related duty for the officers to collect store video surveillance and the allegedly stolen merchandise as part of their shoplifting investigation:

> [T]here is no free-floating obligation to preserve evidence in a criminal prosecution and [the plaintiff] cites to no case that so holds. Obviously, there are potentially serious consequences to the viability of the prosecution if relevant evidence is lost. But the

court-imposed obligation is only to make available evidence favorable to the accused, and thus, obviously, to preserve it. The Brady obligation applies to evidence that is actually favorable to the accused, not to "preliminary, challenged, or speculative information. In *Arizona v. Youngblood*, the Supreme Court specifically refused to "impos[e] on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution."

*Tchatat*, 249 F. Supp. 3d at 709-10 (citations omitted).

The plaintiffs maintain that although the question of which specific pieces of evidence investigators collect may be discretionary, investigators had a duty to collect at least some physical evidence of the cause of Mr. Murray's death and could not rely solely on Officer Norton's testimony.

Asked to assume that the evidence in plaintiffs' spoliation allegations was uncollected rather than destroyed, the plaintiffs had the opportunity at oral argument to identify some source of law that creates a judicially enforceable duty to the plaintiffs to collect the evidence of the cause of Mr. Murray's death. The plaintiffs could not identify the source of a legally enforceable duty on law enforcement officers to collect physical evidence of Mr. Murray's death. Neither the bad-men provision nor any other source—aside from the nature of the job of law enforcement officers and appealing to the general duty to preserve relevant evidence in foreseeable litigation under the spoliation doctrine—could be identified by the plaintiffs as potential sources of the duty the plaintiffs seek to impose, and the Court could likewise find none.[7] A general duty affirmatively requiring federal law enforcement to investigate deaths and collect physical evidence of their cause must have some source other than this court's inherent power to prevent abuses of the judicial process.

### 3. There is no evidence of a conspiracy not to collect evidence.

Despite these limitations on the definitions of "control" and "evidence" and the absence of any duty to collect specific evidence, the Court leaves open the question, not presented here, of whether evidence of a conspiracy *not to collect evidence* could be sanctioned as spoliation. In such a case, a spoliation claim would in effect be a claim for violations of constitutional and civil rights. There is neither an allegation nor evidence of such a conspiracy in this case. The plaintiffs only allege that Agent Ashdown and Officer Norton were friends. Agent Ashdown and Officer Norton both testified that their relationship was professional, not social. The Court will not infer a conspiracy from the fact of their professional friendship alone. There are no specific

---

[7] The Court rejects the plaintiffs' argument that FBI or U.S. Bureau of Indian Affairs policy manuals create a judicially enforceable duty to collect particular evidence in this case. Those policies are for the agency itself, not this Court, to enforce. They do not give rise to rights enforceable by third parties against the United States.

allegations and no evidence in the record to support an inference of a conspiracy to violate Mr. Murray's civil rights involving the federal agents.

### C.      The United States spoliated the .380 handgun.

The United States had control of the .380 handgun found near Mr. Murray's body. The federal agents collected the handgun and kept it as evidence. The state, county, and municipal defendants received a Notice of Claims from one of the plaintiffs. The FBI agent responsible for investigating Mr. Murray's death pursued the prosecution of the handgun's straw purchaser. The district court ordered the forfeiture of the handgun after the defendant gave notice of the gun's forfeiture on the forfeiture.gov website. The FBI memorandum closing the investigation of Mr. Murray's death mentioned a request for evidence from Vernal City for the previously-noticed civil litigation. The FBI removed the .380 handgun from evidence and provided it to the U.S. Marshals Service for destruction.

Litigation involving the gun was reasonably foreseeable when the gun was destroyed. First, the Court agrees with the district court's finding that, "in light of the seriousness of the incident and the involvement of officers on the Reservation where they did not have jurisdiction, litigation could reasonably be expected." *Jones v. Norton*, 2014 WL 909569, at *7 (D. Utah Mar. 7, 2014), *aff'd*, 809 F.3d 564 (10th Cir. 2015). Further, the FBI's September 17, 2008 case-closing memo mentions "an active civil suit" for which bullet casings were provided to the city police department. (ECF 118-3 at JONES0010902; *see* ECF 77 ¶ 34.)

The United States, citing *Micron*, argues that the reasonably-foreseeable standard, although objective, is fact-specific enough to account for the fact that although litigation was reasonably foreseeable or pending against the local officers or state, litigation against the United States was not reasonably foreseeable in late-2008. Nothing in the facts of *Micron*, which addressed a plaintiff's destruction of evidence, supports the proposition that the foreseeability inquiry is defendant-specific. Further, the United States was not entirely uninvolved in the anticipated litigation, because it had already removed the bullet casings from evidence to provide to the Vernal City Police Department.

The .380 handgun was and remains relevant to the plaintiffs' claim that Officer Norton shot Mr. Murray. Although the United States' expert testified that blowback is not left on a gun by every contact-shooting, the absence of blowback could, in conjunction with other evidence, lead a reasonable fact finder to question Officer Norton's account.

The United States argues that it was not culpable for destroying the .380 handgun because it did so pursuant to a court order after public notice. The plaintiffs reply that the federal agents should have disclosed the handgun's character as evidence to the judge who ordered its forfeiture.

Nothing in the record supports a conclusion that federal agents destroyed the .380 handgun with the intent to deprive other parties of its use in litigation. The plaintiffs did not send the Notice of Claims to any of the federal agents, the FBI or the U.S. Bureau of Indian Affairs. The Notice did not specifically request the .380 handgun's preservation, even when the Marshals Service gave public notice of its imminent destruction. The Court cannot find any

evidence that the FBI intended in bad faith to prevent the .380 handgun's use in future litigation, so this court cannot find bad faith.

Nonetheless, the FBI's apparent failure to disclose the .380 handgun's character as evidence to the judge who ordered its disposal was sufficiently negligent to warrant a sanction for its spoliation. The gun was stored in an evidence room as evidence. It was unlike routine business records stored in an office file cabinet, rough interview notes in someone's desk, photos stored in a multifunction electronic device, video stored on reusable media, or other evidence whose intentional destruction pursuant to normal business processes was not sufficiently culpable to amount to spoliation in other cases.

The federal agents' destruction of the gun was sufficiently negligent to support a spoliation sanction. The item was collected as evidence and litigation had been noticed and was impending in which other items from the same collection, the bullet casings, were being used as evidence. The United States spoliated the .380 handgun.

## D.    Appropriate Sanction

As a sanction for spoliating the .380 handgun in this case, the United States will not be allowed to rely on any evidence related to that gun, including the presence of an unejected shell casing in the destroyed handgun and the presence or absence of fingerprints or blowback on the handgun, to support the United States' conclusion that Mr. Murray died by suicide.

The Court determines a sanction for spoliation by considering (1) the degree of the United States' culpability, (2) the degree of prejudice to the plaintiffs, and (3) whether any lesser sanction might be sufficient. *See Micron*, 645 F.3d at 1329. When the Court exercises its inherent authority to sanction, it also has discretion to determine the appropriate sanction. *Id.* at 1326; *see also Chambers*, 501 U.S. at 55.

The plaintiffs argue for entry of a default judgment as a sanction, but the defendant's spoliation was not sufficiently culpable to merit this dispositive sanction. The Court does not find the United States destroyed the .380 handgun in bad faith, so the Court will not grant default judgment. *See Micron*, 645 F.3d at 1328.

The plaintiffs have the burden to show the prejudice they suffered from the .380 handgun's destruction because the United States did not destroy the gun in bad faith. *Id.* Prejudice requires a "showing that the spoliation 'materially affect[s] the substantial rights of the adverse party and is prejudicial to the presentation of his case.'" *Id.* (quoting *Wilson v. Volkswagen of Am., Inc.,* 561 F.2d 494, 504 (4th Cir.1977)). "In satisfying that burden, a party must only 'come forward with plausible, concrete *suggestions* as to what [the destroyed] evidence *might have been.'" Id.* (emphasis in original) (quoting *Schmid*, 13 F.3d at 81).

As a lesser sanction, the plaintiffs argue for an inference that Officer Norton killed Mr. Murray. The plaintiffs did not show prejudice commensurate to their requested remedy. The plaintiffs support their request for this broad inference by arguing that the spoliation was so broad that it makes it impossible to prove conclusively the cause of Murray's death—that the FBI destroyed "nearly all of the evidence." (ECF 142 at 17). The spoliation was not so broad.

Only the .380 handgun was spoliated and there remains other evidence, such as scene photographs, witness testimony, and medical examination results.[8]

The Court has considered whether the plaintiffs showed prejudice sufficient to support a narrower inference specific to forensic testing of the .380 handgun. The Court finds that the plaintiffs failed to establish their suggestions of what forensic testing might have revealed as more than speculation. For example, the plaintiffs argued that forensic testing of the .380 handgun could have shown Officer Norton's fingerprints on the handgun. The plaintiffs support the plausibility of such fingerprints with what they perceive as inconsistencies in Officer Norton's account of Mr. Murray's shooting, like the unlikelihood of the right-handed Mr. Murray reaching the gun to the left side of his head. The plaintiffs argue that these observations, combined with the fact that Officer Norton was the only other person present when Mr. Murray was shot, make plausible that testing of the .380 handgun could show that Officer Norton handled the gun. The plaintiffs, however, offer no basis sufficient for the Court to distinguish their theory from other possibilities that incorporate these same facts.

Any sanction for the spoliation of the .380 handgun must be narrowly tailored to remedy the prejudice caused by the handgun's destruction. *See, e.g.*, *SDI Operating P'ship, L.P. v. Neuwirth*, 973 F.2d 652, 654 (8th Cir. 1992) (affirming district court's further narrowing of a magistrate judge's already-narrow sanction for defendant's destruction of wiring that prevented plaintiff's own more precise testing). The United States may not rely affirmatively on any facts related to the .380 handgun, including the fact that the third shell casing was not ejected from the destroyed handgun and the presence or absence of fingerprints or blowback on the handgun, to support the United States' conclusion that Mr. Murray died by suicide.[9]

_____

[8] Although the plaintiffs were not specifically notified of the government's intention to destroy the .380 handgun, nothing prevented the plaintiffs from discovering who controlled the gun and requesting its preservation for forensic testing before its destruction, especially given the public notice of the gun's impending destruction. The plaintiffs' failure in this regard must be held against them.

[9] The Court reserves for later decision, if necessary, whether to permit the defendant to use the .380 handgun defensively, in rebuttal, in the event the plaintiffs attempt to construct an argument based on that firearm.

**IV.      CONCLUSION**

The plaintiffs' motion for spoliation sanctions is GRANTED in part and DENIED in part. The motion is granted as to the defendant's destruction of the .380 handgun.  The motion is denied in all other respects.  As a sanction for the defendant's spoliation of the .380 handgun, the defendant will not be permitted to rely on any facts related to the .380 handgun, including the fact that the third shell casing was not ejected, as evidence supporting the claim that Mr. Murray shot himself with that handgun.

It is so **ORDERED**.

s/ Richard A. Hertling
**Richard A. Hertling**
**Judge**