# In the United States Court of Federal Claims

No. 13-227L
Filed: July 8, 2020
FOR PUBLICATION

|  |  |
|---|---|
| **DEBRA JONES and ARDEN C. POST individually and as the natural parents of Todd R. Murray;**<br><br>**DEBRA JONES as personal representative of the Estate of Todd R. Murray, deceased, for and on behalf of the heirs of Todd R. Murray; and the**<br><br>**UTE INDIAN TRIBE OF THE UINTAH AND OURAY RESERVATION,**<br><br>     *Plaintiffs*,<br><br>**v.**<br><br>**UNITED STATES,**<br><br>     *Defendant*. | Keywords: Summary Judgment, Sufficiency of Evidence, Issue Preclusion, "Bad Men" Provision |

*Jeffrey S. Rasmussen*, Patterson Earnhart Real Bird & Wilson LLP, Louisville, Colorado, for the plaintiffs.

*Kristofor R. Swanson* with *Terry Petrie*, Natural Resources Section, Environment & Natural Resources Division, U.S. Department of Justice, for the defendant.  *Christopher R. Donovan*, Office of the General Counsel, Federal Bureau of Investigation, and *James W. Porter*, Office of the Solicitor, U.S. Department of the Interior, of counsel.

## MEMORANDUM OPINION

***HERTLING*, Judge**

  Todd Murray, a member of the Ute Indian Tribe, died of a close-contact gunshot wound after he and the driver of the car in which he rode were pursued by state and local police officers acting without law-enforcement jurisdiction on the tribe's reservation in northeastern Utah.  One of the pursuing officers reported seeing Mr. Murray shoot himself while the officer stood about 100 yards from Mr. Murray.  Another officer standing farther away saw significant distance between the first officer and Mr. Murray shortly before seeing Mr. Murray fall to the ground.  A state medical examiner found Mr. Murray's head wound consistent with suicide.

Mr. Murray's parents brought both a district-court civil rights action against the state and local officers and this case, a treaty claim against the United States. In both actions, Mr. Murray's parents have argued that the officers murdered Mr. Murray and conspired to destroy any evidence that the plaintiffs could have offered to prove the alleged homicide. In both actions, the plaintiffs have attributed a lack of conclusive evidence to the success of officers' and federal agents' alleged cover-up. The plaintiffs have, therefore, sought to prove their allegations by obtaining an evidentiary inference or default judgment against the local officers or the United States as a sanction for the respective defendants' alleged spoliation of evidence.

In the civil-rights action, the district court found that the officers' and state medical examiner's testimony supporting suicide were uncontroverted because the plaintiffs offered only speculation, not evidence, and the state and local officers could not be sanctioned for spoliating evidence in a federal investigation. The district court found insufficient evidence for a reasonable fact-finder to conclude that Mr. Murray's death was not a suicide. The district court considered the officers' liability for other parts of the pursuit and their conduct after the shooting but granted summary judgment for the officers and their employing municipalities on all claims.

This Court found the plaintiffs' treaty claims non-cognizable or precluded by the district court's decision. The Federal Circuit reversed and remanded the case for this Court to reconsider, after first considering whether sanctions for the federal agents' alleged spoliation of evidence might affect the preclusive effect of the district court's decision.

On remand, the case was transferred to this judge, and the Court found no intentional cover-up involving federal agents. This Court found, however, that federal agents negligently spoliated the alleged suicide weapon that investigators had found near the spot where Mr. Murray was shot. As a sanction, this Court prohibited the defendant from relying on the gun or on any inferences favorable to the defendant that could be drawn from it.

With the spoliation issue resolved, the defendant has moved for summary judgment under Rule 56 of the Rules of the Court of Federal Claims ("RCFC"). The Court finds that the Utah district court's decision precludes the plaintiffs from proving facts essential to their treaty claims. Moreover, some of the plaintiffs' claims are not cognizable under the treaty's "bad men" provision, or are inadequately supported by evidence to conclude that crimes had been committed against Mr. Murray, a predicate to recovery under the treaty's "bad men" provision. Accordingly, the defendant's motion for summary judgment is granted.

## I.    FACTS

The apparent facts of Mr. Murray's death are described in the district court's decision granting summary judgment for the local authorities. *Jones v. Norton*, 3 F. Supp. 3d 1170 (D. Utah 2014) [hereinafter *Jones D. Ct. Merits*], *aff'd,* 809 F.3d 564 (10th Cir. 2015) [hereinafter *Jones 10th Cir.*]. Those facts, as they relate to the United States, are summarized in this Court's earlier opinion dismissing this case and the Federal Circuit opinion reversing that dismissal, *see Jones v. United States*, 122 Fed. Cl. 490 (2015) [hereinafter *Jones Fed. Cl. Dismissal*], *vacated and remanded*, 846 F.3d 1343 (Fed. Cir. 2017) [hereinafter *Jones Fed. Cir.*], and in this Court's opinion granting-in-part and denying-in-part the plaintiffs' motion for spoliation sanctions, 146 Fed. Cl. 726 (2020) [hereinafter *Jones Fed. Cl. Spoliation*].

The Court draws its recitation of the facts from these previous opinions, the parties' Joint Stipulations Regarding Spoliation (ECF 77), the transcript of the district court's evidentiary hearing on spoliation (ECF 77-1), and the Supplemental Joint Appendix of documents from the district court litigation (ECF 127).[1]  The parties also agreed to submit as evidence the depositions of their respective experts (ECF 144).  The Court references the plaintiffs' allegations from the Amended Complaint (ECF 17) for contextual facts that are not covered by the Stipulations or undisputed elements of the testimony before the district court.

### A.     On-Reservation Events: Pursuit, Gunshot Wound, and Handcuffing

On April 1, 2007, a Utah state trooper radioed the state Central Police Dispatch advising that he was pursuing a car containing "two tribal males" for a speeding violation.  (ECF 17 ¶ 21.)  Mr. Murray was the passenger in the vehicle being pursued.  (ECF 77 ¶ 5.)  The vehicle eventually stopped within the boundaries of the Ute reservation, where Mr. Murray and the driver exited and stood on either side of the vehicle.  (ECF 17 ¶ 26.)  The trooper approached the driver and Mr. Murray, ordering them to the ground multiple times.  (*Id.* ¶ 26.)  Mr. Murray and the driver ran off in opposite directions.  (*Id.* ¶ 26.)  The trooper pursued and apprehended the driver.  (*Id.*)

As the trooper returned to his patrol car with the handcuffed driver, off-duty Vernal City police officer Larry "Vance" Norton arrived on the scene wearing plain clothes and driving his personal car.  (*Id.* ¶ 27.)  The trooper asked Officer Norton to pursue Mr. Murray.  (*Id.*)  Another state trooper and a county deputy arrived next and joined the search for Mr. Murray.  (*Id.* ¶ 29.)  The parties stipulated that none of the state, county, or municipal officers involved could lawfully exercise authority over Mr. Murray on the Ute reservation.  (*See* ECF 77 ¶¶ 8-10.)

Officer Norton testified that, after a foot chase, Mr. Murray fired at Officer Norton.  (*Id.* ¶ 21).  Officer Norton testified that he then fired two shots back at Mr. Murray with a .40-caliber handgun before retreating while watching Mr. Murray over his shoulder.  (*Id.* ¶¶ 21-22, *as clarified by* ECF 152 at 2.)  Officer Norton testified that "Mr. Murray put a gun to his head as Officer Norton shouted at Mr. Murray to put it down, that Mr. Murray then pulled the trigger, and . . . collapsed."  (ECF 77 ¶ 23.)  Officer Norton was the only witness to the gunshot that killed Mr. Murray.  (*See* ECF 77-1 at 251.)

After Mr. Murray was shot, while he was still alive, the deputy, Anthoney Byron, handcuffed him.  (ECF 17 ¶ 33; ECF 139 at 4.)  The plaintiffs allege that, half an hour after Mr.

---

[1] Because the Joint Stipulations Regarding Spoliation (ECF 77) had been submitted for the limited purpose of the plaintiffs' motion for spoliation sanctions, the Court ordered (ECF 151) the parties to advise if they disavowed any of those stipulated facts and informed the parties that any facts not specifically disavowed would be accepted as true for purposes of the defendant's summary judgment motion.  The defendant filed a notice (ECF 152) disavowing or clarifying several of the stipulated facts, but the notice does not put into dispute any facts material to the resolution of the motion for summary judgment; the plaintiffs did not file any notice disavowing any of the previously stipulated facts.

Murray was reported shot, an ambulance arrived and took Mr. Murray—who was still alive—to a hospital, where he was declared dead shortly after arriving.  (ECF 17 ¶¶ 39, 41.)

### B.   Off-Reservation Events: Hospital, Mortuary, and Medical Examiner's Office

At the hospital, the plaintiffs allege, state, county, and municipal officers removed Mr. Murray's clothes, unnecessarily photographed and manipulated his unclothed remains, and photographed one officer "sticking a finger into Murray's head wound."  (*Id.* ¶ 42.)  U.S. Bureau of Indian Affairs ("BIA") Officer Kevin Myore was allegedly also present at the hospital.  (*Id.*)

State, county, and municipal officers then transported Mr. Murray's body to a mortuary to store it overnight until it could be transported to the state medical examiner's office the next day.  (*Id.* ¶ 43.)  At the mortuary, the plaintiffs allege, the officers drew two vials of blood from Mr. Murray's body by inserting a needle into Mr. Murray's heart and asking a mortuary employee to make an incision in Mr. Murray's neck.  The plaintiffs allege that Federal Bureau of Investigation ("FBI") Agent Rex Ashdown arrived at the mortuary and was "informed that a sample of Mr. Murray's blood had been drawn earlier at the [hospital]," but did nothing to stop the officers from drawing more blood.  (*Id.* ¶ 44.)

The next day, Mr. Murray's body was moved to the state medical examiner's office in a body bag.  (ECF 17 ¶ 48; *see* ECF 77-1 at 54.)  The medical examiner reported that Mr. Murray's remains arrived with hands bagged.  (ECF 17 ¶ 52.)  He found no soot on either hand.  (*Id.*)  Mr. Murray's left hand was "clean and free of any debris or blood."  (*Id.*)  Mr. Murray's right hand was "caked in blood."  (*Id.*)

The FBI requested that the medical examiner perform an autopsy.  (ECF 77 ¶ 43.)  The state medical examiner performed an external examination of Mr. Murray but did not conduct an autopsy.  (*Id.* ¶ 44.)

### C.   Federal Investigation

The FBI had jurisdiction to investigate Mr. Murray's death on the reservation.  (*Id.* ¶ 25.)  Agent Ashdown of the FBI's Vernal Resident Agency arrived on the scene after the ambulance had transported Mr. Murray to the hospital.  (*Id.* ¶¶ 13, 24.)

Agent Ashdown testified that, on his arrival at the scene of the shooting, someone he only remembered as a "senior supervisory officer" told him that Mr. Murray had shot himself.  (ECF 77 ¶ 26.)  Agent Ashdown documented the scene and collected evidence.  The parties stipulated that "some or all of" the evidence collected was ultimately entered into the FBI Salt Lake City Division's evidence room.  (Id. ¶ 37.)  The parties further stipulated that the collected evidence included photographs and GPS coordinates documenting the scene and the relative location of its elements, a .380-caliber handgun found near Mr. Murray's body, two spent .380-caliber shell casings found near the .380 handgun, and two spent .40-caliber shell casings found 113 yards from the location of Mr. Murray's body (*Id.* ¶ 34).

### a.      Documenting the Scene

Agent Ashdown "took photographs of various angles of the scene[,] . . . identified photos, marked exhibits, and photographed the exhibits in place from various positions, . . . collected those items he believed had evidentiary value[,] . . . [and] placed yellow evidence placards . . . to mark [at least some of] the evidence he observed for later purposes to identify what he was looking at." (*Id.* ¶¶ 27-28.)  Agent Ashdown "marked and photographed some of the blood and blood splatter that could be identified as blood." (*Id.* ¶ 29.)  Agent Ashdown took GPS measurements of the location of found shell-casings and Mr. Murray's body. (*Id.* ¶ 33.)

### b.      .380 Handgun

Agent Ashdown collected as evidence the .380 handgun found next to Mr. Murray's body. (*Id.* ¶¶ 29-30.)  Agent Ashdown photographed a spent shell-casing that apparently had failed to eject properly, "jammed" inside the .380 handgun. (*Id.* ¶ 36.)  The FBI retained possession of the .380 handgun. (*Id.* ¶ 31.)  Agent Ashdown did not request a test firing of the .380 handgun, later testifying that the only purpose of test firing it would have been to confirm that it functioned and had been fired. (*Id.* ¶ 35.)

### c.      Shell-Casings

Agent Ashdown testified that he also collected two spent .380 shell-casings from the ground from within the expected ejection-radius of the .380 handgun's location.  The FBI retained possession of the .380 shell casings. (*Id.* ¶ 34.)

Agent Ashdown also photographed and collected Officer Norton's two .40-caliber shell-casings approximately 113 yards from where Mr. Murray had fallen. (*Id.* ¶ 32.)

### d.      Officer Norton's Gun, Person, Clothes, and Vehicle

The parties stipulated that Agent Ashdown "testified that he did not perform or request any testing of Officer Norton's clothing because he did not observe anything on Officer Norton's body and did not see any blow back blood or blood splatter type evidence on the clothes." (*Id.* ¶ 48.)  Officer Norton's supervisor, Chief Gary Jensen of the Vernal City Police Department, also testified he did not see any blood or tissue on Officer Norton when Chief Jensen arrived at the scene. (ECF 77-1 at 215-16.)

Chief Jensen testified that he took custody of Officer Norton's .40-caliber handgun at the scene and saw no blood or tissue on the gun. (*Id.* at 215-16.)  The weapon was later returned to Officer Norton. (*See id.* at 238.)  When the district court asked about his motivation for believing that it was not necessary to test Officer Norton's gun or clothing, Chief Jensen responded:

> The motivation is that, with all due respect, Vance Norton was a very good Detective.  Vance Norton was involved in a situation.  He described the situation.  The scene appeared to be as he described it. It appeared to be a suicide and it was believable.  I didn't feel it was necessary.

(*Id.* at 222.)

### e.    Reliance on Officer Norton's Account

Agent Ashdown testified that he spoke with Officer Norton at the scene to arrange an interview, and the conversation ended after Officer Norton stated that he would want an attorney present.  (ECF 77-1 at 159-60.)  Agent Ashdown did not remember receiving an account directly from Officer Norton at the scene.  (*Id.* at 158-59.)  Agent Ashdown testified that his partner later conducted an interview with Officer Norton and his attorney while Agent Ashdown was out of town.  (*Id.* at 159-60.)

Agent Ashdown testified that he had a professional but not a personal relationship with Officer Norton, and that he "knew him to be a credible officer in all of the interactions I ha[d] during the past 10 years prior to this, and I had no reason to discount the story I had been given as I approached that scene."  (*Id.* at 157.)

During the district court's spoliation hearing, Agent Ashdown was asked whether, due to his reliance on Officer Norton's account, he had neglected to document the location of various elements at the scene of Mr. Murray's death to a degree that would allow a recreation of that scene.  Agent Ashdown testified that he had not:

> Because I took the information received regarding what Officer Norton had reported.  I had gone down to the crime scene, reviewed the crime scene and everything had been consistent with what I had been told.  There was nothing inconsistent that I could see, and it had been determined at that time it was a suicide, and the FBI office and the FBI lab don't have the resources or does any department have the resources to take a suicide investigation to an Nth degree to prove something that we already know.

(*Id.* at 164.)

### D.    Alleged Meeting with the Family and Promise to Investigate

One of the plaintiffs, Ms. Jones, Mr. Murray's mother, submitted a declaration recounting a meeting with Agent Ashdown on April 25, 2007, together with other members of Mr. Murray's family.  (ECF 14-3 ¶¶ 5-8.)  Ms. Jones explains that she "understood [her] son [had] died from a gunshot wound to the head," however, "when his body was returned to the family for burial, we were shocked to see that his neck had been slashed and then stitched together in a horrific, unsightly manner."  (*Id.* ¶ 10.)

Ms. Jones alleges that, in this meeting with Agent Ashdown, she "pleaded" with him to investigate the circumstances of Mr. Murray's death.  (*Id.* ¶ 7.)  Agent Ashdown, she declared, "promised" the victim's family and her that he would conduct a "full investigation."  (*Id.* ¶ 8.)

In this same meeting, Ms. Jones recounts, family members told Agent Ashdown that Mr. Murray was right-handed and asked Agent Ashdown to demonstrate on himself how a right-handed person could have shot himself on the left-side of his head above and behind his left ear.

(*Id.* ¶ 6.)  Ms. Jones recounts that Agent Ashdown was "unable to position a gun in a manner consistent with the bullet trajectory that was reported by the medical examiner."  (*Id.*)

### E.        Forfeiture of the .380 Handgun

After Agent Ashdown's May 2007 retirement, FBI Special Agent David Ryan took over the investigation of Mr. Murray's death.  (ECF 77 ¶ 14.)  Agent Ryan investigated the purchase of the .380 handgun and assisted in the criminal prosecution of the handgun's straw purchaser.  (*Id.* ¶¶ 14, 38.)  This investigation linked the gun to the driver of the vehicle in which Mr. Murray had been a passenger.  (*See* ECF 118-6 at JONES0018324-25).  The .380 handgun's straw-purchaser was indicted in January 2008, and the indictment contained a notice of intent to seek forfeiture of the gun.  (ECF 77 ¶ 38.)

On March 2, 2008, Ms. Jones sent a "Notice of Claims" to the Vernal City police department, state highway patrol, county sheriff, Uintah County, and Officer Norton.  *See Jones v. Norton,* No. 2:09-CV-730-TC, 2014 WL 909569, at *4 (Mar. 7, 2014) [hereinafter *Jones D. Ct. Spoliation*] (describing the Notice).  Officer Norton testified that he received the Notice on April 1.  (ECF 77-1 at 240.)  The Notice summarized the facts of Mr. Murray's death from the police pursuit to the examination of Mr. Murray's body.  (*Id.*)  The Notice indicated that Ms. Jones intended to bring claims against the recipients for violations of Fourth Amendment protections against unreasonable search and seizure, Fourteenth and Fifth Amendment guarantees of due process, the Fourteenth Amendment guarantee of equal protection, and the Fifth Amendment right not to be compelled to be a witness against oneself, violation of the equivalent state constitutional provisions, assault and battery, intentional and/or negligent infliction of emotional distress, negligence, and wrongful death.  *Jones D. Ct. Spoliation*, 2014 WL 909569, at *4-5.  The first paragraph of the Notice provided "[t]his notice should not be deemed to waive any cause of action that Debra Jones may have against any individual or entity, governmental or otherwise, who may later be determined to be ultimately responsible for the damages she has sustained."  *Id.*

The .380 handgun's straw purchaser pleaded guilty, and the district court entered a preliminary forfeiture order in May 2008.  (ECF 77 ¶¶ 38-40.)  Pursuant to this order, the United States published a notice on www.forfeiture.gov for anyone to claim an interest in the gun within 30 days.  (*Id.* ¶ 40.)

An FBI memorandum dated September 17, 2008, recommended closing the investigation of Mr. Murray's death.  (ECF 118-3 at JONES0010902.)  The memorandum described Mr. Murray's death as a suicide and reported that the FBI had completed the prosecution of the .380 handgun's straw purchaser.  (*Id.*)  The memorandum further reported that "[t]he firearm recovered from Murray after he shot himself has been forfeited" and continued "[d]ue to an active civil suit involving [redacted] and the [Vernal City Police Department], items 1Bl - 1B4

have been removed from FBI evidence and provided to VPD.  No other items remain in FBI evidence."[2]  (*Id.* (redaction in original)).

On November 14, 2008, the district court found that adequate notice had been given and that no one had claimed an interest in the .380 handgun.  (ECF 77 ¶ 41.)  The court ordered the .380 handgun forfeited to the United States and "disposed of according to law."  (*Id.*)  The FBI took the .380 handgun "out of evidence" on November 26, 2008, and provided it to the U.S. Marshals Service on December 2, 2008.  (*Id.* ¶ 42.)  The Marshals Service destroyed the handgun, as is its routine practice.

The FBI turned over the two .380-caliber shell-casings and two .40-caliber shell-casings to a Vernal City police detective on December 15, 2008, "because of the Utah District Court litigation."  (*Id.* ¶ 34.)

## II.   PROCEDURAL HISTORY

### A.   Civil Rights Claims Against Local Authorities

In July 2009, the individual plaintiffs and Mr. Murray's estate filed federal-law civil rights claims in state court against Uintah County, Vernal City, the state troopers, the county sheriff's deputies, and Officer Norton, along with state-law "assault and battery" and wrongful death claims against Officer Norton individually.  In August 2009, the defendants removed the case to the United States District Court for the District of Utah.  (ECF 117-2 at JONES001018-87.)  The plaintiffs argued that Officer Norton killed Mr. Murray by shooting him in the head at point-blank range either with Officer Norton's own gun or with the .380 handgun found near Mr. Murray's body, and that the state, county, and municipal officers spoliated the evidence of Officer Norton's act.  *Jones D. Ct. Merits*, 3 F. Supp. 3d at 1191.

In 2014, the district court granted summary judgment for the defendant state, county, and municipal officers and Vernal City, holding that there was insufficient evidence for a reasonable jury to conclude that Officer Norton shot Mr. Murray in the head at point-blank range.  *Jones D. Ct. Merits*, 3 F. Supp. 3d at 1192, 1213.  In a separate decision denying spoliation sanctions against the defendants in that case, the district court found that certain elements of spoliation were met as to some evidence, but, in part because the FBI had the jurisdiction to investigate Mr. Murray's death, the state, county, and municipal defendants did not have a duty to preserve the allegedly spoliated evidence.  *See Jones D. Ct. Spoliation*, 2014 WL 909569, at *8 ("None of the named Defendants [except possibly Vernal City] can be held liable for these alleged misdeeds, because Agent Ashdown and Keith Campbell were in charge of the investigation."); *Jones D. Ct. Spoliation*, 2014 WL 4825894, at *1 n.6 (D. Utah Sept. 25, 2014) (noting that the district court denied the motion for spoliation sanctions against Vernal City after the opportunity for additional briefing).

---

[2] The Court understands "items 1B1-1B4" to refer to the two .40-caliber and two .380-caliber shell casings that the FBI had collected at the shooting scene.  (*See* ECF 77 ¶ 34.)

The plaintiffs appealed to the U.S. Court of Appeals for the Tenth Circuit, which affirmed the district court's decisions. *See Jones 10th Cir.*, 809 F.3d at 568.

### B.       Treaty Claim Against the United States

While the civil rights action against the local officers was still pending before the district court in February 2012, the plaintiffs notified the BIA and the Department of Justice of Mr. Murray's death. (ECF 17 ¶ 75.) They sent a Statement of Claim for damages, typically a required precursor to filing suit under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346, in March 2013. (*Id.* ¶ 76.) The plaintiffs never pursued a FTCA action for Mr. Murray's death.

The plaintiffs, on April 1, 2013, filed suit against the United States in this Court. (ECF 1.) The plaintiffs' claims were founded on the "bad men" provision of the 1868 Treaty between the United States and the Ute Tribe.

### 1.       The "Bad Men" Provision

By 1868, Congress had concluded that the "aggressions of lawless white men" were the cause of most "Indian" wars. *Jones Fed. Cir.*, 846 F.3d at 1348. That year, the United States entered into a treaty with the Ute Tribe of the Uintah & Ouray Reservation aimed at "peace between the Ute Tribe and white settlers." *Id.* at 1348. The treaty provides:

> If bad men among the whites or among other people, subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will . . . cause the offender to be arrested and punished according to the laws of the United States, and also reimburse the injured person for the loss sustained.

*See* Treaty with the Ute, art. 6, Mar. 2, 1868, 15 Stat. 619. The "bad men" clause made the federal government "responsible for what white men do within the Indian's territory." *Janis v. United States*, 32 Ct. Cl. 407, 410 (1897).

### 2.       Court of Federal Claims Dismissal

While the appeal of the civil rights action was still pending at the Tenth Circuit, this Court granted the United States' motion to dismiss for failure to state a claim. 122 Fed. Cl. at 490, 522, 529-30. Judge Horn held that the United States could only be liable under the treaty's "bad men" provision for "affirmative" criminal acts committed on the reservation, and, further, that the plaintiffs were collaterally estopped from relitigating "the factual circumstances of Todd Murray's death, and the allegations of the destruction of evidence." *Id.*

### 3.       Federal Circuit's Reversal and Remand

The plaintiffs appealed the dismissal to the U.S. Court of Appeals for the Federal Circuit. The Federal Circuit vacated the dismissal and remanded the case. The Federal Circuit's opinion provides standards for this Court to determine which specific crimes are cognizable as wrongs under the "bad men" provision. *See Jones Fed. Cir.*, 846 F.3d at 1357 ("Jones has not yet

explained what particular crimes each alleged omission constituted, so we do not have concrete criminal-law duties to analyze.")  The Court of Appeals also directed this Court to consider whether federal agents spoliated evidence, and whether that spoliation affected the plaintiffs' full and fair opportunity to litigate otherwise precluded issues decided by the district court in the civil rights action.  *Id.* at 1363-64.  The Federal Circuit's holding and instructions are discussed more fully below in the relevant portions of the Court's analysis.

### 4.    Spoliation Sanctions

On remand, this Court found that the United States had spoliated the .380 handgun. Federal agents failed to disclose to the judge who ordered the illegally purchased handgun's routine forfeiture and destruction that handgun's character as potential evidence in what was then foreseeable litigation.  The Court found no evidence of a spoliation conspiracy and further held that the federal agents' discretionary choices not to collect specific pieces of evidence did not constitute spoliation.

As a sanction for the spoliation of the .380 handgun, the Court prohibited the United States from relying on any evidence related to the .380 handgun, "including the presence of an unejected shell casing in the destroyed handgun and the presence or absence of fingerprints or blowback on the handgun, to support the United States' conclusion that Mr. Murray died by suicide."  *Jones Fed. Cl. Spoliation*, 146 Fed. Cl. at 742.

The Court declined to infer that testing of the spoliated handgun would have proven that Officer Norton killed Mr. Murray, finding that conclusion to be speculation based largely on the perceived unlikelihood that Mr. Murray would use his non-dominant hand to discharge the firearm and Officer Norton's circumstance as the lone witness.  *Id.* at 742-43.  The Court found "no basis sufficient for the Court to distinguish [the plaintiffs'] theory from other possibilities that incorporate the same facts."  *Id.* at 743.

### 5.    Discovery and Motion for Summary Judgment

Following the Federal Circuit's mandate to apply the "bad men" provision to specific crimes and to consider the effect of any spoliation sanctions on the preclusion of specific issues, the Court directed limited discovery as to specific crimes the plaintiffs allege as "wrongs."  (ECF 148.)  On January 24, 2020, the defendant served the plaintiffs with requests for admission and interrogatories (ECF 150-5), noting a 30-day deadline to respond.  The defendant requested that the plaintiffs identify the specific individuals that they allege to be "bad men" under the treaty provision, the crimes each is alleged to have committed, and citations to the federal or Utah criminal statutes for each crime.  On February 7, the defendant filed its answer.

The plaintiffs served the defendants with their responses on March 3, 2020, 39 days after the defendant served its requests, and 25 days after the defendant served its answer.[3]  The

---

[3] The defendant argues that its requests for admissions are admitted because the plaintiffs responded nine days late.  *See* RCFC 36(a)(3).  The plaintiffs argue that their responses were six

plaintiffs qualified their responses with objections that the requests and interrogatories called for legal conclusions and that their responses are protected work product.  The responses allege that Officer Norton committed murder, negligent or reckless homicide, battery, and any lesser included offenses against Mr. Murray.[4]  (ECF 150-6 at 3.)

As additional "bad men," the plaintiffs identify 21 individuals, mostly law enforcement officials, who were presumably present or supervised others who were present at the shooting scene, hospital, mortuary, or medical examiner's office; they also identify eight government entities and a private business related to the individuals:

> FBI Agent Rex Ashdown
>
> FBI Agent David Ryan
>
> United States Federal Bureau of Investigations
>
> United States Bureau of Indian Affairs
>
> Vance Norton, Uintah County Sheriff's office
>
> Craig Young, Utah Highway Patrol
>
> Anthony Byron, Uintah County Sheriff's Department
>
> Jeff Chugg, Utah Highway Patrol
>
> Troy Slaugh, Uintah County Sheriff's Department
>
> Sean Davis, Utah Division of Wildlife Resources

---

days early because the 30-day clock to respond to the defendant's requests started when the defendant filed its Answer on February 7, not when the requests were served.  *See* RCFC 26(d)(1) (providing the Joint Preliminary Status Report conference as the start of discovery); RCFC Appendix A ¶ 3 (providing that parties confer on the Joint Preliminary Status Report ("JPSR") after the Answer is filed).  The defendants maintain that the 30-day clock started at service of the requests because the parties had already conferred on a JPSR and some discovery had already occurred in this case before the defendant served the requests for admission.

The Court deems the plaintiffs' argument regarding the deadline as a timely request to withdraw and amend its deemed admissions.  *See United States v. Petroff-Kline*, 557 F.3d 285, 294 (6th Cir. 2009) ("Despite its failure to have filed a formal motion to withdraw its claimed admissions, the Government's filing of a slightly overdue response effectively served as such a withdrawal.").  The defendant has not been prejudiced by the nine-day delay, and permitting withdrawal promotes the resolution of this case on the merits.  See RCFC 36(b); *Gwynn v. City of Philadelphia*, 719 F.3d 295, 299 (3d Cir. 2013) ("The prejudice contemplated by Rule 36(b), however is not simply that the party who obtained the admission now has to convince the [fact finder] of its truth.  Something more is required.") (citation omitted).

[4] The plaintiffs listed the relevant statutory provisions as 18 U.S.C. §§ 13, 1111, 1112, 1117, 1152 and Utah Code §§ 76-5-202 (e), (f), (k), (s); 76-5-201 76-5-205, 206,209.

Gary Jensen, Logan Police Department, Logan, Utah

Rex Olsen, Utah Highway Patrol

Bevan Watkins, Uintah County Sheriff's Department

Keith Campbell, Vernal City Police Department

Ben Murray, Vernal City Police Department

Dave Swenson, Utah Highway Patrol

James Beck, . . . Bureau of Indian Affairs

("BIA") Police Chief at the time

Terrance Cuch

Kevin Myore

Colby Decamp, . . . St. George, Utah

Mitch Blackburn, Vernal, Utah, owner of Blackburn Mortuary

Dr. Edward Leis, M.D., Office of Medical Examiner, State of Utah

Vernal City Police Department

Uintah County Sheriff's office

Uintah County, Utah

State of Utah Office of Medical Examiner

State of Utah Highway Patrol

State of Utah

Blackburn Mortuary

(ECF 150-6 at 1-2.)

The plaintiffs intend to assert that all these alleged "bad men," along with Officer Norton, conspired to commit the following crimes defined by federal statute:

Criminal trespass, 18 U.S.C. §§ 13, 1152, 1165[;] 1868 Treaty Art[.] 2.

Obstruction of justice, 18 U.S.C. §§ 13, 1152, 1503, 1505, 1506, 1510, 1511, 1512, 1513, 1519.

Unlawful arrest and detention, [18 U.S.C.] §§ 13, 1152.

Kidnapping, 18 U.S.C. § 13, 1152, 1201.

Conspiracy against rights, 18 U.S.C. §§ 13, 1152, 241, 242.

Hate crimes, 18 U.S.C. §§ 249.

False claims and conspiracy to defraud United States, 18 U.S.C. §§ 13, 1152, 286, 287, 371.

Wire fraud, 18 U.S.C. § 1343.

Injury to government property, 18 U.S.C. §§ 13, 1152, 1361.

Pe[r]jury and subornation of perjury, 18 U.S.C. §§ 13, 1152, 1621, 1622.

Destruction of records or evidence, 18 U.S.C. §§ 13, 1152, 2071, 2232.

RICO, [18] U.S.C. Ch. 96. [§§ 1962, 1963(a)]

Conspiracy to commit each of the above, §§13, 1152.

Accessory after the fact for all of the above and for Norton's crimes, 18 U.S.C. §§ 3, 13, 1152.

Misprision of felony related to all of the above and related to Norton's crimes, 18 U.S.C. §§ 4, 13, 1152.

(ECF 150-6 at 3-4, *as amended by* ECF 150-7 at 1-2.)

Further, the plaintiffs intend to prove that the alleged "bad men," including Officer Norton, committed the following crimes defined by Utah statute and incorporated into federal law, 18 U.S.C. § 13, 1152, or, alternatively directly under general principles of Utah criminal law, Utah Code §§ 76-2-101; 76-2-202; 76-2-204; 76-2-205, and the Utah conspiracy and attempt statutes, §§ 76-4-201; 76-4-202; 76-4-101:

Assault, §76-5-102.

Reckless endangerment §76-5-112.

Kidnapping, §76-5-301.

Criminal mischief, §76-6-106.

Criminal Trespass, §76-6-206.

Official or unofficial misconduct §§76-8-201, 203.

Interference with public servant or peace officer, §§76-8-301; 76-8-305.

Obstruction of criminal investigation, §76-8-306.

Doing business without a license, §76-8-410.

Destruction of government property §76-8-412 or 413.

False statement and pe1jury; §§76-8-502 to 506.

Retaliation against a witness, victim, or information, § 76-8-508.3.

Tampering with evidence, falsification or alternation of government record, §§76-8-

510.5, 511.

Impersonation of officer, §76-8-512.

Disorderly conduct §76-9-102.

Disrupting a funeral or memorial service, §76-9-108.

Abuse or desecration of a dead human being, §76-9-704.

(ECF 150-6 at 4, *as amended by* ECF 150-7 at 1-2.)

The defendant moves for summary judgment on all the plaintiffs' claims.  The defendant argues that for the plaintiffs to prove the elements of many of the crimes they cite, they would be required to relitigate factual findings and legal conclusions previously litigated and resolved by the district court.  According to the defendant, the doctrine of issue preclusion forbids the plaintiffs from relitigating these claims, now that the Court has refused to grant the plaintiffs' request for adverse evidentiary inferences against the defendant based on the defendant's alleged spoliation of evidence.  The defendant further argues that the crimes the plaintiffs allege occurred that were not resolved by the district court are not cognizable under the "bad men" provision.

The motion has been fully briefed.  (*See* ECF 150, 156, 157.)

## III.   ANALYSIS

Summary judgment is appropriate when no material fact is in genuine dispute and the law entitles the moving party to judgment.  *See* RCFC 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  One way a defendant can demonstrate that no material fact is genuinely disputed is by showing that the plaintiffs lack sufficient evidence to prove an essential element of their claim.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) ("[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.")  If the plaintiffs respond to such a motion by pointing to sufficient evidence for the Court reasonably to find an essential element of the plaintiffs' claim, the Court will find a genuine dispute, deny summary judgment, and allow the plaintiffs a chance to prove their claim at trial.  *See Anderson*, 477 U.S. at 248.  The plaintiffs' response "must point to an evidentiary conflict created on the record; mere denials or conclusory statements are insufficient." *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1116 (Fed. Cir. 1985) (*en banc*).

In this case, for the plaintiffs to prevail, they must prove that a non-Indian committed one or more federally punishable crimes against Mr. Murray's person or property on the reservation or as a direct result of actions on the reservation.  The plaintiffs identify 26 federal- and state-law crimes (or categories of crimes) that they intend to prove were committed as "wrongs" compensable under the "bad men" provision by the 30 officials or entities the plaintiffs have identified.

The defendant's motion for summary judgment exhaustively demonstrates, on a crime-by-crime and fact-by-fact basis, how issue preclusion, the terms of the "bad men" provision, or a complete lack of evidence prevents the plaintiffs from proving each identified crime at trial.  For many of the crimes, the defendant identifies multiple bases for summary judgment in its favor.

The plaintiffs respond that issue preclusion is inapplicable but otherwise do not comprehensively rebut all the defendant's more specific arguments regarding proof of specific

crimes that the plaintiffs have identified.  The plaintiffs' response argues in essence that they do not need to respond.  They argue that the defendant has the burden on summary judgment, and that the defendant's motion tries impermissibly to shift the burden to the plaintiffs.  The plaintiffs have failed to meet the defendant's demonstration of specific material facts by pointing to evidence that tends to contravene or put those facts into dispute.

Even having accepted some of the plaintiffs' more specific legal objections and rejected some of the defendant's arguments, the Court finds that the defendant is entitled to judgment as a matter of law on other bases suggested in its motion, and the plaintiffs point to no genuine issue of material fact that would preclude summary judgment.

Some of the identified crimes are not plausibly relevant to the allegations in the amended complaint, and the plaintiffs have not clarified their relevance.  Others are not cognizable under the "bad men" provision because they are not federally punishable or were not committed "against the person or property of the Indians," as the treaty provision's language requires.  Summary judgment is appropriate for all these claims.

Establishing liability for the remaining, cognizable crimes requires the plaintiffs to prove that the bad men they have identified committed arrestable, prosecutable criminal acts with the intent specified in the federal or state statute defining each crime.  The plaintiffs made clear when amending their complaint that they based their claims on the action or inaction of "individual federal officers," not their employing federal agencies.  *See Fed. Cl. Dismissal*, 122 Fed. Cl. at 501.  The state of Utah, its agencies, and political subdivisions listed by the plaintiffs are not arrestable, and thus cannot be "bad men" under a provision that is limited to arrestable wrongs.  *See Jones Fed. Cir.*, 846 F.3d at 1356 (relying on the provision's reference to the arrest of "bad men" as a basis to limit cognizable wrongs to arrestable conduct or omissions, and rejecting broader, less literal interpretations of the word "arrest").  Summary judgment is therefore appropriate as to these claims.

As for the officials that the plaintiffs identify as "bad men," the district court's decision precludes the plaintiffs from litigating many of the facts relevant to their acts or intent.  For the crimes addressing conduct based on stipulated facts, the plaintiffs lack sufficient evidence for this Court—as a trier of fact—to find reasonably the necessary criminal intent.  Accordingly, summary judgment is also appropriate as to these claims.

## A.     Issue Preclusion and Spoliation

Finding that federal agents spoliated the .380 handgun has not changed the evidentiary landscape for the central issues relevant in this case decided by the district court, such as the cause of Mr. Murray's death.  The district court's decision of these issues precludes relitigating them in this Court.

Whether issue preclusion applies is a question of law and is therefore appropriately resolved on summary judgment.  *See United States v. Gallardo-Mendez*, 150 F.3d 1240, 1242

(10th Cir. 1998).  The Court continues to apply Tenth Circuit issue-preclusion precedent in this case.[5]

> To invoke issue preclusion, a party must show four elements:
>
> > 1. The issue previously decided is identical with the one presented in the action in question;
> >
> > 2. The prior action has been finally adjudicated on the merits;
> >
> > 3. The party against whom the doctrine is invoked was a party, or in privity with a party, to the prior adjudication; and
> >
> > 4. The party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

*Jones 10th Cir.*, 846 F.3d at 1361 (citing *Park Lake Res. Ltd. Co. v. U.S. Dep't of Ag.*, 378 F.3d 1132, 1136 (10th Cir. 2004)).

As between this case and the district-court action, the plaintiffs conceded the second and third elements to support issue preclusion before the Federal Circuit.  *Id.* at 1362.  Accordingly, the Court need only consider the first and fourth elements: (1) whether an issue raised in this case is identical to an issue decided in the district court, and (2) whether the plaintiffs had a full and fair opportunity to litigate the issue in the district court.

The Federal Circuit held that the plaintiffs were not, as Judge Horn had held for this Court, collaterally estopped from litigating whether Mr. Murray had shot himself, and whether federal agents had spoliated evidence.  The Federal Circuit explained that collateral estoppel, or "issue preclusion," requires, among other things, identical issues and a full and fair chance to litigate the issues that were decided in the prior action.  *Jones Fed. Cir.*, 846 F.3d at 1362-64.  The Federal Circuit held that "[t]he culpability of the federal officers for spoliation" could not

---

[5] Following Judge Horn's decision to apply Tenth Circuit issue-preclusion law, the Federal Circuit concluded that "[t]he elements of issue preclusion are essentially the same under Federal Circuit and Tenth Circuit law," and that choice of law was thus not dispositive of the issues it decided on appeal.  *Jones Fed. Cir.*, 846 F.3d at 1361 n.7.  Unlike *res judicata* between courts of different states, there appears to be no clear choice-of-law rule for a federal court measuring the preclusive effect of an earlier federal-court decision.  At least one other circuit has applied the Federal Circuit's issue-preclusion precedent to measure the preclusive effect of a patent-infringement action.  *See Matter of Provider Meds, L.L.C.*, 907 F.3d 845, 852 & n.21 (5th Cir. 2018), cert. denied, 139 S. Ct. 1347, 203 L. Ed. 2d 570 (2019); Edward H. Cooper, *Res Judicata Between Federal Courts*, 18B Fed. Prac. & Proc. Juris. (Wright & Miller) § 4466 (2d ed. 2020).  This approach is consistent with the rule proposed by legal scholars, that "[a]ny court, state or federal, must ascribe to the judgment of any other state or federal court the res judicata effects that would be recognized by the court that rendered the judgment."  Edward H. Cooper, *Res Judicata Between Federal Courts*, 18B Fed. Prac. & Proc. Juris. (Wright & Miller) § 4466 (2d ed. 2020).

have been precluded by the district court's resolution of the plaintiffs' civil rights suit because the issue "[had] never been decided." *Id.* at 1363. The Federal Circuit noted that the district court had denied spoliation sanctions not because it found no spoliation, but merely because it found that the named-defendant local authorities could not have been responsible for any spoliation by federal investigators who were not named defendants in the district-court action. *Id.* at 1362-63.

Additionally, the Federal Circuit held that this Court could not determine that the plaintiffs had had a full and fair chance to litigate the substantive issues decided in the district court without first deciding how any spoliation might have affected the evidence available to prove various elements of the plaintiffs' discrete claims. The Federal Circuit instructed:

> If the [Court of Federal Claims ("CFC")] concludes on remand that spoliation sanctions are not appropriate, or that the appropriate sanctions would not change the evidentiary landscape for particular issues, the CFC may reconsider the application of issue preclusion. If it determines that sanctions are appropriate and do change the evidentiary landscape, the CFC should independently consider Jones's substantive allegations of bad men violations.

*Id.* at 1363-64.

In their task to prove that the "bad men" they identify committed the crimes they identify, the plaintiffs do not start with a clean slate. Many of the act and intent requirements of the crimes they identify implicate facts that were decided against them by the district court. Principles of issue preclusion prohibit relitigating these facts in this Court.

The plaintiffs in this case, by needing to prove acts and intent inconsistent with the district court's factual findings, raise issues identical to those decided in their district court case. Although the district court's ultimate legal conclusions used the legal standards for civil rights violations, the district court explicitly described the facts that it found and applied to those standards as insufficient evidence to prove the alternative explanation of Mr. Murray's death alleged by the plaintiffs. Relitigating those same facts on the basis of the same evidence, even if applying them to a different legal standard, raises issues identical to those already decided by the district court. Further, the federal agents' spoliation did not deprive the plaintiffs of a full and fair opportunity to litigate these identical issues in the district court.

### 1.     "Identical" Issue

The issue resolved in the prior litigation and the issue presented in this case must be identical for issue preclusion to apply. When an earlier decision addresses a purely factual question, such as what happened, the issue in the later case need only address those same events to be considered "identical." *See Overseas Motors, Inc. v. Import Motors Ltd., Inc.*, 375 F. Supp. 499, 518 n.66 (E.D. Mich. 1974), *judgment aff'd*, 519 F.2d 119 (6th Cir. 1975). When an earlier decision addresses the legal significance of a fact, such as whether what happened was reasonable or constituted a criminal act or tort, the issue in the later case must implicate the same legal standards and tests that the earlier decision applied in order to be considered "identical."

*Id.; see also Bobby v. Bies*, 556 U.S. 825, 834-35 (2009) (considering a defendant's "mental retardation" under a newly decided legal standard for Eighth Amendment purposes even though the sentencing court had already considered mental retardation as a mitigating factor).

The body of issues that the earlier court decides is not strictly limited to the ultimate questions the earlier court answers but may include other issues necessarily decided along the way, including issues necessarily implied in the definition of a claim or defense.  For example, in *Fenwick v. Pudimott*, the D.C. Circuit held that a civil rights plaintiff's assault conviction in D.C. superior court for the same incident in which the plaintiff alleged that police used excessive force "constrained[ed]" how the court viewed the facts in deciding whether the defendant-officers were entitled to qualified immunity.  778 F.3d 133, 138 (D.C. Cir. 2015) ("[T]he Superior Court Judge, in finding that Fenwick committed felony assault on [the officer], necessarily determined that [the plaintiff-driver] created 'a grave risk of causing significant bodily injury' to [the officer] when, 'without justifiable [and] excusable cause,' he drove the car forward in a manner that put the deputy in danger of being hit.") (citation omitted, quoting the relevant assault statute); *see also Robinson v. Volkswagenwerk AG*, 56 F.3d 1268, 1273 (10th Cir. 1995) (rejecting claims alleging facts that were "inconsistent with facts underlying the prior judgment").

The district court's grant of summary judgment to the local officers and municipalities necessarily decided the following issues that constrain this Court's view of facts the plaintiffs must prove to prevail on their "bad men" claims:

### a.      The Officers' Distance from Mr. Murray

In the district court, the plaintiffs argued that the officers had violated Mr. Murray's Fourth Amendment right against unreasonable seizure by surrounding him with a "perimeter" of police officers, shooting Mr. Murray in the head, or handcuffing Mr. Murray at gunpoint after the shooting—all without any law-enforcement jurisdiction to pursue or arrest a tribe member on the reservation.  Except for the extra-jurisdictional handcuffing of Mr. Murray after he was shot, the district court found no seizure.  *See Jones D. Ct. Merits*, F. Supp. 3d at 1186-93.  Specifically, the district court found that there was insufficient evidence for a jury reasonably to conclude that any officers, including Officer Norton, were ever less than 100 yards from Mr. Murray in terms of surrounding him to prevent his escape.  *Id.* at 1187, 1191 ("The officers were one to two hundred yards away from Mr. Murray and did not have him surrounded. . . .  Detective Norton was more than 100 yards away when Mr. Murray was shot.").

### b.      The Cause of Mr. Murray's Death

The district court found insufficient evidence that Officer Norton had shot Mr. Murray in the head.  *Id.* at 1192 ("Because direct evidence (unrefuted by admissible evidence) that Mr. Murray's gunshot wound was self-inflicted, it could not be a physical restraint imposed by Detective Norton.  Consequently, the fatal shot was not a seizure by a law enforcement officer.").  The district court concluded, "[b]ased on the evidence in the record, no reasonable jury could find that Detective Norton inflicted the mortal blow to Mr. Murray."  The district court noted that the plaintiffs had offered mere "speculation" that Officer Norton shot Mr. Murray in the head at point-blank range, "not evidence."  *Id.* at 1191.

### c.      No Harm from Handcuffing

The plaintiffs' excessive force claim, as it related to handcuffing, required the district court to find some physical or emotional harm to Mr. Murray caused by the alleged use of force. *Id.* at 1194.  The district court found "no evidence of physical harm or emotional harm to Mr. Murray" from the handcuffing.  It noted that "[t]he manner in which Deputy Byron handcuffed Mr. Murray was simple and the least intrusive way to secure the scene for the EMTs."

### d.      The Officers' Motives

The civil-rights-specific, ultimate questions of fact that the district court answered are not, themselves, identical to the criminal act and intent elements that the plaintiffs must prove to prevail on their "bad men" claims.  While deciding whether Deputy Byron was entitled to qualified immunity for handcuffing Mr. Murray without jurisdiction, whether the officers used excessive force, and whether the officers acted with racial animus, however, the district court considered and accepted as uncontroverted the officers' explanations of the knowledge and motives driving their conduct.  For example, when finding that Deputy Byron was entitled to qualified immunity, the district court considered what Deputy Byron knew and when he knew it.  The district court supported its conclusion that Deputy Byron's actions were reasonable with these facts:

> Here, Deputy Byron did not know the identity of Mr. Murray or anything about him other than his involvement in the high-speed chase, his flight from a police officer, subsequent exchange of gun shots, and a gun on the ground next to Mr. Murray.  He rushed onto the scene and had little time to assess the situation before he handcuffed Mr. Murray.  He knew he had a wounded suspect and that emergency personnel were on the way.  He secured the scene, as he was trained to do.  Securing the scene, no matter what it might present, is a reasonable response by a police officer.

*Id.* at 1194.  To defeat Deputy Byron's motion for summary judgment, the plaintiffs could have pointed to evidence that Deputy Byron knew more or was acting based on an impermissible motive.  The district court's grant of summary judgment for Deputy Byron relying on these facts precludes, or at least severely limits, the plaintiffs' ability in this case to prove criminal knowledge and intent without relitigating what Deputy Byron knew and why Deputy Byron took the actions that he did.

The district court's grant of summary judgment for the local officers on the plaintiffs' excessive-force claim required a similar examination of the state of mind of each officer when pursuing Mr. Murray.  For the plaintiffs to prove that the officers' pursuit amounted to excessive force under the Due Process Clause, the plaintiffs needed to point to evidence that the officers' conduct was "arbitrary, or conscience shocking, in a constitutional sense," in that it could be characterized as the "most egregious official conduct."  *Id.* at 1195.  The district court found that "[a]ll of the Plaintiffs' claims of egregious behavior stem from their complaint that the actions took place on the Reservation and were aimed at an enrolled member of the tribe."  The district court then relied on the officers' accounts to find the pursuit was not egregious but "reasonable

19

under the circumstances." The district court described the state-of-mind facts underlying its reasonableness finding:

> Mr. Murray was part of a high speed chase and fled from Trooper Swenson. This information created sufficient concern in the officers' minds about Mr. Murray's motives for the flight and the danger he posed, if any. They reasonably believed he had committed at least one crime (flight from a police officer) and pursuing him for that was reasonable. Even though the BIA police had been called as a precaution, no BIA police officer was there at the time. It was completely reasonable to apprehend the fleeing suspect so they could fully investigate and turn him over to the proper authorities, if necessary. There is no evidence that the officers were acting like a posse to capture the "Indian," as Plaintiffs have argued. Although Plaintiffs paint it that way, they do so without evidence to support their theory.

*Id.*

The district court further concluded that Officer Norton's firing his gun at Mr. Murray was reasonable because "Mr. Murray shot at [Officer] Norton first," and Officer Norton "was retreating to protect himself when he shot back." *Id.* The district court concluded that "[n]one of the officers' actions were egregious or conscience shocking," and that "[t]heir attempt to apprehend Mr. Murray while protecting themselves—and the means they used to do so—were expected police behavior in light of the circumstances." *Id.*

Finally, the district court's grant of summary judgment for the officers on the plaintiffs' hate-crimes conspiracy claims directly considered the officers' motives, not only as a supporting fact but as an ultimate question of fact. After considering the perspective and information available to each officer involved, the district court concluded that "no reasonable jury could find that the facts offered by the Plaintiffs amount to invidious racial animus toward Native Americans generally, or Mr. Murray in particular." *Id.* at 1201. With the plaintiffs' having presented some evidence of racial tension between law enforcement and Native Americans, *see id.* at 1201 n.89, this issue offered the plaintiffs their best opportunity to present evidence of the criminal knowledge or intent that they must prove to prevail in this case. The plaintiffs failed to do so.

Despite answering different ultimate questions than those presented in this case, these and the district court's other reasonableness findings rely on state-of-mind facts that include the officers' knowledge and motives for the officers' conduct. These knowledge-and-intent issues are identical to those at stake in this case. This Court applies these and other examples from the district court's factual findings as it considers the factual issues raised by the *actus reus* and intent requirements of each alleged crime identified by the plaintiffs as having been committed in violation of the "bad men" provision. Overall and with respect to their particular elements, the crimes that the plaintiffs have alleged and must prove in this case raise issues identical to those decided by the district court.

2.    **Full and Fair Opportunity to Litigate**

The Federal Circuit overturned this Court's earlier application of issue preclusion because this Court had not considered whether the alleged spoliation of evidence by federal agents had deprived the plaintiffs of evidence that they might have used to litigate their factual contentions fully and fairly before the district court.  The Federal Circuit explained:

> Though the district court did ultimately decide that Murray shot himself and that there was no conspiracy, the preclusive effect of that conclusion is explicitly limited to situations where no additional evidence (possibly in the form of spoliation sanctions) arises out of the federal officers' actions with respect to the evidence.

> The culpability of the federal officers for spoliation has never been decided, and to assume the resolution of such a central issue *ipse dixit* without substantive consideration "depriv[es] litigants of their first chance[ ] to litigate an issue," and is an improper application of issue preclusion.

*Jones Fed. Cir.*, 846 F.3d at 1363 (citation omitted) (quoting *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, 719 F.3d 1367, 1371 (Fed. Cir. 2013)).

The Federal Circuit's mandate on remand instructed this Court to consider the plaintiffs' spoliation allegations in the first instance and the appropriate sanction for such spoliation, if any. *Id*. at 1363-64.  It then provided that if "the appropriate spoliation sanctions would not change the evidentiary landscape for particular issues, the [Court of Federal Claims] may reconsider the application of issue preclusion." *Id.*

The evidentiary prohibition this Court imposed for the United States' spoliation of the .380 handgun reduces the evidence available to the United States to argue that Mr. Murray shot himself, but it does not augment the evidence that is available to the plaintiffs now—or was available in the district court—to prove that Officer Norton shot Mr. Murray.  As the defendant notes, Officer Norton's motion for summary judgment in the district court did not rely on the gun this Court found had been subject to spoliation by the defendant.

This Court's spoliation sanction changes the evidence, but does not change the evidentiary "landscape" for any particular question at issue.  The plaintiffs argue that a reduction in the evidence available to the defendants in this Court versus that available to them in the district court is necessarily a change in the evidentiary landscape.  That view is inconsistent with how courts typically use the term—to distinguish between harmless and prejudicial error affecting proof of a particular issue.[6]

---

[6] Courts have consistently described changes or differences in an "evidentiary landscape" as "material" or otherwise legally or factually determinative.  The Court finds it unlikely that the

The district court's finding of insufficient evidence of an execution-style shooting, racial animus, or a conspiracy did not depend on the .380 handgun that federal agents spoliated. This Court has prohibited the defendant from relying on the .380 handgun as evidence in this case, but that prohibition adds nothing to the evidence available to the plaintiffs to prove their factual contentions of homicide, conspiracy, and cover-up. The sanction applied for the spoliation of the gun also does not affect the evidentiary landscape as to the police pursuit or the existence of a cover-up or other alleged conspiracy.

The federal agents' spoliation did not deprive the plaintiffs of a full and fair opportunity to litigate whether Officer Norton shot and killed Mr. Murray or whether local authorities and federal agents conspired to destroy evidence of Mr. Murray's homicide before the district court. Accordingly, the district court's decision precludes relitigating identical issues raised in this case.

## B.   Cognizable Claims

Summary judgment for the defendant is proper for any of the crimes that the plaintiffs identify as "wrongs" that are not federally punishable because they are preempted by federal statute or implicate only off-reservation conduct.

The Federal Circuit affirmed that a "wrong" cognizable under the treaty's "bad men" provision must be an arrestable, prosecutable crime. *Id.* at 1356. Further, cognizable wrongs under "the laws of the United States" include state criminal offenses made federally punishable by the Assimilative Crimes Act, 18 U.S.C. § 13, "which makes federally punishable any act or omission committed on '[a]ny lands reserved or acquired for the use of the United States, and

---

Federal Circuit's concise omission of "material," "essential," "determinative," or another similar legally descriptive term was meant to depart from the uniform sense in which courts have referred to a "change" in the "evidentiary landscape." *See, e.g.*, *Musladin v. Lamarque*, 555 F.3d 830, 850 (9th Cir. 2009) (finding no violation of a criminal defendant's due process rights, reasoning that the trial was not "fatally infected" by the exclusion of evidence when "the essential evidentiary landscape—that the only evidence of Musladin's self-defense was his own statements—would remain the same had the proffered testimony been allowed"); *see also United States v. Ribota*, 792 F.3d 837, 841 (7th Cir. 2015) (discussing substitution of charges in response to a "materially altered evidentiary landscape"); *United States v. LaDeau*, 734 F.3d 561, 571 (6th Cir. 2013) (finding that the government failed to demonstrate that the "evidentiary landscape has materially altered" for substitution of charges); *Griffin v. Johnson*, 350 F.3d 956, 959 (9th Cir. 2003) (describing a fingerprint expert's reversal of his earlier conclusion that would have exculpated the defendant as a "sudden shift in the evidentiary landscape [that compromised the] defense strategy"); *United Elec. Radio & Mach. Workers of Am. (UE) v. 163 Pleasant St. Corp.*, 987 F.2d 39, 47 (1st Cir. 1993) (finding "perceived voids in the evidentiary landscape" that required finding a lack of jurisdiction); *Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 784 (9th Cir. 2002) (distinguishing case from precedent as presenting a "decidedly different evidentiary landscape").

under the exclusive or concurrent jurisdiction thereof,' where that act or omission would be punishable under state law if committed within the state's jurisdiction." *Id.* at 1357 (quoting 18 U.S.C. § 7 (defining the territorial jurisdiction to which 18 U.S.C. § 13 applies)).

The Federal Circuit rejected, however, some of this Court's conclusions as to the nature of cognizable wrongs and the territorial applicability of the "bad men" provision. The Federal Circuit rejected this Court's requirement that a "wrong" be an affirmative act. *See id.* at 1355-57. Instead, the Federal Circuit held that an omission, *i.e.,* the failure to act, could also constitute a "wrong" under the "bad men" provision. *Id.* Finding that the plaintiffs had, however, failed to identify the alleged omissions with specific crimes, the Federal Circuit left this Court to reconsider the "bad men" provision's application to omissions in the context of specific crimes, in the event that the plaintiffs could establish any of the omissions they alleged to be cognizable crimes under the "laws of the United States." *Id.*

Additionally, the Federal Circuit rejected the requirement from this Court's dismissal of the plaintiffs' claims that the conduct constituting a wrong must occur entirely on the reservation. *Id.* at 1361. The Federal Circuit cautioned that it was not rejecting the existence of a geographic limitation. *Id.* Rather, it specified that this Court had "erred in summarily dismissing Jones's allegations of off-reservation wrongs without considering the connection those alleged wrongs had, if any, to the alleged on-reservation wrongs." *Id.* The Federal Circuit left to this Court to determine, "in the first instance, whether any of the[] off-reservation acts demonstrate the alleged continuation of on-reservation acts so as to be cognizable under the bad men provision." *Id.* at 1361.

Some of the state-law crimes identified by the plaintiffs implicate conduct outside of the reservation's boundaries. The defendant acknowledges that the Assimilative Crimes Act makes state-law crimes, such as desecration of a corpse, federally punishable when committed on the reservation, but argues that any assimilated state-law offenses are not federally punishable, cognizable wrongs when committed outside of the reservation's boundaries.

Some of the federal-law crimes identified by the plaintiffs also implicate off-reservation conduct. The defendant argues that, for off-reservation conduct like the destruction of the .380 handgun to constitute a cognizable wrong under the treaty's "bad men" provision, the wrong must be a clear continuation of an on-reservation wrong. Thus, according to the defendant, even if the local officers' or federal agents' off-reservation conduct can be established as independently-punishable federal crimes, those crimes are not cognizable wrongs under the treaty's "bad men" provision because they do not clearly continue an on-reservation wrong.

The defendant argues that some of the identified state-law crimes are preempted by analogous federal crimes or only implicate off-reservation conduct not federally punishable, and thus not cognizable as a "bad men" claim. The defendant further argues that the plaintiffs' failure to prove an on-reservation wrong precludes them from proving off-reservation wrongs.

### 1. State-Law Crimes

Conduct must be criminally punishable under federal law in order to constitute a wrong under the "bad men" provision. State-law crimes can only be cognizable wrongs under the "bad

men" provision if they are not preempted by federal law and were committed on the reservation. Otherwise, state-law crimes are not punishable under federal law and, thus, not cognizable wrongs under the "bad men" provision.

### a. Preemption of State-Law Crimes

As explained above, the Federal Circuit held that the universe of crimes cognizable as "wrongs" under the "bad men" provision includes state-law crimes made federally punishable within federal enclaves by the Assimilative Crimes Act, 18 U.S.C. § 13, and applied to Indian reservations by the Indian Country Crimes Act, 18 U.S.C. § 1152. The Assimilative Crimes Act does not, however, assimilate into federal law state-law crimes consisting of conduct that Congress punishes under an independent federal statute. *Lewis v. United States*, 523 U.S. 155, 159-66 (1998); *see Jones Fed. Cir.*, 846 F.3d at 1357. The plaintiffs identify several state-law crimes with obvious federal analogs, like murder, manslaughter, assault, kidnapping, attempt, and conspiracy. The defendant argues that the Court should not consider these state-law crimes as cognizable wrongs because they are preempted by their federal-statute analogs.

When deciding whether federal law makes punishable the same conduct prohibited by a state criminal statute, the Supreme Court has rejected both a broad reading of the Assimilative Crimes Act's exception that would let "*any*" federal crime, like assault, preempt even a qualitatively different state crime, like murder. *See Lewis*, 523 U.S. at 162. The Supreme Court also has rejected a narrower reading of the Act's exception that would make an additional element or a different definition in a state offense sufficient to displace Congress's considered approach to punishing the same harm. *Id.* at 164. Instead, the Court has provided a specific test that accounts for both the Assimilative Crimes Act's language and its gap-filling purpose.

A court must focus on the "act or omission" prohibited by the state statute. If (literally) "*any*" federal statute punishes that "act or omission," a court must ask whether the applicable federal statutes preclude application of the state law in question because the state law would "interfere with the achievement of a federal policy" by "effectively rewrit[ing] an offense definition that Congress carefully considered or because federal statutes reveal an intent to occupy so much of a field as would exclude use of the particular state statute at issue." *Id.* at 164-65 (citations omitted).

The Supreme Court rejected a one-size-fits-all answer to the question of Assimilative Crimes Act preemption but offered three rules of thumb. First, the Act does not apply when both statutes "seek to punish approximately the same wrongful behavior—where, for example, differences among elements of the crimes reflect jurisdictional, or other technical, considerations, or where differences amount only to those of name, definitional language, or punishment." *Id.* at 165.

Second, "assimilation may not rewrite distinctions among the forms of criminal behavior that Congress intended to create." *Id.* "[O]rdinarily, there will be no gap for the [Assimilative Crimes] Act to fill where a set of federal enactments taken together make criminal a single form of wrongful behavior while distinguishing (say, in terms of seriousness) among what amount to different ways of committing the same basic crime." *Id.* (citation omitted).

"At the same time, a substantial difference in the kind of wrongful behavior" covered by the federal versus the statute statutes "will ordinarily indicate a gap for a state statute to fill—unless Congress, through the comprehensiveness of its regulation, or through language revealing a conflicting policy, indicates to the contrary in a particular case." *Id.* at 165-66. The Supreme Court emphasized that "[t]he primary question . . . is one of legislative intent:  Does applicable federal law indicate an intent to punish conduct such as the defendant's to the exclusion of the particular state statute at issue?" *Id.*

This issue raises a list of complex questions as long as the list of state-law crimes identified by the plaintiffs.  In this case, it raises these questions in an uncommon context, far less concrete than the appeal of an individual criminal conviction.  Although the Court might have held some of the identified state-law crimes preempted by their obvious federal analogs, harmonizing those conclusions with the scores of other decisions to consider these issues in criminal prosecutions would delay decision and add complexity to a case that can be resolved fairly on other grounds.  The application of issue preclusion and consideration of analogous intent requirements in both the federal and state versions of the crimes the plaintiffs identify eliminate the need for the Court to consider whether the identified state-law crimes are preempted by their analogous federal statutes.

### b.        Off-Reservation State-Law Crimes

The state-law crimes that are made federally punishable by the Assimilative Crimes Act and applied to Indian reservations by the Indian Country Crimes Act are not federally punishable, as a general matter, outside of the reservation's boundaries.  *See* 18 U.S.C. § 13; *Gov't of Virgin Islands v. Dowling*, 866 F.2d 610, 615 (3d Cir. 1989) (rejecting a defendant's argument based on the Assimilative Crimes Act because the defendant acted outside of a federal enclave and within the jurisdiction of the local legislature).  As a result, state-law crimes committed outside of the reservation cannot be wrongs under the "bad men" provision.[7]

The plaintiffs' allegations that Mr. Murray's corpse was desecrated rely solely on provisions of Utah criminal law.  Mr. Murray was not pronounced dead until he arrived at the hospital, which was located outside of the reservation.  The mortuary and medical examiner's office were also outside of the reservation.  State-law desecration of a corpse might be a federally punishable crime, and thus a cognizable wrong under the "bad men" provision, if committed on the reservation.  The treatment of Mr. Murray's body at the hospital, mortuary, and state medical examiner's office, however, fall outside of the geographical reach of the

---

[7] While it may be possible to commit some of an assimilated state-law crime's elements within the reservation while committing other elements outside of the reservation, all of the state-law crimes at issue in this case other than conspiracy include a location-based element that would likely be jurisdictionally determinative if, in other circumstances, the same crime were committed partially in-state and partially out-of-state.  In any case, the plaintiffs do not allege these types of crimes here.

Assimilative Crimes Act.  Accordingly, these state-law crimes do not constitute federal crimes in this case and, therefore, are not "wrongs" under the "bad men" provision.

## 2. Federal-Law Crimes Committed Outside of the Reservation

To be cognizable as wrongs under the "bad men" provision, independently-punishable federal crimes (those not dependent on the Assimilative Crimes Act for their application) committed outside of the reservation's boundaries must be a clear continuation of on-reservation conduct.  *See Jones Fed. Cir.*, 846 F.3d at 1360-61.

The defendant argues that the Federal Circuit set a narrower standard, that an off-reservation wrong must be a clear continuation of an entirely on-reservation "wrong"—a complete on-reservation crime.  Examination of the language of the Federal Circuit's opinion shows ambiguity as to this point.  This Court concludes, however, that the defendant's reading of the Federal Circuit's decision as requiring an independently sufficient on-reservation predicate crime misconstrues the Federal Circuit's holding.

The Federal Circuit's opinion referred to on-reservation "wrongs," "acts," and "activities" interchangeably when discussing the predicate condition for a cognizable off-reservation wrong.  *See Jones Fed. Cir.*, 846 F.3d at 1361.  Its use of "wrong," strictly construed, suggests that a complete crime must occur on the reservation and then continue off the reservation or result in a separate off-reservation crime.  Other sentences in the opinion, however, referred to "acts" or "activities" that must be directly continued for an off-reservation wrong.  The use of "acts" or "activities" suggests that a single crime, with on-reservation conduct satisfying some elements and off-reservation conduct satisfying the remaining elements, might constitute a cognizable "wrong" under the "bad men" provision.

Moreover, the need to consider off-reservation conduct at all suggests that on-reservation conduct insufficient to constitute a complete crime is cognizable under the "bad men" provision when considered together with off-reservation conduct that is a clear continuation of the on-reservation conduct.  If the Federal Circuit's rejection of this Court's prior holding that ignored off-reservation conduct was meant to ensure that a plaintiff could prove two completed wrongs instead of one, then the defendant's interpretation makes sense.  If, on the other hand, the Federal Circuit's rejection of a strictly territorial application of the "bad men" provision was meant to allow a plaintiff to prove a single completed wrong when the plaintiff could otherwise prove none, then this Court's interpretation rejecting the defendant's reading of the Federal Circuit's decision is more appropriate.

Although the Court disagrees with the defendant's reading of the Federal Circuit's ruling, the Court nevertheless reaches the result the defendant urges.  Even without considering the location where specific acts occurred, the plaintiffs have failed otherwise to prove the act or intent requirements for the identified, federally-punishable crimes that reach and implicate their allegations of off-reservation conduct, like conspiracy, perjury, false statements, or destruction of evidence or official records.  The Court addresses the insufficiency of the evidence for each category of crime below.

### C.     Proof of Particular Crimes

As a preliminary matter, the defendant argues that the following crimes alleged by the plaintiffs do not plausibly fit within the allegation of the amended complaint and therefore cannot form the basis for liability under the "bad men" provision: hunting, trapping, or fishing on Indian lands; conspiracy to defraud the United States to obtain payment or allowance; false claims against the United States; conspiracy to commit an offense against or defraud the United States; wire fraud (requiring intent to obtain money or property); injuries to or depredation of federal property; racketeering; obstruction of criminal investigations through bribery; obstruction of state or local law enforcement to facilitate illegal gambling; intimidation of jurors or judicial officers; theft or alteration of judicial records; intentional destruction of property through criminal mischief; doing business without a license; disorderly conduct in refusing a law enforcement order or causing public inconvenience; and disruption of a funeral or memorial service.  (*See* ECF 150-1 at 15.)

With the exception of "conspiracy to commit an offense against or defraud the United States," which serves as the general federal conspiracy provision, the Court agrees that the relevance of these identified crimes is unclear.  The plaintiffs fail to clarify how their allegations of these crimes and the evidence they can present are sufficient to prove the act and intent elements of these crimes; indeed, the plaintiffs merely accuse the defendants of impermissibly shifting the burden of production to the plaintiffs.  (ECF 156 at 5-6.)  The Court has independently reviewed the record in the case, with no assistance or guidance from the plaintiffs, and has found the allegations of these offenses identified by the plaintiffs unsupported by any facts.  Accordingly, the Court finds no issue of material fact as to these potential wrongs that would preclude summary judgment for the defendant.

The Court considers the other crimes identified by the plaintiffs as the basis for liability under the "bad men" provision as they relate to the plaintiffs' allegations and the facts before the Court.

### 1.     Homicide

The crux of this case is the plaintiffs' allegation that Officer Norton murdered Mr. Murray.  The parties agree that Mr. Murray died from a close-contact gunshot wound to the head.  Proving murder or any of the other homicide crimes identified by the plaintiffs requires proof that Officer Norton caused this close-contact gunshot wound.  The district court found that none of the officers was closer than 100 yards from Mr. Murray before Mr. Murray was shot.  The district court decision finding that Mr. Murray shot himself precludes the plaintiffs from litigating this fact.

The plaintiffs may also contend that the officers involved in the pursuit (and those arriving before Mr. Murray was taken away in the ambulance) are guilty of some form of criminal homicide because they did not provide appropriate on-scene medical aid.  To prove that allegation, the plaintiffs would need to show both intent and proximate cause.  *See United States v. Serawop*, 410 F.3d 656, 663–64 (10th Cir. 2005) (discussing *mens rea*); *United States v. Swallow*, 109 F.3d 656, 659 (10th Cir. 1997) (proximate cause).

Here too, the plaintiffs are collaterally estopped as to the State and local officers' inaction.  The district court already considered the questions of the officers' state of mind and whether the alleged failure to provide medical aid was a proximate cause of Mr. Murray's death. *Jones D. Ct. Merits*, 3 F. Supp. 3d at 1208 (finding no evidence to support a conclusion that the defendants were "deliberately indifferent" or knew there was a substantial risk of harm); *id.* at 1208–09 (finding no evidence to support conclusion that aid at scene would have saved Mr. Murray's life).  The district court also held that the officers fulfilled any duty owed to Mr. Murray when they called the ambulance.  *See id.* at 1207.

Because the alleged commission of a homicide or related criminal behavior was fully and fairly litigated before the district court by the plaintiffs in reliance on the same evidentiary landscape before this Court, the plaintiffs are precluded from pursuing their "bad men" claim by proving a homicide crime.

## 2.      Assault and Reckless Endangerment

The plaintiffs' allegations of state-law assault and reckless endangerment appear to stem from Officer Norton having fired his gun in retreat and from Deputy Byron having handcuffed Mr. Murray.  *See* Am. Compl. ¶¶ 32, 33, 67; *accord Jones 10th Cir.*, 809 F.3d at 575 (noting allegations of excessive force allegedly committed by Officer Norton, Trooper Young, and Deputy Byron).  The plaintiffs do not dispute the defendant's supposition that these claims rest on the actions cited in the amended complaint in the referenced paragraphs.

The plaintiffs did not identify the federal assault statute as a potential wrong they intend to prove at trial.  *See* 18 U.S.C. § 113.  Without deciding whether the federal assault statute preempts the Utah assault statute, the Court nevertheless finds that the plaintiffs would not be able to prove criminal liability under the Utah statute if this claim were to proceed to trial.  Utah law justifies the reasonable use of force by Officer Norton and Deputy Byron, and the district court's decision precludes the plaintiffs from arguing that these officers' use of force was not reasonable.

The Utah criminal-assault provision on which the plaintiffs rely requires "unlawful force or violence." Utah Code Ann. § 76-5-102(1).  The Utah reckless endangerment statute makes it a crime to "recklessly engage[ ] in conduct that creates a substantial risk of death or serious bodily injury to another person." Utah Code Ann. § 76-5-112(1).  This standard requires proof that the officers' conduct was "a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint."  *State v. Robinson*, 63 P.3d 105, 107 (Utah Ct. App. 2003) (stating the general standard for criminal recklessness); *Utah v. Carter,* 2005 UT App. 232, No. 20040637-CA, 2005 WL 1177063, at *1 (Utah Ct. App. May 19, 2005) (unpublished) (applying general recklessness standard to reckless endangerment offense).

Utah law, however, justifies the use of "any force, except deadly force, which [the actor] reasonably believes to be necessary to effect an arrest or to defend himself or another from bodily harm while making an arrest."  Utah Code Ann. § 76-2-403.  A peace officer is justified in using even deadly force if "the officer reasonably believes that the use of deadly force is

necessary to prevent death or serious bodily injury to the officer or another person." Utah Code Ann. § 76-2-404(1)(c).

The plaintiffs already had a full and fair opportunity to litigate the question of whether Officer Norton and Deputy Byron acted reasonably. The excessive-force question before the district court—like the assault and reckless endangerment claims that would be before this Court—presented for necessary resolution the issue of the reasonableness of the officers' actions. *See Jones D. Ct. Merits*, 3 F. Supp. 3d at 1194 (quoting *Graham v. Connor*, 490 U.S. 386, 396–97 (1989)). The district court determined that it was "reasonable under the circumstances for Detective Norton to fire his gun at Mr. Murray. Mr. Murray shot at Detective Norton first. Detective Norton was retreating to protect himself. . . . [The officers'] attempt[s] to apprehend Mr. Murray while protecting themselves—and the means they used to do so—were expected police behavior in light of the circumstances." *Id.* at 1195. Plaintiffs are therefore precluded from arguing in this Court that Officer Norton's or Deputy Byron's actions were unreasonable such that either could be found guilty under Utah's assault or reckless endangerment statutes.

### 3.    Kidnapping

The plaintiffs cannot prove that the officers kidnapped Mr. Murray when they pursued and handcuffed him. *See* Pls.' Resp. to U.S. Interrog. No. 5 (citing 18 U.S.C. § 1201; Utah Code Ann. § 76-5-301). The federal kidnapping statute punishes anyone who, within certain territorial and other limitations, "unlawfully seizes" a person. 18 U.S.C. § 1201(a). As with assault, the existence of a federal kidnapping statute may preclude the Assimilative Crimes Act from incorporating into federal law the state-law kidnapping offense identified by the plaintiffs. Without deciding that issue, however, the Court finds that the plaintiffs would not be able to prove either the federal- or state-law elements of kidnapping at trial.

The defendant argues that the officers did not "unlawfully" seize Mr. Murray because the district court found that most of the officers' conduct did not amount to a seizure for Fourth Amendment purposes, and the one act that did—handcuffing Mr. Murray without law-enforcement jurisdiction—was reasonable. This argument takes the district court's reasonableness finding out of its qualified-immunity context.

The district court first concluded that, under binding Tenth Circuit precedent, Deputy Byron's handcuffing of Mr. Murray without law-enforcement jurisdiction was *per se* unlawful as an unreasonable seizure that violated Mr. Murray's Fourth Amendment rights. *Jones Dist. Ct. Merits*, 3 F. Supp. 3d at 1192 (citing *Ross v. Neff*, 905 F.2d 1349, 1353–54 (10th Cir.1990)). The district court then considered whether Deputy Byron was entitled to qualified immunity, finding him immune from suit for the Fourth Amendment violation. Finding Deputy Byron's actions reasonable for qualified immunity did not excuse, justify, or render the handcuffing "lawful" so as to preclude proof of an "unlawful[ ]" seizure under the federal kidnapping statute.

Nevertheless, both the federal and Utah kidnapping statutes require that the unlawful seizure, detention, or restraint be intentional or knowing. While considering the reasonableness of Deputy Byron's conduct, the district court found that the officers did not learn that Mr. Murray was a Ute Tribe member until the EMTs retrieved Mr. Murray's identification card while tending to him, 30 minutes after the shooting and after Mr. Murray had been handcuffed. *See*

*Jones Dist. Ct. Merits*, 3 F. Supp. 3d at 1183.  Thus, the officers did not know that they lacked jurisdiction to arrest him when Deputy Byron handcuffed him.  Relatedly, the district court found no evidence of racial animus and no evidence of intent to "hunt" an Indian.  *Id.* at 1199-1201.  The plaintiffs had the full and fair opportunity to litigate these facts and thus are precluded from relitigating them here.  Although Deputy Byron seized Mr. Murray "without authority of law," the plaintiffs are precluded from proving that Deputy Byron did so intentionally or knowingly.  The plaintiffs cannot prove the federal- or state-law crime of kidnapping.

### 4.  Criminal Trespass

The defendant ascribes the plaintiffs' identification of criminal trespass, Utah Code Ann. § 76-6-206, as a potential "wrong," to the officers' lack of law-enforcement authority on the Ute Tribe's reservation.  Criminal trespass in this context, however, would be an alleged wrong against *the Tribe*, not against *Mr. Murray*.  The Ute Tribe does not have standing to bring a claim under the treaty's "bad men" provision.  *See Hebah v. United States*, 428 F.2d 1334, 1337 (Ct. Cl. 1970); *Hernandez v. United States*, 93 Fed. Cl. 193, 200 (2010).  This Court reached that conclusion in granting the United States' motion to dismiss.  *See Jones Fed. Cl. Dismissal*, 122 Fed. Cl. at 528 n.31.  Additionally, the plaintiffs conceded the point before the Federal Circuit.  Pl.-Appellants' Principal Br. at 37 n.8, filed Dec. 14, 2015, *Jones Fed. Cir.*, No. 2015-5148.

### 5.  Conspiracy

The plaintiffs allege that the officers conspired to kill Mr. Murray and cover up their actions.  *See* Am. Compl. ¶¶ 17, 67, 70.  To prove a conspiracy, the plaintiffs would need to prove an agreement or "meeting of the minds" to murder Mr. Murray and cover it up.  *See United States v. Anderson*, 981 F.2d 1560, 1563–64 (10th Cir. 1992) (under federal law); Utah Code Ann. § 76-4-201 (conspiracy is when one "agrees with one or more persons to engage in or cause the performance of the conduct. . . .").  With respect to the State and local officers, the plaintiffs litigated and lost this exact issue in the district court.  *See Jones D. Ct.*, 3 F. Supp. 3d at 1197–99, 1201–06.  The district court found no direct evidence of a "meeting of the minds."  The district court then considered whether the plaintiffs had produced any circumstantial evidence of a conspiracy to violate Mr. Murray's rights.  It considered whether the officers decided not to provide CPR to Mr. Murray after the shooting so that he would not survive to contradict Officer Norton's version of events and rejected the claim.

That finding leaves no conspiracy for the federal agents to have joined, and the plaintiffs offer no evidence of a purely federal conspiracy to cover up the local officers' alleged conduct.  The federal agents also could not have conspired to murder Mr. Murray because no federal agents arrived at the scene until after the shooting.  *See* Pls.' Resp. to Req. for Admis. No. 2.

### 6.  Obstruction of Justice, Perjury, False Statements, and Destruction of Evidence

The defendant argues that crimes related to interference with government investigations or judicial proceedings, including witness tampering and retaliation, perjury, and interference with public servants are not cognizable under the specific language of the "bad men" provision.  1868 Treaty, art. 6, 15 Stat. 619 ("any wrong *upon the person or property of the Indians . . .*"

(emphasis added)); *see also Banks v. Guffy*, No. 1:10-cv-2130, 2012 WL 72724, at *6 (M.D. Pa. Jan. 10, 2012) (no viable "bad men" claim for property belonging to someone else). The "bad men" provision's language, the defendant argues, focuses on the individual tribal victim rather than on the tribe or some "broader sense of societal harm" because Article 6 of the treaty "concerns the rights of and obligations to individual Indians. . . ." *Hebah*, 428 F.2d at 1337. The procedural crimes identified by the plaintiffs, the defendant further argues, "would be crimes against a public interest in achieving justice, not against Mr. Murray's "person or property." Nor would these crimes, the defendant concludes, be "peace-shattering crimes of 'moral turpitude' that the 'bad men' provision was intended to cover." ECF 150-1 at 30-31 (quoting *Hernandez*, 93 Fed. Cl. at 199 & n.5).

The Court is skeptical that perjury or other procedural offenses can fairly be construed as categorically victimless crimes when committed in the course of an investigation or judicial proceeding to determine whether an individual's constitutional rights were violated. The Court, however, need not decide whether these crimes can be wrongs "against the person or property of the Indians" because all these crimes include an intent element that the plaintiffs cannot prove. *See, e.g.,* 18 U.S.C. § 1519 ("Whoever knowingly alters, [or] destroys, . . . *with the intent to* impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States . . . ." (emphasis added)). The same points apply to the identified crimes relating to destruction or manipulation of judicial or government records, and abuse or unauthorized use of official power. *See* 18 U.S.C. §§ 1519, 2071, 2232; Utah Code Ann. §§ 76-8-201, 76-8-203, 76-8-412, 76-8-413, 76-8-510.5, 76-8-511, 76-8-512.

This Court found no intent to destroy or withhold evidence on the part of federal agents, s*ee Jones Fed. Cl. Spoliation*, 146 Fed. Cl. at 737–41, and the record is bereft of any evidence of any such intent. If the plaintiffs had evidence that federal or local officers engaged in a cover-up or destroyed evidence, they ought to have presented it to support their motion for spoliation sanctions. The plaintiffs offered no such evidence when they had both the chance to present it and the maximum incentive to convince the Court that anything beyond the federal agents' negligent destruction of the .380 handgun occurred. Likewise, the plaintiffs offered no evidence of a conspiracy involving federal or local officers to destroy evidence. Having failed to bring forth such evidence on their motion for spoliation sanctions, the plaintiffs fail to point to any evidence sufficient to create a genuine issue of material fact in response to this motion for summary judgment.

The Court finds no disputed material facts with respect to the obstruction of justice, false statements, and destruction of evidence or government records crimes identified by the plaintiffs. Without evidence of the requisite intent on the part of any federal or local officer to commit these crimes, summary judgment for the defendant on these claims is appropriate.

### 7.    Criminal Civil Rights Violation

The defendant argues that the plaintiffs are precluded from seeking to prove that the state and local officers violated Mr. Murray's constitutional rights under § 1983's criminal analog, 42 U.S.C. § 242. The plaintiffs may be precluded from relitigating the same civil rights allegations rejected by the district court, but it is unclear why the similarity in subject matter between the

two statutes, by itself, would preclude the plaintiffs from proving violations of Mr. Murray's civil rights not considered by the district court.

Moreover, the district court found that Deputy Byron violated Mr. Murray's Fourth Amendment rights by handcuffing Mr. Murray without enforcement jurisdiction. Deputy Byron escaped liability for that violation by asserting qualified immunity. Deputy Byron's personal immunity from civil suit for the violation, however, does not extend to the United States, should it be found liable for his conduct that would otherwise amount to a crime via the "bad men" provision. The Tenth Circuit appears to have erred in recognizing that Deputy Byron's extra-jurisdictional handcuffing of Mr. Murray was a seizure violating Mr. Murray's rights, but treating the finding of qualified immunity for Deputy Byron as if it had found that no violation had occurred—effectively imputing Deputy Byron's immunity from suit for the violation to Uintah County.[8]  *See Owen v. City of Indep., Mo.*, 445 U.S. 622, 638 (1980) ("[T]the municipality may not assert the good faith of its officers or agents as a defense to liability under § 1983.").

The Court respects the Tenth Circuit's decision as to Uintah County but will not accept the defendant's argument and perpetuate the error by imputing Deputy Byron's qualified immunity from civil suit for the seizure to the United States. Deputy Byron's good-faith belief that he had enforcement jurisdiction over Mr. Murray garners Deputy Byron immunity from civil suit, but it does not make the handcuffing at gunpoint any more lawful.

Although the district court's qualified immunity holding does not preclude "bad men" liability for the United States, the district court's subsidiary finding that the officers' actions were reasonable relies on state-of-mind facts inconsistent with the intent that § 242 requires.  A criminal violation of civil rights must be "willful." *Screws v. United States*, 325 U.S. 91, 101-04 (1945) (plurality opinion) ("[Willful] generally means an act done with a bad purpose. . . . [M]ore is required than the doing of the act proscribed by the statute. . . .  [T]he specific intent required by the Act is an intent to deprive a person of a right. . . ."), *narrowed on other grounds by United States v. Lanier*, 520 U.S. 259, 259-60 (1997).

The district court's finding that the officers' actions were reasonable, based on its examination of the officers' knowledge and motives, precludes the plaintiffs from both relitigating and proving that Deputy Byron's handcuffing, or any other potential constitutional

---

[8] The Tenth Circuit cited *Apodaca v. Rio Arriba County Sheriff's Department,* 905 F.2d 1445, 1447-48 (10th Cir.1990), which cites *City of Los Angeles v. Heller,* 475 U.S. 796, 799 (1986).  In those cases, unlike in the *Jones* civil rights action, however, no constitutional violation was found.  Indeed, in *Ross v. Neff*, 905 F.2d 1349, 1353–54 (10th Cir.1990), the precedent that required the district court and Tenth Circuit panel to acknowledge that the extra-jurisdictional handcuffing was a *per se* Fourth Amendment violation, the Tenth Circuit granted the arresting officer qualified immunity but remanded the case for a trial against the County, citing *Owen v. City of Indep., Mo.*, 445 U.S. 622 (1980).

violations not already precluded, were willfully criminal.  Accordingly, summary judgment for the defendant is appropriate on this claim.

## IV.   CONCLUSION

The Court **GRANTS** the United States' motion for summary judgment on all the plaintiffs' claims.  An order is being issued concurrently with this Memorandum Opinion directing the entry of judgment for the defendant on all counts.

s/ Richard A. Hertling

**Richard A. Hertling**
**Judge**
