# In the United States Court of Federal Claims

No. 13-227
Filed: March 29, 2023
NOT FOR PUBLICATION

---

**DEBRA JONES, et al.,**

                    *Plaintiffs,*

**v.**

**UNITED STATES,**

                    *Defendant.*

---

*Jeffrey S. Rasmussen*, Patterson Earnhart Real Bird and Wilson, Louisville, Colorado, for the plaintiffs.

*J. Scott Thomas*, Environment & Natural Resources Division, U.S. Department of Justice, Washington, D.C., and *Christopher C. Hair*, Department of Justice, of counsel, for the defendant.

## MEMORANDUM OPINION AND ORDER

***HERTLING*, Judge**

      This case returns following its second remand from the U.S. Court of Appeals for the Federal Circuit.  *See Jones v. United States*, No. 2020-2182, 2022 WL 473032 (Fed. Cir. Feb. 16, 2022) ("*Jones V*").  The Federal Circuit reversed the grant of summary judgment in favor of the defendant, the United States, and against the plaintiffs, who are the parents, estate, and tribe of the deceased Ute Tribe-member Todd R. Murray.  In its opinion, the Federal Circuit clarified the standards for determining whether the defendant spoliated evidence, including when the defendant controls evidence.  The Circuit also vacated the limited spoliation sanction that had been awarded and clarified what the Court needs to consider in fashioning an effective spoliation sanction.  The Court applies the standards elaborated by the Federal Circuit to the plaintiffs' renewed motion for spoliation sanctions.

      On remand, the plaintiffs have limited the items for which they now seek sanctions.  The plaintiffs now seek spoliation sanctions for the defendant's failure to collect and retain only three pieces of evidence: (1) the .380 Hi-Point handgun, found near Mr. Murray, which was already determined to have been spoliated; (2) the .40 Glock handgun carried by the officer involved in the shooting that preceded Mr. Murray's death; and (3) the clothing the officer wore that day.

      For its spoliation of the .380 Hi-Point, the Court imposes on the defendant a sanction of a rebuttable adverse inference.

The plaintiffs have not shown, however, that the defendant had a duty to preserve the .40 Glock or the officer's clothing. The duty to preserve only arises when litigation is reasonably foreseeable, and the supposed spoliator had "a legal right to obtain or control [the supposedly spoliated] evidence." *Jones V*, *supra*, at *4. Although litigation was reasonably foreseeable on the day of the shooting that preceded Mr. Murray's death, April 1, 2007, the defendant had no legal right to control the evidence, and no sanction is appropriate for the failure to collect these items.

## I.   PROCEDURAL HISTORY

This opinion assumes familiarity with this case's protracted history. *Jones v. United States*, 122 Fed. Cl. 490 (2015) ("*Jones I*"); *Jones v. United States*, 846 F.3d 1343 (Fed. Cir. 2017) ("*Jones II*"); *Jones v. United States*, 146 Fed. Cl. 726 (2020) ("*Jones III*"); *Jones v. United States*, 149 Fed. Cl. 335 (2020) ("*Jones IV*"); *Jones V*, 2022 WL 473032. This opinion also assumes familiarity with the related litigation in the District of Utah and the subsequent appeal. *Jones v. Norton*, 3 F. Supp. 3d 1170 (D. Utah 2014), *aff'd*, 809 F.3d 564 (10th Cir. 2015).

In *Jones I*, a judge of this court dismissed the plaintiffs' claims, but the Federal Circuit in *Jones II* vacated the dismissal to allow the plaintiffs to present their argument that the defendant, by failing to collect and preserve evidence, had spoliated that evidence.

In *Jones III*, the plaintiffs' motion for spoliation sanctions was granted in part and denied in part. The plaintiffs had sought spoliation sanctions for the defendant's supposed failure to collect and preserve evidence in 11 respects. *Jones III*, 146 Fed. Cl. at 735-36. In addition to the defendant's supposed failure to preserve the three pieces of evidence currently at issue, the plaintiffs argued that the defendant had failed to preserve Mr. Murray's clothing, that the shooting scene was not properly documented and possibly tampered with, that Mr. Murray's body had been improperly handled, and that authorities should have performed an autopsy on Mr. Murray, among other complaints. *Id.* Except for the .380 Hi-Point, the Court denied sanctions for all the spoliation allegations, finding that the mishandling of Mr. Murray's body was "not an independent basis for spoliation sanctions" and that the other items of supposedly spoliated evidence were not within the defendant's control. *Id.* at 737-42. The defendant's destruction of the .380 Hi-Point handgun that was found near Mr. Murray, however, was found to have constituted spoliation. Based on that determination, the defendant was forbidden from "rely[ing] affirmatively on any facts related to the .380 handgun, including the fact that the third shell casing was not ejected from the destroyed handgun and the presence or absence of fingerprints or blowback on the handgun, to support the [defendant's] conclusion that Mr. Murray died by suicide." *Id.* at 742-43.

The defendant was then granted summary judgment in *Jones IV*. The Court found that issue preclusion applied to the plaintiffs' claims, notwithstanding the spoliation sanction imposed for the destruction of the .380 Hi-Point. *Jones IV*, 149 Fed. Cl. at 348-54. The Court also rejected claims based on the plaintiffs' alleged wrongs that were not punishable under federal criminal law or that only implicated off-reservation conduct because these were not cognizable as "wrongs" under the bad men provision of the treaty between the United States and the Ute Tribe. *Id.* at 354-57. Finally, the Court found that the plaintiffs had not alleged sufficient facts

to show that some of the claimed federal crimes had occurred, and that issue preclusion estopped the plaintiffs from re-arguing issues relating to all other alleged federal crimes. *Id.* at 357-62.

In *Jones V*, the Federal Circuit held that the Court in *Jones III* had applied the "wrong standard in its spoliation opinion" regarding whether the defendant had "control" of any of the supposedly spoliated evidence. *Jones V*, 2022 WL 473032, at *1, *4. In doing so, the Federal Circuit held that the defendant, like any other party, has "control" over evidence when "it has a legal right to obtain or control that evidence." *Id.* at *8.

The Federal Circuit also rejected the sanction imposed for the defendant's destruction of the.380 Hi-Point handgun in *Jones III* as "futile." *Id.* at *9-11. Specifically, the Federal Circuit held that "[a]lthough a sanction preventing the spoliator from relying on the evidence they destroyed might be appropriate in other cases, it is not appropriate in this case because it serves none of the rationales underlying the spoliation doctrine." *Id.* at *11. According to the Federal Circuit, "[c]onsidering the import of the Hi-Point .380 handgun to Mr. Murray's parents' case, a harsher sanction is required." *Id.* at *9.

The Federal Circuit therefore remanded the case to determine: (1) whether the defendant controlled and spoliated evidence relating to the defendant's supposed failure "to enforce its request for an autopsy and failure to bag Mr. Murray's hands," *id.*, at *8; (2) "whether litigation was reasonably foreseeable while the government had control (as we define it here) over any allegedly spoliated evidence other than the spoliated Hi-Point .380 handgun," and therefore whether any such evidence was spoliated, *id.* at *9; and (3) "to determine the exact bounds of the appropriate remedy, such as an adverse inference or inferences, that should apply to any spoliated evidence in this case," including "whether the government should be permitted to rely on secondary evidence related to the spoliated [.380 Hi-Point handgun]," *id.* at *11.

Having vacated the ruling on spoliation, the Federal Circuit reversed the *Jones IV* ruling on issue preclusion and the grant of summary judgment to the defendant. The Federal Circuit held that issue preclusion did not apply based on the change in the evidentiary landscape and remanded for further consideration of the plaintiffs' substantive allegations of violations of the bad men provision of the treaty between the Ute Tribe and the defendant. *Id.* at *12.

Following remand from the Federal Circuit, the Court held an evidentiary hearing at which it heard testimony from October 31, 2022, through November 2, 2022, in Salt Lake City, Utah, regarding spoliation. (ECF 198-200.) Before the hearing, the parties submitted joint stipulations of fact for use in resolving the spoliation issues. (ECF 189.)[1] On January 6, 2023, and February 3, 2023, the plaintiffs and the defendant submitted their respective proposed

---

[1] The joint stipulations contain a list of the exhibits that the parties agreed to admit into evidence. (ECF 189 at ¶ 17.) The plaintiffs' stipulated exhibits were subsequently renumbered. (ECF 198 at 4.) This opinion cites the plaintiffs' exhibits by the numbering used at the evidentiary hearing and not by the numbering used in the joint stipulations.

findings of fact, based on the stipulations and the hearing evidence, and their proposed conclusions of law.  (ECF 201, 203.)  Closing arguments were heard on February 14, 2023.

In their post-hearing submission, the plaintiffs limited their motion for spoliation sanctions to three items: (1) the handgun of the officer who shot at Mr. Murray, a .40 Glock handgun; (2) the clothing worn by that officer at the scene of the events that led to Mr. Murray's death; and (3) the .380 Hi-Point handgun that was found near Mr. Murray and has already been found to have been spoliated by the defendant.  (ECF 201 at 23-27.)  The plaintiffs further confirmed during their closing summation that they are only seeking spoliation sanctions for those three pieces of evidence.  Accordingly, notwithstanding the Federal Circuit's directive concerning the autopsy and the bagging of Mr. Murray's hands, *Jones V*, 2022 WL 473032, at *8, the plaintiffs have abandoned any argument for the imposition of spoliation sanctions based on any evidence other than these three items.

## II.   FINDINGS OF FACT

For purposes of deciding the plaintiffs' spoliation motion only, the Court makes the following findings of fact based on the joint stipulations (ECF 189),[2] the proposed findings of fact submitted by the parties (ECF 201, 203), and the testimony and evidence submitted in connection with the evidentiary hearing between October 31, 2022, and November 2, 2023 (ECF 198-200).[3]

### A.   Persons Involved with the Shooting on April 1, 2007, and the Subsequent Investigation

"Todd Rory Murray was a member of the Ute Tribe.  He died on April 1, 2007, at the age of 21."  (ECF 189 at ¶ 3.)  "Debra Jones and Arden Post are the natural parents of Mr. Murray; and Ms. Jones is the personal representative of the Estate of Mr. Murray, for and behalf of the heirs of Mr. Murray."  (*Id.* at ¶ 4.)  "The Ute Tribe is a federally recognized Tribe, with a Reservation in northeastern Utah."  (*Id.* at ¶ 5.)

---

[2] The parties agreed that any statements in the joint stipulations of fact are "solely for purposes of the spoliation issue to be briefed by the [p]arties" and that "[f]or any statements that a person 'testified to . . .' the parties are stipulating that the person so testified, but do not agree to the truth of any such testimonies."  (ECF 189 at ¶¶ 1-2.)

[3] It is a party's responsibility to support its proposed findings of fact with relevant citations to the evidence in the record.  *Cf. Phillips & Jordan, Inc. v. United States*, 158 Fed. Cl. 313, 326 (2022) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("But the significance of sufficient citation to the evidentiary record cannot be overstated.  Failure to accurately cite to case law and the record invokes the oft-repeated adage: '[j]udges are not like pigs, hunting for truffles buried in briefs.'")).  Inadequately supported or irrelevant proposed findings of fact have been disregarded unless necessary to this decision.

"Uriah Kurip was the driver of a car involved in the high[-]speed car pursuit with Utah State Patrol officers.  Although Mr. Kurip was not an enrolled Ute tribal member on April 1, 2007, he was enrollable as an Indian and was an 'Indian' as that term is used to define a political classification under federal law on April 1, 2007."  (*Id.* at ¶ 6.)

"Dave Swenson, Craig Young, Jeff Chugg, and Rex Olson were Utah State Troopers on April 1, 2007, and were employed by the State of Utah.  Each was on duty on April 1, 2007.  They were not cross-deputized by the United States or the Ute Indian Tribe on April 1, 2007, to exercise law enforcement authority on the Ute Reservation."  (*Id.* at ¶ 7.)[4]

"Vance Norton was, on April 1, 2007, a Vernal City police officer.  [Officer] Norton was not on duty on April 1, 2007.  Vernal City is a municipality located wholly within the State of Utah and wholly outside the Ute Indian Reservation.  [Officer] Norton was not cross-deputized by the United States o[r] the Ute Indian Tribe on April 1, 2007, to exercise law enforcement authority on the Ute Reservation."  (*Id.* at ¶ 8.)  Officer Norton first began working in law enforcement in 1993 in Utah.  (ECF 198 at 69:7-8.)

On April 1, 2007, Gary Jensen was the chief of the Vernal City Police Department.  (ECF 199 at 233:20-21, 278:1-2.)  Chief Jensen was not cross-deputized as a tribal officer or an officer of the United States Bureau of Indian Affairs ("BIA").  (*Id.* at 350:22-24.)

On April 1, 2007, Dylan Rooks was a detective with the Vernal City Police Department.  (*Id.* at 298:2-5.)

On April 1, 2007, Officer Ben Murray was an officer with an unspecified law enforcement agency.  (*See id.* at 307:15-20; 364:16.)

"Anthoney Byron, Bevan Watkins, and Troy Slaugh were Uintah County Deputy Sheriffs on April 1, 2007, and employed by Uintah County.  Each was on duty on April 1, 200[7].  They were not cross-deputized by the United States or the Ute Indian Tribe on April 1, 2007, to exercise law enforcement authority on the Ute Reservation."  (ECF 189 at ¶ 9.)

"On April 1, 2007, Keith Campbell was a Uintah County Deputy Sheriff and employed by Uintah County.  On April 1, 2007, Mr. Campbell was also a contract employee for the Utah State Medical Examiners and employed by the State of Utah."  (*Id.* at ¶ 10.)  More specifically, in 2007, Mr. Campbell was the Chief Deputy of the Uintah County Sheriff's Department (ECF 199 at 222:11-14), and a medical examiner investigator working in Uintah County (*id.* at 215:21-217:6).  Mr. Campbell was at the scene of the shooting in his role as a medical examiner investigator.  (*Id.* at 231:14-22.)  In that role, he was responsible for investigating the mechanics as well as the likely cause and manner of Mr. Murray's death.  (*Id.* at 225:5-9.)

---

[4] To avoid any confusion in the roles the witnesses had in investigating the shooting on April 1, 2007, all witnesses are referred to by the job titles they had on that date.

"Sean Davis was a Utah Department of Natural Resources officer on April 1, 2007, and was employed by the State of Utah.  He was not cross-deputized by the United States or the Ute Indian Tribe on April 1, 2007, to exercise law enforcement authority on the Ute Reservation." (ECF 189 at ¶ 11.)

"On April 1, 2007, Rex R. Ashdown was employed as a Special Agent with the United States Federal Bureau of Investigation ('FBI') with duty in the Vernal Resident Agency out of the Salt Lake Division.  He was assigned to investigate the death of Todd Murray on the Reservation through the date of his retirement on May 31, 2007."  (*Id.* at ¶ 12.)  Agent Ashdown is an experienced investigator, having served with the FBI from 1985 until his retirement.  (ECF 199 at 269:16-22.)

"David Ryan is employed as a Special Agent with the FBI with duty in the Vernal Resident Agency out of the Salt Lake Division.  On April 1, 2007, and thereafter, [ ] Agent Ryan was assigned to the Vernal Resident Agency.  [ ] Agent Ryan took over the investigation of Todd Murray's death after [ ] Agent Ashdown retired on May 31, 2007."  (ECF 189 at ¶ 13.)  Agent Ryan and Agent Ashdown were the only two agents working in the FBI's Vernal Resident Agency on April 1, 2007.  (ECF 199 at 275:16-19.)  The Vernal Resident Agency had no support staff.  (*Id.* at 273:18-24.)

"In April of 2007, Dr. Edward A. Leis was employed as the Deputy Chief Medical Examiner for the State of Utah Medical Examiner's Office.  Dr. Leis conducted the examination of Mr. Murray's body and testified at a June 6, 2013, evidentiary hearing in the Utah District Court [l]itigation."  (ECF 189 at ¶ 14.)

Officer Norton knew Agent Ashdown professionally because they had worked "a couple cases together and stuff like that."  (ECF 198 at 183:9-15.)  Officer Norton considered Agent Ashdown a friend, although no closer a friend than any of his other colleagues, noting that they "never went to lunch or dinner or anything like that."  (*Id.* at 183:8-184:6.)  Investigator Campbell and Officer Norton are friends who have known each other since junior high school. (*Id.* at 132:19-22.)

Officer Norton described his relationships with Deputy Byron and Trooper Young as follows:

> Deputy Byron, he was with the sheriff's office when I was working there, and Trooper Young just – I mean, he was working at the same time.  We had interaction as far as maybe having a drink or something if we were working the same shift or something like that, but that was about it.

(*Id.* at 84:18-23.)

Officer Norton did not know Todd Murray and had not met him before April 1, 2007. (*Id.* at 106:19-22, 169:18-20.)  Officer Norton did not know any members of Mr. Murray's family or Mr. Kurip before April 1, 2007.  (*Id.* at 120:13-18, 169:21-22.)

**B.      Background Litigation Involving the Ute Tribe**

Since 1975, the Ute Tribe and the State of Utah have engaged in substantial litigation concerning the boundaries of the Uintah and Ouray Reservation and state and local law enforcement's jurisdiction to enforce state law within those disputed boundaries.  *Ute Indian Tribe v. Utah,* 521 F. Supp. 1072 (D. Utah 1981) ("*Ute I*"); *Ute Indian Tribe v. Utah*, 716 F.2d 1298 (10th Cir. 1983) ("*Ute II*"); *Ute Indian Tribe v. Utah*, 773 F.2d 1087 (10th Cir. 1985) (en banc) ("*Ute III*"), *cert. denied*, 479 U.S. 994 (1986); *Ute Indian Tribe v. Utah*, 935 F. Supp. 1473 (D. Utah 1996) ("*Ute IV*"); *Ute Indian Tribe v. Utah*, 114 F.3d 1513 (10th Cir. 1997) ("*Ute V*"), *cert. denied*, 522 U.S. 1107 (1998); *Ute Indian Tribe v. Utah*, 790 F.3d 1000 (10th Cir. 2015) ("*Ute VI*"), *cert. denied*, 577 U.S. 1216 and 577 U.S. 1229 (2016); *Ute Indian Tribe v. Myton*, 835 F.3d 1255 (10th Cir. 2016) ("*Ute VII*").

The Tenth Circuit has ruled favorably for the Ute Tribe in each of the *Ute* cases before it. The most relevant of these decisions is *Ute VI*, involving an attempted state prosecution of an Indian for, among other things, driving without an ignition interlock.  *Ute VI*, 790 F.3d 1007 n.1. The decision in *Ute VI* postdates the events giving rise to this suit.  The Tenth Circuit held that "prosecut[ing] tribal members in state court for conduct occurring within the tribal boundaries recognized by *Ute III*" is something "the State had no business doing." *Id.* at 1003.  The Tenth Circuit directed the district court to enter "appropriate preliminary injunctive relief forthwith" to halt the prosecution.  790 F.3d. 1011-13.  In doing so, the Tenth Circuit noted that it had already decided the boundaries of the Uintah and Ouray Reservation in *Ute V*, almost 20 years previously. *Id.*  The decision in *Ute V* predates the events giving rise to this case by approximately 10 years.

Despite the line of *Ute* cases extending back more than two decades at the time of Mr. Murray's death, Officer Norton testified that during his 13 years as a law enforcement officer in Uintah County the maps his agency used for Indian reservation land changed "from time to time," and that he would arrest tribal members on tribal land based on the directions he was given. (ECF 198 at 142:24-145:7.)

**C.      The Vehicle Pursuit**

"On April 1, 2007, Utah State Patrol Officer Dave Swenson began a high-speed car pursuit of a vehicle driven by Uriah Kurip."  (ECF 189 at ¶ 18.)  During the chase, "[Trooper] Swenson activated the dashboard camera in his police vehicle on Highway 88." (*Id.* at ¶ 19.) "[Trooper] Swenson contacted police dispatch to inform them that he was in pursuit while he was on Highway 88." (*Id.* at ¶ 20.)  "[Trooper] Swenson stated to dispatch that there were two occupants in the car that he was pursuing—one driver and one passenger.  He later stated to dispatch that the driver was male and appeared to be tribal."  (ECF 189 at ¶ 21.)  The BIA was notified of the high-speed chase by at least 11:04 a.m. on April 1, 2007.  (Def. Ex. 43 at 2 (Jones0011445).)

Officer Norton was not part of the chase.  (ECF 198 at 74:25-75:2.)  Officer Norton was off duty on April 1, 2007, a Sunday, driving his personal, unmarked vehicle when he saw Trooper Swenson in pursuit of a vehicle. (*Id.* at 72:20-21, 73:6-8, 81:5-10.)  Officer Norton

called dispatch with his cellphone, "found out what was going on," and chose to assist Trooper Swenson "as a backup officer . . . until somebody else . . . could actually get there and take over . . . ." (*Id.* at 73:21-74:24.)  Trooper Swenson did not request that Officer Norton assist with the pursuit of Mr. Kurip's vehicle.  (Def. Ex. 43.)  According to Agent Ashdown, there was nothing unusual about Officer Norton's assisting Trooper Swenson because officers in the sparsely populated Uintah Basin area would often assist officers from other jurisdictions.  (ECF 199 at 289:6-14.)

"The car that [Trooper] Swenson was pursuing crashed at the intersection of Seep Ridge Road and Turkey Track Road, on the Ute Indian Reservation."  (ECF 189 at ¶ 22.)  "The two occupants of the vehicle got out of the vehicle.  The driver, subsequently identified as Uriah Kurip, exited the driver['s] seat.  Todd Murray, the passenger, exited the front passenger seat." (*Id.* at ¶ 23.)  "Both Uriah Kurip and Todd Murray ran away from the car in different directions." (*Id.* at ¶ 24.)  "[Trooper] Swenson notified dispatch that the two occupants appeared to be tribal males."  (*Id.* at ¶ 25.)  At that time, Mr. Murray was on Ute Reservation land.  (Pl. Ex. 18 at 12-13 (Jones 0011223, Jones0011462).)

"[Trooper] Swenson previously testified that he visually checked Mr. Murray's hands and waistband for weapons, and that he did not see any weapon."  (ECF 189 at ¶ 26.)  "Mr. Murray was wearing short pants with short socks, a t-shirt and short-sleeved button up shirt."  (*Id.* at ¶ 27.)  "[Trooper] Swenson did not put Mr. Murray under arrest on April 1, 2007."  (*Id.* at ¶ 28.) "[Trooper] Swenson did not pursue Mr. Murray on foot."  (*Id.* at ¶ 29.)  "[Trooper] Swenson did pursue, and catch up to, Mr. Kurip, and he placed Mr. Kurip under arrest."  (*Id.* at ¶ 30.)  "After he began his pursuit of Mr. Kurip, [Trooper] Swenson did not see Mr. Murray again."  (*Id.* at ¶ 31.)  "[Trooper] Swenson did not see or hear any interaction between Officer Norton and Mr. Murray."  (*Id.* at ¶ 36.)

### D.   Officer Norton's Pursuit of Mr. Murray

"After [Trooper] Swenson had Mr. Kurip in handcuffs but before he made it back to Mr. Kurip['s] and [Trooper] Swenson's vehicles, Officer Norton arrived at the scene."  (*Id.* at ¶ 32.) Officer Norton arrived in his personal vehicle and was wearing jeans and a short sleeve shirt. (ECF 198 at 81:5-10, 90:3-4; Pl. Ex. 2 at 13.)

"[Trooper] Swenson pointed out to Officer Norton where Mr. Murray had gone and provided a general description of Mr. Murray."  (ECF 189 at ¶ 33.)  "[Trooper] Swenson did not tell Officer Norton that he had witnessed Mr. Murray commit any crime on April 1, 2007."  (*Id.* at ¶ 34.)  "Prior to the time that Officer Norton talked to [Trooper] Swenson, Officer Norton had not witnessed Mr. Murray commit any crime on April 1, 2007."  (*Id.* at ¶ 35.)

Officer Norton drove a short distance away, parked on the side of a road, and exited his vehicle in search of Mr. Murray.  (ECF 198 at 82:1-83:19.)  Trooper Young and Deputy Byron arrived shortly after Officer Norton exited his vehicle.  (*Id.* at 83:25-84:15.)  The officers then split up and went in different directions in search of Mr. Murray.  (*See id.* at 83:25-84:15, 90:7-24 (referring to a Trooper Troy Marks), 90:25-91:12 (Officer Norton admitting he might have confused Trooper Marks with Trooper Young).)

Officer Norton moved to the highest point he could to "visualize" where Mr. Murray could have run.  (*Id.* 83:3-6.)  To do so, Officer Norton walked 50-75 yards to the west from the road to reach the edge of a hill. (*Id*. at 83:14-15.)  Officer Norton then first observed Mr. Murray when he looked "west down over the hill" and saw Mr. Murray about 120-130 yards away.  (*Id*. at 87:18-21.)

Officer Norton was holding his weapon, a .40 Glock handgun, at "low ready" position as he observed Mr. Murray running "around the hill" towards Officer Norton's location.  (*Id*. at 93:5-14.)  Officer Norton observed "something black in [Mr. Murray's] hands," specifically in Mr. Murray's left hand.  (*Id*. at 89:15-17, 95:24-96:8.)  Officer Norton thought it was a gun but was not certain "because of the distance."  (*Id*. at 93:5-14*.*)  Officer Norton grew concerned for his own safety, so he drew his weapon and yelled "Police, get on the ground[!]" (*Id*. at 89:15-21.)  Officer Norton suspected Mr. Murray may have been "coming back to actually kill [Trooper Swenson] knowing that there [were] . . . no other officers out there."  (*Id*. at 93:5-14.)

Officer Norton testified that he was uncertain whether Mr. Murray heard his yells and acknowledged that he was not in uniform, although he testified that he had his badge on.  (*Id*. at 89:22-90:4.)  Photographs of Officer Norton taken after the shooting show that his badge was on his belt.  (Pl. Ex. 2 at 13.)  According to Officer Norton, when he was yelling toward Mr. Murray, Trooper Young and Deputy Byron were located "off to [Officer Norton's] left down a little ways," indicating they were to Officer Norton's south.  (*Id*. at 90:7-91:12.)

### E.    The Shooting[5]

According to Officer Norton, when Mr. Murray saw Officer Norton, Mr. Murray raised his arm and fired one shot at Officer Norton, which hit the ground below him.  (*Id*. at 93:15-21.)  Officer Norton lacked any cover.  (*Id*. at 93:19-20.)  Officer Norton fired two shots at Mr. Murray in rapid succession while facing Mr. Murray.  (*Id*. at 94:4-10, 172:7-9.)  Officer Norton saw the impact of his two shots on the sandstone rocks, with neither shot hitting Mr. Murray.  (*Id*. at 170:4-8.)  Officer Norton then turned around and ran 30-40 yards up the hill to a location where he thought he was safer.  (*Id*. at 93:19-25.)

Officer Norton testified that, with his cellphone in his left hand and his gun in his right hand, he then attempted to call dispatch via his cellphone "to let them know what was going on."

---

[5] The plaintiffs' entire case disputes Officer Norton's account of the shooting and rests on the premise that Officer Norton's account is false.  The dispute over whether Mr. Murray shot himself or was shot at close range by Officer Norton lies at the heart of the case and will be determined at a trial on the merits.  These findings are based on the evidence submitted solely for the plaintiffs' spoliation motion and are supported by the testimony and physical evidence submitted by the parties.  These findings do not and are not intended to reflect any determinations with respect to the merits of the plaintiffs' claim as to what occurred on April 1, 2007, leading to Mr. Murray's death.  The plaintiffs remain free to challenge Officer Norton's account and credibility, as well as the official cause of Mr. Murray's death, at trial on the merits.

(*Id.* at 94:1-3, 95:2-7.)  Officer Norton kept misdialing "because of stress and what was going on," while watching Mr. Murray and "scream[ing] at him to put the gun down."  (*Id.* at 95:5-7.)

Officer Norton testified that he then saw Mr. Murray put the gun to his head.  Mr. Murray held the gun against his head long enough for Officer Norton to give "3-4 commands before" Mr. Murray pulled the trigger, whereupon he immediately fell to the ground.  (*Id.* at 91:21-92:6, 93:23-94:3, 95:8-14; Def. Ex. 8 at 3 (Jones0018844).)  Officer Norton was about 150-160 yards away from Mr. Murray at that time.  (*Id.* at 98:16-21.)  Officer Norton claimed that he did not know he was on an Indian reservation.  (*Id.* at 136:16-20.)

### F.    Officer Norton's Subsequent Actions

Officer Norton re-holstered his weapon and eventually got through to dispatch on his phone and let dispatch know that "shots had been fired and [the] suspect was down[.]"  (*Id.* at 95:8-17.)  Officer Norton asked that dispatch send Trooper Young and Deputy Byron to his location and requested an ambulance.  (*Id.*)  Officer Norton also requested that dispatch send his supervisors.  (*Id.* at 97:3.)

Officer Norton testified that he did not believe that anyone else had observed the shooting but thought that Deputy Byron may have seen him on the hill.  (*Id.* at 92:7-93:1.)  Officer Norton admitted that he could not view things from the other officers' perspectives and did not read other officers' reports of the incident.  (*Id.*)

After the shooting and a few minutes after Officer Norton had spoken with dispatch, Trooper Young and Deputy Byron arrived at Officer Norton's location.  (*Id.* at 173:4-12.)  After Trooper Young and Deputy Byron approached him, Officer Norton "explained to them exactly what took place."  (*Id.* at 102:12-15.)  Trooper Young and Deputy Byron then approached Mr. Murray to "secur[e] the suspect."  (*Id.*)  Trooper Young and Deputy Byron moved towards Mr. Murray, gave him commands not to move, and handcuffed him.  (*Id.* at 102:25-103:2.)  Meanwhile, Officer Norton remained on the hill, where he was joined by Deputy Slaugh.  (*Id.* at 103:3-10.)

When Officer Norton initially talked to other officers after the shooting, he told them that Mr. Murray had fired at him once and that he had heard only one shot.  (*Id.* at 109:18-20, 110:8-10.)  Officer Norton "saw the bullet [supposedly fired at him by Mr. Murray] hit the ground" before Mr. Murray shot himself.  (*Id.* at 112:13-15.)  Later, after observing two shell casings and one "stovepiped" casing in the .380 Hi-Point handgun near where Mr. Murray lay, Officer Norton changed his belief about the number of rounds that Mr. Murray had fired at him.[6]  (*Id.* at 109:15-110:7.)

---

[6] A "stovepiped" round is when "the round has gone off, but the casing itself is actually stuck in the chamber.  And sometimes they're partially out . . . ."  (ECF 198 at 182:16-24.)  The resulting stuck casing jams the firearm.  (*See* ECF 199 at 294:15-25.)  Agent Ashdown testified

"Mr. Murray was unconscious and bleeding from his head when officers at the scene handcuffed Mr. Murray." (ECF 189 at ¶ 45; Pl. Ex. 2 at 8-11.) "Shortly after Mr. Murray was shot, an ambulance arrived and he was provided with medical assistance. No officer provided medical assistance to Mr. Murray before or during his treatment by ambulance personnel." (ECF 189 at ¶ 44.) Mr. Murray was handcuffed for approximately 30 minutes before an ambulance arrived. (Def. Ex. 43 at 8 (Jones0011451) (shooting reported by Officer Norton at approximately 11:30 a.m.), 13 (Jones0011456) (ambulance reported it was a couple of minutes away at 11:59 a.m.).)

"After Mr. Murray was shot, Officer Norton walked through the crime scene and took pictures." (ECF 189 at ¶ 38.) Specifically, after Mr. Murray was handcuffed, Officer Norton went down the hill to evaluate the scene and suggested to Deputy Byron that they take some photographs of the "pristine" scene before the ambulance arrived and moved any evidence. (ECF 198 at 108:11-14, 191:19-192:10.) After Officer Norton came down from the hill, Officer Davis arrived on the scene. (*Id.* at 104:11-19.) Officer Davis volunteered to stand at Mr. Murray's location to "protect the evidence" by ensuring that nothing was moved. (*Id.* at 108:14-18.) Officer Norton then went back up the hill and borrowed Deputy Slaugh's newer camera to take photographs. (*Id.* at 108:19-109:1.) Deputy Slaugh did not take the photographs because "he wasn't real familiar with the camera." (*Id.*)

While taking photographs, Officer Norton observed a .380 caliber handgun, later determined to be a Hi-Point brand handgun, near Mr. Murray. (*Id.* at 110:15-20.) Officer Norton testified that "[n]obody touched" that handgun. (*Id.* at 111:16-19.) Officer Norton also observed two bullet casings near Mr. Murray, and one that was visibly "stovepiped" in the .380 Hi-Point's chamber. (*Id.* at 109:14-17, 110:11-111:19.) A "stovepiped" round occurs when a "round has gone off, but the casing itself is actually stuck in the chamber." (*Id.* at 182:16-24.) Officer Norton did not move anything at the scene or touch any of the evidence. (*Id.* at 175:8-14.) At all times other than during the shooting and the immediate aftermath before other officers arrived, Officer Norton was either accompanied by or within the sight line of other law enforcement officers at the scene, including when Officer Norton went back to his vehicle at some point and when he was asked at some other unspecified point to help search for any evidence Mr. Kurip may have discarded. (*Id.* at 177:9-23.)

After Officer Norton had completed taking the photographs and while returning to the location of the patrol vehicles, Deputy Slaugh suggested putting up police tape around the scene to establish a perimeter around any evidence; officers on the scene then placed police tape around the site. (*Id.* at 176:9-19; 177:3-8; *see also id.* at 54:7-9, 64:7 (referring to left-over

---

that "[a] stovepipe[d] round happens for a variety of reasons. The two most common would maybe be the gun is dirty and uncared for and the slide action is gritty, so the slide doesn't move smoothly back and forth, so the gun doesn't operate correctly. The other most common reason for a stovepipe[d] round would be a -- a weak grip or lack of support for the gun when the gun's fired, which -- which again hinders the full action of the -- the slide to eject a round and reload another round." (*Id.* at 294:19-295:5.)

crime-scene tape at the scene the next day); ECF 199 at 233:20-25 (referring to a perimeter).)  At some time, likely after having taken the photographs, Officer Norton and Deputy Slaugh conducted a search for the shell casings from Officer Norton's firearm.  (*Id*. at 170:19-171:10.) At no point did any "officer instruct[] Officer Norton to remove himself from the scene."  (ECF 189 at ¶ 46.)

"Officer Norton was left in possession of his own handgun after he admittedly shot at Mr. Murray, and then he exchanged guns with his supervisor."  (*Id*. at ¶ 39.)  At some unspecified point, Chief Jensen, Officer Norton's superior, arrived at the scene and took Officer Norton's weapon.  (ECF 198 at 116:24-25.)  Officer Norton testified that he was told Chief Jensen conducted a visual inspection of the weapon and did not observe anything on it.  (*Id*. at 122:14-18.)  Officer Norton's weapon was his department-issued and owned Glock-brand .40 caliber handgun.  (*Id*. at 130:18, 131:10-23.)  Officer Norton is unsure whether he ever received that handgun back from Chief Jensen.  (*Id*. at 156:3-8.)  In accordance with departmental "custom," however, Chief Jensen gave his own service weapon to Officer Norton in return; Chief Jensen's weapon was "the same model and everything" as Officer Norton's.  (*Id*. at 130:1-25.)

Additionally, at some unspecified point between the shooting and Officer Norton's brief interaction with Agent Ashdown, Officer Norton returned to his car and called his attorney.  (*Id*. at 118:8-10.)  Officer Norton's attorney told him not to talk to anyone without the attorney being present.  (*Id*. at 154:11-13.)  Officer Norton does not remember ever going to his car to retrieve anything or put anything away.  (*Id*. at 185:24-186:2.)  Officer Norton, however, spent a significant amount of time by his car.  (*Id*. at 120:22-121:2.)

A few days after the incident, Officer Norton authored a police report.  (*Id*. at 133:24-134:4.)

### G.    Agent Ashdown's Investigation of the Scene

"The FBI had exclusive jurisdiction to investigate the incident because it occurred on the Ute reservation and because it was determined by law enforcement after Mr. Murray was shot that he was an enrolled member of a federally recognized tribe."  (ECF 189 at ¶ 47.)  The FBI Vernal Resident Agency was notified of the shooting at about 11:45 a.m.  (Pl. Ex. 17 at 1.)

On April 1, 2007, Agent Ashdown was informed that "there had been a car chase and a shooting and that a tribal member had been involved."  (ECF 199 at 274:22-275:2.)  Agent Ashdown "left from [his] home in [his] government vehicle and dr[o]ve straight to the scene." (*Id*. at 275:3-4.)  Based on the "word-of-mouth confirmation from BIA officers that were at the scene with – that had – maybe had personal knowledge of [Mr. Murray] being there," Agent Ashdown thought that it was "pretty well assured" that the FBI would have jurisdiction over the investigation, even before a certificate of membership could be obtained from the Tribe to confirm Mr. Murray's tribal status.  (*Id*. at 276:8-21.)  Agent Ashdown would spend a couple of hours at the scene.  (*Id.* at 299:13-15.)

"Agent Ashdown was the only FBI employee to arrive on the scene on April 1, 2007, and he did not arrive to the scene until after the shooting had occurred and until after Mr. Murray had been transported to the hospital."  (ECF 189 at ¶ 48.)  Agent Ashdown arrived at the scene at

approximately 12:30 p.m., about 15 minutes after the ambulance carrying Mr. Murray had departed for the hospital emergency room. (*Id.*; ECF 199 at 277:9-12; Pl. Ex. 17 at 1-2; Def. Ex. 43 at 14 (Jones0011457).) "[Trooper] Swenson was still at the scene of the incident when Agent Ashdown arrived, along with other state and local law enforcement officers." (ECF 189 at ¶ 49.) When Agent Ashdown arrived at the scene, he observed vehicles from the BIA, the Vernal City Police Department, the Utah Highway Patrol, and the Uintah County Sheriff's Office; he also observed other, unspecified vehicles. (ECF 199 at 277:18-22.)

Consistent with his general practice when arriving at a crime scene, Agent Ashdown believed he received a briefing on what had occurred from the most senior officers present, Chief Jensen of the Vernal City Police Department and Sergeant Chugg of the state police. (*Id.* at 277:16-278:13, 348:18-349:9.) While testifying, however, Agent Ashdown did not remember speaking to these officers, and instead relied on a photograph that shows them together. (*Id.* at 278:9-13, 348:18-349:9.) Agent Ashdown also recalls seeing Detective Rooks and Investigator Campbell at the scene. (*Id.* at 297:24-299:6.) Agent Ashdown is certain that he interacted with Investigator Campbell, although he has no specific recollection of his interaction. (*Id.* at 298:10-14.) While at the scene on April 1, 2007, Agent Ashdown did not interview any of the officers who had witnessed the shooting and its immediate aftermath. (*Id.* at 304:25-305:2.) "On April 1, 2007, no other officer reported to the FBI that they had seen Mr. Murray being shot." (ECF 189 at ¶ 37.) The FBI did not interview Officer Norton until one month after the shooting, on May 1, 2007. (Pl. Ex. 8.)

Agent Ashdown recalled speaking with Trooper Swenson, who showed Agent Ashdown the route that Trooper Swenson had taken to apprehend Mr. Kurip and the location where the shooting had occurred. (ECF 199 at 278:16-279:1.) Agent Ashdown did not place any markers in the area where Mr. Kurip's car was located. Agent Ashdown believed that the Highway Patrol would investigate the high-speed chase because the chase was within its purview. (*Id.* at 279:23-280:5.) Agent Ashdown nonetheless took photographs of the wrecked car Mr. Kurip had been driving and its skid marks. (*Id.* at 280:15-22.)

After examining the scene around Mr. Kurip's vehicle, Agent Ashdown went to the area from which he had been told Officer Norton had fired his shots. (*Id.* at 282:4-12.) Agent Ashdown observed Officer Norton standing nearby. (*Id.*) He also observed two expended shell casings that had already been marked by state or local law enforcement officers with evidence markers. (*Id.*) The shell casings from the .40 Glock were found at a noticeable distance from each other. (Def. Ex. 45DD (Jones0011742).) Later, Agent Ashdown collected the shell casings, which he verified were .40 caliber shell casings. (*Id.* at 300:22-301:4; Def. Ex. 4 at 8 (Jones0038089) (listing two .40 caliber casings as items #39 and #40).) Agent Ashdown knew that Officer Norton's handgun was .40 caliber based on his knowledge of the caliber of the standard-issue firearm for Vernal City officers. (ECF 199 at 301:4-11.)

Agent Ashdown observed Officer Norton's demeanor to be normal and that his clothes were "clean and pristine[.]" (*Id.* at 283:4-11.) Agent Ashdown testified that Officer Norton "hadn't been running or involved in any sort of altercation that was obvious from his clothes." (*Id.*; see Pl. Ex. 2 at 13 (photograph of Officer Norton).) "Agent Ashdown did not perform any testing of Officer Norton's clothing." (ECF 189 at ¶ 55.)

"The FBI is unaware of any state or local officer at the scene requesting permission to search Officer Norton's vehicle." (*Id.* at ¶ 40.) "Agent Ashdown did not request permission to search Officer Norton's vehicle, and did not search Officer Norton's vehicle; and the FBI is unaware of any search having been performed by local or state law enforcement." (*Id.* at ¶ 52.) Agent Ashdown did not believe there was any investigative need to search Officer Norton's car because he did not suspect Officer Norton of having done anything wrong. (ECF 199 at 288:18-25.)

Agent Ashdown had a brief conversation with Officer Norton and requested an interview. (*Id.* at 282:13-23.) Officer Norton advised that he wanted his attorney present for an interview. Agent Ashdown considered that request to be "typical" for a law enforcement officer involved in a shooting. (*Id.*) Agent Ashdown testified that, although he would have liked to interview Officer Norton on April 1, 2007, it was not unusual to wait until later so that Officer Norton's attorney could be present. (*Id.* at 305:6-22.)

"Agent Ashdown did not examine Officer Norton's gun, nor did he request that Officer Norton's gun be tested for blood or tissue." (ECF 189 at ¶ 54.) "Agent Ashdown [also] did not request that Officer Norton's hands be tested for blood or tissue, and did not test Officer Norton's hands." (*Id.* at ¶ 53.) Notwithstanding Officer Norton's request that an attorney be present for any questioning, Agent Ashdown believed that he could have asked to examine Officer Norton's handgun, but he did not do so. (ECF 199 at 360:6-12.) Agent Ashdown saw no reason to request that Officer Norton hand over his weapon. Instead, Agent Ashdown permitted Chief Jensen, who commanded Officer Norton's department (the Vernal City Police Department), to retain Officer Norton's handgun in accordance with its own protocol. (*Id.* at 288:9-17.) Further, Agent Ashdown did not have access to a DNA testing kit at the scene on April 1, 2007.[7] (*Id.* at 281:14-17.)

Ultimately, "[n]o officer at the scene tested Officer Norton's gun" or his "hands for blood or tissue." (ECF 189 at ¶¶ 41-42.) In any case, Agent Ashdown was "the decider" as to what evidence was taken into custody. (ECF 199 at 361:14-18.) Agent Ashdown did not ask anybody else at the scene to collect any evidence on his behalf. (*Id.* at 295:18-21.)

After talking to Officer Norton, Agent Ashdown traveled to the area where Mr. Murray had lain. (*Id.* at 290:11-14.) While there, "Agent Ashdown inspected the scene and laid down his own evidence markers." (ECF 189 at ¶ 50; *see also* ECF 199 at 290:17-291:7; Def. Ex. 45V (Jones0011733).) "Agent Ashdown independently photographed the scene, including photographing some of the blood and blood splatter [*sic*] that could be identified as blood."

---

[7] Wes Fitzer, a retired FBI agent and one of the defendant's expert witnesses, thought it was "odd" that Agent Ashdown did not have a DNA testing kit. In his experience, "[t]ypically within Indian country, [FBI agents] have the supplies necessary" to collect blood spatter and submit it for DNA testing. That said, Mr. Fitzer noted he would not have collected any blood spatter because Mr. Murray was the only one at the scene with an apparent injury, meaning any blood at the scene had to have been his. (ECF 200 at 525:15-526:23.)

(ECF 189 at ¶ 51.)  Agent Ashdown took photographs of blood spatter because he believed the spatter provided an indication of what had happened at the scene.  (ECF 199 at 292:5-9.)  He did not collect any samples of the blood spatter because he had been told that only one person (Mr. Murray) had been injured at the scene.  There was therefore, according to Agent Ashdown, no question of whose blood it was and no reason to do any scientific testing on the blood.  (*Id.* at 301:16-302:3.)  While at the scene, Agent Ashdown did not have any information about which side of Mr. Murray's head the bullet had entered.  (*Id.* at 259:2-5.)

Agent Ashdown also observed a handgun at the scene, near where he had been told Mr. Murray had lain; that handgun was later determined to be a .380 Hi-Point.  (*Id.* at 292:17-293:24, 300:5-21; Def. Ex. 45OO (Jones0011753).)  Agent Ashdown observed an "expended round that [was] jammed into the action" of the handgun, *i.e.,* the stovepiped round.  (ECF 199 at 293:1-2.)

Agent Ashdown later collected the gun, took the live rounds out of the magazine, and cleared the action.  He observed five rounds in the magazine, a spent round in the chamber, and two spent shell casings in the area (for a total of eight rounds).  (*Id.* at 294:5-14; Def. Ex. 4 at 8 (Jones0038089) (listing two .380 caliber casings as items #1 and #3).)  Upon collecting the handgun, Agent Ashdown identified it as a .380 caliber Hi-Point.  He also identified the two spent casings in the vicinity and the stovepiped round as .380 caliber, based on the writing on the rim of each cartridge.  (ECF 199 at 300:5-21.)  The .380 Hi-Point handgun did not appear to have any visible blood or tissue on it.  (Pl. Ex. 2 at 12, 15-16.)

The FBI never conducted any forensic testing of the .380 Hi-Point because Agent Ashdown did not believe there was anything to be learned from it.  (ECF 199 at 321:25-322:6.)  A few days following the shooting, after he had received a courtesy call from the medical examiner to inform him that Mr. Murray's death would be ruled a suicide, Agent Ashdown concluded that "[i]t was at that point pretty obvious of what we had as far as the cause of death, manner of death." (*Id.* at 320:20-322:6.)

In total, "Agent Ashdown collected the following physical evidence from the scene: (a) a .380 Hi[-]Point pistol; (b) the magazine with five rounds of ammunition from the .380 highpoint [*sic*] pistol; (c) an expended round shell that was jammed in the .380 pistol; (d) two .380 caliber shell casings; and (e) two .40 caliber shell casings."  (ECF 189 at ¶ 51.)  Agent Ashdown did not observe any signs that anyone had moved or tampered with any of the evidence near where Mr. Murray had been.  (ECF 199 at 295:9-12.)  Agent Ashdown did not conduct a search for any of the fired rounds because he did not reasonably expect that the rounds could be located, calling such a search "nigh on impossible."[8]  (ECF 199 at 290:4-10.)

---

[8] On April 2, 2007, the day after these events, Mr. Murray's family searched the area for expended rounds without success.  (ECF 198 at 28:17-29:2.)

### H.        Investigator Campbell's Investigation of the Scene

Before his arrival on scene, Investigator Campbell recalled Officer Norton calling him on April 1, 2007, and informing him of the events, including how Officer Norton had followed Mr. Kurip's car to serve as backup.  He also recalled that Officer Norton had informed him that Mr. Murray had shot at Officer Norton and then shot himself.  (ECF 199 at 232:2-233:8.)

When Investigator Campbell arrived at the scene, he spoke with Officer Norton and told him to stay at his location on the hill while Investigator Campbell walked down the hill to where Mr. Murray had lain.  (*Id*. at 233:20-234:4.)  Investigator Campbell was instructed to enter the scene through a perimeter law enforcement had set up to preserve evidence.  (*Id*. at 249:4-13.)  According to Investigator Campbell, he and Agent Ashdown were at the scene at the same time and spoke with one another. (*Id*. at 235:11-17.)

Along with Agent Ashdown, Investigator Campbell observed the scene where Mr. Murray had been shot, the Hi-Point .380 handgun near that location, the two spent .380 casings, and the stovepiped round in the handgun.  (*Id*. at 241:10-242:16, 260:7-14.)

Based on the direction of the blood spatter and brain matter on the sandstone, Investigator Campbell determined the direction of the bullet he believed had killed Mr. Murray.  (*Id*. at 258:18-259:1.)  Specifically, the blood spatter indicated that the shot that killed Mr. Murray traveled from north to south, at a right angle from where spent bullet casings indicated that Officer Norton was standing.  (*Id.* at 258:18-259:1, 260:16-18, 262:4-24; Def. Ex. 41 at 2 (Jones0011385).)  He also determined the number of shots that had been fired from the .380 Hi-Point gun by observing the number of shell casings on the ground and the stovepiped round in the weapon itself.  (ECF 199 at 260:1-14.)

Investigator Campbell also observed the location from where Officer Norton stated he had fired his shots.  Investigator Campbell saw the shell casings from Officer Norton's .40 Glock while viewing that location with Agent Ashdown.  (*Id.* at 249:15-23, 264:6-9.)  Investigator Campbell confirmed Officer Norton's location at the time of the shooting based on foot tracks and spent shell casings.  (*Id.* at 262:11-24, 263:13-22.)  Investigator Campbell specifically noted the absence of tracks in the "crusty, yellow clay and sand" between where Mr. Murray had been and where Officer Norton said he had been during their exchange of gunfire.  (*Id.*)

Investigator Campbell conveyed a summary of his findings to the Medical Examiner in a report, which consisted of a handwritten summary narrative about his observations.  (*Id.* at 252:10-16; Def. Ex. 41.)  Investigator Campbell's report states that "[b]lood spatter at the scene was clearly at a right angle to the location of [Officer Norton], and consistent with a self[-]inflicted gunshot to the head."  (Def. Ex. 41 at 2 (Jones0011385).)  Investigator Campbell did not speak with the Medical Examiner beyond submitting his handwritten report.  (ECF 199 at 254:10-21.)

16

## I.      The Forensic Examinations

After leaving the scene of the shooting, Agent Ashdown went to Blackburn Mortuary, where Mr. Murray's body had been taken following his death at a hospital.  (ECF 199 at 255 12-17, 307:5-13.)  While at the mortuary, Agent Ashdown observed Mr. Murray's body and spoke with the state and local officers gathered there, including Investigator Campbell, Deputy Byron, Officer Ben Murray, and Detective Rooks.  (*Id.* at 298:2-5, 307:15-20.)

While at the mortuary, and in Agent Ashdown's presence but not at his request, Officer Byron placed a gloved finger inside the entrance wound into Mr. Murray's skull to feel for beveling.[9]  (ECF 199 at 309:11-310:13; Pl. Ex. 2 at 2-4.)  Because Agent Ashdown could not himself determine which wound was the entry wound and which the exit wound, he decided to wait for the results from the Medical Examiner's examination of the body.  (ECF 199 at 307:21-25.)

Agent Ashdown did not see or collect Mr. Murray's clothing at the mortuary.  (*Id.* at 311:22-312:2.)  Agent Ashdown assumed that any clothing had been removed at either the hospital or the mortuary before Agent Ashdown's arrival.  (*Id.* at 311:25-312:8.)  Agent Ashdown did not believe the clothing would have added anything to the FBI's investigation.  (*Id.* at 312:9-13.)  Agent Ashdown observed that Mr. Murray's hands had been bagged, although he did not know who had requested that they be bagged or who had bagged them.  (*Id.* at 312:14-23.)  Agent Ashdown did not test Mr. Murray's hands for gunshot residue because the FBI did not conduct gunshot residue tests at that time.  (*Id.* at 322:7-14.)  Ultimately, Agent Ashdown did not collect any evidence at the mortuary.  (*Id.* at 313:10-15.)  Officer Ben Murray offered Agent Ashdown a vial of Todd Murray's blood, that Agent Ashdown assumed had been collected to test for alcohol or drugs, but Agent Ashdown rejected the offered vial both because he anticipated receiving blood-testing results from the Medical Examiner and because he had chain-of-custody concerns.  (*Id.* at 313:10-315:1.)

"The FBI requested that the Utah State Office of Medical Examiner perform an autopsy on Mr. Murray on April 1, 2007."  (ECF 189 at ¶ 56; Pl. Ex. 11.)  Specifically, Agent Ashdown requested an autopsy be performed.  (ECF 199 at 318:2-4; Def. Ex. 39.)

---

[9] Beveling refers to "a sort of cone shaped bone erosion in the direction of the bullet path through the cranial vault."  Lorenzo Gitto, M.D. & Robert Stoppacher, M.D., *Autopsy & Forensics, Types of Injuries, Gunshot Wounds*, Pathology Outlines (Aug. 24, 2021), https://www.pathologyoutlines.com/topic/forensicsgunshotwounds.html#:~:text=Beveling%20is%20a%20sort%20of,Sci%201991%3B36%3A1592) (last visited Mar. 23, 2023).  Dr. Joseph Cohen, one of the defendant's expert witnesses, described "the best example of [beveling] that I can think of is if one has seen a BB gun defect in a window, one side is very flat and the other side has the beveling.  And the beveling occurs on the opposite side of the window from where the BB came from."  (ECF 200 at 442:24-443:4.)

Agent Ashdown recalled receiving a courtesy call from the Medical Examiner's office within a day or two of the shooting. (ECF 199 at 320:20-321:4.) During that call he was informed that the Medical Examiner was "going to call [the incident] a self-inflicted wound, close-contact, self-inflicted wound, suicide;" a full report from the Medical Examiner was to follow. (ECF 199 at 321:3-13.) Agent Ashdown retired before the FBI received the Medical Examiner's written report. (*Id.* at 361:25-362:3.)

Despite Agent Ashdown's request for an autopsy, "Dr. Leis, a medical examiner for the Utah State Office of Medical Examiner, [only] performed an external examination of Mr. Murray's body." (ECF 189 at ¶ 57.) "Dr. Leis did not perform an autopsy." (*Id.* at ¶ 58.) Dr. Leis's report from that examination noted that Mr. Murray's left hand was clean, and his right hand was "caked" in blood. (Def. Exs. 51-52.) "Mr. Murray's wound has been described by Medical Examiner Leis and Plaintiffs' and Defendant's expert witnesses, Dr. Arden and Dr. Cohen, as a 'contact wound.'" (ECF 189 at ¶ 43.)

"The FBI did not request that the Office of Medical Examiner perform any additional testing on Mr. Murray's clothing." (*Id.* at ¶ 60.) "The FBI did not request that the Office of Medical Examiner turn over to it Mr. Murray's clothes after the examination of Mr. Murray's body. Dr. Leis [previously had] testified that had the FBI made such a request, the Office[] of the Medical Examiner would have turned the clothing over to the FBI." (*Id.* at ¶ 59.)

## J.    Subsequent Investigations

"Agent Ashdown interviewed Trooper Dave Swenson on April 2, 2007." (*Id.* at ¶ 61.)

Deanna Aguilar-Ramirez, Mr. Murray's aunt, visited the scene of the shooting on April 2, 2007, to search for evidence and take photographs and videos of the scene. (ECF 198 at 44:5-7, 46:4-47:5.) Ms. Aguilar-Ramirez found two cigarettes or cigarette butts, band aids, bandages, tapes, gloves, three large pools of blood, yellow glasses, crime scene tape, and empty beer bottles at or near the scene; she did not find any bullets. (*Id.* at 49:16-52:7, 63:17-64:7; *see also id.* at 28:17-29:2 (Ms. Jones stating that neither she nor her family members found or have possession of any bullets).)

Ms. Jones grew suspicious about the cause of Mr. Murray's death when she saw his body at the mortuary with a cut in his throat. (*Id.* at 25:17-26:5.) Ms. Jones was also suspicious because of the location of Mr. Murray's wounds. Ms. Jones believed her son had been "shot in the back of his head," based on her belief regarding the location of the entry wound. (*Id.* at 26:24-27:4.) Ms. Jones testified that her son was right-handed (*id.* at 27:9-10) but admitted that she had never seen him fire a gun and did not know whether he used his right or left hand to fire a gun. (*Id.* at 32:19-23.) Ms. Jones believed it was impossible for her son to have shot himself in the back of the head with his right hand. (*Id.* at 27:5-8.)

After Mr. Murray's funeral, Mr. Murray's family contacted the Ute Indian Tribe's Business Committee ("Business Committee") to pursue a lawsuit regarding Mr. Murray's death. The Business Committee provided an attorney, who met with Mr. Murray's family on April 11, 2007. (*Id.* at 17:24-18:18, 55:15, 64:8-15.) Although Mr. Murray's family knew that no autopsy

had been performed before Mr. Murray's body was released to the family, the family did not retain an independent forensic pathologist to conduct an autopsy.  (*Id*. at 29:3-30:1.)

Mr. Murray's family met with Agent Ashdown towards the end of April 2007, during the week after their initial meeting with their attorney.  (*Id*. at 40:21-23, 54:10-17.)  The family's attorney was not present for the family's meeting with Agent Ashdown.  (*Id*. at 65:2-7.)  Agent Ashdown also recalled meeting with five or six members of Mr. Murray's family during, as far as he recalls, an unannounced visit approximately a couple of weeks after April 1, 2007.  (ECF 199 at 323:2-22.)

Ms. Jones testified that she and her family told Agent Ashdown during their meeting that they disagreed with the conclusion that Mr. Murray's wound was self-inflicted, and that the family would be "pursuing this."  (ECF 198 at 23:1-3.)  Ms. Jones could not remember the exact words that she or her family members had used to express their dissatisfaction with Agent Ashdown's conclusion of a suicide, but she testified that someone informed Agent Ashdown at the meeting that the family was going to file a lawsuit.  (*Id*. at 30:2-16.)  Ms. Jones' sister, Martha Cornpeach, who also attended this meeting, testified that Agent Ashdown told the family that the investigation "was still ongoing" and that he was "gonna try his best to get our questions answered and try his best to follow through with the investigation."  (*Id*. at 36:16-21.)

That meeting in late April 2007 was the only time the Murray family met with someone from the FBI.  (*Id.* at 27:21-28:9.)  The Murray family did not contact the FBI again after the meeting in 2007 until the family's attorney filed a notice of claim in March 2009.  (*Id.*)

Agent Ashdown viewed the meeting as one with an upset, but respectful family that did not believe Mr. Murray had committed suicide.  (ECF 199 at 324:24-325:20.)  Agent Ashdown does not recall Mr. Murray's family providing him with any additional evidence, and nothing about the meeting changed Agent Ashdown's existing belief that the totality of the evidence supported the conclusion that Mr. Murray had committed suicide.[10]  (*Id*. at 329:3-17.)

On April 12, 2007, Agent Ashdown prepared a summary report of the incident.  That report contained the GPS locations Agent Ashdown had recorded for Officer Norton's location and Mr. Murray's location, based on what he had been told and the locations of physical evidence.  (*Id.* at 316:9-16; *see also* Def. Ex. 6.)  Agent Ashdown approximated the distance between those two GPS locations as 113 yards.  (Def. Ex. 6 at 1 (Jones 0006858).)

"Agent David Ryan interviewed Officer Norton in the presence of Officer Norton's lawyer on May 3, 2007."  (ECF 189 at ¶ 62.)  Agent Ryan's notes of the interview do not indicate that he asked Officer Norton any questions concerning Officer Norton's inconsistent

---

[10] During the meeting, Ms. Jones, her family, and Agent Ashdown together watched dash camera footage of the car chase leading up to the shooting on April 1, 2007.  (ECF 198 at 20:4-21:25, 56:14-22; ECF 199 at 327:12-19.)  No party has proffered dashboard camera video, and none has been admitted into evidence or reviewed by the Court.

statements about the number of shots Mr. Murray had fired; Officer Norton having initially stated that Mr. Murray fired one shot at him but later stated that he had fired two shots. (Pl. Ex. 8.) At the conclusion of the interview, Agent Ryan did not suspect Officer Norton of any wrongdoing. (ECF 199 at 392:20-395:4.) Agent Ryan did not believe there was probable cause to arrest Officer Norton or that there was any legal basis to request a search warrant for Officer Norton's person or property. (*Id.* at 394:11-395:4.)

Agent Ryan received the Medical Examiner's final report on Mr. Murray's death in July 2007 (*id.* at 395:21-23), and he did not notice or question the Medical Examiner's decision to conduct only an external examination rather than an autopsy on Mr. Murray. (*Id.* at 398:12-25.) The Medical Examiner's final report determined that the manner of death was suicide, and the cause of death was a contact gunshot wound to the left side of the head. (Def. Ex. 52.) After receiving the Medical Examiner's report, Agent Ryan did not think further investigation into Mr. Murray's death was necessary because the Medical Examiner's conclusion of suicide was corroborated by the evidence at the scene and Officer Norton's account. (ECF 199 at 399:4-13.)

### K.    Initiation of Legal Actions

Officer Norton did not learn that he was being accused of any wrongdoing related to the April 1, 2007, incident until about "a year or so later[.]" (ECF 198 at 190:7-13.) At some time in the spring or summer of 2008, Agent Ryan learned that Mr. Murray's family would be suing the local and state police officers and their employers over Mr. Murray's death. (ECF 199 at 405:11-19.)

Agent Ryan investigated the purchase of the .380 Hi-Point. That investigation revealed that that weapon had been illegally purchased for Uriah Kurip. (*Id.* at 399:17-401:12.) Agent Ryan closed the investigation into both the illegal purchase of the .380 Hi-Point and Mr. Murray's death in September 2008, after a conviction against a third party related to the illegal straw purchase of the .380 Hi-Point for Mr. Kurip. (*Id.* at 242:17-21, 326:9-13, 401:6-402:7, 405:6-10; Def. Ex. 19.)

Following the conviction of the straw-purchaser and the closure of the FBI case file, a United States District Judge issued an order of forfeiture for the .380 Hi-Point on November 14, 2008. (ECF 199 at 401:6-402:7; Def. Ex. 19.) Pursuant to this order, the .380 Hi-Point was removed from the FBI's evidence locker in late November 2008 and handed over to the U.S. Marshals Service in December 2008. (ECF 199 at 406:20-25.) "The Marshals Service destroyed the handgun, as is its routine practice." *Jones III*, 149 Fed. Cl. at 344. According to Agent Ryan's review of the case file and his familiarity with the general contours of the forfeiture process, the FBI followed its normal procedures for turning property over to the U.S. Marshals Service after an order of forfeiture has been entered. (*Id.* at 402:18-404:11.)

Agent Ryan was not thinking about civil litigation at the time the .380 Hi-Point was forfeited to the U.S. Marshals Service and destroyed, and to his knowledge, neither was anyone else involved in the forfeiture process. (*Id.* at 404:12-405:2.) Agent Ryan also did not contemplate the Murray family suing the United States because "this was a clear-cut case" of suicide and "[e]verything matched up from the [ ] statements[,] to the evidence that was found[,]

to the autopsy report. It just matched up." (*Id.* at 406:4-15.) Agent Ryan did not contemplate litigation against the United States over Mr. Murray's death until March 2009, when the family served the FBI with a notice of claim. (*Id.* at 405:20-406:3; Def. Ex. 50.)

### L.   Expert Witness Evidence

#### 1.   The Plaintiffs' Expert Witnesses

 "Dr. Jonathon Arden and William Gaut are experts retained by the Plaintiffs, and they have been deposed once in the Utah District Court [l]itigation and once by the United States in this case." (ECF 189 at ¶ 15.) The parties stipulated to portions of prior deposition testimony for use in resolving the motion for spoliation sanctions.[11] (*Id.* at ¶ 16.) Neither Dr. Arden nor Dr. Gaut testified at the evidentiary hearing, and neither was qualified as an expert witness.

Dr. Gaut, an expert in police practices, opined that "this case can't be closed, we can't prove this is a suicide just because we have one officer who says it was a suicide." (ECF 144-2 at 150:13-15.) He also opined that he "didn't see any evidence to corroborate or to refute [Dr. Leis's determination of cause and manner of death]. Because, remember, the evidence might show that exactly what was alleged to happen did, but we can't know the answer to that because all of the evidence went away." (*Id.* at 151:16-24 (apparently referencing the blood spatter, Officer Norton's clothes, and the lack of testing of one or more guns, including whether the.380 Hi-Point was functional).) In reference to an unspecified checklist, Dr. Gaut opined that: "You can't, for instance, choose not to collect a gun, or choose not to identify a blood stain. Those are things that are not discretionary. They become -- evidence becomes part of the crime scene, and it has to be protected, collected, analyzed." (*Id.* at 31:7-20.)

Dr. Gaut acknowledged that the FBI could properly conclude that a death was a suicide when it receives a certification of death by suicide from a forensic pathologist and there exists "even a slight bit" of corroborating forensic evidence. (*Id.* at 151:10-15.)

Dr. Arden, a widely recognized medical examiner, opined:

> There should have been further inquiry and examination, should have been further documentation of critical facts. . . . I'm not saying affirmatively this was not a suicide. I'm certainly not saying it could not have been a suicide. I am saying that the totality of the investigation and the examination were not adequate and leave questions open.

---

[11] Specifically, "[t]he parties stipulate that the following pages of deposition transcripts are considered as testimony for purpose of Plaintiff[s'] renewed motion for spoliation sanctions. Deposition of Jonathan Arden: pages 13, 54–55, 57, 61–64, 77–78, 82–84, 124–29, and 163–65 [available at ECF 144-1]. Deposition of William Gaut: pages 10, 14–20, 31, 87–88, 134, 146–47, and 150–51 [available at ECF 144-2]." (ECF 189 at ¶ 16.)

(ECF 144-1 at 57:10-19.)  Dr. Arden also opined that the gunshot wound to Mr. Murray's head was "atypical for a self-inflicted gunshot wound," and that the location of the head wound was "unusual" and the supposed trajectory of the bullet "a little unusual." (*Id.* at 55:4-11.)

In reference to suicides by gunshot, Dr. Arden also opined that "there probably is some spattering in every one of these cases but it doesn't create visible identifiable spatter or blow-back in a hundred percent of the cases." (*Id.* at 82:3-7.)  He added that only a minority of suicide-by-gunshot cases lack visible blow-back on the hand or gun, "[b]ut is it something that can occur, yes." (*Id.* at 82:8-16.)  Dr. Arden opined that the absence of blow-back on Mr. Murray's hand:

> would raise the question to me about whether it was actually a suicide.  And it would cause me to make sure I'd investigated very thoroughly and make sure that the other evidence is sufficient if I were going to certify that case as a suicide.  It would not by itself absolutely exclude a suicide, no.

(*Id.* at 83:6-19.)

Finally, Dr. Arden opined that "a complete autopsy should have been performed rather [than] an external examination . . . to confirm that the external features" of the gunshot wound were consistent with the internal features, to examine the brain injury further, and to compare this information with witness accounts of the shooting.  (*Id.* at 126:16-127:14.)

### 2.    The Defendant's Expert Witnesses

#### a.    Mr. John W. Fitzer

Mr. John W. Fitzer is a retired FBI agent with extensive experience and specialized training in conducting criminal investigations in Indian country and in evidence-gathering procedures.  (ECF 200 at 482-96.)  He has processed more than a thousand crime scenes throughout his career.  (*Id.* at 496:2-10.)  Mr. Fitzer was designated "as an expert in crime scene investigations or crime scene processing and criminal investigations in Indian country" and testified at the evidentiary hearing.  (*Id.* at 496:17-497:17.)  Mr. Fitzer reviewed the evidence, police reports, photographs, and deposition testimony of the responding law enforcement officers related to the death of Mr. Murray.  (*Id.* at 498:2-11.)  In August 2008, he also visited the scene where the incident had taken place.  (*Id.*)

Mr. Fitzer explained that FBI guidance limits the FBI's investigative jurisdiction to crimes based on specific violations of federal laws.  (Def. Ex. 16 at 8 (Jones0042228).)  He also explained that an FBI agent typically begins an investigation by identifying the legal authority for the FBI's presence at the scene and determining that there is a potential criminal violation of law that would confer authority on the FBI to conduct a criminal investigation.  (ECF 200 at 503:16-504:14.)

Mr. Fitzer explained that the FBI processes crime scenes using a 12-stage process, which is taught to all FBI agents.  (*Id.* at 501:18-22.)  The 12 stages include, among other things, the

securing and protection of a scene, evaluation of evidence possibilities, documentation of the scene with photographs, a detailed search, and collection and recordation of evidence. (Def. Ex. 18 at 22 (Jones0038326) (admitted as a demonstrative exhibit only).)  Mr. Fitzer did not see any evidence that Agent Ashdown had failed to follow that 12-stage process in processing the scene of Mr. Murray's death.  (ECF 200 at 515:15-516:1.)

With regards to the scene of the shooting on April 1, 2007, Mr. Fitzer opined that the non-federal law enforcement officers appropriately acted to preserve and protect the scene until the FBI arrived.  (*Id*. at 507:21-508:3.)  The responding law enforcement officers stood near items of potential evidentiary value, including fired rounds, to ensure that those items were neither touched nor moved.  (*Id*. at 508:4-25.)  According to Mr. Fitzer, Officer Norton's participation in the investigation by taking photographs of the scene was not improper because it was done in the presence of other law enforcement officers and did not disturb any evidence. (*Id*. at 513:9-514:17.)

Mr. Fitzer opined that, upon arrival, Agent Ashdown appropriately took responsibility for documenting and gathering evidence at the scene.  (*Id*. at 509:1-5.)  First-hand information is not available for every incident, so investigators must take all evidence into consideration to include testimonial evidence and physical evidence.  (*Id.* at 552:22-553:9.)  In Mr. Fitzer's opinion, Agent Ashdown reasonably relied on some second-hand information because it corroborated evidence at the scene.  (*Id*. at 553:10-25.)  Agent Ashdown also properly located, documented, and collected all the spent bullet casings at the scene (*id*. at 510:23-511:9); recorded GPS coordinates to identify the location of Officer Norton's shell casings and the location where Mr. Murray had fallen after being shot (*id*. at 512:8-15); and took possession of the .380 Hi-Point handgun (*id*. at 511:16-512:5).

In Mr. Fitzer's opinion, Agent Ashdown had "zero" information at the scene that Officer Norton was ever near Mr. Murray prior to the gunshot wound to Mr. Murray's head.  (*Id*. at 518:19-519:14.)  Based on the information and evidence gathered by Agent Ashdown at the scene, Mr. Fitzer opined there was neither reasonable suspicion nor probable cause for the FBI to search Officer Norton's car or collect his clothing or his .40 Glock.  (*Id*. at 520:13-521:13.) Additionally, the FBI's decision to photograph, but not collect, blood spatter evidence was reasonable because no one other than Mr. Murray had been injured, and there was therefore no doubt that the blood on the scene had come from Mr. Murray.  (*Id*. at 525:9-527:12.)

Further, Mr. Fitzer opined that there was no need to collect Officer Norton's .40 caliber service weapon to tie it to the spent shell casings found at Officer Norton's location, because there were other methods to connect that gun to the spent casings.  (*Id.* at 519:4-6.)  Although not specified by Mr. Fitzer, one apparent method was reading the listed caliber of the bullets written on the rim of the spent shell casings.  (ECF 199 at 300:5-301:9.)  The FBI's decision not to collect Officer Norton's weapon was therefore reasonable, in Mr. Fitzer's opinion, because neither physical evidence nor witness testimony at the scene indicated that any of Officer Norton's rounds had struck Mr. Murray.  (ECF 200 at 518:4-18.)

In any case, Mr. Fitzer opined that Chief Jensen's inspection of Officer Norton's weapon was equivalent to any inspection the FBI would have performed, except for not confirming the

gun's make, model, and serial number.  (*Id.* at 560:5-20.)  Because there were only two weapons fired at the scene on April 1, 2007, a .40 caliber and a .380 caliber, Mr. Fitzer opined that there was no reason to conduct further testing to tie those weapons to the shell casings found at the scene because those casings were clearly identified by their caliber.  (*Id.* at 528:1-10.)

Mr. Fitzer also explained that the FBI had stopped conducting gunshot residue tests before April 1, 2007, because they had proven unreliable due to an unacceptable number of false negatives and false positives.  (*Id.* at 522:1-16.)  Mr. Fitzer also opined that gunshot residue testing would not have added any evidentiary value because the testimonial and physical evidence at the scene showed that both Officer Norton and Mr. Murray had fired weapons on April 1, 2007.  (*Id.* at 522:17-24.)

Mr. Fitzer concluded that the FBI properly identified, preserved, collected, and analyzed the physical evidence from the scene.  (*Id.* at 499:6-11.)  Mr. Fitzer added that crime scene investigations cannot operate in a vacuum; instead, an investigator must assimilate all available information and apply it to what the investigator observes at the scene.  (*Id.* at 499:20-500:2.)  Mr. Fitzer opined that the FBI maintained a proper chain of custody for the evidence that was collected.  (*Id.* at 516:11-23.)

In Mr. Fitzer's opinion, a search for any fired bullets was unnecessary due to the exorbitant effort that would have been required to find them, and because all the evidence at the scene supported the conclusion that Mr. Murray had suffered a self-inflicted gunshot wound to his head.  (*Id.* at 523:6-525:8.)  When asked if the FBI should have searched for the projectiles fired at the scene, Mr. Fitzer testified that "[t]he amount of effort that would have been needed to even undertake searching for the rounds would have been exorbitant and beyond reasonable given the facts and circumstances known."  (*Id.* at 522:25-523:11.)  With regards to the projectiles from the .380 Hi-Point, Mr. Fitzer described the effort involved as searching an area of approximately 240,000 square yards, or 37 football fields, to find objects "roughly twice the size of a pencil eraser."  (*Id.* at 523:12-525:8.)

### b.    Dr. Joseph Cohen

The Court qualified Dr. Joseph Cohen as an expert in forensic pathology, and he testified at the evidentiary hearing.  (*Id.* at 426-34.)  He has performed 7,000 autopsies, 15,000 external examinations, and 15,000 to 20,000 medical record reviews during his career.  (*Id.* at 430:24-431:8.)

According to Dr. Cohen, forensic pathologists or medical examiners generally perform three levels of service: (a) medical record review, (b) external examination, and (c) autopsy.  When performing a medical record review, the medical examiner only reviews medical charts to determine the cause and manner of death.  When performing an external examination, the medical examiner examines the outside of the body, documents injuries, and draws biological fluids.  When performing an autopsy, the medical examiner performs an external examination but also makes incisions on the body and removes organs one-by-one.  All three "levels of service are for the same purpose, for cause and manner of death certification."  (*Id.* at 429:21-430:21.)

In Dr. Cohen's opinion, Mr. Murray's gunshot wound was a contact wound, meaning that the weapon that fired the fatal shot was very near Mr. Murray's skull.  (*Id*. at 440:21-443:12.)  More specifically, a contact wound is "when the muzzle of the gun . . . abuts, it's touching the skin surface or the scalp."  (*Id*. at 444:4-7.)  Dr. Cohen noted that Dr. Leis, who conducted the external examination of Mr. Murray's body, reported finding soot in the wound track, which is consistent with a contact wound.  (*Id*. at 436:13-15, 442:7-10, 443:14-445:7.)

Dr. Leis determined that Mr. Murray's entrance wound was near his left temple slightly above and behind his left ear.  (*Id*. at 440:21-441:7; *see also* Def. Exs. 29 and 32.)  According to Dr. Cohen, Dr. Leis also determined that the exit wound was in the back-right portion of Mr. Murray's head, behind and above his right ear.  (ECF 200 at 446:6-16; Def. Exs. 30 and 31.)  By knowing the locations of the entrance and exit wounds, Dr. Leis could deduce the bullet's path through Mr. Murray's brain, which, according to Dr. Cohen, was "left to right, slightly upward, and slightly front to back."  (ECF 200 at 446:19-447:10.)

According to Dr. Cohen, a third party sticking a finger into the entrance wound in the form of "a simple prod [of] the wound, [to] palpate or touch inside of the wound . . . would not alter the [evidentiary] landscape significantly."  (*Id*. at 445:9-21.)  Likewise, Dr. Cohen opined that a post-mortem cut in Mr. Murray's neck would not have affected the ability of a medical examiner to determine the cause and manner of death.  (*Id*. at 478:18-21.)

Dr. Cohen noted that Dr. Leis also took an x-ray of Mr. Murray's brain, which in Dr. Cohen's opinion revealed no discernible projectiles or projectile fragments.  (*Id*. at 449:8-450:1.)  According to Dr. Cohen, an internal examination of Mr. Murray's skull and brain would not have changed Dr. Leis's determinations regarding cause and manner of death.  (*Id*. at 452:3-8.)  The x-ray revealed no bullet fragments that were large enough to be seen, so even if an autopsy had been conducted, Dr. Cohen opined that no "reasonable forensic pathologist would [have] search[ed] for" any minute fragments that were not visible on the x-ray.  (*Id*. at 455:17-456:7.)  Dr. Cohen also noted that Dr. Leis took blood samples from Mr. Murray's body, and that these samples revealed that Mr. Murray was under the influence of alcohol and methamphetamine when he died.  (*Id*. at 447:13-448:4.)

According to Dr. Cohen, Dr. Leis had noted in his Medical Examiner's report that Mr. Murray's right hand was "caked in blood."  (*Id.* at 448:5-11.)  Reviewing the photographs of Mr. Murray's right hand, Dr. Cohen opined that the blood on Mr. Murray's right hand came from the effects of the discharge of the weapon, or from Mr. Murray's hand lying in a pool of his own blood, or from both causes.  (*Id*. at 448:5-449:7.)  Dr. Cohen also opined that the blood could have been transferred to Mr. Murray's hand when Mr. Murray was moved prior to the paramedics arriving or after he was moved into the ambulance and later into the hospital.  (*Id.*)

Dr. Cohen agreed that the physical information could only reveal that Mr. Murray had suffered a close contact wound and not who had inflicted it.  (*Id.* at 477:24-478:6.)  Dr. Cohen opined that the manner of death had to be either suicide or by a shot from someone else holding a firearm that was in contact with Mr. Murray's head at the time it was fired.  (*Id.* at 478:22-479:13.)

III.    **ANALYSIS**[12]

As noted above, the plaintiffs have narrowed their requests for spoliation sanctions.  They now seek sanctions for the spoliation of only three pieces of unavailable evidence: (1) the .380 Hi-Point, (2) Officer Norton's clothing, and (3) the .40 Glock.

A.    **Spoliation Sanctions for the .380 Hi-Point**

*Jones III* previously held that the defendant had negligently spoliated the .380 Hi-Point; based on that finding, the Court imposed a sanction that limited the defendant's use of that weapon as evidence to support the theory that Mr. Murray had committed suicide with it.  *Jones III*, 146 Fed. Cl. at 741-43.  The Federal Circuit reversed the spoliation sanction and remanded for a redetermination of "the exact bounds of the appropriate remedy, such as an adverse inference or inferences, that should apply to any spoliated evidence in this case."  *Jones V*, 2022 WL 473032, at *11.

As a sanction for the defendant's spoliation of the .380 Hi-Point, the plaintiffs seek an irrebuttable adverse inference that "the .380 gun did not have Mr. Murray's blood, tissue, fingerprints, or DNA on it" and "that the .380 gun was not operational."  (ECF 201 at 25-26.)[13] If the Court were to award the plaintiffs their requested sanction of several adverse, irrebuttable inferences, the defendant would not be allowed to offer any evidence or argument against any adverse inference imposed, and the Court would have to accept any such adverse inferences as fact.

The defendant, after reasserting that no sanction should have been imposed and that the original sanction was sufficient, argues that "the Court should limit any sanction to a permissive negative inference related to [the .380 Hi-Point]."  (ECF 203 at 2, 29 n.8, 42.)  Specifically, the defendant argues that the appropriate sanction for the FBI's negligent destruction of the .380 Hi-Point is a "rebuttable, permissive inference" that "'the .380 gun did not have Mr. Murray's blood, tissue, fingerprints, or DNA on it.'"  (*Id.* at 42, 48 (quoting ECF 201 at 26).)  The defendant opposes the plaintiffs' requested adverse inference that the .380 Hi-Point was not operational because such an inference "does not fill an evidentiary gap, but instead contradicts credible testimonial and physical evidence that the Hi-Point .380 was fired at the scene on April 1, 2007."  (*Id.* at 48-49.)  Importantly, other than "re-assert[ing] that the Court's original sanction" imposed in *Jones III* "was sufficient," a position the Federal Circuit rejected in *Jones V*, the defendant has not argued that any sanction less than an adverse inference is appropriate for the spoliation of the .380 Hi-Point.  The defendant, however, has argued that it should not be

---

[12] The Court's analysis contains additional findings of fact, as well as conclusions of law predicated on the facts found.

[13] Although not clear from the plaintiffs' filings, the plaintiffs clarified during their closing summation that they were seeking *irrebuttable* adverse inferences as sanctions for the alleged spoliation.

precluded from presenting secondary evidence related to the .380 Hi-Point because Agent Ashdown, Investigator Campbell, and Officer Norton can credibly testify about their observations of the weapon and because such a sanction would be "a highly punitive, default judgment-type sanction" when combined with an adverse inference.[14]   (*Id.* at 47-48.)

The Federal Circuit specifically held that an appropriate sanction for the destruction of the .380 Hi-Point "should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." *Jones V*, 2022 WL 473032, at *9 (cleaned up).  The appropriate sanction must "(1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." *Id.* at *10 (cleaned up).  The Federal Circuit also noted that an appropriate sanction might include "an adverse inference or inferences." *Jones V*, 2022 WL 473032, at *11.

Because the imposition of a spoliation sanction for the destruction of the .380 Hi-Point is levied pursuant to the Court's inherent power, "restraint and discretion" are necessary. *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44 (1991).  "[G]iven the potential harshness of negative inferences, the discretion of the court must be exercised in a common sense manner." *Chapman Law Firm, LPA v. United States*, 113 Fed. Cl. 555, 611 (2013), *aff'd*, 583 F. App'x 915 (Fed. Cir. 2014).

To accomplish the goals set out by the Federal Circuit, the imposition of a rebuttable adverse inference is warranted because any lesser sanction would be ineffective, *see Jones V*, 2022 WL 473032, at *9-11, and because the parties have both argued that some form of adverse inference is an appropriate sanction.

With the "prophylactic, punitive, and remedial rationales underlying the spoliation doctrine" in mind, *Jones V*, 2022 WL 473032, at *9 (cleaned up), the following two sanctions are imposed on the defendant for the spoliation of the .380 Hi-Point:

1. A rebuttable adverse inference that the .380 Hi-Point did not have Mr. Murray's blood, tissue, fingerprints, or DNA on it.  The defendant may rebut this adverse inference only with physical evidence or corroborating testimony from at least one witness other than Officer Norton.  If the defendant rebuts this adverse inference, the question of what the .380 Hi-Point would have shown will be treated as unknowable.

2. To prevent circumvention of the first sanction, the defendant may not rely on any secondary evidence as to what may have been found on the .380 Hi-Point or secondary evidence concerning the un-ejected (or stovepiped) shell casing found in the destroyed handgun to support its arguments on the merits that Mr. Murray

---

[14] Here, secondary evidence refers to "evidence related to the spoliated gun in the form of photographs and testimony . . . ." *Jones V*, 2022 WL 473032, at *11.

died by a self-inflicted gunshot wound.  The defendant may on the merits, however, present physical evidence or testimony from witnesses to corroborate Officer Norton's testimony to show that Mr. Murray was in possession of and used the .380 Hi-Point on April 1, 2007, and to provide evidence concerning the origin, ownership, and destruction of the weapon.

These sanctions provide the plaintiffs with an adverse inference that the .380 Hi-Point would have produced evidence favorable to their assertion that Mr. Murray did not commit suicide.  These sanctions also prevent the defendant from benefiting from any evidence that might have been found on the .380 Hi-Point, other than to rebut the adverse inference and render the question of blood, tissue, fingerprints, or DNA on the handgun unknowable.  These sanctions ameliorate the prejudice done to the plaintiffs by placing upon the defendant the burden to show the .380 Hi-Point would not have provided evidence favorable to the plaintiffs.  They prevent the defendant from using whatever evidence would likely have been found or had been missing on the .380 Hi-Point, even if the defendant rebuts the adverse inference favorable to the plaintiffs, because the defendant was negligently culpable in the destruction of the .380 Hi-Point.

To ensure that the risk of an incorrect judgment is placed on the defendant, commensurate with its negligence, and to deter future spoliation, the defendant will face limitations on the evidence it may use to rebut the adverse inference.  The defendant will not be able to rely solely on the testimony of Officer Norton to overcome the adverse inference.  Instead, the defendant will have to provide physical evidence or credible corroborating testimony from at least one witness other than Officer Norton to rebut the adverse inference being imposed with respect to the .380 Hi-Point.

These limitations are necessary to prevent prejudice to the plaintiffs.  Officer Norton is the only surviving eyewitness to the actual shooting of Mr. Murray.  If the defendant were allowed to rebut the adverse inference by relying simply on his testimony, the plaintiffs would not be able to mount a meaningful rebuttal except by undercutting Officer Norton's credibility.

To rebut the adverse inference being imposed, the defendant will therefore have to rely on physical evidence from the scene or from the testimony of other officers who were present near the shooting or who investigated the scene.  Officer Norton will be permitted to testify about the events, but that testimony will not be sufficient to rebut the adverse inference.  If the evidence produced by the defendant is sufficient to rebut the adverse inference, any evidence that would or would not have been found on the .380 Hi-Point will be treated as unknowable.

These sanctions permit the defendant to use secondary evidence to rebut the adverse inference but not to prove or to argue what testing of the .380 Hi-Point may have revealed to support its theory of the case.  As the Federal Circuit noted, allowing the defendant to present secondary evidence regarding the .380 Hi-Point to support its theory of the case could render a spoliation sanction meaningless.  *See Jones V*, 2022 WL 473032, at *10-11.  The gravamen of the plaintiffs' claimed spoliation concerning the .380 Hi-Point is that the plaintiffs were denied an opportunity to test that weapon for blood, tissue, fingerprints, and DNA (*see* ECF 201 at 25-26), evidence that plausibly could have been on the gun but not visible to the naked eye (*see* ECF 144-1 at 82:3-7).  Allowing the defendant to rely on secondary evidence to support its theory of

28

the case would undermine the effectiveness of the rebuttable adverse inference sanction. Therefore, secondary evidence related to what was on the gun can only be used to rebut the adverse inference being imposed but may not be used affirmatively by the defendant to argue that Mr. Murray committed suicide.

In other words, if the defendant rebuts the adverse inference, what may have been found on the .380 Hi-Point will be treated as unknowable.  To do otherwise would allow the defendant to use secondary evidence to show what may have been on the .380 Hi-Point for use in support of arguments on the merits.  To allow the defendant to make such arguments on the merits would allow the defendant to circumvent the spoliation sanction with secondary evidence and benefit from its destruction of the primary evidence, *i.e.*, the .380 Hi-Point.  That outcome would be inconsistent with the Federal Circuit's direction.

As the .380 Hi-Point was undisputedly present at the scene of the shooting, however, the defendant may still present evidence to corroborate Officer Norton's testimony, that the .380 Hi-Point was present and operable on April 1, 2007.  The plaintiffs have offered no arguments that the destruction of the .380 Hi-Point somehow led to the prejudicial loss of evidence related to the presence, origin, or ownership of the .380 Hi-Point.  Questions about the ownership and origin of the .380 Hi-Point were also the subject of other federal court proceedings, and the plaintiffs have presented no reason to question the reliability of previous conclusions related to that weapon. (ECF 199 at 401:15-402:7; Def. Ex. 19.)  Therefore, the defendant may rely on secondary evidence, in addition to Officer Norton's testimony, to show the origins of the .380 Hi-Point and how it came to be at the scene of the shooting.  The defendant will also be able to introduce physical evidence, such as photographs of the .380 Hi-Point, to show that it was found at the scene of the shooting but may not rely on any evidence to argue on the merits that the weapon was free of blood, tissue, fingerprints, and DNA.

Because the defendant's destruction of the .380 Hi-Point was at most negligent, the adverse inference imposed will be rebuttable.[15]  The evidence shows that the defendant

---

[15] There is a circuit split as to whether negligence alone suffices for the imposition of an adverse inference as a sanction for spoliation of evidence, or whether a state of mind more culpable than negligence, such as bad faith, is required.  *See Jandreau v. Nicholson*, 492 F.3d 1372, 13776 n.3 (Fed. Cir. 2007) (noting that the Second and Sixth Circuits permit an adverse inference for "mere negligence," while the First, Third, Fifth, Ninth, Tenth, and Eleventh Circuits do not).  The Federal Circuit held in *Jandreau* that the "general rules of evidence law" require that the spoliated evidence be "destroyed with a culpable state of mind" before a court may impose an adverse inference.  *Id.* at 1375; *Burns v. McDonough*, No. 2021-1878, 2022 WL 2899087, at *3 n.4 (Fed. Cir. July 22, 2022); *Alexce v. Shinseki*, 447 F. App'x 175, 178 (Fed. Cir. 2011) (quoting *Jandreau*, 492 F.3d at 1375).  The Federal Circuit, however, has never specified what level of culpability is required for the imposition of an adverse inference.  *Burns,* 2022 WL 2899087, at *3 n.4; *Kirkendall v. Dep't of Army*, 573 F.3d 1318, 1327 n.6 (Fed. Cir. 2009) (noting that *Jandreau* "presented . . . the question of whether negligent, as opposed to bad

destroyed the .380 Hi-Point pursuant to a forfeiture order signed by a federal district judge. (ECF 199 at 401:15-402:7; Def. Ex. 19.)  As was noted in *Jones III*, the weapon was destroyed only after public notice of its forfeiture and impending destruction were provided.  146 Fed. Cl. at 733 (citing ECF 77 at ¶ 40).  That public notice undercuts any claim that the defendant's employees were acting in secrecy and bad faith to destroy useful evidence.  Further, no evidence has been presented that the defendant destroyed the weapon to prevent its usage as evidence in this or any other case arising from Mr. Murray's death.  There is no evidence that the defendant or any of its employees, including agents and employees of the FBI or the Marshals Service, acted with bad faith or with an improper motive.

Additionally, although litigation was reasonably foreseeable as early as April 1, 2007, the plaintiffs apparently took no steps themselves to request that the defendant preserve the .380 Hi-Point for use in the litigation the plaintiffs were contemplating at the time the weapon was destroyed, following public notice of that impending action.  *See Jones III*, 146 Fed. Cl. at 742 n.8.  This is not a case in which the plaintiffs notified the defendant of their need for the .380 Hi-Point or requested that the defendant preserve the weapon, and the defendant subsequently ignored any such notice or request and destroyed the weapon.  Instead, the evidence shows that the .380 Hi-Point was destroyed in accordance with routine FBI procedures.  (ECF 199 at 402:18-404:11).  Although those procedures proved inadequate for preserving evidence for the reasonably foreseeable litigation in this civil case, the plaintiffs are not entirely blameless, having taken no action to request that the defendant preserve the .380 Hi-Point.

The plaintiffs also did not offer any evidence indicating that the FBI's routine procedures that were relied upon here have previously resulted in the spoliation of evidence such that relying on them was reckless or grossly negligent.  While the plaintiffs have questioned Agent Ashdown's motives and investigation methods, Agent Ashdown had been retired for more than a year by the time the .380 Hi-Point was destroyed in December 2008.  (ECF 189 at ¶ 12; ECF 199 at 406:20-25); *Jones III*, 149 Fed. Cl. at 344.  Therefore, as was previously found, *Jones III*, 146 Fed. Cl. at 741-42, the .380 Hi-Point was spoliated due to negligence and not a more culpable mental state.

---

faith, destruction of documents can give rise to an adverse inference" and that the issue "was not decided in that case"); *Advanced Powder Sols., Inc. v. United States,* 160 Fed. Cl. 575, 582 n.10 (2022), *reconsideration denied*, No. 20-137C, 2022 WL 2720193 (Fed. Cl. July 13, 2022).  Both parties to this case have argued that some form of adverse inference is appropriate; based on the defendant's concession that its negligent spoliation of the .380 Hi-Point supports the imposition of an adverse inference, the Court need not decide whether mere negligence is a sufficiently culpable state of mind for the imposition of an adverse inference as a spoliation sanction.  (ECF 203 at 2, 42, 44-49 (the defendant conceding that negligence can support a rebuttable adverse inference after noting that "the FBI, at most, acted negligently," and arguing "[a]nything more than a permissive, rebuttable adverse inference would be 'disproportionate to the offense,'" (quoting *Cencast Servs., L.P. v. United States*, 94 Fed. Cl. 425, 444 (2010))).)

The adverse inference imposed for the negligent destruction of the .380 Hi-Point will therefore not be irrebuttable, as that degree of sanction would be a greater punishment than necessary and appropriate given the defendant's culpability. *See Cencast Servs., L.P. v. United States*, 94 Fed. Cl. 425, 444 (2010) (noting that "[u]nder any applicable test, the level of culpability is relevant to the propriety of a sanction"), *aff'd*, 729 F.3d 1352 (Fed. Cir. 2013). The Court must also "'construct a sanction that is just and proportionate in light of the circumstances underlying the failure to preserve relevant evidence, as well as the punitive, prophylactic, remedial and institutional purposes to be served by such sanctions.'" *Id*. (quoting *United Med. Supply Co. v. United States*, 77 Fed. Cl. 257, 270 (2007)).

An irrebuttable adverse inference would put the plaintiffs in a better position than they would have been in had the evidence not been spoliated because the significance and accuracy of any favorable evidence and related testing could normally be subject to challenge and cross-examination. The defendant's negligence lessens the need for a more severe prophylactic sanction to deter or punish the defendant. An irrebuttable adverse inference therefore would excessively and unfairly place on the defendant the burden of an incorrect determination of the claims at trial beyond what is necessary and appropriate based on the facts of this case.

Additionally, the defendant has conceded that "a permissive inference sanction is not toothless in that it may create a genuine dispute sufficient to preclude summary judgment." (ECCF 203 at 46.) These sanctions therefore will further deter the defendant because they will likely prevent a complete disposition of this case on summary judgment and allow the plaintiffs to test their theory of the case at a trial. As the Federal Circuit noted:

> If absence of blowback on Officer Norton is evidence that he did not shoot Mr. Murr[a]y, it is a plausible and concrete suggestion that absence of blowback on the Hi-Point .380 handgun is evidence that it was not used to shoot Mr. Murray. Had the government not destroyed the gun, these suggestions may have been evidence that constituted a key part of Mr. Murray's parents' case.

*Jones V*, 2022 WL 473032, at *11.

The adverse inference being imposed will likely create disputes over material facts regarding who fired the shot that killed Mr. Murray because it is unlikely that the .380 Hi-Point would have been clean of blood and tissue if Mr. Murray had used it on himself in a contact shooting. (ECF 144-1 at 82:3-16.) A permissive inference concerning the .380 Hi-Point and the evidence that the Court will infer was on it when it was recovered on April 1, 2007, will provide an effective sanction that will likely require a trial on the merits.

The plaintiffs' requested sanction concerning the inoperability of the .380 Hi-Point is denied. That proposed adverse inference is counterfactual to such an extent as to render it implausible.

The plaintiffs' request for the sanction that the .380 Hi-Point was not operational appears to be based on the stovepiped round and Agent Ashdown's testimony regarding that round. (*See*

ECF 201 at 25-26.)  Specifically, the plaintiffs rely on Agent Ashdown's testimony that the round was stovepiped in the .380 Hi-Point due either to the shooter gripping the weapon weakly when firing or to the weapon not being properly maintained.  (ECF 199 at 294:19-295:5.)

The conclusion that the .380 Hi-Point was not operable after the stovepiped round was fired would be supported because such a blockage would prevent the proper action of the gun.  (*See* ECF 198 at 182:16-24; ECF 199 at 294:15-25.)  The plaintiffs, however, request an inference that the gun was not operable *at all* on April 1, 2007.  (*See* ECF 201 at 25-26.)

That inference is implausible.  Two expended .380 caliber cartridges were found very close to where Mr. Murray had lain.  This evidence reflects that a .380 caliber firearm had been fired at that location.  While a stovepiped round would have prevented the .380 Hi-Point from firing *subsequent* rounds, the existence of the stovepiped round indicates that the weapon had in fact been fired in the first place.  (*See id.* at 294:19-25; Pl. Ex. 2 at 12, 15-16.)  The plaintiffs argue those cartridges did not come from a firearm carried by Mr. Murray, and they remain free to attempt to prove that point.

Only a couple of scenarios could account for expended .380 cartridges being at the scene of the shooting so close to Mr. Murray's location if the .380 Hi-Point was not operable.  One would be that someone else fired a .380 weapon at that precise location at some time in the past, and the spent cartridges had remained there.  This scenario appears exceedingly unlikely, given the remote location of the shooting.  (Def. Ex. 45 at E-I (Jones0011716-20), M-P (Jones0011724-27), V-Y (Jones0011733-36), DD-JJ (Jones0011742-48, WW-ZZ (Jones0011761-64).)  Another would be that one of the officers planted them or manipulated the evidence at the scene.  There is no evidence to show or even suggest that the physical evidence at the scene of the shooting was manipulated, let alone fabricated.  (ECF 198 at 175:8-14; ECF 199 at 295:9-12; ECF 200 at 514:12-17.)  Given that multiple officers were involved in securing the scene (ECF 198 at 99:7-12, 102:12-103:2, 104:13-18, 173:7-12), manipulating the evidence would have required a conspiracy among several officers.  The record is devoid of any evidence of such a conspiracy, and the plaintiffs have neither attempted to show the existence of such a conspiracy nor proffered any proposed finding of fact or conclusion of law regarding such a conspiracy.

Awarding an adverse inference against the physical evidence of expended cartridges of the same caliber as the .380 Hi-Point would therefore impose too severe a sanction on the defendant for its negligence and excessively risks of an incorrect conclusion at trial.

In addition, any inference that the .380 Hi-Point was not operable before the shooting on April 1, 2007, would be improper because it is not plausibly related to what testing of the weapon would have shown had it not been destroyed.  *See Jones V*, 2022 WL 473032, at *11 (cleaned up) (emphasis added) (noting "a party may satisfy its burden to show prejudice by coming forward with *plausible, concrete* suggestions as to what the destroyed evidence *might have been*").  The plaintiffs have not provided any evidence that a test exists that could identify when the stovepiped round was fired.  Without such a test, even had the .380 Hi-Point not been destroyed, it would be impossible to determine if the weapon was rendered inoperable before or on April 1, 2007.  Without some reason to think such a test exists, the plaintiffs cannot plausibly

suggest that they could have shown that the .380 Hi-Point was inoperable had the weapon not been spoliated.

### B.    Standards for Spoliation

Having imposed sanctions for the destruction of the .380 Hi-Point handgun, the Court turns to the remaining question of whether Officer Norton's .40 Glock and his clothing were spoliated, based on the Federal Circuit's guidance on spoliation standards.

"Spoliation is the breach of the duty to preserve evidence, either through destruction of evidence or through failure to properly preserve it." *Id.*, at *4. "A duty to preserve evidence arises when a party knows or reasonably should know that evidence in its control may be relevant to a reasonably foreseeable legal action." *Id.*

"Reasonable foreseeability 'is an objective standard, asking not whether the party in fact reasonably foresaw litigation, but whether a reasonable party in the same factual circumstances would have reasonably foreseen litigation.'" *Id.*, at *9 n.5 (quoting *Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1320 (Fed. Cir. 2011)).[16]

Control is the "right to obtain or control that evidence." *Id* at *4. The defendant is held to the same standard as "any other civil litigant," and therefore "'controls' evidence under the duty to preserve where it has a legal right to obtain or control that evidence." *Id.* "[C]ontrol requires only a legal right to obtain evidence, not a legal requirement to obtain evidence." *Id.* at *6.

In cases involving law enforcement, "the extent of the government's control over an investigation scene is dependent on its suspicion of a crime." *Id.* at *8. "[L]aw enforcement's

---

[16] During their closing argument, the plaintiffs argued that the defendant should not be allowed to argue that reasonable foreseeability is a claim-specific inquiry that must consider whether the claim was foreseeable against a specific defendant. The plaintiffs argued that if the defendant had wanted to preserve this argument, the defendant should have appealed the *Jones III* decision. The defendant could not, however, have appealed *Jones III*, because the defendant had succeeded on the merits and was not aggrieved by the collateral ruling on spoliation. *See Deposit Guar. Nat. Bank, Jackson, Miss. v. Roper*, 445 U.S. 326, 333 (1980) ("Ordinarily, only a party aggrieved by a judgment or order of a district court may exercise the statutory right to appeal therefrom. A party who receives all that he has sought generally is not aggrieved by the judgment affording the relief and cannot appeal from it."); *SkyHawke Techs., LLC v. Deca Int'l Corp.*, 828 F.3d 1373, 1375 (Fed. Cir. 2016) ("Even if the prevailing party alleges some adverse impact from the lower tribunal's opinions or rulings leading to an ultimately favorable judgment, the matter is generally not proper for review.") Therefore, the defendant was free to make new arguments concerning the proper scope of the reasonable-foreseeability analysis when the case was remanded for reconsideration of the spoliation issue.

'control' over an investigation scene is not unlimited and, therefore, neither is its duty to preserve evidence on that investigation scene." *Id.*

"The Fourth Amendment . . . constrains the government's legal right to obtain or control evidence in an investigation." *Id.; see also Mincey v. Arizona,* 437 U.S. 385, 395 (1978) (holding that the fourth and fourteenth amendments do not contain a "murder scene exception"). Generally, law enforcement officers who are legally present and have lawful access to criminal evidence in plain view may seize it without a warrant when "its incriminating character" is "immediately apparent." *Horton v. California*, 496 U.S. 128, 136-37 (1990) (cleaned up). Underpinning the plain view doctrine is that an officer has probable cause that whatever he searches or seizes is evidence of a crime. *Arizona v. Hicks*, 480 U.S. 321, 326-27 (1987); *see United States v. Soussi*, 29 F.3d 565, 572 (10th Cir. 1994) (describing *Horton*'s "immediately apparent" incriminating character requirement as being "*i.e.* did the agents have probable cause to believe that the items were evidence of a crime or illegal contraband").

In general, probable cause is loosely defined as "reasonable ground for belief of guilt, and [ ] the belief of guilt must be particularized with respect to the person to be searched or seized." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (cleaned up). Probable cause "depends on the totality of the circumstances." *Id.*

The plain view doctrine does not authorize anything other than plain view searches of evidence to find probable cause. *See Hicks,* 480 U.S. at 323-25, 328-29 (holding that moving stereo equipment even a few inches to find its serial number, as opposed to reading a serial number already in view, to confirm whether something is stolen property was an unconstitutional search in the absence of existing probable cause to seize the stereo equipment).

If probable cause exists to arrest someone, further searches and seizure of evidence may be authorized as searches incident to arrest or inventory searches. *Illinois v. Lafayette*, 462 U.S. 640, 643-44 (1983) (noting that "the interests supporting a search incident to arrest would hardly justify disrobing an arrestee on the street, but the practical necessities of routine jail administration may even justify taking a prisoner's clothes before confining him"). As applied to the question of control, if law enforcement has probable cause to detain someone, then law enforcement has a legal right to control the evidence on the detainee. *Jones V*, 2022 WL 473032, at *8.

In short, for the defendant to spoliate evidence for purposes of civil litigation, evidence relevant to objectively reasonably, foreseeable litigation must have been lost or destroyed, and the government must have had a legal right to obtain or control the relevant evidence. In cases involving evidence at a crime scene, the key question as to control is whether the defendant had the legal right to obtain or control the evidence in compliance with the fourth amendment.

## C.    Reasonable Foreseeability

In *Jones III*, the Court found that litigation was reasonably foreseeable by the time the .380 Hi-Point was destroyed, but the question of precisely when litigation became reasonably foreseeable was left unresolved. The Federal Circuit remanded for a resolution of the question of

when litigation became reasonably foreseeable.  In resolving that issue, the Circuit required the consideration of "all information the federal officers gleaned from their observations at the scene, morgue, and coroner's office, including the coroner's failure to carry out the ordered autopsy." *Jones V*, 2022 WL 473032, at \*9 n.5.

"When litigation is 'reasonably foreseeable' is a flexible fact-specific standard" that considers "whether a reasonable party in the same factual circumstances would have reasonably foreseen litigation."  *Micron Tech., Inc.*, 645 F.3d at 1320, *quoted in part in Jones V*, 2022 WL 473032, at \*9 n.5.  A determination of reasonable foreseeability is an objective one, not dependent on the subjective awareness of the relevant participants.  *Jones V*, 2022 WL 473032, at \*9 n.5 (quoting *Micron Tech., Inc.*, 645 F.3d at 1320).

The extensive and extended litigation over the boundaries of the Ute reservation on which Mr. Murray was fatally injured and over the authority and activities of state and local law enforcement agencies on the reservation lands outside their jurisdiction, as well as the seriousness of an incident resulting in death combine to weigh in favor of a finding that litigation was reasonably foreseeable relatively early in the case.  *See Jones III*, 146 Fed. Cl. at 741.  The existence of the bad men provision of the treaty between the defendant and the Ute Tribe leads to the conclusion that litigation against the United States was also reasonably foreseeable as early as April 1, 2007.

Any reasonable person involved in law enforcement in Indian country in northeastern Utah should have been familiar with the long-running litigation about the boundaries of the Ute reservation and the jurisdiction thereon of state law enforcement.  *See Ute I-V.*  The district court in the earlier litigation against the state and local actors arising from Mr. Murray's death found that "in light of the seriousness of the incident and the involvement of officers on the Reservation where they did not have jurisdiction, litigation could reasonably be expected," although the district court did not clearly specify that litigation was reasonably foreseeable on April 1, 2007.  *Jones v. Norton*, No. 2:09-CV-730-TC, 2014 WL 909569, at \*7 (D. Utah Mar. 7, 2014), *aff'd*, 809 F.3d 564 (10th Cir. 2015).

In accordance with the Federal Circuit's directive to examine the facts available to Agent Ashdown based on the scene of the shooting and the mortuary, a short summary of those facts follows.

Agent Ashdown arrived on the scene of the shooting.  At the scene, consistent with his practice in such cases, he spoke to the highest-ranking officers to get a sense of what had happened.  (ECF 199 at 277:16-278:13, 348:18-349:11.)  During that briefing, Agent Ashdown likely would have been informed of the version of events that Officer Norton had provided to other officers about how the shooting occurred.  (ECF 198 at 102:12-15; ECF 199 at 259:18-23, 261:24-262:3, 279:2-16, 281:5-11, 281:25-282:12.)  Agent Ashdown would have likely heard through second- or third-hand sources that Officer Norton was on a hill when he spotted Mr. Murray, that Mr. Murray appeared to have a gun in his hand, that Officer Norton raised his gun towards Mr. Murray and commanded him to surrender, that Mr. Murray then fired twice at Officer Norton (*id.* at 259:18-260:14), and that Officer Norton returned fire (*id.* at 282:4-12) before retreating to the top of the hill he had been standing on.  (ECF 198 at 93:3-94:3; ECF 199

at 316:11-16; *see also* Def. Ex. 6.)  Agent Ashdown also would have indirectly been made aware of Officer Norton's claim that he saw Mr. Murray put his firearm to his head and shoot himself. (ECF 199 at 259:18-260:14; Def. Ex. 6.)

Agent Ashdown investigated the scene and found a .380 Hi-Point handgun along with two matching spent casings near where he was told Mr. Murray had lain; that location was confirmed by the blood at that site.  (ECF 199 at 291:1-7, 294:5-14; Def. Ex. 4 at 1 (Jones0038082), 3-5 (Jones0038084-86).)  Agent Ashdown also found two bullet casings, whose caliber matched the .40 Glock that he knew Officer Norton used, approximately 113 yards from Mr. Murray's location.  (ECF 199 at 281:6-11, 300:22-301:11; Def. Exs. 4 at 9-13 (Jones0038089-93), 6.)  Agent Ashdown also observed Officer Norton and saw nothing to indicate that he had been in a physical altercation with Mr. Murray or that there was any blood, viscera, or anything else noteworthy on Officer Norton's clothing, describing it as "clean and pristine."  (ECF 199 at 283:4-11; *see* Pl. Ex. 2 at 13 (photograph of Officer Norton).)  Agent Ashdown should also have seen from the blood spatter that the shot that killed Mr. Murray traveled north to south at a right angle from where the spent .40 caliber bullet casings indicated was the location from which Officer Norton had fired.  (ECF 199 at 258:18-259:1, 260:16-18, 262:4-24; Def. Ex. 41 at 2 (Jones0011385).)

It should have been apparent at the scene that Officer Norton "was not cross-deputized by the United States o[r] the Ute Indian Tribe on April 1, 2007, to exercise law enforcement authority on the Ute Reservation." (ECF 189 at ¶ 8.)  Further, it should have been apparent to Agent Ashdown that Officer Norton's jurisdiction as a Vernal City police officer was "wholly outside the Ute Indian Reservation." (*Id.*)  It also should have been apparent that the only witness to Mr. Murray's shooting was Officer Norton himself, a fact that should have made Agent Ashdown seek to corroborate the hearsay telling of Officer Norton's potentially self-interested account.  (*Id.* at ¶ 37.)

Based on the testimony of Investigator Campbell, there were no tracks that connected where Officer Norton had been standing to where Mr. Murray was found.  (ECF 199 at 262:11-24, 263:13-22.)  Investigator Campbell's testimony also indicates that an officer would have been able to determine that the bullet that killed Mr. Murray was fired at a right angle from where Officer Norton stood on the hill.  (*Id.* at 258:18-259:1, 262:4-24; Def. Ex. 41 at 2 (Jones0011385).)  That said, Officer Norton did, by his own admission, approach Mr. Murray to take photographs of the crime scene.  (ECF 189 at ¶ 38; ECF 198 at 108:11-14, 191:19-192:10.) Therefore, there should have been footprints connecting Officer Norton to sites close to Mr. Murray, even if these footprints did not reach Mr. Murray directly.  Further, it is not evident how an observer at the scene could have differentiated Officer Norton's footprints from those of Deputy Byron and Trooper Young, who went from Officer Norton's location on the hill down to Mr. Murray and placed him in handcuffs.  (ECF 198 at 95:8-17, 102:12-15, 102:25-103:2, 173:7-22.)

After finishing with the scene, Agent Ashdown went to the mortuary to examine Mr. Murray's body.  (ECF 199 at 307:5-13.)  At the mortuary, he was unable to determine the entrance and exit wounds (ECF 199 at 307:21-25), and he did not collect any evidence (*id.* at 311:22-24, 312:24-313:15).  Agent Ashdown would have been able to see that Mr. Murray's

right hand was "caked in blood" and that his left hand was clean.  (ECF 200 at 448:5-10; Def. Ex. 51.)  Agent Ashdown was offered vials of Todd Murray's blood by Officer Ben Murray but rejected them due to "a questionable chain of custody" and a lack of a way to properly store the blood.  (ECF 199 at 313:12-25, 364:11-18.)  Officer Byron also inappropriately handled Mr. Murray's body to examine it for beveling, although Agent Ashdown did not believe that improper handling would have altered any evidence.  (*Id.* at 309:5-311:21.)

Taken together, a reasonable person presented with this information should have anticipated litigation.  Mr. Murray died after a shooting involving an officer who was not authorized to engage in law enforcement activities vis-à-vis Indians on a reservation where that officer was the only witness to the shooting.  While the evidence at the scene, particularly the direction of the blood spatter and the location of the expended shell casings, strongly suggests that Mr. Murray shot himself, it did not conclusively establish a suicide as the only possible scenario.  For example, the .380 Hi-Point was apparently clean of any visible signs of blood or viscera, despite having allegedly been used by Mr. Murray to commit suicide by a contact shooting.  Further, the evidence at the scene did not clearly establish who fired the first shot such that it was clear that Officer Norton was acting in self-defense by shooting at Mr. Murray.  Understanding much of the evidence also requires Officer Norton's explanation, whose presumptive reliability as a witness a reasonable person might find questionable, given his role in events.

There is no doubt that Agent Ashdown's investigation left evidentiary gaps resulting in some unanswered questions.  Agent Ashdown did not interview any officer who had been present at or near the shooting, leaving him without contemporaneous evidence as to what those officers saw and heard.  (*Id.* at 304:25-305:2.)  While Officer Norton had refused to speak with Agent Ashdown (*id.* at 282:13-23), Agent Ashdown could have spoken with Deputy Byron and Trooper Young to learn what they had seen and heard.  Agent Ashdown never asked to look at Officer Norton's gun, even though it had been involved in a shooting.  (*Id.* at 360:6-12.)  Agent Ashdown never tested the .380 Hi-Point for blood.  (*Id.* at 321:25-322:6.)  Even though no blood was observable on it (Pl. Ex. 2 at 12, 15-16; Def. Ex. 45OO (Jones0011753)), testing the weapon for any residue might have confirmed its likely use in the close-contact shooting.

A reasonable person living and working near the Ute reservation should also have been aware that there had been frequent litigation involving the exact boundaries of the reservation and the authority of state and local law enforcement officers thereon before the shooting.  *See Ute I-V.*  Those cases should have put any reasonable person on notice that infringement of tribal sovereignty was not likely to be ignored, especially where it involved the death of a tribal member.

Further, litigation did in fact occur.  While this fact cannot bootstrap the plaintiffs' argument that litigation was reasonably foreseeable into proving that argument, the eventual litigation notably found a substantive violation of Mr. Murray's rights.  Specifically, the Utah district court found that Deputy Byron's handcuffing of Mr. Murray "was a *per se* violation of Mr. Murray's Fourth Amendment right, albeit a technical violation."  *Jones*, 3 F. Supp. 3d at

1192 (citing *Ross v. Neff*, 905 F.2d 1349, 1353-54 (10th Cir.1990)).[17]  While Deputy Byron's actions were protected by qualified immunity because "[e]ven if the rule of law regarding an officer's jurisdiction was clearly established in *Ross*, that decision did not address how or when a police officer must determine the tribal status of the suspect."  *Id.* at 1192-93.  That said, the facts that led to this litigation were readily apparent from the scene: state and local officers had seized Mr. Murray, a tribal member, on reservation land without being cross-deputized.  Even if litigation should only have been anticipated as to Deputy Byron's actions, his act of placing Mr. Murray in handcuffs would inevitably implicate questions of what led to that handcuffing.  Therefore, litigation concerning Deputy Byron would necessarily involve litigation about Officer Norton's actions.

The defendant argues that before it can be held liable for spoliating evidence, litigation had to be reasonably foreseeable against the United States and not simply the state and local officers.  Litigation involving Mr. Murray's death would be based on the allegedly illegal acts of law enforcement.  Illegal acts involving the use of force by law enforcement could easily constitute crimes, even if only of a technical nature.  For example, an unlawful use of force, either by unlawfully shooting at Mr. Murray or placing him in handcuffs, could at least arguably constitute assault under 18 U.S.C. § 113 or a criminal deprivation of rights under color of law under 18 U.S.C. § 242, depending on the officers' *mens rea*.

A reasonable person should have expected a tribal decedent's family would seek to hold the defendant liable for such crimes pursuant to a "bad men" treaty claim.  *See Tsosie v. United States*, 825 F.2d 393, 400 (Fed. Cir. 1987) ("In addition, the 'bad men' provision is not confined to 'wrongs' by government employees.  The literal text of article I and the 'legislative history' of the treaty show that any 'white' can be a 'bad man' . . . ."); *see also Richard v. United States*, 677 F.3d 1141, 1150-53 (Fed. Cir. 2012) (reaffirming *Tsosie*); *Jones II*, 846 F.3d at 1353 (noting *Richard*'s "holding that bad men need not be agents of the federal government.").

It appears that claims under treaty "bad men" provisions were rare prior to 2007.  Neither party has cited to any case raising such claims.  It is unlikely that even FBI agents working in Indian country were informed of the existence of such provisions, although there is no evidence on that point in the record.  That said, the infrequency of "bad men" claims against the United States and the lack of awareness of such provisions by Agent Ashdown or others is not relevant to a determination of whether litigation against the United States was reasonably foreseeable.

_____

[17] The district court's opinion suggests that any seizure of an Indian on tribal land by state and local law enforcement when those officers do not have jurisdiction is a *per se* violation of an Indian's Fourth Amendment rights.  *Jones*, 3 F. Supp. 3d at 1192 (citing *Ross v. Neff*, 905 F.2d 1349, 1353-54 (10th Cir.1990)).  This issue was not disputed on appeal.  *Jones v. Norton*, 809 F.3d 564, 573 n.1 (10th Cir. 2015).  The Tenth Circuit, however, also has suggested that temporarily detaining Indians on tribal land to inquire into their tribal status, as opposed to arresting and prosecuting them, is lawful, citing the *Jones* district opinion as evidence that law enforcement was already following this practice in 2007.  *Ute VI*, 790 F.3d at 1006-07 (citing *Jones*, 3 F. Supp. at 1192).

Because reasonable foreseeability is an objective standard, a person's subjective ignorance of the law is no defense to reasonable foreseeability.  *Cf. Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 581-83 (2010) (cleaned up) ("We have long recognized the common maxim, familiar to all minds, that ignorance of the law will not excuse any person, either civilly or criminally.")

The facts available on April 1, 2007, at the scene of the shooting made litigation reasonably foreseeable to a reasonable person.  The facts available to Agent Ashdown at the mortuary did not diminish the reasonable foreseeability of litigation.  If anything, the "grossly inappropriate" acts of state and local officers in obtaining a blood draw with a questionable chain of custody and their manipulation of Mr. Murray's body made litigation more foreseeable.  *Jones III*, 146 Fed. Cl. at 737; (ECF 199 at 309:5-311:21, 313:10-25, 364:11-18.)  The existence of the "bad men" provision of the treaty between the Ute Tribe and the United States meant that any reasonable prospect of litigation against the officers also made litigation against the defendant reasonably foreseeable on April 1, 2007.

### D.     Control of Evidence

For the plaintiffs to show spoliation of evidence, the plaintiffs must first show that the defendant had "a legal right to obtain or control that evidence."  *Jones V*, 2022 WL 473032, at *4.

As relevant to the current case, Agent Ashdown may have had the legal right to seize evidence at the scene of Mr. Murray's shooting without a warrant in three ways.  First, if a weapon or other evidence is in plain view, to seize such evidence, "the government must establish probable cause that [the possessor of the firearm] had committed, or was committing, a crime involving the firearm."  *See United States v. Chavez*, 985 F.3d 1234, 1246 (10th Cir. 2021) (citing *Texas v. Brown*, 460 U.S. 730, 738 (1983)).  Second, officers may search and seize evidence with consent.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (noting that a consent search is one of the "well settled . . . specifically established exceptions to the requirements of both a warrant and probable cause").  Third, evidence may also be searched incident to an arrest and may be seized as part of an inventory of an arrestee's property.  *Lafayette*, 462 U.S. at 643-49 (permitting warrantless inventory searches of "the personal effects of a person under lawful arrest as part of the routine administrative procedure at a police stationhouse incident to booking and jailing the suspect"); *United States v. Robinson*, 414 U.S. 218, 224-26 (1973) ("It is well settled that a search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment.")

For evidence to be seized without a warrant under the plain view doctrine, an officer must satisfy the three-prong *Horton* test.  *See Soussi*, 29 F.3d at 572 (describing how the government must "scrupulously adhere[] to the three-prong *Horton* test" to seize evidence in plain view without a warrant).  The *Horton* test requires that:

> (1) the officer was lawfully in a position from which to view the object seized in plain view; (2) the object's incriminating character was immediately apparent-*i.e.* the officer had probable cause to

believe the object was contraband or evidence of a crime; and (3) the officer had a lawful right of access to the object itself.

*Id.* at 570 (citing *Horton*, 496 U.S. 128 at 136-37; *United States v. Dixon*, 1 F.3d 1080, 1084 (10th Cir. 1993)).[18]

For warrantless arrests, "'[p]robable cause to arrest exists only when the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.'"[19] *Cortez v. McCauley*, 478 F.3d 1108, 1116 (10th Cir. 2007) (quoting *United States v. Valenzuela*, 365 F.3d 892, 896 (10th Cir. 2004)).

---

[18] The first prong of the *Horton* test was met because Agent Ashdown was lawfully present on the Ute reservation as an FBI agent investigating a tribal death on a reservation. The third prong was met because Officer Norton's clothing and .40 Glock were both also present and in view such that Agent Ashdown could examine them "at least cursorily." *Soussi*, 29 F.3d at 527; *see also United States v. Naugle*, 997 F.2d 819, 823 (10th Cir. 1993) (describing the *Horton* lawful access requirement as being "implicated in situations such as when an officer on the street sees an object through the window of a house, or when officers make observations via aerial photography or long-range surveillance").

[19] Despite reasonable foreseeability and probable cause both being standards that involve an objective test of reasonableness, they have important differences, traceable to their roles as a civil and a criminal standard, respectively. These differences mean that the finding that litigation was reasonably foreseeable does not require a parallel finding that probable cause must have existed to seize Officer Norton's .40 Glock or his clothing.

Reasonable foreseeability of civil litigation only requires that a reasonable person anticipate litigation, even if the reasonable person might think that litigation is ultimately meritless. To that end, understanding whether similar circumstances or issues led to litigation in the past is relevant to reasonable foreseeability but not probable cause. Unanswered questions involving a person's death also significantly increase the foreseeability of litigation, even if those unanswered questions might weigh against success on the merits and ultimately cause litigation to fail. Civil litigation often begins before many facts are developed, with complaints being held to a low plausibility standard and allegations filed on information and belief. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007)). The discovery process is also fundamentally different in civil cases versus criminal cases. *Compare* Fed. R. Civ. Pro. 26 *with* Fed. R. Crim. Pro 16. In civil cases, discovery frequently provides key information necessary for a party to prove its case many months or years after the case is filed. In contrast, probable cause requires something significantly more than plausibility. Probable cause requires "'facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, [that] are sufficient in themselves to

The Tenth Circuit has explained "probable cause itself is a relatively low threshold of proof." *Valdez v. McPheters*, 172 F.3d 1220, 1227 n.5 (10th Cir. 1999).[20] "Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction." *United States v. Pollack*, 895 F.2d 686, 691 (10th Cir. 1990) (citing *Draper v. United States*, 358 U.S. 307, 311-12 (1959)). "The officer's belief that he is presented with evidence of a crime need not be certain or even more likely true than false; 'a practical, nontechnical probability that incriminating evidence is involved is all that is required.'" *United States v. Padilla*, 819 F.2d 952, 962 (10th Cir. 1987) (quoting *Brown*, 460 U.S. at 742) (partially cleaned up).

> In determining whether an officer has sufficient reasonably trustworthy information to constitute probable cause, clearly established case law requires officers to look at the totality of the circumstances. While officers may weigh the credibility of witnesses in making a probable cause determination, they may not ignore *available and undisputed* facts. *Cf. Romero* [*v. Fay*, 45 F.3d [1472,] 1476-77 & n. 2 [(10th Cir. 1995)] (noting that while officers do not have [the] duty to interview alleged alibi witness once probable cause is established, the probable cause standard "requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of a warrantless arrest and detention") . . . .

*Baptiste v. J.C. Penney Co*., 147 F.3d 1252, 1259 (10th Cir. 1998) (partially cleaned up) (emphasis in original).

## 1.  Officer Norton's Clothing on April 1, 2007

The plaintiffs argue that the defendant had control over Officer Norton's clothing because he could have been expected to consent to a seizure of it.  (ECF 201 at 27.)  The plaintiffs further

------

warrant a man of reasonable caution in the belief that an offense has been or is being committed.'"  *Cortez*, 478 F.3d at 1116 (quoting *Valenzuela*, 365 F.3d at 896).

In short, not knowing how or why certain events occurred might prompt a civil lawsuit to find an answer, and the likelihood of such a lawsuit may be influenced by the identity of the potential plaintiff(s).  But neither a lack of information, nor likelihood of potential civil litigants filing suit, can form the basis of probable cause that would allow the government to exercise its criminal powers to seize evidence.

[20] In its determination of the existence of probable cause, the Court relies on decisions from the Supreme Court and the Tenth Circuit that predate April 1, 2007, because those cases would have governed the acts of Agent Ashdown and others on the scene of the shooting on that date.

developed this argument during their closing argument by relying on *Gardner v. Broderick*, 392 U.S. 273 (1968), to argue that Officer Norton in fact could not have refused to give Agent Ashdown his clothing because he had a duty to assist with any investigation into crimes he may have committed.  The plaintiffs also argue that this evidence is relevant because it was never tested for blood or tissue that might have indicated that Officer Norton approached Mr. Murray and shot him at close range.

The Federal Circuit made clear that the defendant has control over evidence only if it has "a legal right to obtain or control that evidence." *Jones V*, 2022 WL 473032, at *4.  The plaintiffs have not identified any legal authority for the proposition that the *potential* for consent gives a party control over evidence or requires a party to attempt to gain consent to avoid spoliation of evidence.  In fact, the plaintiffs acknowledge that "if the United States had asked [Officer Norton] to turn over his clothing, he could have asserted a right not to do so without a warrant." (ECF 201 at 27.)  If anything, the need for consent to obtain a piece of evidence indicates that the party requesting access to the evidence did not have a legal right to obtain or control the evidence.

The plaintiffs' argument also would greatly expand when a party had control over evidence.  Taken to its logical extreme, the plaintiffs' position would mean that a party has control over any evidence over which it could *potentially* get consent to access.  Such an argument would impose a dramatic expansion of the duty on parties to preserve evidence that they do not actually possess.  The plaintiffs' argument might be persuasive if Officer Norton had proactively offered Agent Ashdown his clothing, but there is no evidence that such an offer was made.  (*See* ECF 199 at 352:3-15, 410:21-23.)  As such, any claim that the defendant could have gotten Officer Norton's consent to take his clothing is irrelevant to whether the defendant had control over the clothing.[21]

The plaintiffs' reliance on *Gardner* is not helpful to their argument.  That case involved a police officer who had been subpoenaed to appear before a grand jury; the officer had been made aware of his right against self-incrimination but was asked to sign a "waiver of immunity" on pain of being fired if he refused.  *Gardner*, 392 U.S. at 274-76.  The officer refused to sign the waiver and was fired.  *Id.*  The Supreme Court held that the officer's employer could not fire him for refusing to waive his immunity to testify.  *Id.* at 278-79.  The Supreme Court did note, however, that the department could have fired him for refusing to "answer questions specifically, directly, and narrowly relating to the performance of his official duties, without being required to

---

[21] Even if it were proper to rely on the possibility of consent, Officer Norton's consent was highly unlikely here.  When asked by Agent Ashdown if he would be willing to talk, Officer Norton invoked his right to an attorney, with whom he had already spoken on the phone.  (ECF 198 at 153:25-154:13, 184:7-18; ECF 199 at 282:13-17.)  This fact militates strongly in favor of finding that Officer Norton would not have consented to undressing and providing his clothing to Agent Ashdown on April 1, 2007, if he had been asked to do so.

waive his immunity with respect to the use of his answers or the fruits thereof in a criminal prosecution of himself." *Id.* at 278.

Notably absent from this language or any part of *Gardner* is anything supporting the proposition that law enforcement officers surrender their constitutional rights when they are under investigation. *Gardner* was a case involving the fifth amendment, and the Supreme Court held that a police officer could not be forced to give up his fifth amendment right against self-incrimination. The decision cannot be read to require Officer Norton to give up his rights under the fourth amendment against unreasonable searches and seizures.

In the absence of consent or a requirement to assist, the plaintiffs have not argued that probable cause existed to seize Officer Norton's clothing under the plain view doctrine. Nevertheless, the Court considers whether probable cause existed for Agent Ashdown to have seized Officer Norton's clothing, and since the clothing was in public view, whether the plain view doctrine applied.

Because Agent Ashdown had no probable cause to believe that the clothing was evidence of a crime or that Officer Norton had committed a crime for which the clothing was evidence, the plain view doctrine does not apply. The doctrine requires that to seize evidence its "incriminating character" must be "immediately apparent." *Horton*, 496 U.S. at 136 (cleaned up). At the very least, this means that Agent Ashdown must have had probable cause that the clothing was evidence of a crime without anything more significant than a minimal search. *See Hicks*, 480 U.S. at 326-27. Agent Ashdown, however, testified that he visually inspected Officer Norton's clothing and saw no blood or other viscera on it, calling it "clean and pristine." (ECF 199 at 283:4-11; *see* Pl. Ex. 2 at 13 (photograph of Officer Norton).) This credible testimony, corroborated by the photograph taken on April 1, 2007, of Officer Norton in his clothing, makes clear that there was no immediately apparent incriminating character to the clothing, and therefore no probable cause to seize it as evidence of a crime. And, as addressed below, no probable cause otherwise existed to arrest Officer Norton, and thus there was no possibility of searching and seizing his clothing incident to an arrest.

In the absence of probable cause, the defendant did not have control over Officer Norton's clothing on April 1, 2007.

### 2.      The .40 Glock on April 1, 2007

The second piece of evidence that the plaintiffs argue was spoliated is Officer Norton's .40 Glock service weapon, which was owned by the Vernal City Police Department. (ECF 198 at 131:10-23.) The plaintiffs argue that the .40 Glock was evidence of the shooting that occurred on April 1, 2007. The plaintiffs also argue that the City of Vernal "did not have a legal basis for refusing to turn the gun over to Agent Ashdown" because there "was no constitutional prohibition on the United States taking possession of that evidence." (ECF 201 at 26.) The plaintiffs argue that Agent Ashdown could have obtained consent from the City of Vernal and that obtaining evidence by consent is common. (*Id.* at 27.)

43

The defendant responds by arguing that it did not have the right to seize the .40 Glock, that there is no evidence that the City of Vernal would have consented to a seizure, and that the FBI's ability to ask for consent is insufficient to establish a legal right to obtain evidence.  (ECF 203 at 34-36.)

The Court has already rejected the plaintiffs' argument that the possibility of consent grants a party control over evidence because the mere possibility of obtaining consent does not provide a legal right to control evidence.

The .40 Glock was in Chief Jensen's possession by the time Agent Ashdown arrived on the scene.  Chief Jensen, as the chief of the Vernal City Police Department, had a legitimate possessory interest in the .40 Glock such as to exclude Agent Ashdown from searching and seizing it in the absence of probable cause.[22]  *See Rakas v. Illinois*, 439 U.S. 128, 143 n.12 (1978) ("[O]ne who owns or lawfully possesses or controls property will in all likelihood have a

_____

[22] Even if Chief Jensen's possessory rights were not sufficient, Vernal City itself may have had fourth amendment rights against Agent Ashdown seizing the weapon.  To be sure, the Supreme Court has not addressed whether municipal corporations have fourth amendment rights.  When addressing searches under the fourth amendment generally, however, the Supreme Court has noted that "[t]he Fourth Amendment proscribes *all* unreasonable searches and seizures, and it is a cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *Mincey*, 437 U.S. at 390 (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)) (emphasis added); *see also Byrd v. United States*, 138 S. Ct. 1518, 1527 (2018) (cleaned up) ("[I]n the main, one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of the right to exclude.").

Municipalities have other constitutional rights.  For example, the Supreme Court has recognized the rights of municipalities under the Takings Clause of the fifth amendment when property is condemned by the United States.  *United States v. 50 Acres of Land*, 469 U.S. 24, 31 (1984).  Other courts have also noted a municipality's rights under the seventh amendment, *Dr. John's, Inc. v. City of Sioux City, Iowa*, 467 F. Supp. 2d 925, 927 (N.D. Iowa 2006), and to due process, *Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*, 721 F.3d 264, 290-91 (4th Cir. 2013).  When courts have found that municipalities do not have rights under the Constitution, those conclusions tend to be with respect to constitutional rights against their own state government and not against the federal government.  *See, e.g., Williams v. Mayor & City Council of Baltimore*, 289 U.S. 36, 40 (1933) ("A municipal corporation, created by a state for the better ordering of government, has no privileges or immunities under the Federal Constitution which it may invoke in opposition to the will of its creator.").

Given the finding that probable cause to seize the .40 Glock did not exist, the Court need not determine whether Vernal City had a right under the fourth amendment.

44

legitimate expectation of privacy by virtue of this right to exclude."), *quoted in Byrd v. United States*, 138 S. Ct. 1518, 1527 (2018).

Accordingly, the defendant's "control" over the .40 Glock on April 1, 2007, depends on whether Agent Ashdown had probable cause to seize the .40 Glock from Chief Jensen.  *See Hicks*, 480 U.S. at 326-27 (noting that the seizure of evidence under the plain view doctrine requires probable cause);  *Soldal v. Cook Cnty., Ill.*, 506 U.S. 56, 66 (1992) ("[I]n the absence of consent or a warrant permitting the seizure of the items in question, such [plain-view] seizures can be justified only if they meet the probable-cause standard."); *Brown*, 460 U.S. at 738 (cleaned up) (emphasis added) (recognizing "the well-settled rule that objects such as weapons or contraband found in a public place may be seized by the police without a warrant.  The seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, *assuming that there is probable cause* to associate the property with criminal activity.").

Regardless of whether the right that Agent Ashdown would have to overcome to seize the .40 Glock on April 1, 2007, belonged to Chief Jensen, Vernal City, or both, there was no probable cause that Officer Norton committed a crime on April 1, 2007.  The absence of probable cause on that date that Officer Norton had committed a crime means that there was no probable cause to seize the .40 Glock as evidence of any crime.  In other words, Agent Ashdown did not have "reasonable trustworthy information" that was "sufficient to warrant a prudent man in believing that [Officer Norton] had committed . . . an offense."  *Beck v. State of Ohio*, 379 U.S. 89, 91 (1964); *see also Valenzuela*, 365 F.3d at 896 (discussing *Beck* and the differences between probable cause and reasonable suspicion); *Baptiste*, 147 F.3d at 1259 (cleaned up) (noting that the probable cause standard requires an officer "to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of a warrantless arrest and detention").

The plaintiffs have asserted violations of more than 40 federal and state criminal statues by state and local law enforcement officers as the basis for their bad men claim against the defendant.  (ECF 150-6 at 3-5.)[23]  During their closing argument, the plaintiffs argued that, at least with respect to some of these alleged crimes, probable cause existed on April 1, 2007, such that Agent Ashdown could have seized the .40 Glock.  The statutes are addressed in turn.

To begin, the plaintiffs cite statutes involving the actual or planned unlawful use of force. (ECF 150-6 at 3-5.)  Under Title 18, these statutes include deprivation of rights under color of law (§ 242), hate crimes (§ 249), murder (§ 1111), manslaughter (§ 1112), conspiracy to murder (§ 1117), and kidnapping (§ 1201).  Under the Utah Code, these statutes include assault (§ 76-5-102), reckless endangerment (§ 76-5-112), criminal homicide (§ 76-5-201), aggravated murder

---

[23] The amended complaint is not clear as to the specific criminal statutes alleged as bad men treaty violations.  (*See* ECF 17 at ¶¶ 67, 69.)  The Court relies on the list of crimes and corresponding statutes that the plaintiffs contend, in their responses to the defendant's interrogatories, the various state and local law enforcement officers each committed.  (ECF 150-6 at 3-5.)

(§ 76-5-202), manslaughter (§ 76-5-205), negligent homicide (§ 76-5-206), homicide by assault (§ 76-5-209), kidnapping (§ 76-5-301), and disorderly conduct (§ 76-9-102).

On April 1, 2007, there was no probable cause to suspect that Officer Norton's use of force was anything other than lawful. Based on the evidence available that day at the scene, there was no reason a prudent investigator would think that Officer Norton either approached Mr. Murray and shot him at close range, that Officer Norton's shots hit Mr. Murray from more than 100 yards away, or that Officer Norton assaulted Mr. Murray by firing at Mr. Murray without lawful cause.

Starting with the circumstantial evidence, Officer Norton was off duty when he decided to assist another officer in a pursuit; this fact undercuts any inference that Officer Norton had a pre-meditated plan to commit a crime. (ECF 189 at ¶ 8; ECF 198 at 71:22-74:24). Until Officer Norton knew that Mr. Murray was a tribal member, Officer Norton could reasonably believe that he was lawfully in hot pursuit of a person who, as far as he knew, had unlawfully resisted arrest when he fled from Trooper Swenson.[24]  *See United States v. Shareef,* 100 F.3d 1491, 1503 n.4 (10th Cir. 1996) (citing *United States v. Hensley,* 469 U.S. 221, 231 (1985)) ("It is well-established that when an order to stop or arrest a suspect is communicated to officers in the field, the underlying facts constituting probable cause or reasonable suspicion need not be communicated, so long as the individual or agency issuing the order can justify the intrusion on Fourth Amendment rights."); Utah Code § 76-8-305 (1990) (interference with peace officer) (amended 2017); § 305.5 (2005) (failure to stop at the command of a peace officer) (amended 2018).

Officer Norton had the authority to detain Mr. Murray, at least temporarily, to determine his tribal status. *Ute V,* 790 F.3d at 1005-06 (10th Cir. 2015) (cleaned up) (emphasis in original) ("The Tribe's position, they say, would require state officers patrolling [on reservation] rights-of-way to engage in racial profiling because they would have to hazard a guess about whether a driver is or isn't an Indian before pulling her over. But even assuming the relevance of this concern, it is misplaced. After all, officers could just as easily (and lawfully) inquire into a motorist's tribal membership after she is stopped for a suspected offense. Indeed, it seems Utah's law enforcement agencies are *already* doing just that."); *see also Brendlin v. California,* 551 U.S. 249, 254-56 (2007) (holding that a passenger in a car stop is seized for purposes of the

---

[24] The parties agree that Trooper Swenson did not inform Officer Norton that Trooper Swenson had seen Mr. Murray commit any crime. (ECF 189 at ¶ 34.) Although neither party asked Officer Norton why he pursued Mr. Murray, it is a commonsense inference that Officer Norton understood Mr. Murray had resisted arrest by fleeing. Trooper Swenson had "pointed out to Officer Norton where Mr. Murray had gone and provided a general description of Mr. Murray," indicating that Trooper Swenson wanted Officer Norton to chase Mr. Murray and arrest him. (*Id.* at ¶ 33.) Officer Norton also observed that Trooper Swenson had been in pursuit of a vehicle with two occupants and saw that vehicle crashed on the side of the road with Trooper Swenson having one person in handcuffs, suggesting the other occupant had fled. (ECF 198 at 74:25-77:17.)

fourth amendment and may challenge whether an officer had reasonable suspicion to initiate the traffic stop).[25]  The record includes no evidence to suggest that Officer Norton knew Mr. Murray was an enrolled tribal member.

As for the physical evidence, none of it indicates who fired the first shot.  The physical evidence indicates that Officer Norton could not have been close enough to Mr. Murray to inflict a close-contact wound to the head.  While there is some doubt as to the value of the evidence concerning footprints between Officer Norton's and Mr. Murray's locations, this evidence does not support an inference or finding that Officer Norton got close to Mr. Murray outside the presence of other officers.  (ECF 198 at 175:8-14; ECF 199 at 262:11-24, 263:13-22, 295:9-12; ECF 200 at 514:12-17.)  Further, the blood spatter indicates that the lethal shot traveled from north to south, at a right angle from where Officer Norton was apparently standing.  (ECF 199 at 258:18-259:1, 260:16-18, 262:4-24; Def. Ex. 41 at 2 (Jones0011385).)  There also were expended .40 caliber shell casings approximately 110 yards from where Mr. Murray fell, near where the expended .380 caliber shell casings and the .380 Hi-Point were found.

Officer Norton was the only apparent eyewitness to the shooting.  (*See* ECF 189 at ¶ 37.)  Yet Officer Norton's account, while admittedly provided to Agent Ashdown second- or third-hand (ECF 198 at 102:12-15; ECF 199 at 259:18-23, 261:24-262:3, 279:2-16, 281:5-11, 281:25-282:12), was consistent with the physical evidence at the scene.  This physical evidence included footprints, bullet casings, and the direction of the blood spatter.  Mr. Murray was also found in the possession of a gun, and no evidence indicates that Officer Norton had approached Mr. Murray outside the presence of other officers such that he could have manipulated the scene.[26]  (ECF 198 at 175:8-14; ECF 199 at 262:11-24, 263:13-22, 295:9-12; ECF 200 at 514:12-17.)

---

[25] If Mr. Murray had not been a tribal member, then state criminal laws would have unquestionably applied to Mr. Murray for any state crime not involving an Indian victim, such as resisting arrest.  *United States v. McBratney*, 104 U.S. 621, 622-24 (1881).  In such a case, Officer Norton could have arrested Mr. Murray pursuant to that state criminal law jurisdiction, even though Officer Norton was outside his usual jurisdiction.  Section 77-9-3 of the Utah Code defines four cases in which a Utah police officer can exercise jurisdiction beyond his usual jurisdiction; two of those situations likely apply to Officer Norton's conduct.  First, under subsection 1(a), Officer Norton was in "fresh pursuit of [Mr. Murray] for the purpose of arresting and holding [Mr. Murray] in custody or returning [Mr. Murray] to the jurisdiction where the offense was committed."  Second, under subsection 1(d), Officer Norton was "called to assist peace officers of another jurisdiction" when he contacted dispatch and when Trooper Swenson effectively indicated he wanted Officer Norton to pursue and arrest Mr. Murray.  (*See* ECF 189 at ¶ 33.)

[26] To be clear, none of this evidence proves that Mr. Murray shot himself or that Officer Norton did not shoot Mr. Murray; it is relied on here not to resolve the merits of the plaintiffs' claim but merely to determine the existence of probable cause to seize Officer Norton's service weapon on April 1, 2007.

For Agent Ashdown to have had probable cause that Officer Norton assaulted or murdered Mr. Murray, and thus that the .40 Glock was evidence of a crime, Agent Ashdown would have needed to disregard the circumstantial and physical evidence surrounding the shooting to conclude that a prudent person would have found that there was a fair probability that Officer Norton attacked Mr. Murray.  Further, Agent Ashdown would have had to have thought that Officer Norton attacked Mr. Murray for no apparent reason for Officer Norton to have committed assault by firing first.  And the only way Officer Norton could have approached Mr. Murray and inflicted a close-contact wound on him when Mr. Murray had a gun is if Mr. Murray had surrendered and Officer Norton then approached and shot him, again for no apparent reason. This latter scenario is implausible given what Agent Ashdown could observe at the scene on April 1, 2007.

Although the plaintiffs may argue that the .40 Glock could have provided evidence to contradict the apparent positions of Mr. Murray and Officer Norton during the shooting, the plaintiffs cannot bootstrap their argument that relevant evidence would have been found on the .40 Glock because probable cause existed to seize the .40 Glock.  That analysis is only appropriate once a court has already determined that a sanction is appropriate.  *See Jones V*, 2022 WL 473032, at *11 (quoting *Micron*, 645 F.3d at 1328 (emphasis in original)) ("A party may satisfy its burden to show prejudice by coming forward 'with plausible, concrete *suggestions* as to what [the destroyed] evidence *might have been.*'").  Furthermore, the available evidence suggests that Chief Jensen at least visually inspected the .40 Glock and saw nothing of note on it, meaning that even if Agent Ashdown had visually inspected the weapon, no reasonable observer would have seen anything suspicious on it.  (ECF 198 at 122:14-18.)  Although that evidence comes from Officer Norton, it is undisputed that Chief Jensen took possession of the .40 Glock, and there has been no suggestion that he told Agent Ashdown that he had noted anything suspicious about it.

At best, the plaintiffs can argue that it was odd that the .380 Hi-Point had no blood or viscera on it if it had been used by Mr. Murray to shoot himself at close range; they can also argue that there is no evidence as to whether Officer Norton or Mr. Murray fired the first shot. The absence of evidence, however, is not itself evidence.  Further, the .40 Glock also apparently lacked any observable blood or viscera on it.  The absence of blood on the .380 Hi-Point alone is not sufficient to create probable cause that Officer Norton improperly used force against Mr. Murray.

The only other use of force against Mr. Murray at the scene was when Trooper Young and Deputy Byron placed him in handcuffs.  (ECF 198 at 102:25-103:2.)  Thus, any claim predicated on the use of the handcuffs would not give rise to probable cause to seize Officer Norton's .40 Glock, because that action did not directly involve Officer Norton or his service weapon.

Other crimes the plaintiffs assert require Officer Norton to have committed perjury, destroyed evidence, or failed to report a crime.  (ECF 150-6 at 3-5 (citing 18 U.S.C. §§ 4 (misprision of felony), 1361 (depredation of government property), 1503 (influencing or injuring officer or juror), 1505 (obstruction), 1506 (theft or alteration of records), 1510 (obstruction of criminal investigations), 1511 (conspiracy to obstruct state or local law enforcement regarding

gambling), 1512 (victim or witness tampering), 1513 (retaliation against a witness or victim), 1519 (destruction, alteration, or falsification of records), 1621 (perjury), 1622 (subornation of perjury), 2071 (concealment, removal or mutilation of court records), 2232 (destruction or removal of property to prevent seizure); Utah Code §§ 76-6-106 (criminal mischief), 76-8-201 (official misconduct), 76-8-301 (interference with public servant), 76-8-305 (interference with peace officer), 76-8-306 (obstruction of criminal investigation), 76-8-412 (now 8-413) (theft or destruction of public records), 76-8-502-506 (false statement and perjury), 76-8-510.5, (tampering with evidence), 76-8-511 (falsification or alteration of government records)).)

The plaintiffs, however, have not introduced any evidence that shows that Agent Ashdown could have found evidence of such crimes on April 1, 2007.  To the contrary, Agent Ashdown found nothing to suggest that anyone had tampered with the evidence (ECF 199 at 295:9-12), that Officer Norton's account was false, or that Officer Norton had conspired with others to lie about what happened or mislead Agent Ashdown.

The plaintiffs have also not provided any evidence that Agent Ashdown could have found evidence of a conspiracy on April 1, 2007.  (ECF 160-6 at 3-5 (citing 18 U.S.C. §§ 2 (aiding and abetting), 3 (accessory), 241 (conspiracy against rights), 286 (conspiracy to defraud government with respect to claims), 371 (conspiracy to commit offense against or defraud the United States), 1961-68 (The Racketeer Influenced and Corrupt Organizations Act)).) Furthermore, several crimes that the plaintiffs contend form the basis for their bad men treaty claim seem to have no connection to Officer Norton or the events that occurred at the scene of the shooting on April 1, 2007.  (*Id.* (citing 18 U.S.C. §§ 287 (false, fictitious or fraudulent claims), 1343 (wire fraud); Utah Code §§ 76-8-410 (doing business without a license), 76-8-508.3 (retaliation against a witness, victim, or information), 76-9-108 (disrupting a funeral or memorial service); 76-9-704 (abuse or desecration of a human being)).)

As for any offenses concerning Officer Norton's lack of jurisdiction (*id.* (citing Utah Code §§ 76-8-203 (unofficial misconduct), 512 (impersonation of officer))), Officer Norton had, as previously noted, the authority to stop Mr. Murray to determine his tribal status, even if he did not have jurisdiction to arrest him.  *See Ute V*, 790 F.3d at 1005-06.[27]  Further, Officer Norton, even if outside of his jurisdiction, was still a police officer, and therefore was not acting with an intent to deceive regarding his status as a police officer.

Finally, the plaintiffs argue that Officer Norton had committed criminal trespass. Criminal trespass is defined under Utah Code § 76-6-206 (2006) (amended 2010, 2014, 2015,

---

[27] The Tenth Circuit had held at the time that an arrest outside of an officer's jurisdiction "is analogous to a warrantless arrest without probable cause," but clarified that only in cases "[a]bsent exigent circumstances, [is] such an arrest [ ] presumptively unreasonable." *Ross v. Neff*, 905 F.2d 1349, 1354 (10th Cir. 1990).  Given the circumstances involved in the pursuit of Mr. Kurip's vehicle, in which Mr. Murray was a passenger, and Mr. Murray's flight on foot, exigent circumstances supported Officer Norton's initial pursuit and would have supported a brief detention to determine Mr. Murray's tribal status.

and 2017).[28]  Assuming *arguendo* that the statute applies to reservation land under the Assimilative Crimes Act, 18 U.S.C. § 13, and the General Crimes Act, 18 U.S.C. § 1152, there is no evidence that Officer Norton's actions constituted criminal trespass under Utah law.[29]

Under Utah law,[30] Officer Norton could have committed a criminal trespass in one of two ways.  First, he could have trespassed under subsection 2(a) of § 76-6-206 if he "enter[ed] or

---

[28] The plaintiffs also rely on 18 U.S.C. § 1165 and article 2 of the 1868 Treaty between the defendant and the Ute Tribe to claim that Officer Norton and other state and local officers committed a criminal trespass.  (ECF 150-6 at 4.)  Section 1165 of Title 18 does not apply, however, as it only applies when a person trespasses "for the purpose of hunting, trapping, or fishing . . . or the removal of game, peltries, or fish" from Indian land.  As for article 2 of the 1868 Treaty (in the record as Def. Ex. 1), while it does include a provision that forbids unauthorized persons from "pass[ing] over, settl[ing] upon, or resid[ing] in the" Ute reservation, it does not provide any penalty against a private actor for the violation of the treaty.  The treaty is not a criminal statute, even assuming this portion of it has not been abrogated.  *Cf. Van Buren v. United States*, 141 S. Ct. 1648, 1661 (2021) (declining to read a statute as imposing criminal liability when doing so would criminalize a variety of commonplace activities); 25 U.S.C. § 311 (allowing the Secretary of the Interior to grant permission to state and local authorities to open public highways through Indian reservation or lands).  Violation of the treaty could not have created probable cause for Agent Ashdown to seize any evidence.

[29] The Court has already held that criminal trespass cannot form a basis of the plaintiffs' bad men claim because such a wrong would only be against the Ute Tribe, which does not have standing to bring a bad man claim.  *See Jones I*, 122 Fed. Cl. at 528 n.31; *Jones IV*, 149 Fed. Cl. at 360; *Hebah v. United States*, 428 F.2d 1334, 1337 (Ct. Cl. 1970); *Hernandez v. United States*, 93 Fed. Cl. 193, 200 (2010).  As noted in *Jones IV*, "the plaintiffs conceded the point before the Federal Circuit."  149 Fed. Cl. at 360 (citing Pl.-Appellants' Principal Br. at 37 n.8, filed Dec. 14, 2015, Jones Fed. Cir., No. 2015-5148.)  The Federal Circuit did not disturb this portion of *Jones IV* in *Jones V*.  That said, if there was probable cause to arrest for criminal trespass, Agent Ashdown could have arrested Officer Norton and seized evidence on his person and evidence relating to his crime, making it relevant to the question of control.

[30] Section 76-6-206 of the Utah Code, as it read in 2007, lays out two possible ways Officer Norton could have been guilty of trespass.  The statute provides:

> (1) As used in this section, "enter" means intrusion of the entire body.

> (2) A person is guilty of criminal trespass if, under circumstances not amounting to burglary as defined in Section 76–6–202, 76–6–203, or 76–6–204 or a violation of Section 76–10–2402 regarding commercial terrorism:

remain[ed] unlawfully on property" and "intend[ed] to cause annoyance or injury," was "reckless with regards to if his presence would cause fear for the safety of another," or "intend[ed] to commit any crime, other than theft or a felony."  Utah Code § 76-6-206(2)(a) (2006). Alternatively, he would have criminally trespassed under subsection 2(b) if he had notice that his presence was unlawful by communication from the owner or someone with their authority, if there was fencing or another enclosure, or if there were signs warning against trespass.  Utah Code § 76-6-206(2)(b) (2006).

---

> (a) he enters or remains unlawfully on property and:
>
>> (i) intends to cause annoyance or injury to any person or damage to any property, including the use of graffiti as defined in Section 76–6–107;
>>
>> (ii) intends to commit any crime, other than theft or a felony; or
>>
>> (iii) is reckless as to whether his presence will cause fear for the safety of another;
>
> (b) knowing his entry or presence is unlawful, he enters or remains on property as to which notice against entering is given by:
>
>> (i) personal communication to the actor by the owner or someone with apparent authority to act for the owner;
>>
>> (ii) fencing or other enclosure obviously designed to exclude intruders; or
>>
>> (iii) posting of signs reasonably likely to come to the attention of intruders; or
>
> (c) he enters a condominium unit in violation of Subsection 57–8–7(7).
>
> (3)    (a) A violation of Subsection (2)(a) or (b) is a class B misdemeanor unless it was committed in a dwelling, in which event it is a class A misdemeanor.
>
> (b) A violation of Subsection (2) (c) is an infraction.
>
> (4) It is a defense to prosecution under this section that:
>
>> (a) the property was open to the public when the actor entered or remained; and
>>
>> (b) the actor's conduct did not substantially interfere with the owner's use of the property.

51

There is no evidence that the requirements of either subsection 2(a) or subsection 2(b) of section 76-6-206 were met.  The plaintiffs have not introduced any evidence that there was any enclosure or signage against trespass.  The plaintiffs' record citations do not adequately support their claim that the land in question was not open to the public.  (*See* ECF 201 at 4.)  Although some photographs of the scene of the shooting suggest there may have been some fencing in the area (Def. Ex. 45 at M-P (Jones0011724-27)), other photographs (Def. Ex. 45 at A-I (Jones0011712-20), WW-ZZ (Jones0011761-64)) and the only testimony regarding fencing indicate that there was no fencing between the road and the scene of the shooting (*see* ECF 199 at 382:23-383:7 ("And at that time - - there's not a fence saying 'This is the Ute Reservation.'")).  Further, there is no evidence that Officer Norton intended to commit a crime or an injury when he entered the reservation land searching for Mr. Murray.

Finally, and most fundamentally, Officer Norton was in hot pursuit of someone he reasonably believed he had probable cause to detain; Officer Norton did not know that Mr. Murray was a tribal member.  *See Ute V*, 790 F.3d at 1005-06; Utah Code §§ 76-8-305 (1990), 305.5 (2005).  Officer Norton's presence on the reservation to arrest Mr. Murray, even assuming the land was non-public, did not violate Utah's criminal trespass law.  *See* Utah Code §§ 76-6-201(3) (1973) (clarifying that privileged and licensed actors are lawfully present on land), 206(a) (2006); Restatement (Second) of Torts § 204 (1965) (describing the privilege to enter private land to make an arrest).[31]

Given that all available evidence on April 1, 2007, either indirectly supported Officer Norton's description of the shooting or, at least, did not contradict it, there was no reason for a prudent person to suspect that Officer Norton had committed a crime through unlawfully using force against Mr. Murray.  There also was no reason to suspect from the scene of the shooting that Officer Norton had committed any other crime, let alone that probable cause existed that he had done so.  Absent any reason to believe Officer Norton had committed any crime, there was no probable cause that the .40 Glock was evidence of any crime.  Agent Ashdown and the defendant therefore did not have the legal right to seize the .40 Glock as of April 1, 2007.

### 3.    Control After April 1, 2007

Probable cause for a seizure did not exist on April 1, 2007, and it did not develop at any time thereafter.  Dr. Leis's report concerning Mr. Murray's death concluded that it was a suicide. (Def. Ex. 52.)  Agent Ryan's interview with Officer Norton did not note any new information or inconsistencies with evidence the FBI previously had collected.  (Pl. Ex. 8.)  While the plaintiffs have suggested that there was a video from Trooper Swenson's dashcam that might have shed

---

[31] Utah courts have relied on the Restatement (Second) of Torts regarding trespass, although not § 204.  *See Colosimo v. Gateway Cmty. Church*, 424 P.3d 866, 871-78 (Utah 2018) (discussing §§ 334-335, 339 of the Restatement (Second) of Torts); *Whipple v. Am. Fork Irr. Co.*, 910 P.2d 1218, 1220-22 (Utah 1996) (discussing §§ 329, 333-39 of the Restatement (Second) of Torts); *Purkey v. Roberts*, 285 P.3d 1242, 1247-48 (Utah App. 2012) (discussing §§ 158, 163-64 of the Restatement (Second) of Torts).

light on Mr. Murray's appearance before the shooting, no such video has been presented.  (*See* ECF 189 at ¶ 19; ECF 198 at 20:4-21:25, 56:14-22; ECF 199 at 327:1412-19.)

Further, even if probable cause had arisen after April 1, 2007, that probable cause would not necessarily have given the defendant legal control over the .40 Glock or Officer Norton's clothing.

Those pieces of evidence were removed from the scene on April 1, 2007 (ECF 198 at 28:17-29:2, 46:4-10, 49:16-52:7, 63:17-64:7 (describing the evidence left at the scene of the shooting on April 2, 2007, without noting Officer Norton's clothing or the .40 Glock)) and presumably were not kept anywhere in plain view.  With the items no longer in plain view, the plain view doctrine would not have applied.  *See Brown*, 460 U.S. at 738..  As such, the FBI would have needed consent or a warrant to seize such evidence.  *Mincey*, 437 U.S. at 390 (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)) ("The Fourth Amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'"); *Illinois v. Andreas*, 463 U.S. 765, 771 (1983) ("The plain view doctrine authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity.").

 If the defendant would have needed a warrant to seize the .40 Glock and Officer Norton's clothing  after April 1, 2007, then the defendant no longer had the legal right to seize the evidence absent such a warrant founded on probable cause.

Even if the defendant had obtained a legal right to control the .40 Glock and Officer Norton's clothing at any time after April 1, 2007, the plaintiffs have not provided any evidence that the .40 Glock or Officer Norton's clothing had been preserved in the same condition as they existed on April 1, 2007; in other words, the items may have been altered or cleaned by third parties by the time the defendant accrued the legal right to control those items (assuming *arguendo* the defendant had obtained them).  *See Jandreau v. Nicholson*, 492 F.3d 1372, 1375 (Fed. Cir. 2007) (cleaned up) ("The burden is on the party seeking to use the evidence to show the existence of each criterion" including that "the party having control over the evidence had an obligation to preserve it at the time it was destroyed.")  Instead, the record is silent as to whether Officer Norton washed his clothes and whether Chief Jensen cleaned Officer Norton's service weapon or issued it to another officer.  At best, Officer Norton is unsure if he ever received the .40 Glock back or if he was issued a new 9-millimeter handgun when his department switched service weapons shortly after April 1, 2007.  (ECF 198 at 131:19-23, 156:1-12.)

Without at least some showing that the evidence existed in an undisturbed state from April 1, 2007, until some other, later date on which probable cause could be shown to have existed, the plaintiffs cannot demonstrate that there was evidence for the defendant to take control of after April 1, 2007.  Without such a showing, the plaintiffs cannot demonstrate that there was evidence which the defendant had a duty to preserve.

**IV.     CONCLUSION**

The plaintiffs' motion for spoliation sanctions (ECF 204) is **GRANTED** in part, with respect to the .380 Hi-Point handgun, and **DENIED** in part, with respect to Officer Norton's clothing and the .40 Glock handgun.

The parties are **DIRECTED** to file a joint status report by **May 15, 2023**, setting forth a proposed schedule for further proceedings.

It is so **ORDERED**.

s/ Richard A. Hertling
**Richard A. Hertling**
**Judge**