<span style="color:red">Corrected</span>

# In the United States Court of Federal Claims

No. 13-227
Filed: May 7, 2024
FOR PUBLICATION

---

**DEBRA JONES, et al.,**

                        *Plaintiffs,*

**v.**

**UNITED STATES,**

                        *Defendant.*

---

*Jeffrey S. Rasmussen*, Patterson Earnhart Real Bird and Wilson, Louisville, Colorado, for the plaintiffs.

*J. Scott Thomas*, Environment & Natural Resources Division, U.S. Department of Justice, Washington, D.C., with *Christopher C. Hair* and *Amanda K. Rudat*, Department of Justice, of counsel, for the defendant.

## MEMORANDUM OPINION

***HERTLING*, Judge**

On April 1, 2007, Todd Murray, a member of the Ute Tribe, died from a contact gunshot wound to his head inflicted while he was on the Ute Reservation in Utah. The factual question at the heart of this case is simple: who is the more likely person to have shot Mr. Murray? The plaintiffs, who are Debra Jones, Mr. Murray's mother, and the Estate of Arden Post, Mr. Murray's father, allege that Officer Vance Norton, a local police officer, fired the shot and thereby committed homicide. If true, the plaintiffs are entitled to damages under the "bad men" provision of the treaty between the Ute Tribe and the federal government.[1] The defendant counters that it was Mr. Murray, who either accidentally or purposefully fired the fatal shot after

---

[1] The "bad men" provision is found in Article VI of the 1868 Treaty with the Ute Indians. Treaty with the Ute, Mar. 2, 1868, 15 Stat. 619 (the "Ute Treaty"). It provides: "If bad men among the whites or among other people, subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will, upon proof made to the agent and forwarded to the Commissioner of Indian Affairs at Washington City, proceed at once to cause the offender to be arrested and punished according to the laws of the United States, and also reimburse the injured person for the loss sustained."

first firing two shots at Officer Norton, and argues that no federal crimes necessary for liability under the Ute Treaty were committed that day by any state or local officers.

This case has been extensively litigated, and the plaintiffs, in particular Ms. Jones, have demonstrated great stamina, fortitude, and resolve in vigorously pursuing their claims. It began in 2009 with a civil rights suit under 42 U.S.C. §§ 1983 and 1985 in the District of Utah. The district court entered summary judgment against the plaintiffs, and the Tenth Circuit affirmed. *Jones v. Norton*, 3 F. Supp. 3d 1170 (D. Utah 2014), *aff'd*, 809 F.3d 564 (10th Cir. 2015). The plaintiffs also filed suit in this court in 2013. After more than 10 years of litigation, with two appeals to the Federal Circuit, the plaintiffs' claims were tried in November 2023.

This opinion, written more than 17 years after the events giving rise to this suit occurred, does not and cannot definitively resolve what occurred on April 1, 2007. This decision can only resolve whether the plaintiffs have met their required burden under the law, based on the evidence presented, to impose liability on the defendant. Many documents were received into evidence and extensive testimony was taken at trial and at a separate, earlier evidentiary hearing on an appropriate sanction for the defendant's spoliation of evidence. Even so, memories have faded. Evidence has been lost to time, was never collected, or has even been destroyed, including a .380 Hi-Point handgun that was found near Mr. Murray and seized by the defendant.

Because the defendant's destruction of the .380 Hi-Point was found to have been negligent, the defendant was sanctioned with a rebuttable adverse evidentiary presumption that the .380 Hi-Point did not have Mr. Murray's blood, tissue, DNA, or fingerprints on it. That sanction enabled the plaintiffs to avoid summary judgment and reach trial. The sanction also enabled the plaintiffs to overcome the defendant's motion for judgment on partial findings under Rule 52(c) of the Rules of the Court of Federal Claims ("RCFC"), because the presumption made it unlikely that Mr. Murray had ever touched or used the destroyed firearm.

The issue of who fired the shot that killed Todd Murray was tried and is now ripe for resolution. The questions to be determined from trial are whether the defendant has met its burden to overcome the adverse evidentiary presumption, and whether the plaintiffs have met their burden of proof to prevail on the merits.

This decision constitutes the findings of fact and conclusions of law required by RCFC 52(a)(1). Based on the evidence, the defendant has rebutted the adverse presumption imposed for its destruction of evidence by showing that it is more likely than not that Mr. Murray possessed and brought the .380 Hi-Point to the scene of the shooting on April 1, 2007. With the adverse presumption rebutted, the evidence shows that it is more likely than not that Mr. Murray died by a self-inflicted gunshot wound. Consistent with this factual finding, the plaintiffs cannot show that a federal crime was committed by any of the responding or investigating state or local officers. Because no federal crime was committed, Mr. Murray's death is not compensable by the defendant under the Ute Treaty. Judgment will be entered in favor of the defendant.

## I.   PROCEDURAL HISTORY

### A.   Prior Rulings

This opinion assumes familiarity with this case's extensive history.  *See Jones v. United States*, 122 Fed. Cl. 490 (2015) ("*Jones I*"); *Jones v. United States*, 846 F.3d 1343 (Fed. Cir. 2017) ("*Jones II*"); *Jones v. United States*, 146 Fed. Cl. 726 (2020) ("*Jones III*"); *Jones v. United States*, 149 Fed. Cl. 335 (2020) ("*Jones IV*"); *Jones v. United States*, No. 2020-2182, 2022 WL 473032 (Fed. Cir. Feb. 16, 2022) ("*Jones V*"); *Jones v. United States*, No. 13-227, 2023 WL 2681819 (Fed. Cl. Mar. 29, 2023) ("*Jones VI*").  This opinion also assumes familiarity with the related litigation in the District of Utah and the subsequent appeal.  *Jones v. Norton*, 3 F. Supp. 3d 1170 (D. Utah 2014), *aff'd*, 809 F.3d 564 (10th Cir. 2015).

In *Jones I*, a judge of this court dismissed the plaintiffs' claims.  In *Jones II*, the Federal Circuit vacated the dismissal and remanded for consideration of the plaintiffs' argument that the defendant had spoliated evidence by failing to collect and preserve certain alleged pieces of evidence.  *Jones II*, 846 F.3d at 1363-64.

In *Jones III*, the plaintiffs' motion for spoliation sanctions was granted in part and denied in part.  The plaintiffs sought sanctions for the defendant's supposed spoliation by failing to collect and preserve evidence in 11 respects.  *Jones III*, 146 Fed. Cl. at 735-36.  Except for the .380 Hi-Point, no evidence was found to have been spoliated.  *Id.* at 737-43.  Based on the determination that the .380 Hi-Point had been negligently spoliated, the defendant was forbidden from "rely[ing] affirmatively on any facts related to the .380 handgun, including the fact that the third shell casing was not ejected from the destroyed handgun and the presence or absence of fingerprints or blowback on the handgun, to support the [defendant's] conclusion that Mr. Murray died by suicide."  *Id.* at 742-43.

The defendant was granted summary judgment in *Jones IV* because issue preclusion applied to the plaintiffs' claims, notwithstanding the spoliation sanction imposed for the destruction of the .380 Hi-Point.  *Jones IV*, 149 Fed. Cl. at 348-54.  In addition, two sets of the plaintiffs' claims were determined not to have been "wrongs" under the "bad men" provision of the Ute Treaty.  First, the plaintiffs' claims based on alleged wrongs that were not punishable under federal criminal law were rejected.  *Id.* at 354-56.  Second, the claims that only implicated conduct that occurred solely off-reservation were rejected.  *Id.* at 356-57.  The plaintiffs were found not to have provided sufficient proof to show even on summary judgment that certain alleged federal crimes had occurred, and the plaintiffs were estopped from re-arguing issues relating to certain other alleged federal crimes due to issue preclusion arising from the summary judgment in the Utah district court litigation.  *Id.* at 357-62.

In *Jones V*, the Federal Circuit held that the decision in *Jones III* had applied the "wrong standard" in evaluating whether the defendant had "control" of any of the evidence in deciding whether the defendant had spoliated that evidence.  *Jones V*, 2022 WL 473032, at *1, 4.  In so doing, the Federal Circuit held that the defendant, like any other party, has "control" over evidence when "it has a legal right to obtain or control that evidence."  *Id.* at *4, 8.  The Federal Circuit also rejected the sanction imposed for the defendant's destruction of the .380 Hi-Point

handgun in *Jones III* as "futile." *Id.* at *9-11. Specifically, the Federal Circuit held that "[a]lthough a sanction preventing the spoliator from relying on the evidence they destroyed might be appropriate in other cases, it is not appropriate in this case because it serves none of the rationales underlying the spoliation doctrine." *Id.* at *11. According to the Federal Circuit, "[c]onsidering the import of the Hi-Point .380 handgun to Mr. Murray's parents' case, a harsher sanction is required." *Id.* at *9.

The Federal Circuit therefore remanded the case to determine: (1) whether the defendant controlled and spoliated evidence relating to the defendant's supposed failure "to enforce its request for an autopsy and failure to bag Mr. Murray's hands," *id.* at *8; (2) "whether litigation was reasonably foreseeable while the government had control (as we define it here) over any allegedly spoliated evidence other than the spoliated Hi-Point .380 handgun," and, accordingly, whether any such evidence was spoliated, *id.* at *9; and (3) "to determine the exact bounds of the appropriate remedy, such as an adverse inference or inferences, that should apply to any spoliated evidence in this case," including "whether the government should be permitted to rely on secondary evidence related to the spoliated [.380 Hi-Point handgun]," *id.* at *11.

Having vacated the rulings on spoliation, the Federal Circuit reversed the *Jones IV* ruling on issue preclusion and vacated the summary judgment for the defendant. The Federal Circuit held that issue preclusion did not apply based on the change wrought by its decision to the evidentiary landscape and remanded for further consideration of the plaintiffs' substantive allegations of violations of the bad men provision of the Ute Treaty. *Id.* at *12.[2]

---

[2] Notably, the plaintiffs did not appeal the holding in *Jones IV* dismissing the plaintiffs' claims as to wrongs that were not cognizable under federal criminal law, that implicated only off-reservation conduct, or that suffered from other defects unrelated to the spoliation of evidence or issue preclusion. Brief for Plaintiffs-Appellants, *Jones V*, 2020 WL 7642010, at *1-2 (making no mention of these aspects of *Jones IV*). Because the plaintiffs never raised them, the Federal Circuit's decision did not mention these aspects of *Jones IV*. *See Jones V*, 2022 WL 473032, at *4 (emphasis added) ("[The plaintiffs] appeal *aspects* of both the Claims Court's spoliation decision and its summary judgment decision."), 12 (addressing the *Jones IV* summary judgment opinion in a section entitled "Issue Preclusion"). Federal Circuit "law is well established that arguments not raised in the opening brief are forfeited." *Rueter v. Dep't of Com*., 63 F.4th 1357, 1367 n.4 (Fed. Cir. 2023) (cleaned up). As the Federal Circuit has noted, "[t]he scope of the issues presented to [the Federal Circuit] on appeal must be measured by the scope of the judgment appealed from, not by the arguments advanced by the appellant. . . . An issue that falls within the scope of the judgment appealed from but is not raised by the appellant in its opening brief on appeal is necessarily waived. Unless remanded by [the Federal Circuit], all issues within the scope of the appealed judgment are deemed incorporated within the mandate and thus are precluded from further adjudication." *Engle Indus., Inc. v. Lockformer Co.*, 166 F.3d 1379, 1382-83 (Fed. Cir. 1999) (cleaned up). To similar effect, the Federal Circuit has held that "[a]n issue that falls within the scope of the judgment appealed from but is not raised by the appellant in its opening brief on

Following remand from the Federal Circuit, the Court held an evidentiary hearing from October 31, 2022, through November 2, 2022, regarding the spoliation issues remanded by the Federal Circuit. (Transcripts available at ECF 198 through ECF 200.) The opinion on spoliation was issued on March 29, 2023. *Jones VI*, 2023 WL 2681819. The plaintiffs' request for sanctions for the alleged failure by the Federal Bureau of Investigation ("FBI") to seize Officer Norton's .40 Glock handgun and clothing was denied.[3] Although litigation was reasonably foreseeable on April 1, 2007, the evidence presented showed that the FBI lacked legal control over these items because it did not have probable cause to seize them. *Id.* at *27-42.

As regards the .380 Hi-Point, the defendant was sanctioned as follows:

> 1. A rebuttable adverse inference that the .380 Hi-Point did not have Mr. Murray's blood, tissue, fingerprints, or DNA on it. The defendant may rebut this adverse inference only with physical evidence or corroborating testimony from at least one witness other than Officer Norton. If the defendant rebuts this adverse inference, the question of what the .380 Hi-Point would have shown will be treated as unknowable.

> 2. To prevent circumvention of the first sanction, the defendant may not rely on any secondary evidence as to what may have been found on the .380 Hi-Point or secondary evidence concerning the un-ejected (or stovepiped) shell casing found in the destroyed handgun to support its arguments on the merits that Mr. Murray died by a self-inflicted gunshot wound. The defendant may on the merits,

---

appeal may properly be deemed waived." *Bannum, Inc. v. United States*, 779 F.3d 1376, 1382 (Fed. Cir. 2015) (cleaned up). Based on these precedents, the Court adopted the view that the plaintiffs had forfeited any objections to those aspects of the *Jones IV* summary judgment ruling not addressed in their opening appellate brief. Accordingly, those aspects were not disturbed by the Federal Circuit reversal of the summary judgment and are the law of the case. The defendant shares this view of the effect of the plaintiffs' failure on appeal to address aspects of the summary judgment ruling. (ECF 219 at 4-6.) The plaintiffs disagree with this position. (*See, e.g.*, ECF 215; ECF 219 at 1 n.1, 6-7.) That said, it is ultimately the province of the Federal Circuit to determine on appeal the extent to which it vacated *Jones IV*, and whether any issues related to *Jones III* or *Jones IV* not raised by the plaintiffs' appeal in *Jones V* remain appealable. While continuing to object to the Court's position to reserve their rights on appeal (ECF 215; ECF 219 at 1 n.1, 6-7), the plaintiffs agreed to proceed to trial on their claims that were necessarily revived by the Federal Circuit's ruling in *Jones V* (ECF 219 at 2-3).

[3] Although the Federal Circuit instructed the Court to consider on remand potential spoliation sanctions for other uncollected items of evidence, the plaintiffs voluntarily abandoned their request for spoliation sanctions for anything other than Officer Norton's .40 Glock handgun, his clothing, and the .380 Hi-Point. *Jones VI*, 2023 WL 2681819, at *3.

however, present physical evidence or testimony from witnesses to corroborate Officer Norton's testimony to show that Mr. Murray was in possession of and used the .380 Hi-Point on April 1, 2007, and to provide evidence concerning the origin, ownership, and destruction of the weapon.

*Id.* at *21.[4]

## B.   Pre-Trial and Trial Proceedings

After the *Jones VI* spoliation opinion was issued, and in anticipation of trial, the plaintiffs were instructed to file a more definite statement as to the remaining crimes they alleged could form the possible basis on which to recover damages under the Ute Treaty.  (ECF 214.)  The plaintiffs filed a list that included crimes that they had not previously alleged or relied on in opposing the defendant's prior summary judgment motion, most notably claimed violations of Ute tribal law.  (ECF 215 at 1-3.)

At a status conference on June 27, 2023, the Court informed the parties of its view that many of the plaintiffs' claimed offenses were not viable for trial because they were unaffected by the spoliation sanctions imposed by *Jones VI*.  As the plaintiffs correctly understood (ECF 219 at 1, 6-7), the Court viewed the *Jones V* ruling as not having completely displaced the *Jones IV* summary judgment ruling.  Further, the plaintiffs were precluded from arguing that Ute tribal law provided a basis for recovery under the "bad men" provision of the Ute Treaty.  The plaintiffs had never previously cited a violation of Ute law as a possible wrong under the Ute Treaty.  Ute criminal law is not federal law and is only applicable to Indians.  *See Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 212 (1978) ("Indian tribes do not have inherent jurisdiction to try and to punish non-Indians."); 25 U.S.C. § 1301(2) (recognizing and affirming "the inherent power of Indian tribes . . . to exercise criminal jurisdiction over all Indians").  In addition, there was no evidence that any of the officers alleged by the plaintiffs to have committed "wrongs" under the treaty were Indians.  Noting that the plaintiffs had preserved the claimed crimes listed in the plaintiffs' more definite statement (ECF 215) for purposes of appeal, the Court instructed the parties to confer and agree on a narrower list of offenses for purposes of trial.  The parties agreed to proceed to trial on a narrower list of crimes supporting potential "bad

---

[4] "A 'stovepiped' round is when 'the round has gone off, but the casing itself is actually stuck in the chamber.  And sometimes they're partially out . . . . ' (ECF 198 at 182:16-24 [(Testimony of retired FBI Agent Rex Ashdown)].)  The resulting stuck casing jams the firearm.  (*See* ECF 199 at 294:15-25.)  Agent Ashdown testified that '[a] stovepipe[d] round happens for a variety of reasons.  The two most common would maybe be the gun is dirty and uncared for and the slide action is gritty, so the slide doesn't move smoothly back and forth, so the gun doesn't operate correctly.  The other most common reason for a stovepipe[d] round would be a — a weak grip or lack of support for the gun when the gun's fired, which — which again hinders the full action of the — the slide to eject a round and reload another round.' (*Id*. at 294:19-295:5.)" *Jones VI*, 2023 WL 2681819, at *8 n.6.

men" liability.  (ECF 219 at 2-3.)  The plaintiffs also asserted to preserve the issue for appeal that, notwithstanding its mandate, the Federal Circuit in *Jones V* had reversed or vacated all aspects of the *Jones IV* summary judgment ruling.  (*Id.* at 1-4, 6-7.)  On July 18, 2023, an order bifurcated the issues of liability and damages for trial and set a schedule for trial on liability in November 2023.  (ECF 220.)

The parties subsequently stipulated to certain facts for trial.  These stipulations concerned the background of most witnesses and the basic facts as to what occurred on April 1, 2007, and during the subsequent investigation of Mr. Murray's death.  (ECF 232 at 1-6.)  The parties also agreed to admit as evidence certain defense exhibits (*id.* at 8-10) and most of the testimony taken at the 2022 evidentiary hearing on spoliation (*id.* at 6-8); a part of the stipulation covering certain portions of the spoliation-hearing testimony was subsequently withdrawn (ECF 251 at 1).  Due to the death of Dr. Edward Leis, the medical examiner who examined Mr. Murray's body and made the official determinations as to the cause and manner of death, the parties also agreed to admit his prior deposition testimony, his testimony in the Utah district court case, and his written report.  (ECF 219 at 8; *see also* ECF 234-1 (deposition testimony), ECF 234-2 at 43-117 (trial testimony), ECF 234-3 (medical examiner's report).)

Regarding trial testimony, the parties agreed the defendant could begin its direct examination of the plaintiffs' witnesses immediately following the plaintiffs' own direct examination to speed up the presentation of evidence and avoid the need to recall witnesses.  (ECF 243 at 2.)  At trial, the parties further stipulated to the admission of parts of the deposition transcript of Colby DeCamp, as well as the admission of certain demonstrative exhibits as evidence.  (ECF 251.)

Trial was held from November 6, 2023, to November 14, 2023, with closing arguments heard on November 14, 2023.  (Trial transcripts available at ECF 254 through ECF 259.)  At the end of the plaintiffs' presentation of evidence, the defendant moved for judgment on partial findings under RCFC 52(c); a ruling on that motion was deferred until a post-trial hearing in January 2024.  (ECF 258 at 502:16-505:1.)  The trial included a site visit on November 9, 2023, to the approximate location of the shooting and the surrounding area.[5]  As noted in the parties'

---

[5] "[T]he decision to conduct a site visit is a matter that is subject to the discretion of the trial court.  Having conducted such a visit in the exercise of its discretion and without objection from counsel, the court [is] free to make use of its observations, to the extent relevant, in its decision of the case."  *Arkansas Game & Fish Comm'n v. United States*, 736 F.3d 1364, 1380 (Fed. Cir. 2013) (quoting 2 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 403.07[4] (J.M. McLaughlin ed. 2013) ("'[T]he modern position is that the view does provide independent evidence.'"); *Snyder v. Massachusetts*, 291 U.S. 97, 121 (1934) ("the 'inevitable effect [of a site visit] is that of evidence, no matter what label the judge may choose to give it'")).  "Absent an objection or insistence on some limitation on the court's use of information obtained during the site visit, [a party] waive[s] its right to object to the court's use of any relevant information obtained in that fashion."  *Arkansas Game & Fish Comm'n*, 736 F.3d at

stipulations regarding the site visit, no testimony or argument from counsel was accepted during the site visit, but the parties agreed in advance to the admission of photographs of the site taken on April 1, 2007.  (ECF 242 at 1.)

After the trial concluded, the parties filed proposed findings of fact and conclusions of law on January 8, 2024.  (ECF 260; ECF 261.)  On January 18, 2024, a hearing was held to address questions about the parties' filings and to resolve the defendant's RCFC 52(c) motion. The defendant's motion was denied.  (ECF 262.)

### C.    Dismissal of the Ute Tribe and Substitution for Arden Post

On October 19, 2023, the Ute Tribe's claims were dismissed with prejudice based on the parties' consent to dismissal.  (ECF 241; *see also* ECF 219 at 1 (noting the parties' agreement that "the Ute Tribe can be dismissed as a party").)

At a status conference on September 6, 2023, the defendant orally notified the Court of the death of Mr. Post.  The plaintiffs were ordered to file a formal notification of the death pursuant to RCFC 25(a)(1) by October 17, 2023 (ECF 233); the plaintiffs did so (ECF 238).  On May 1, 2024, the Estate of Arden Post filed an unopposed motion to substitute as a plaintiff in place of Mr. Post.  (ECF 265.)  Attached to the motion was an order from the Ute Tribal Court authorizing the substitution of the Estate of Arden Post as a party.  (ECF 265-1.)  The motion was granted on May 2, 2024.  (ECF 266.)

## II.    FINDINGS OF FACT[6]

### A.    Background of Key Persons and Witnesses

#### 1.    Mr. Murray, the Plaintiffs, and Mr. Kurip

Mr. Murray was a member of the Ute Tribe who died on April 1, 2007, at the age of 21. (ECF 232 at ¶ 2.)  The Ute Tribe is a federally recognized tribe, with a reservation in northeastern Utah.  (*Id.* at ¶ 4.)  On the day of the shooting, Mr. Murray was wearing short pants with short socks, a white t-shirt, and a short-sleeved button-up shirt.  (*Id.* at ¶ 22; Def. Ex. 70; Def. Ex. 102.)  A photograph of Mr. Murray taken at the scene of the shooting on April 1, 2007, shows the button-up shirt to have been navy or dark blue.  (Def. Ex. 102.)  Mr. Murray was right-

---

1379-80.  Neither party objected to the site visit or proposed any limitations on its usage by the Court; indeed, the parties agreed that "the purpose of the site visit is for the Court to independently survey the site where the crash took place and where Mr. Murray was mortally wounded on April 1, 2007."  (ECF 242 at 1.)  Findings of fact predicated on the Court's impression of the scene of the shooting will be cited as "(Site Visit)."

[6] This section constitutes the findings of facts required by RCFC 52(a).

handed.  (ECF 198 at 27:9-10.)  He died on April 1, 2007, from a contact gunshot wound to the left lateral scalp.  (Def. Ex. 73 at 1-3.)

Debra Jones and Arden Post are the natural parents of Mr. Murray.  Ms. Jones is the personal representative of the Estate of Mr. Murray, for and on behalf of the heirs of Mr. Murray.  Arden Post died on December 16, 2022.  (ECF 232 at ¶ 3.)  As noted above, Mr. Post's estate is now a plaintiff, in place of Mr. Post.  (ECF 266.)

Uriah Kurip was the driver of a car involved in the high-speed pursuit with a Utah State trooper.  Although Mr. Kurip was not an enrolled Ute tribal member on April 1, 2007, he was enrollable as an Indian and was an "Indian" as that term is used to define a political classification under federal law on April 1, 2007.  (ECF 232 at ¶ 5.)

### 2.    State and Local Officers

Vernal City is a municipality located within Uintah County in the State of Utah and wholly outside the Ute Indian Reservation.  (*Id.* at ¶ 7.)

Vance Norton was, on April 1, 2007, a Vernal City detective with approximately 14 years of experience working in law enforcement.  (ECF 254 at 118:4-15.)  Officer Norton was not on duty on April 1, 2007.  (ECF 232 at ¶ 7.)  His call sign on that date was Whiskey 17.  (ECF 198 at 100:9-11, 101:18-20; Def. Ex. 31 at 4.)

Gary Jensen was the Vernal City Chief of Police on April 1, 2007.  He did not arrive at the scene until after an ambulance had taken Mr. Murray to the hospital.  (ECF 232 at ¶¶ 7-8.)

Dave Swenson and Craig Young were Utah State Troopers on April 1, 2007, and were employed by the State of Utah.  Anthoney Byron, Bevan Watkins, and Troy Slaugh were Uintah County Deputy Sheriffs on April 1, 2007, and were employed by Uintah County.  Sean Davis was a Utah Department of Natural Resources officer on April 1, 2007, and was employed by the State of Utah.  All these officers were on duty on April 1, 2007, and responded to the scene of Mr. Murray's fatal shooting on that date.  (*Id.* at ¶¶ 6, 9, 11; *see* ECF 254 at 78:21-80:1 (Officer Davis testifying that he "heard some radio traffic" about a "high-speed pursuit in progress" that was "kind of in my area," suggesting he was on duty).)

None of the aforementioned state and local officers was cross-deputized by the United States or the Ute Tribe on April 1, 2007, to exercise law enforcement authority on the Ute Reservation.  (ECF 232 at ¶¶ 6-7, 9, 11.)

On April 1, 2007, Trooper Swenson's call sign was 135 and Trooper Young's call sign was 372.  (ECF 254 at 48:25-49:2; ECF 255 at 196:14-19.)  Deputy Byron's call sign that day included the number 18.  (Def. Ex. 31 at 9 (after Trooper Young reported that he would be "just west with [Deputy Byron]," dispatch replied "copy, just west with [undecipherable] 18").)

On April 1, 2007, Keith Campbell was Chief Deputy Sheriff of Uintah County and was employed by Uintah County.  (ECF 255 at 272:18-25.)  He and Vance Norton were long-time friends.  (ECF 198 at 132:19-22; ECF 199 at 218:5-21; ECF 255 at 271:2-6.)  On April 1, 2007,

Mr. Campbell was also a contract employee for the Utah State Medical Examiner as an investigator. (ECF 232 at ¶ 10.) This role involved investigating deaths and reporting any findings that would help the medical examiner's officer determine the cause and manner of death. (ECF 199 at 218:22-219:9; ECF 255 at 271:7-17, 272:11-17, 279:10-280:2.)

### 3. Federal Agents

On April 1, 2007, Rex Ashdown was employed as an FBI Special Agent at the Vernal (Utah) Resident Agency, which reports to the Salt Lake City Division of the FBI. Agent Ashdown was experienced and had served in Indian country for many years. (ECF 199 at 269:16-272:19 (Agent Ashdown testifying that he joined the FBI in 1985, spent seven years working on white collar crimes in Dallas, Texas, and then spent five years on the "Mexican drug trafficking squad" before transferring to the Vernal Resident Agency), 276:2-3.) He was assigned to investigate the death of Mr. Murray on the Ute Reservation and responded to the scene of Mr. Murray's shooting on April 1, 2007. He supervised the investigation into Mr. Murray's death until the date of his retirement on May 31, 2007. (ECF 232 at ¶ 12.)

David Ryan is employed as an FBI Special Agent at the FBI Academy at Quantico, Virginia. From April 1, 2007, until his transfer to the FBI Academy in August 2023, Agent Ryan was assigned to the Vernal Resident Agency. Agent Ryan took over the investigation of Mr. Murray's death after Agent Ashdown retired on May 31, 2007. (*Id.* at ¶ 13.)

### 4. Dr. Leis and Expert Witnesses

In April of 2007, Dr. Edward A. Leis was employed as the Deputy Chief Medical Examiner for the State of Utah Medical Examiner's Office. Dr. Leis conducted the examination of Mr. Murray's body and testified at a June 6, 2013, evidentiary hearing in the Utah district court litigation. Dr. Leis died on April 30, 2023. (*Id.* at ¶ 14.)

The plaintiffs retained two experts, Dr. Jonathan Arden and Dr. William Gaut. Dr. Arden is a forensic pathologist. (*Id.* ¶ 40.) Dr. Gaut is a board-certified forensic examiner and criminal-justice consultant, with a doctorate in criminal justice. (ECF 256 at 342:19-345:14.) Both experts were both deposed in the Utah district court litigation and by the defendant in this case. (ECF 232 at ¶¶ 15, 40.)

Dr. Joseph Cohen is a forensic pathologist, retained by the defendant in this case. (*Id.* at ¶ 40.)

All three experts were qualified as expert witnesses at trial. (ECF 256 at 353:4-5; ECF 257 at 460:10-15; ECF 258 at 506:5-13.)

### B. The Vehicle Pursuit and Crash
### 10:52:49 a.m. – 11:23:40 a.m.

On April 1, 2007, Trooper Swenson of the Utah Highway Patrol was on duty on U.S. Route 40 in Uintah County. (ECF 254 at 20:3-11; *see* ECF 232 at ¶ 17.) Using his radar, Trooper Swenson observed that a vehicle, eventually found to have been driven by Mr. Kurip,

was going 74 miles-per-hour on a road with a 65 miles-per-hour speed limit.  (ECF 254 at 20:6-21:1.)  Trooper Swenson attempted to pull over the vehicle, but Mr. Kurip did not stop.  Trooper Swenson began a high-speed pursuit of Mr. Kurip.[7]  (ECF 232 at ¶ 16.)  Trooper Swenson activated his police vehicle's dashboard camera ("dashcam").  (*Id.* at ¶ 17.)  The dashcam footage shows that the pursuit began at approximately 10:53 a.m.[8]  (Def. Ex. 134 at 0:00.)

Less than two minutes into the chase, Mr. Kurip made a left turn.  (*Id.* at 1:12-1:24.)  Trooper Swenson then informed police dispatch that he was pursuing a vehicle on Highway 88.  (ECF 232 at ¶ 18.)  During the pursuit, Trooper Swenson and Mr. Kurip drove up to 125 miles per hour.  (ECF 254 at 35:10-17.)  About seven minutes into the pursuit, Trooper Swenson reported to dispatch that the driver "appears to be tribal."  (Def. Ex. 31 at 3.)

Almost 30 minutes after the pursuit began, the vehicle Mr. Kurip was driving crashed at the intersection of Seep Ridge Road and Turkey Track Road (or simply the "Turkey Track"), on the Ute Reservation.  (ECF 232 at ¶ 19.)  Seep Ridge Road is a paved road, while the Turkey Track was an unpaved, dirt road on April 1, 2007.  (Def. Ex. 134 at 28:50-29:30.)  The time of the crash was approximately 11:20:25 a.m.  (*Id.* at 27:27-27:43.)

Following the crash, Mr. Kurip exited the driver's seat of the crashed vehicle and Mr. Murray exited the front passenger seat.  (ECF 232 at ¶¶ 20-21.)  Trooper Swenson arrived at the scene of the crash, stopped, and exited his vehicle approximately 20-30 feet away from Mr. Murray.  (Def. Ex. 134 at 27:42-27:47 (the dashcam footage showing Mr. Murray to be about 20 to 30 feet away from the camera).  *But see* ECF 254 at 30:4-6 (Trooper Swenson estimating he

---

[7] At various times during the litigation, the plaintiffs have suggested that the pursuit began on the Ute Reservation.  (*See, e.g.*, ECF 223 ("Plaintiffs expect[ ] to show that Trooper Swenson believed he was attempting to stop a vehicle containing two tribal males, and that the alleged cause for the stop arose on the Reservation.").)  The plaintiffs, however, neither raised this claim nor presented evidence supporting it, either at trial or in their proposed findings of fact and conclusions of law.  (ECF 261.)  As the plaintiffs have either not made or abandoned any claims based on alleged crimes relating to the start or course of the pursuit (*see infra*, footnote 17; Section III B), no findings as to whether the chase started on- or off-reservation are necessary.

[8] There is a time discrepancy between the dashcam footage and the transcript of the police-dispatch audio.  (*Compare* Def. Ex. 134 *with* Def. Ex. 31.)  Based on the portions of the dispatch transcript that are audible in the footage, the time noted on the dashcam footage runs approximately three minutes and 11 seconds early compared to the time reflected in the audio transcript.  No party presented any evidence or testimony to explain which time stamps are more accurate.  Because the transcript shows time stamps based on file names that may have been manually generated, whereas the dashcam footage provides an always-present time stamp, all times have been adjusted to match the timing provided in the dashcam footage.  When audible, the actual time any transmission is heard in the dashcam footage based on the timestamp therein is used.  If any audio from the transcript is not audible in the dashcam footage, it is assumed to take place three minutes and 11 seconds earlier than the time noted on the transcript.

was 60 to 70 feet away).)  Trooper Swenson drew his service weapon, keeping it pointed at the ground, and ordered Mr. Murray and Mr. Kurip to "lie on the ground, now!"  (Def. Ex. 134 at 27:42-27:47; *see* ECF 254 at 30:12-15, 31:13-32:7 (Trooper Swenson recalling that he had ordered the occupants of the vehicle "to put their hands up")).)  Neither complied.  Instead, Mr. Kurip ran southeast, while Mr. Murray ran southwest.  (Def. Ex. 134 at 27:43-28:03; Def. Ex. 135.)[9]  Although Trooper Swenson did not see Mr. Murray with a weapon before he ran away (ECF 254 at 33:18-20), Trooper Swenson only had a few seconds to observe Mr. Murray and did not recall seeing the entirety of his waistband.  (ECF 254 at 54:10-22; Def. Ex. 134 at 27:42-28:03.)  Trooper Swenson testified that he had not observed Mr. Murray commit any crimes.  (ECF 254 at 35:7-9, 35:21-22, 36:6-8.)  Although Trooper Swenson acknowledged that fleeing from the police was illegal, he declined to label Mr. Murray's actions a crime.[10]  (*Id.* at 55:2-8.)

At approximately 11:20:47 a.m., Trooper Swenson reported to dispatch that he had "two runners out.  Both tribal males."  (Def. Ex. 31 at 6; Def. Ex. 134 at 27:35-28:13.)  Trooper Swenson did not pursue Mr. Murray, opting instead to pursue Mr. Kurip.  (ECF 232 at ¶¶ 23-24.)  After he began his pursuit of Mr. Kurip, Trooper Swenson did not see Mr. Murray again.  (*Id.* at ¶ 25.)  Trooper Swenson initially pursued Mr. Kurip on foot but then turned around to remove the keys from the crashed vehicle.  (ECF 254 at 31:1-4.)  Trooper Swenson then got back into his own vehicle, drove it a short distance down Turkey Track Road, made a U-turn, and returned to Seep Ridge Road, heading south.  (*Id.* at 57:15-58:9; Def. Ex. 134 at 28:52-29:43.)

While driving, Trooper Swenson reported to dispatch at approximately 11:22:16 a.m. that he had removed the keys from the crashed vehicle and that he saw one occupant, whom he was pursuing, heading north, and another occupant heading south.  (Def. Ex. 31 at 6; Def. Ex. 134 at

---

[9] Although Trooper Swenson testified that Mr. Kurip headed north and Mr. Murray headed south after exiting the vehicle (ECF 254 at 30:16-17) and marked a map at trial to indicate a more east/west direction of flight (Def. Ex. 135), the most reliable evidence is the dashcam footage.  The footage shows that Mr. Murray fled in a southwesterly direction, given that Trooper Swenson's vehicle was facing south.  (Def. Ex. 134 at 27:40-28:03).  As for Mr. Kurip, the dashcam footage shows that Trooper Swenson returned to his vehicle and pursued him by driving south on Seep Ridge Road before exiting his vehicle.  Because the footage does not show Trooper Swenson crossing Seep Ridge Road to head west on foot, the dashcam footage reflects that Mr. Kurip fled in a southeasterly direction.  (Def. Ex. 134 at 28:52-29:47.)

[10] Mr. Murray's flight from Trooper Swenson may not have been a crime because he was a tribal member on a reservation fleeing from a state trooper.  *See Jones ex rel. Murray v. Norton*, No. 2:09-CV-00730-TC-SA, 2010 WL 2990829, at *4 (D. Utah July 26, 2010) ("While disobeying a lawful order of a law enforcement officer violates Utah Code section 41-6a-209, Mr. Murray was not subject to Utah law at the time the order was given, and therefore the order for him to submit to law enforcement authority was not lawful.").  A reasonable officer might have suspected, but could not have known, that Mr. Murray was a tribal member simply by looking at him.  Therefore, probable cause existed to pursue Mr. Murray even if he had not technically committed a crime by running.  *Jones VI*, 2023 WL 2681819, at *37.

29:20-29:51.)  At approximately 11:22:35 a.m., Trooper Swenson halted and exited his vehicle to pursue Mr. Kurip on foot off-road heading west.  (Def. Ex. 134 at 29:40-29:48; ECF 254 at 57:15-58:1.)  At trial, Trooper Swenson estimated that Mr. Kurip had run about a quarter to half a mile from the crash site.  (ECF 254 at 37:23-38:1.)  At 11:23:40 a.m., Trooper Swenson reported to dispatch that he had apprehended Mr. Kurip.  (Def. Ex. 31 at 7; Def. Ex. 134 at 30:50-30:56.)[11]

### C.      Officers Arrive On-Scene and Search for Mr. Murray

Four other state and local officers arrived on-scene after the crash but before Mr. Murray was shot.  In order of arrival, these are: Officer Norton of the Vernal City Police Department, Trooper Young of the Utah Highway Patrol, Deputy Byron of the Uintah County Sheriff's Office, and Officer Davis of the Utah Department of Natural Resources.

#### 1.       Officer Norton's Arrival
11:23:20 a.m. – 11:24:00 a.m.

On April 1, 2007, Officer Norton was off duty, driving in his personal vehicle when he observed Trooper Swenson in pursuit of the vehicle driven by Mr. Kurip.  (ECF 198 at 72:20-21; ECF 254 at 121:11-123:9.)  Although he was off duty, Officer Norton called dispatch on his cell phone to ask if there was a chase in progress.  (ECF 254 at 122:14-17.)  Despite being told that other officers were en route (*id.* at 122:17-24), Officer Norton volunteered to stay close to the chase until other officers arrived to back up Trooper Swenson.[12]  (ECF 31 at 4.)

Because Officer Norton was off duty, he was dressed in plain clothes, specifically a blue shirt and light-blue jeans.  (Def. Ex. 103.)  He had a 3-inch by 3-inch police badge affixed to his belt (*id.*; ECF 254 at 162:9-16), and he was carrying his department-issued .40 Glock service weapon (ECF 254 at 130:13-17).  Because he was in his personal vehicle, Officer Norton did not have a police radio with him and could only communicate with dispatch via his cell phone.  (*Id.* at 123:10-16.)  These cell phone communications between dispatch and Officer Norton were not audible to other officers, and Officer Norton could not hear any transmissions made by other

---

[11] The exact words that Trooper Swenson used were "I'm 10-82 with the driver."  (Def. Ex. 31 at 7.)  Although it was never clarified at trial what "10-82" meant, context indicates that Trooper Swenson had Mr. Kurip in custody as an unknown speaker replies to this update saying, "go ahead and cancel 13 as long as we have the driver."  (*Id.*)  This understanding is confirmed by Trooper Swenson's testimony that he "notified dispatch that [he] had [Mr. Kurip] secure." (ECF 254 at 66:2-4.)

[12] Technically, Officer Norton was checked in and considered to have been on duty once he spoke to dispatch and decided to assist in the pursuit.  (ECF 254 at 121:11-23.)  Nevertheless, the key point is that Officer Norton was not on duty when he decided to assist and had no plans to assist with any police pursuit or perform any official duties that day; he was on his way to visit his father when he observed the pursuit of Mr. Kurip and Mr. Murray.  (*Id.* at 121:24-122:8.)

officers over the radio.  (*See* ECF 31 at 8-9 (Officer Norton reporting the shooting to dispatch, yet no officers respond in the transcript to the report of the shooting until dispatch informed the officers that there were "shots fired").)  Dispatch used Officer Norton's call sign, Whiskey 17, to refer to him when communicating with other officers.  (ECF 198 at 101:18-20; Def. Ex. 31 at 4, 9.)

Officer Norton was the first officer to arrive on the scene after Trooper Swenson.  (ECF 254 at 36:20-25 (Trooper Swenson referring to other officers arriving after Officer Norton), 127:23-128:17, 129:7-23 (Officer Norton testifying that Trooper Young and Deputy Byron arrived after him).)

When Officer Norton arrived near the intersection of Seep Ridge Road and Turkey Track Road, he drove towards Trooper Swenson, who indicated the direction in which Mr. Murray had fled.  Trooper Swenson testified that he told Officer Norton something along the lines of "I'll take the driver," that is Mr. Kurip, "if you want to see if you can find the passenger."  (*Id.* at 32:8-20.)  Officer Norton similarly recalls asking Trooper Swenson "where the other guy went," and Trooper Swenson telling him "'[g]o look over that way.  He went over that way,' something of that nature."  (*Id.* at 126:14-18.)

The testimony of Trooper Swenson and Officer Norton establishes that Trooper Swenson had Mr. Kurip in custody when Officer Norton arrived.  Although Trooper Swenson initially testified that Officer Norton had arrived before he had Mr. Kurip in custody (*id.* at 31:7-11), he clarified on cross-examination after having his memory refreshed with his written incident report that he had already apprehended Mr. Kurip and had him handcuffed when Officer Norton arrived.  (*Id.* at 58:25-60:24.)  Trooper Swenson's report, which he began writing only two to three hours after the incident (*id.* at 69:13-18), is in evidence as Defense Exhibit 120.  That report confirms that Trooper Swenson's testimony on cross-examination is correct:  Officer Norton arrived after Trooper Swenson had Mr. Kurip in handcuffs.  This conclusion aligns with Officer Norton's testimony that he arrived just as Trooper Swenson was picking Mr. Kurip up off the ground after placing him in handcuffs.  (ECF 254 at 126:9-13.)

Because Officer Norton arrived close in time to when Trooper Swenson was picking Mr. Kurip off the ground, Officer Norton likely arrived near the intersection of Seep Ridge Road and Turkey Track Road sometime between 11:23:20 a.m. and 11:24:00 a.m.  Trooper Swenson reported to dispatch that he had apprehended Mr. Kurip at 11:23:40 a.m., only about one minute after exiting his vehicle to pursue Mr. Kurip on foot at 11:22:35 a.m.  (Def. Ex. 31 at 7; Def. Ex. 134 at 29:40-30:56.)  Trooper Swenson estimated that Mr. Kurip had fled between a quarter to a half mile from the crash scene.  (ECF 254 at 37:23-38:1.)  Because the dashcam video does not show Mr. Kurip fleeing (Def. Ex. 134 at 29:40-30:56), it is apparent that Mr. Kurip fled cross-country, away from Seep Ridge Road.  It is unlikely that Trooper Swenson communicated to dispatch about his apprehension of Mr. Kurip after he had returned with Mr. Kurip to his vehicle because there was not enough time.  Given the distance Mr. Kurip fled, one minute would not have been enough time for Trooper Swenson to pursue Mr. Kurip off-road on foot, catch him, handcuff him, presumably pat him down for weapons, and return with him to his vehicle before reporting Mr. Kurip's arrest to dispatch.  This sequence indicates the Trooper Swenson's report to dispatch was made when he away from his vehicle, but likely not long after securing Mr.

14

Kurip or picking him up off the on the ground.  This timeline provides a basis to infer that Officer Norton arrived close to the time that Trooper Swenson was making his report, with Officer Norton likely being in his car on the road some distance away from Trooper Swenson when they spoke.  The evidence therefore suggests that Officer Norton arrived close in time to Trooper Swenson's report to dispatch, meaning he arrived on the scene between 11:23:20 a.m. and 11:24:00 a.m.

After speaking with Trooper Swenson, Officer Norton turned around, drove back up Seep Ridge Road, turned onto Turkey Track Road, drove down it for a short distance, pulled off to the side, and exited his personal vehicle.  (ECF 254 at 127:23-128:8.)

At an unspecified point after Officer Norton arrived at the scene, Trooper Swenson returned to the crashed vehicle to search it.  This search by Trooper Swenson probably took place after Mr. Murray had been shot, based on Trooper Swenson's written report.  (Def. Ex. 120 at 3 (referring to searching the vehicle after a passing motorist advised Trooper Swenson that he had heard gunshots).)  Trooper Swenson found "some drug paraphernalia, . . . some marijuana, a BB gun, and some beer bottles" in the vehicle.  (ECF 254 at 67:21-68:2.)

### 2. Trooper Young's Arrival
### 11:23:45 a.m. – 11:24:15 a.m.

On April 1, 2007, Trooper Young was an officer with the Utah Highway Patrol.  He was in uniform and on duty in his police cruiser in the Vernal area.  (ECF 255 at 192:19-21, 195:5-13.)  His call sign on April 1, 2007, was 372.  (*Id.* at 196:14-19.)  On that same day, Deputy Byron was a deputy with the Uintah County Sheriff's Department on patrol duty in the Ballard City area.  (*Id.* at 231:22-24, 233:21-234:3, 234:12-17.)  Both Trooper Young and Deputy Byron heard of the high-speed chase of the vehicle driven by Mr. Kurip over the radio in their police vehicles and proceeded to assist Trooper Swenson.  (*Id.* at 194:22-195:4, 234:4-11.)

Guided by information shared on the police radio, Trooper Young and Deputy Byron arrived separately at the scene by the intersection of Seep Ridge Road and Turkey Track Road, near the site of the crashed vehicle.  (*Id.* at 196:2-8, 197:11-17, 238:4-19.)  Upon arrival, Trooper Young spoke briefly with Trooper Swenson.  (*Id.* at 197:22-198:7, 198:24-199:4, 199:13-17.)  By then, Trooper Swenson had Mr. Kurip in custody and was walking him back towards his police vehicle.  (*Id.* at 199:5-12.)  Trooper Swenson informed Trooper Young that another individual had been in the crashed vehicle and had run off "over the hill."  (*Id.* at 199:2-4, 201:14-19.)

Trooper Young drove west down Turkey Track Road in search of Mr. Murray.  (ECF 254 at 127:23-128:8; ECF 255 at 200:8-201:15.)  Stopping shortly after having turned onto Turkey Track Road, Trooper Young encountered Officer Norton, who had just exited his vehicle near the intersection of Seep Ridge Road and Turkey Track Road.  (ECF 254 at 127:23-128:8; ECF 255 at 204:4-11 (Trooper Young testifying "[w]hen I got there," referring to his arrival at the scene, "Vance Norton was there" near the right side of the road), 205:17-206:16; Def. Ex. 31 at 8; Def. Ex. 136 (near the "Tu" in the northernmost reference to "Turkey Track" noted on the exhibit).)

15

Based on Officer Norton's testimony, he and Trooper Young briefly spoke and agreed to search for Mr. Murray in different directions.  (ECF 198 at 83:25-84:7; ECF 254 at 127:23-128:17, 129:7-14.)  Although Trooper Young testified that he did not recall such a conversation, he testified that he did remember seeing Officer Norton when he first arrived at the scene.  (ECF 255 at 203:15-204:11.)  The dispatch transcript also supports the conclusion that Officer Norton and Trooper Young spoke to each other before the shooting.  After the shooting, Officer Norton would ask dispatch to direct "Craig to come back to where he saw me and I talked to him," indicating they had spoken beforehand.  (Def. Ex. 31 at 8.)

Given that Trooper Young both saw Trooper Swenson returning to his police vehicle with Mr. Kurip and spoke with Officer Norton on Turkey Track Road, Trooper Young likely arrived at the scene sometime between 11:23:45 a.m. and 11:24:15 a.m.

### 3.    Deputy Byron's Arrival
    **11:24:00 a.m. – 11:24:30 a.m.**

Deputy Byron saw Trooper Swenson upon arriving at the scene but did not speak to him.  (ECF 255 at 239:23-240:3.)  Instead, Deputy Byron proceeded to the location where he saw Trooper Young, who had arrived at "about the same time" as Deputy Byron.  (*Id.* at 238:23-240:10; *see also* ECF 198 at 84:5-7 (Officer Norton testifying that Deputy Byron arrived "just like seconds later" than Trooper Young).)  Deputy Byron also saw Officer Norton's parked vehicle at Trooper Young's location.  (ECF 255 at 239:18-22.)

Officer Norton had started jogging over to the edge of a hill near the site at which he had spoken to Trooper Young when Deputy Byron arrived at the scene.  Officer Norton and Deputy Byron saw each other but did not speak.  (ECF 254 at 129:15-130:1 (Officer Norton testifying that "I know that Deputy Byron showed up, but I think I was actually already jogging over to the edge of the hill when he actually pulled up."), 150:18-20 (Officer Norton testifying that the first time he encountered Deputy Byron was after the shooting); ECF 255 at 257:20-22.)  Deputy Byron's written report of the incident also indicates that he observed "an individual running up a hillside"—Officer Norton—when he arrived.  (Def. Ex. 2 at 9.)  Deputy Byron's report aligns with Officer Norton's account and with the fact that Mr. Murray had already left the scene of the crash several minutes prior to Deputy Byron's arrival.  Deputy Byron also testified that he later learned that the individual whom he had observed running up the hill was Officer Norton.  (ECF 255 at 255:18-256:8.)  Deputy Byron spoke briefly with Trooper Young on the side of Turkey Track Road.  (*Id.* at 240:4-10.)

The record reflects that Deputy Byron arrived very shortly after Trooper Young had spoken with Officer Norton, but that he did not speak with Trooper Swenson.  Instead, he seems to have proceeded directly to Trooper Young's location and arrived just after Officer Norton started jogging towards a hill.  This sequence places Deputy Byron's arrival sometime between 11:24:00 a.m. and 11:24:30 a.m.

16

### 4. Trooper Young and Deputy Byron Proceed to the Oilfield-Service Pad 11:24:30 a.m. – 11:25:30 a.m.

After speaking with Deputy Byron, Trooper Young proceeded in his vehicle further down the unpaved Turkey Track Road and made a right onto an unpaved oilfield-service road; the service road dead-ended in a square concrete pad. (*Id.* at 200:8-201:13, 220:17-221:3; Def. Ex. 136 (near the location marked "CY2").) Deputy Byron drove in the same direction as Trooper Young, and they both reached the concrete pad at the end of the service road. (ECF 255 at 201:20-23, 240:6-17, 258:1-12, 261:10-262:14.) During the site visit, the Court made the same drive in a van that seemed unsuited to dirt-road conditions and drove the same route at a relatively slow speed in no more than two minutes. (Site Visit.) Given that the officers were in pursuit of a fleeing suspect, it likely took them no more than 60 seconds to make the same drive. Based on these estimates, Trooper Young and Deputy Byron would have arrived at the pad at the end of the service road at approximately 11:25:30 a.m.

### 5. Officer Davis Arrives and Drives to a Different Location 11:25:00 a.m. – 11:29:38 a.m.

Officer Davis was an officer with the Utah Department of Natural Resources who was on duty near Myton, Utah on April 1, 2007, when he heard chatter on the radio about a high-speed chase and decided to assist. (ECF 254 at 77:10-80:1.) He did not participate in the chase but arrived at the intersection of Seep Ridge Road and Turkey Track Road to assist. When he arrived, Trooper Swenson already had Mr. Kurip in custody. (*Id.* at 80:23-25; Def. Ex. 132.)

Officer Davis knew that at least one officer other than Trooper Swenson had already arrived before him because another officer had passed him on the road. (ECF 254 at 81:13-24.) As Officer Norton was in his civilian vehicle and civilian clothes (*id.* at 121:3-14; Def. Ex. 103), the officer who passed him must have been either Deputy Byron or Trooper Young. It was probably Deputy Byron, because Officer Davis recalled only one police vehicle passing him, and Deputy Byron arrived after Trooper Young (ECF 255 at 238:23-239:13), with all three having arrived from the same direction (ECF 254 at 80:2-16; ECF 255 at 196:24-197:13, 237:18-238:3).

Because Officer Davis did not see Officer Norton, Deputy Byron, or Trooper Young in or near their vehicles at the scene, Officer Davis likely arrived at the scene sometime between 11:25:00 a.m. and 11:26:00 a.m., after Deputy Byron and Trooper Young had started proceeding towards the pad at the end of the oilfield-service road.

Upon arriving, Officer Davis spoke briefly with Trooper Swenson, who, according to Officer Davis, "pointed to a dirt road and said he went down - - the other person went down that dirt road." (ECF 254 at 80:12-81:12.) Officer Davis then proceeded in his vehicle down Turkey Track Road. (*Id.* at 81:7-12, 82:10-20.) As he drove down the road, he saw Officer "Norton on a hill just west of the Turkey Track [R]oad." (Def. Ex. 132; *see also* ECF 254 at 93:25-94:13, 99:5-15.) Officer Davis eventually stopped at an unspecified "oil location." (Def. Ex. 132.) This location was apparently not near Trooper Young and Deputy Byron's location, as neither

they nor Officer Davis testified that they encountered each other before the shooting.[13]  Officer Davis remained at or near this location until at least 11:29:38 a.m.  (Def. Ex. 132 (noting that Officer Davis was at an "oil location" when he heard "Trooper Swenson" report shots had been fired); Def. Ex. 31 at 9 (Trooper Swenson's report that shots had been fired); Def. Ex. 134 at 36:50-37:00); *see also* ECF 254 at 83:20-84:16 (Officer Davis describing hearing the report of shots fired).)

> ### 6.   Trooper Young Searches Near the Concrete Pad; Deputy Byron Enters the Gully
> ### 11:25:30 a.m. – 11:26:00 a.m.

Upon stopping at the concrete pad at the end of the oilfield-service road, Deputy Byron and Trooper Young exited their vehicles and saw Officer Norton standing on a hill.  (ECF 255 at 240:18-241:6; Def. Ex. 2 at 9.)[14]  Because Trooper Young identified Officer Norton for Deputy Byron (Def. Ex. 2 at 9), but there is no radio transmission about this identification (Def. Ex. 31), Deputy Byron and Trooper Young must have spoken with each other briefly in person upon arriving at the concrete pad.

After speaking, Deputy Byron proceeded on foot northward for approximately 75 yards across broken terrain in search of Mr. Murray.  This direction took Deputy Byron downhill into a gully, approximately 75 to 100 yards away from where he and Trooper Young had parked their vehicles, and towards where he had seen Officer Norton on a hill.  (ECF 255 at 240:18-242:2; Site Visit.)  The gully, also referred to by witnesses as a "wash," into which Deputy Byron

---

[13] From the site visit, it was evident that there were multiple oilfield-service locations and associated access roads along Turkey Track Road.  (Site Visit.)  Officer Davis probably proceeded down Turkey Track Road to a different oilfield-service road from Deputy Byron and Trooper Young, as this scenario would explain why Officer Davis did not recall encountering those officers before he saw them at the location at which Mr. Murray had been shot.

[14] Deputy Byron referred to seeing Officer Norton on his phone while Deputy Byron and Trooper Young were "working our way up through a wash area [the gully] back in the direction of . . . Officer Norton."  (ECF 255 at 240:21-241:6.)  While Deputy Byron should have seen Officer Norton from the concrete pad upon first arriving, Deputy Byron should only have seen Officer Norton on his phone after the shooting.  While in the gully, Deputy Byron likely would not have been able to see Officer Norton on the hill.  (*Id.* at 242:16-21; Site Visit.)  This evidence suggests that Deputy Byron saw Officer Norton both upon entering and exiting the gully but is confusing the exact time with when he saw Officer Norton on his phone; Deputy Byron must have seen Officer Norton on his phone while leaving, rather than entering, the gully.  (Def. Ex. 31 at 8 (Officer Norton referring to how other officers "can see me right now" during his report of the shooting to dispatch).)  Deputy Byron's testimony does not suggest that he arrived at the concrete pad after the shooting, however, because he had to have been by the concrete pad at approximately 11:25:30 a.m. to observe the "runner in blue," as discussed in Section C7, immediately below.

proceeded was quite deep, with steep slopes on both sides, making for rough going.  (Site Visit; *see* ECF 255 at 241:7-14 (Deputy Byron testifying "it was rough getting up through" the gully).)  Deputy Byron testified that Trooper Young had also exited his vehicle and left the service road to search for Mr. Murray on foot, and more specifically that he and Trooper Young had been at both sides of the gully, but that they were both moving towards the location where they had seen Officer Norton on the hill.  (ECF 255 at 240:21-242:2.)  Deputy Byron never fully crossed the gully or climbed out on the other side.  (*See id.* at 241:23-242:2 (Deputy Byron testifying to going "up and downhill" but never testifying he fully crossed the gully).)  At some point after entering the gully, Deputy Byron, who could no longer see Officer Norton, briefly saw Mr. Murray before he disappeared behind some brush.  (*Id.* at 242:13-243:5.)

Trooper Young did not recall getting out of his vehicle, walking anywhere, or speaking with any other officers; instead, he recalled driving halfway down the oilfield-service road off Turkey Track Road to search visually for Mr. Murray.  (ECF 255 at 200:9-204:3, 220:17-221:2; Def. Ex. 136 (the location marked "CY2").)

Trooper Young's recollection is faulty or incomplete.  During the site visit, the Court stopped along the service road at the location at which Trooper Young testified he had stopped his vehicle to scan for Mr. Murray.  The view from that location was blocked by a rise and a protruding boulder.  Trooper Young cannot have seen anything from the location at which he testified he had stopped his vehicle.  (Site Visit.)  Trooper Young's message to dispatch concerning the "runner in blue" (see Section C7, immediately below), however, reflects that Trooper Young must have had a clear view to the west of wherever he stopped.  Even if Trooper Young did stop midway down the service road, he ultimately proceeded to the concrete pad at the dead-end of the service road, near where Deputy Byron had stopped, from which he would have had a clear view to the west and north.  On these facts, Trooper Young would have had time to speak with Deputy Byron in person; this conclusion also explains the later radio communications he had with Deputy Byron about the "runner in blue," indicating that Trooper Young and Deputy Byron must have separated.  Given that Trooper Young later would twice radio dispatch about moving downwards or towards the gully (Def. Ex. 31 at 7, 9), it is likely he did not immediately enter it; rather, he likely first searched the area immediately adjacent to the concrete pad.  In any case, he did not simply remain in his vehicle either on the oilfield-service road or at the concrete pad.

### 7.    The "Runner in Blue"
###        11:25:46 a.m. – 11:26:20 a.m.

While searching for Mr. Murray, Deputy Byron and Trooper Young had access to their radios and could speak with each other and with dispatch.  (ECF 255 at 202:12-24, 242:3-12.)  One of these transmissions reflects the last time someone other than Officer Norton saw Mr. Murray before the shooting.  This conclusion is contrary to the plaintiffs' assertion that the transmission reflected that Deputy Byron and Trooper Young were observing and referring to Officer Norton during their radio communications.

At 11:25:46 a.m., an unidentified voice, per the dispatch transcript, asked on the radio "the runner in blue – who is that?"[15] (Def. Ex. 31 at 7; Def. Ex. 134 at 32:58-33:04.) At 11:25:58 a.m., the same unidentified officer asked for "Officer Craig," who responded, "go ahead." The unidentified voice then asked again "[w]ho's the runner on foot in blue?" (Def. Ex. 31 at 7; Def. Ex. 134 at 33:09-33:15.) A person identified by the transcript as "Craig" responded "I don't know. He's off to the west side of the road. I'll circle around down below." (Def. Ex. 31 at 7; Def. Ex. 134 at 33:15-33:23.) A further transmission was made at 11:26:20 a.m. by an "[u]nknown voice," per the dispatch transcript, stating "[t]he blue is probably going to be the passenger." (Def. Ex. 31 at 7; Def. Ex. 134 at 33:30-33:35.)

These transmissions raise four questions. Who was the "unidentified voice" that asked at 11:25:46 a.m. about the "runner in blue," who answered that person, who was the "unknown voice" who commented at 11:26:20 a.m. that the runner was likely the passenger, and finally who was the "runner in blue"? If it was Mr. Murray, these radio transmissions would indicate the last time someone other than Officer Norton saw Mr. Murray unharmed and unhindered.

The unidentified voice must have been Deputy Byron, as he was the only other person who could have seen a "runner in blue" and asked about him. Officer Norton was off duty and did not have a police radio with him, so he could not have been the speaker. Trooper Swenson was not searching for Mr. Murray and was not near the shooting scene, so he would not have seen a "runner in blue." (ECF 254 at 65:24-67:3 (Trooper Swenson explaining his investigation of the crash scene); *see also* Def. Ex. 31 at 10 (Trooper Swenson asking after the shooting if the other officers "need my assistance where you're at" and Trooper Young replies "[n]egative").) Trooper Swenson also likely would have asked for Trooper Young or used Trooper Young's call sign; as a fellow trooper, he would not have asked for "Officer Craig." Although Officer Davis did at one point see Officer Norton, who was also in blue, at the top of a hill, he cannot have been the speaker. (Def. Ex. 132; *see also* ECF 254 at 93:25-94:13, 99:5-15.) There is no indication that Officer Davis knew that Trooper Craig Young was on-scene until after the shooting. Additionally, Officer Davis "didn't know" Trooper Young, so he would not have recognized Trooper Young's call sign if he heard it used over the radio. (ECF 254 at 87:14-21, 111:14-16.) Without knowing Trooper Young was on-scene, Officer Davis would have had no reason to ask for "Officer Craig" on the radio. Additionally, if Officer Davis asked about a runner in blue and was told the runner was likely to be the passenger he was pursuing, it would not have made sense for him to have kept driving down the oil service road and away from the scene. Finally, the "unidentified voice" cannot have been Trooper Young, as Trooper Young, as outlined below, was the person that answered the question posed. Although Deputy Byron listened to the recording and testified that he did not believe it was his voice on the recording

---

[15] While the transcript identifies the 11:25:46 a.m. voice as an "[u]nknown voice" and the 11:25:58 a.m. speaker as an "[u]nidentified voice," the audio of the two transmissions reflects that these two transmissions were made by the same speaker. (Def. Ex. 31 at 7; Def. Ex. 134 at 32:58-33:15.) This single speaker is therefore referred to as the "unidentified voice" to differentiate him from the 11:26:20 a.m. speaker, whom the transcript also identifies as an "[u]nknown voice." (Def. Ex. 31 at 7; Def. Ex. 134 at 33:30-33:35.)

(ECF 255 at 256:9-257:17), process of elimination leads to the conclusion that the unidentified voice asking about the "runner in blue" was Deputy Byron.[16]

The person who answered the "unidentified voice" must have been Trooper Young. Deputy Byron had asked for "Officer Craig," and "Craig" responded "go ahead." (Def. Ex 31 at 7.) The only Craig at the scene was Trooper Craig Young. Further, the parties have stipulated that the "dispatch transcript[ ] is a true and accurate transcription of the dispatch audio from April 1, 2007." (ECF 232 at ¶ 46.) That transcript reflects that it was "Craig" who answered the question about who the "runner in blue" was. The most likely conclusion is that it must have been Trooper Young who answered the question about the "runner in blue," meaning he cannot have been the unidentified voice who asked the question.

The "[u]nknown voice" that stated "[t]he blue is probably going to be the passenger" also most likely was Trooper Young. The unknown voice most resembles the speaker identified in the transcript as "Craig." It is notably different from the prior unidentified voice, who had inquired about the "runner in blue" and differs from the recorded voice of Trooper Swenson, identified in the transcript by his call sign, 135. While the voice might have belonged to Officer Davis, it would seem odd for him to comment on this one point when the only person he has ever claimed to have seen before the shooting, other than Trooper Swenson, is Officer Norton. (Def. Ex. 132.) Further, although Officer Davis's call sign is unknown, no officer with an unidentified call sign was commenting on the pursuit at this time (Def. Ex. 31 at 6-9), and it would have been odd for Officer Davis to chime in solely to make this one point when he never saw Mr. Murray before the shooting. For similar reasons, it is unlikely that some other, unknown officer who was listening to the radio suddenly voiced an opinion as to who the "runner in blue" likely was.

Despite this finding that the unknown voice was Trooper Young's, the 11:26:20 a.m. transmission does not indicate if Trooper Young could still see the "runner in blue." While it is possible Trooper Young still saw the "runner in blue" at 11:26:20 a.m., the last time the evidence reflects for certain that someone saw the "runner in blue" was shortly after 11:26:00 a.m. (Def. Ex. 134 at 33:15-33:23.)

---

[16] Deputy Byron appeared to testify that "Trooper Young" was the voice in the 11:25:58 a.m. portion of the transcript asking about the "runner in blue." (ECF 255 at 256:9-257:19.) Trooper Young, however, is already identified in the transcript as responding, "go ahead" to the unidentified voice asking for "Officer Craig?" (Def. Ex. 31 at 8.) Although Deputy Byron's attention was drawn to the unknown voice portion of the transcript, it is possible that Deputy Byron was explaining who he thought had said "I don't know. He's off to the west side of the road. I'll circle around down below," rather than testifying as to who he thought the "[u]nidentified voice" was. Notably, Deputy Byron was never directly asked who he thought the unknown voice was or who he thought the speaker asking for "Craig" was, despite the relevant audio clip and transcript containing two different and distinct voices. (ECF 255 at 256:9-257:19; Def. Ex. 31 at 7; Def. Ex. 134 at 33:09-33:25.) It would also be understandable for Deputy Byron not to recognize his own voice from an almost-17-year-old recording of middling quality.

Left for resolution is the question of who was the "runner in blue."  The evidence shows that it was Mr. Murray, who was therefore last seen unharmed and unhindered by someone other than Officer Norton at approximately 11:26:00 a.m.

The plaintiffs have argued that the "runner in blue" is Officer Norton because "he was wearing blue, and Mr. Murray was not."  (ECF 261 at 6.)  The plaintiffs provide no citation to the record to support their assertion that Mr. Murray was not wearing blue.  Contrary to the plaintiffs' assertion, a photograph of Mr. Murray taken at the scene after the shooting shows him wearing a dark blue or navy button-up shirt.  (Def. Ex. 102.)  Based on their mistaken premise, the plaintiffs argue that Officer Norton and Trooper Young cannot have spoken before the shooting, as Trooper Young would otherwise have had no reason to ask who the "runner in blue" was if he had just spoken to and observed Officer Norton in his blue clothing.  (ECF 261 at 6 n.4.)  The plaintiffs also argue that, because Deputy Byron did not recognize the voice of the person asking, "who's the runner in blue," as his own the voice must have been Trooper Young's.  (*Id.* (citing ECF 255 at 256:19-257:17).)  As explained, however, the "unidentified voice" asking about the "runner on foot in blue" was Deputy Byron, not Trooper Young.

The transmission from Trooper Young indicates that the "runner in blue" was Mr. Murray.  Trooper Young spoke with Officer Norton just minutes earlier (ECF 198 at 83:25-84:7; ECF 254 at 127:23-128:17, 129:7-14; Def. Ex. 31 at 8), so he should have recognized the runner as Officer Norton if it was Officer Norton.  He did not, instead saying they are "probably going to be the passenger."  (Def. Ex. 31 at 7.)

The conclusion that the "runner in blue" was Mr. Murray is also further confirmed by Deputy Byron's written police report.  (Def. Ex. 2.)  In that report, Deputy Byron noted that he had asked Trooper Young after arriving at the concrete pad at the end of the oilfield-service road who the person in view standing on a hill was, and Trooper Young had identified the person as Officer Norton.  (*Id.* at 9.)  The dispatch transcript contains no radio communication in which anyone identifies Officer Norton on the hill, indicating that Deputy Byron asked Trooper Young two questions: one in-person about a man he observed on a hill, and a second on the radio about a "runner in blue."  It would have been odd for Deputy Byron to have asked Trooper Young twice about the same person when Trooper Young had identified the first as Officer Norton (*id.*), and the other as "probably" the passenger.  (Def. Ex. 31 at 7.)  This evidence indicates that the "runner in blue" and the person on the hill were two different people, *i.e.*, Mr. Murray and Officer Norton.

At 11:26:00 a.m., the "runner in blue" was unharmed, running, and not near an officer.  Neither Deputy Byron nor Trooper Young indicated over the radio that they observed anyone else standing next to or close to Mr. Murray at the time they observed him.  Neither indicated, either over the radio that day or since that day, that Officer Norton, whom they both knew (ECF 198 at 84:16-23), and to whom Trooper Young had already spoken, was close to the "runner in blue."  In addition, neither Trooper Young nor Deputy Byron reported over the radio that either observed Officer Norton and the "runner in blue" to have been close to each other.  The reference to Mr. Murray as a "runner" indicates that Mr. Murray was running and not being held at gunpoint, lying on the ground, or using a firearm.  Based on the term Deputy Byron and

Trooper Young used to describe him, a "runner," Mr. Murray was apparently still seeking to evade capture and flee the scene.

The evidence reflected in the dispatch transcript shows conclusively that Mr. Murray was unharmed and not close to or interacting with any officer as late as 11:26:00 a.m.

After observing the "runner in blue," Trooper Young proceeded on foot in the direction of the gully.  (Def. Ex. 31 at 7; Def. Ex. 134 at 33:15-33:23 (Trooper Young's 11:26:02 a.m. report that he was going to "circle around down below").)  This conclusion is confirmed by Trooper Young's transmission at 11:27:38 a.m. that he was "gonna [ ] be on foot.  I'll be just west with [Deputy Byron]."  (Def. Ex. 31 at 9; Def. Ex. 134 at 34:50-35:12.)  At that time, Trooper Young reported that he could no longer see Mr. Murray because he had "a big gully here" blocking his view.  (ECF 255 at 224:25-225:6; Def. Ex. 134 at 34:50-35:12.)

Based on the terrain at the scene, the gully could only have obstructed Trooper Young's view if he had already entered it.  (Site Visit.)  If he had remained at the concrete pad or its immediate vicinity, which was elevated above the terrain and the gully, Trooper Young should have had a clear view of Officer Norton and probably could have observed Mr. Murray.  Because Trooper Young did not report to dispatch that he saw Mr. Murray when he was shot, he must have been in the gully at the approximate time of the shooting.

Deputy Byron must also have been in the gully at the time of the shooting.  Deputy Byron's testimony was that he remained in the gully until he briefly saw Mr. Murray from several hundred yards away; Mr. Murray then disappeared behind some brush.  (ECF 255 at 242:13-243:5.)  At that time, Deputy Byron could no longer see Officer Norton.  Based on the terrain, Deputy Byron's inability to see Officer Norton only makes sense if Deputy Byron was in the gully.  (*Id.*; Site Visit.)  Because he thought "it was just an unknown situation at that point," Deputy Byron decided to back out of the gully.  (ECF 255 at 243:3-5.)  At around the same time he decided to back out of the gully, Deputy Byron testified that he also thought that he may have heard either a radio report of "shots fired" or the shots themselves being fired.  (*Id.* at 243:6-13, 258:14-21.)  In either case, Deputy Byron did not observe the shooting of Mr. Murray.  Given the terrain, Deputy Byron's failure to observe the shooting makes sense only if Deputy Byron was, like Trooper Young, still in the gully when Mr. Murray was shot.

### 8.   Officer Norton's Actions Before the Shooting 11:24:30 a.m. – 11:26:00 a.m.

Having examined where every on-scene officer was before the shooting, the question remains as to where Officer Norton was and what he did.  After speaking with Trooper Young and seeing Deputy Byron arrive at approximately 11:24:30 a.m., Officer Norton continued to jog up and over a hill looking for Mr. Murray; he did not thereafter see or hear any other officers arrive to the scene until after the shooting.  (ECF 254 at 129:15-130:1.)

Officer Norton was proceeding towards the site where the shooting would take place.  (*Id.* at 130:2-8.)  After cresting the hill, Officer Norton would eventually see Mr. Murray, but it

is unclear from his testimony how much time elapsed before he observed Mr. Murray.  (ECF 198 at 87:4-8, 16-22.)

The shooting cannot have occurred before 11:26:00 a.m. because, as noted, Deputy Byron and Trooper Young saw Mr. Murray unharmed at that time.  The events of the shooting also must have been completed by 11:27:29 a.m., as the parties agree that Officer Norton notified dispatch of the shooting after it occurred.  (ECF 260 at ¶¶ 41-50; ECF 261 at 8 (emphasis added) (noting that "[*a*]*fter the shooting*, Norton telephoned dispatch to report a shooting").)

Officer Norton's account suggests that he encountered and was fired at by Mr. Murray soon after he crested the hill.  Although Officer Norton initially estimated that he encountered Mr. Murray after jogging 75 yards away from where he had spoken to Trooper Young, he testified that he later used Google Earth to estimate that the distance from his vehicle to where his shell casings would be found was approximately 161 yards.  (ECF 198 at 82:25-83:15; ECF 254 at 130:2-8.)

This chronology leaves a blank space in Officer Norton's account as to what he was doing for the at-least 90-second-long period after he had left the other officers, but before Mr. Murray could have encountered Officer Norton, just after 11:26:00 a.m. at the earliest.

Part of this time would have been simply taken up by Officer Norton jogging the approximately 160 yards from near his vehicle to where he first saw Mr. Murray.  Especially given the rough terrain in the area, jogging 160 yards would have taken longer than jogging it over a flat and hard surface.  (Site Visit.)  Further, Officer Norton is likely to have jogged more than his estimate of 161 yards, because, given the uneven terrain, there is no reason to think he would have jogged in a straight line directly to the crest of the hill and down to where he would first spot Mr. Murray.  (Site Visit.)

An additional portion of the unaccounted-for time was probably consumed by Officer Norton standing at the crest of the hill and surveying the area from that high point.  He may alternatively have moved briefly south along a ridgeline before returning to the crest of the hill and heading down over the crest.  If Officer Norton had briefly paused at or near the crest of the hill, it would explain why Deputy Byron and Officer Davis saw Officer Norton on the hill sometime between 11:25:30 a.m. and 11:26:00 a.m.  (ECF 255 at 240:21-241:6, 260:15-261:5 (Deputy Byron testifying he saw Officer Norton on the hill); Def. Ex. 132 (Officer Davis's report stating he saw Officer Norton on a hill); *see also* ECF 254 at 99:5-15 (Officer Davis testifying "I guess I would have s[een Officer Norton] as I was going out to the dead-end road," *i.e.*, before the shooting).)

The gap in the chronology as to Officer Norton's location and actions is further explained by the fact that Officer Norton was never asked about his actions during this period.  The questions to him focused on his actions from when he crested the hill and first observed Mr. Murray; he was not questioned about the initial aspects of his search for Mr. Murray before he saw him and whether he paused, even briefly, on the hill.  (ECF 198 at 82:25-83:15; ECF 254 at 130:2-10.)  The gap may also be explained by the stress and demands of the situation.  Officer Norton was searching for the fleeing passenger; he was not paying close attention to the time.

Thereafter, he was involved in a shooting, so the timeline of his search for Mr. Murray would not have been foremost in his recollection of the events surrounding the shooting; in retrospect it could easily have seemed to Officer Norton as if he was involved in the shooting immediately after cresting the hill.

   **D.   The Shooting**
   **11:26:00 a.m. – 11:27:29 a.m.**

Because the events described in this subsection go to the heart of the dispute in the case, the findings of fact made in this section reflect those on which the parties agree or summarize the parties' respective contentions; they do not reflect a determination as to what occurred or who shot Mr. Murray. To preserve the chronological account of the events, this section presents the parties' explanations of what occurred but does not make any findings of fact based on Officer Norton's testimony. The parties' disagreements over the events of the shooting of Mr. Murray are resolved *infra* at 47-53. To contextualize the parties' contentions, however, the distance between the location at which shell casings from Officer Norton's .40 Glock would later be found and the location at which Officer Norton left his vehicle was approximately 161 yards. (ECF 254 at 130:2-8.) The distance between where the .40 shell casings were found and where Mr. Murray had fallen was approximately 113 yards. (*Id.* at 162:19-24; Def. Ex. 137.) Sound carried well between those two locations, such that Mr. Murray should have been able to hear clearly any commands or instructions yelled by Officer Norton during their encounter, regardless of how far apart they were. (Site Visit.) The distance between the location at which Mr. Kurip had crashed and the location of the .40 shell casings was approximately 256 yards. (Def. Ex. 137.)

Mr. Murray suffered a contact gunshot wound to the head on April 1, 2007. (ECF 232 at ¶ 27.) The shooting occurred, based on the findings above, sometime after 11:26:00 a.m. The plaintiffs do not dispute that the shooting took place before Officer Norton reported to dispatch at 11:27:29 a.m. that shots had been fired. (ECF 261 at 8 (emphasis added) (stating that "[a]*fter the shooting*, Norton telephoned dispatch to report a shooting"); *see* Def. Ex. 31 at 8 (transcript of Officer Norton's report).) The defendant also agrees that the shooting took place before Officer Norton reported the shooting to dispatch. (ECF 260 at ¶¶ 41-50.)

In short, based on the prior findings, Mr. Murray was unhurt at 11:26:00 a.m. Both parties agree that Mr. Murray was shot before 11:27:29 a.m. The parties otherwise disagree as to what happened after Officer Norton saw Mr. Murray.

The plaintiffs have proposed almost no findings or conclusions about how the shooting occurred, let alone how Officer Norton and Mr. Murray encountered one another. (ECF 261 at 8-9.)[17] According to the plaintiffs' proposed findings of fact, Officer Norton's pursuit of Mr.

---

[17] The plaintiffs' proposed findings effectively forfeit the entirety of their claims preserved for (*see* footnote 2, *supra*) and presented at trial. The plaintiffs failed to propose any findings as

Murray was improper because officers had no reason to suspect that Mr. Murray had committed a crime. (*Id.* at 4-6.) The plaintiffs implicitly assert that, after initiating the improper pursuit, Officer Norton confronted Mr. Murray and shot him in the head. The plaintiffs have proposed no finding as to how Mr. Murray and Officer Norton encountered each other. (*Id.* at 4-8.) The plaintiffs clarified at the hearing on January 18, 2024, that they are contending, without reference to specific evidence to support their view, that Officer Norton and Mr. Murray encountered each other on foot at a close distance after Mr. Murray had rounded a hill. Although they are not explicit about what then occurred, implicit in the plaintiffs' contention is that Officer Norton either simply approached Mr. Murray and shot him in the head with his .40 Glock handgun or that Officer Norton and Mr. Murray had an altercation during which Officer Norton put his .40 Glock handgun to Mr. Murray's head and fatally shot him, in either case without just cause.

The plaintiffs rely on the spoliation sanction that the .380 Hi-Point found at the scene on the ground close to Mr. Murray to argue that that weapon was not used to fire the fatal shot, meaning that shot could only have come from Officer Norton's .40 Glock. (*Id.* at 8, 14-20.) Even as they point to the alleged *actus reus* by Officer Norton in shooting Mr. Murray, the plaintiffs have made no allegations and proposed no findings as to Officer Norton's *mens rea* or any elements related to Officer Norton's state of mind in shooting Mr. Murray. Other than relying on the spoliation sanction to argue that the .380 Hi-Point was not used by Mr. Murray (*id.* at 16-20), the plaintiffs do not suggest or explain how the .380 Hi-Point or the associated shell casings came to be found at the scene of the shooting.

---

to how and why the shooting of Mr. Murray came about, or even a finding that Officer Norton shot Mr. Murray. These facts are essential to the allegation that Officer Norton is culpable for Mr. Murray's death. The plaintiffs' proposed findings even omit any reference to what is, arguably, their best evidence: that Mr. Murray was right-handed but was shot in the left side of his head (although the plaintiffs did indirectly mention that point during their closing argument (ECF 259 at 642:14-20)). These omissions are not isolated events. The plaintiffs' proposed findings of fact (ECF 261) and their closing summary (ECF 259 at 633:11-644:22, 659:18-668:18), in line with their pre-trial contentions (ECF 223), were vague, at best, on many of the details as to when the shooting occurred, how Mr. Murray and Officer Norton came upon each other, and how the shooting actually occurred. The plaintiffs have failed to show how the facts demonstrate the elements required for the commission of any specific offense as required for liability under the bad men provision of the Ute Treaty. Instead, as has been their consistent approach throughout this case, the plaintiffs contend that the absence of facts proves their case. The plaintiffs' case is largely predicated on the spoliation sanction and on innuendo that the failure by the FBI to conduct a thorough investigation left evidence of criminality by Officer Norton unrecovered. Because an allegation of homicide is implicit in the plaintiffs' case and has been their central contention throughout both this case and the civil rights case in the District of Utah, their failure to present proposed findings on the facts necessary to prove all the elements of the claims of homicide and assault will not prevent a resolution of those claims. The plaintiffs' failure will not be overlooked, however, as to crimes other than assault and homicide, as will be detailed below.

The defendant, by contrast, argues that events occurred in line with Officer Norton's testimony. According to the defendant, after Officer Norton crested the hill near the intersection of Turkey Track and Seep Ridge Roads, he saw Mr. Murray about 120-130 yards away from him to the west, down the hill. (ECF 260 at ¶ 34 (citing ECF 198 at 87:18-21).) Officer Norton saw Mr. Murray holding something black in his hands, causing Officer Norton to draw his gun, keep it at a low-ready position pointed in Mr. Murray's direction but not directly at him. Officer Norton, concerned about his own safety, then yelled "Police, get on the ground[!]" (*Id.* at ¶¶ 35-36 (citing ECF 198 at 89:15-21, 93:5-14, 153:20-22; ECF 254 at 153:20-25).) Mr. Murray continued to jog towards Officer Norton, causing him to fear that Mr. Murray may have been heading back towards Trooper Swenson to harm him. (*Id.* at ¶¶ 37-38 (citing ECF 198 at 93:5-14; ECF 254 at 90:5-12).) Mr. Murray then spotted Officer Norton, raised his arm, and fired two shots at Officer Norton. One of the bullets struck the ground below Officer Norton. (*Id.* at ¶¶ 41-42 (citing ECF 198 at 93:19-94:3; ECF 254 at 131:11-21).) Officer Norton returned fire, shooting two shots from his .40 Glock at Mr. Murray. He observed that his shots missed Mr. Murray and hit sandstone rocks. Officer Norton then turned and retreated 30-40 yards back, away from Mr. Murray to the reverse slope of the hill, a location he thought was a safer distance of approximately 150-160 yards and provided some cover against Mr. Murray at the bottom of the hill. (*Id.* ¶¶ 43-44 (citing ECF 198 at 93:19-94:3; ECF 254 at 132:4-8, 132:18-133:14).)

After retreating, Officer Norton attempted to call dispatch on his cell phone but kept misdialing the number due to the stress of events. He was also shouting at Mr. Murray to put the gun down. (*Id.* at ¶¶ 46-47 (citing ECF 198 at 94:2-3, 95:2-7).) From about 150 to 160 yards away, Officer Norton saw Mr. Murray put his own gun to his head, hold it there briefly, pull the trigger, and fall to the ground. (*Id.* at ¶¶ 46, 48-49 (citing ECF 198 at 91:25-92:6, 94:2-3, 95:8-17, 98:16-17; Def. Ex. 101 at 2.) Officer Norton holstered his weapon and successfully called dispatch to report that shots had been fired and the suspect was down after shooting himself in the head." (ECF 260 at ¶¶ 49-50 (citing ECF 198 at 91:25-92:6, 95:8-14); *see also* ECF 31 at 8.)

According to the parties' agreed-upon dispatch transcript, in addition to reporting what happened, Officer Norton requested the other officers at the general location and his "supervisor, chief, and everybody" come to his location along with an ambulance. (Def. Ex. 31 at 8.) Notably, Officer Norton informed dispatch that the other officers on the scene "can see me right now." (*Id.*) Officer Norton described where his vehicle was parked and asked dispatch to "[t]ell Craig to come back to where he saw me and I talked to him." (*Id.*)

### E.    Timeline of Key Events Leading up to the Shooting

The evidence outlined above establishes the following timeline for events leading up to the shooting that occurred on April 1, 2007:

| | |
|---|---|
| 10:52:49 a.m. | Trooper Swenson begins pursuing the vehicle driven by Mr. Kurip. (Def. Ex. 134 at 0:00.) |
| 11:20:25 a.m. | The vehicle driven by Mr. Kurip crashes at the intersection of Seep Ridge Road and Turkey Track Road. (Def. Ex. 134 at 27:27-27:43.) |

27

| 11:20:47 a.m. | Trooper Swenson contacts dispatch to report that he had "two runners out. Both tribal males." (Def. Ex. 31 at 6; Def. Ex. 134 at 27:35-28:13.) |
|---|---|
| 11:22:16 a.m. | Trooper Swenson reports to dispatch that he had removed the keys from the crashed vehicle and that he was pursuing a person (Mr. Kurip) who was fleeing north from the crashed vehicle, and that another person (Mr. Murray) was fleeing south. (Def. Ex. 31 at 6; Def. Ex. 134 at 29:20-29:51.) At this time, Trooper Swenson was in his vehicle in pursuit of Mr. Kurip. (Def. Ex. 134 at 29:20-29:28.) |
| 11:22:35 a.m. | Trooper Swenson exits his vehicle on Seep Ridge Road south of the intersection with the Turkey Track to pursue Mr. Kurip on foot off-road heading west. (ECF 254 at 57:15-58:9; Def. Ex. 134 at 29:40-29:48.) |
| 11:23:40 a.m. | Trooper Swenson reports to dispatch that he has apprehended Mr. Kurip. (Def. Ex. 31 at 7; Def. Ex. 134 at 30:50-30:56.) |
| 11:23:20 a.m. – 11:24:00 a.m. | Officer Norton arrives and speaks briefly with Trooper Swenson before exiting his vehicle on the Turkey Track, just past the intersection with Seep Ridge Road. (ECF 254 at 32:8-20, 58:25-60:24, 126:9-18, 127:23-128:8; ECF 255 at 204:4-11, 205:17-206:16; Def. Ex. 136 (near the location marked "Tu" in the northernmost reference to "Turkey Track" noted on the exhibit).) |
| 11:23:45 a.m. – 11:24:15 a.m. | Trooper Young arrives and speaks with Trooper Swenson before driving to Officer Norton's location, speaking with him, and deciding each to search in different directions. (ECF 198 at 83:25-84:7; ECF 254 at 127:23-128:17; ECF 255 at 204:4-11, 205:17-206:16; Def. Ex. 31 at 8 (indicating Officer Norton and Trooper Young spoke before the shooting); Def. Ex. 136 (near the location marked "Tu" in the northernmost reference to "Turkey Track" noted on the exhibit).) |
| 11:24:00 a.m. – 11:24:30 a.m. | Deputy Byron arrives and sees Officer Norton jogging away from Trooper Young. Deputy Byron and Trooper Young speak briefly and drive down the Turkey Track. (ECF 198 at 83:25-84:7; ECF 254 at 129:15-23, 150:18-20; ECF 255 at 238:23-240:10, 255:18-256:5, 257:20-22; Def. Ex. 2 at 9 (Deputy Byron's report indicating he saw "an individual running up a hillside" as he was arriving on scene, before he arrived at the concrete pad).) |
| ~11:25:30 a.m. | Trooper Young and Deputy Byron, having made a right onto a service road, arrive at a concrete pad with a good view of where the shooting would take place, but that has a deep wash or gully between the two locations. (ECF 255 at 200:8-201:13 (Trooper Young referring to the service road as "an okay road"), 201:20-23, 220:17-221:3, 240:6-17, 258:1-13, 261:10-262:14; Def. Ex. 136; Site Visit.) |
| 11:25:00 a.m. – 11:26:00 a.m. | Officer Davis arrives, speaks with Trooper Swenson, and proceeds down the Turkey Track. He does not see Deputy Byron or Trooper Young before the shooting, driving past the service road they turned onto. At some point while driving, Officer Davis sees Officer Norton on a hill. (ECF 254 at 80:12-81:12, 82:3-20, 93:25-94:13, 99:5-15; Def. Ex. 132.) |

| 11:25:30 a.m. – 11:26:00 a.m. | Deputy Byron and Trooper Young see Officer Norton on top of a hill.  (ECF 255 at 240:18-241:6, 260:15-261:5; Def. Ex. 2 at 9 (indicating Trooper Young identified Officer Norton to Deputy Byron).)  Trooper Young searches near the concrete pad while Deputy Byron enters the gully.  Deputy Byron never fully crossed the gully or climbed out on the other side.  (ECF 255 at 240:18-242:2; Def. Ex. 31 at 7, 9.) |
|---|---|
| 11:25:46 a.m. – 11:26:20 a.m. | Deputy Byron radios Trooper Young asking who the "runner in blue" is.  Trooper Young responds, initially being unsure who the person was before identifying them as likely being the passenger (Mr. Murray).  Trooper Young could see Mr. Murray unharmed and running at 11:26:00 a.m.  (Def. Ex. 31 at 7; Def. Ex. 134 at 32:58-33:35.)  Trooper Young enters the gully in pursuit.  (Def. Ex. 31 at 7, 9; Def. Ex. 134 at 33:15-33:23, 34:50-35:12.) |
| 11:26:00 a.m. – 11:27:29 a.m. | Officer Norton and Mr. Murray encounter each other.  Mr. Murray either shoots himself or is shot by Officer Norton.  (ECF 260 at ¶¶ 41-50; ECF 261 at 8; Def. Ex. 31 at 8.) |
| 11:27:29 a.m. | Officer Norton calls dispatch to report the shooting.  (Def. Ex. 31 at 8.) |

### F.    The Immediate Aftermath of the Shooting

#### 1.    Deputy Byron and Trooper Young Return to the Scene 11:28:27 a.m. – ~11:33 a.m.

At 11:28:27 a.m., dispatch reported "shots fired" and advised that Officer Norton "needs officers."  (Def. Ex. 31 at 9; Def. Ex. 134 at 35:33-35:46.)  Upon either hearing the report of "shots fired" or hearing the shots themselves, Deputy Byron and Trooper Young returned to their vehicles.  (ECF 255 at 203:3-10, 242:13-243:18; Def. Ex. 2 at 9.)

At 11:29:09 a.m., dispatch informed Trooper Young that Officer Norton "advises [you] to go back where you talked to him and you'll see him."  (Def. Ex. 31 at 9; Def. Ex. 134 at 36:21-27.)  Trooper Young acknowledged the transmission, responding to dispatch, "we have a visual of him on the hill.  Did you say shots fired?"[18]  (Def. Ex. 31 at 9; Def. Ex. 134 at 36:27-36:33.)  Deputy Byron and Trooper Young then proceeded separately in their vehicles back to

---

[18] At trial, Trooper Young listened to the recording of this transmission and testified that it was not his voice, but that it might have been Deputy Byron's.  (ECF 255 at 225:15-24.)  Nevertheless, the parties stipulated to the accuracy of the transcript, and that stipulation is accepted here when the speaker is in doubt.  (ECF 232 at ¶ 46.)  Regardless, although not noted on the transcript, the speaker on the recording says, "*we* have a visual."  (Def. Ex. 134 at 36:27-36:33 (emphasis added).)  This use of the first-person plural indicates that the speaker was close enough to a second individual to employ the plural.  Thus, even if the speaker was Deputy Byron and not Trooper Young, the speaker contemporaneously knew that they were both able to observe Officer Norton from their location.

the location where Trooper Young had seen Officer Norton when he first arrived at the scene. (ECF 255 at 206:17-21, 243:22-244:9; Def. Ex. 9.)

At 11:29:38 a.m., Trooper Swenson, after being asked for an update on the location by an unidentified speaker, responded "this is at the Turkey Trail [*sic*] where it divides.  Out on foot.  A motorist did stop and there has [*sic*] been shots fired."  (Def. Ex. 31 at 9; Def. Ex. 134 at 36:50-36:58.)

After hearing Trooper Swenson's 11:29:38 a.m. report that shots had been fired, Officer Davis also began to return by car to the intersection of Turkey Track Road and Seep Ridge Road. (ECF 254 at 83:20-84:16; Def. Ex. 132 (noting that Officer Davis heard Trooper Swenson report that shots had been fired); Def. Ex. 31 at 9; Def. Ex. 134 at 36:50-36:58.)[19]

Deputy Byron and Trooper Young arrived at the location at which Trooper Young had spoken to Officer Norton, near the scene of the crash.  According to Deputy Byron, at this point Officer Norton was "down off the hillside."  (ECF 255 at 243:22-244:3.)  According to Trooper Young, Officer Norton was "up there" on a hill, but the general location he identified may have been a small hill near the crash site and was not the hill overlooking the site where the shooting of Mr. Murray had occurred.  (*Id.* at 221:9-22; *compare* Def. Ex. 136 (the location marked "VN"), *with* Def. Ex. 137 (approximately 30 yards north of the location marked "Norton"); Site Visit.)  The three officers spoke among themselves at a location just off the Turkey Track Road after Deputy Byron and Trooper Young had exited their vehicles.  Mr. Murray was not visible from the site of the conversation.  (ECF 255 at 244:10-245:1.)  The officers then proceeded to the hill on which Officer Norton had been.  From that location they could see Mr. Murray's body fallen on the ground more than 100 yards away.  (Def. Ex. 137 (noting Mr. Murray was approximately 113 yards southwest of where Officer Norton's shell-casings were found); *see also* ECF 255 at 206:17-207:18, 222:7-23 (Trooper Young recalling that Mr. Murray was approximately 100 yards away from the top of the hill), 245:2-17 (Deputy Byron testifying that he and Trooper Young "worked our way around and we made our way down to where [Mr. Murray] was").)  According to Trooper Young, Officer Norton told him that Mr. Murray had

---

[19] Although Officer Davis testified that he spent 15 to 30 minutes driving or being parked on Turkey Track Road, his testimony in this regard is unreliable, as even he appeared to acknowledge.  (ECF 254 at 100:3-19.)  Officer Norton arrived no earlier than 11:23:20 a.m.; he began reporting that shots had been fired by 11:27:29 a.m., and that report was shared by dispatch at 11:28:27 a.m.  (Def. Ex. 31 at 8-9; Def. Ex. 134 at 35:33-35:46.)  Even assuming, contrary to the evidence, that Officer Davis arrived right after Officer Norton and had taken almost five minutes to drive down Turkey Track Road and the oilfield-service road to search for Mr. Murray before hearing the report of shots fired, it cannot have taken him more than another five minutes (and probably far less time) to drive back up Turkey Track Road, for a total of 10 minutes maximum, well short of his 15 to 30 minute estimate.

fired two shots and then put his own gun to his head and shot himself.[20]  (ECF 255 at 207:12-208:11.)  Trooper Young communicated with dispatch at 11:31:19 a.m. to make sure that an ambulance was on the way.  Based on this communication to dispatch, Trooper Young and Deputy Byron arrived at the top of the hill from which they had a view of Mr. Murray at approximately 11:31:00 a.m., some two and a half minutes after the initial report that shots had been fired.  (ECF 255 at 207:12-18, 226:1-14 (Trooper Young testifying that he was "just coming over the hill" when he told dispatch to "[r]oll the ambulance"); Def Ex. 31 at 10 ("we've got a man down.  Roll the ambulance"); Def. Ex. 134 at 38:30-38:37.)

Trooper Young and Deputy Byron then proceeded on foot down the hill with their guns drawn to secure Mr. Murray.  (ECF 255 at 207:2-18, 208:12-16, 245:6-22.)  Officer Norton did not accompany them.  (ECF 254 at 138:18-22; ECF 255 at 207:7-8.)  Mr. Murray was unconscious and bleeding from his head but was still breathing at this time.  (ECF 232 at ¶ 29; ECF 255 at 208:17-23, 244:23-245:24.)  Upon reaching Mr. Murray, Deputy Byron handcuffed him.  Neither Deputy Byron nor Trooper Young rendered any first aid to Mr. Murray.  (ECF 232 at ¶ 28; ECF 255 at 208:21-209:7, 246:5-247:2.)  Close to Mr. Murray's side, Trooper Young and Deputy Byron observed two spent, copper-colored shell casings and a stovepiped handgun.[21]  (ECF 255 at 223:4-21, 245:18-22.)  After Deputy Byron handcuffed and frisked Mr. Murray, no one would disturb or move anything at the scene immediately near Mr. Murray until the ambulance arrived and its crew moved Mr. Murray.  (ECF 255 at 247:3-248:4.)

Based on the distance of at least 113 yards, and perhaps as many as 140-150 yards, between where Trooper Young and Deputy Byron saw Mr. Murray from near the hill where Officer Norton had been and where Mr. Murray was lying, it likely did not take more than one and a half to two minutes, if even that long, for Trooper Young and Deputy Byron to approach

---

[20] Officer Norton testified that he had initially thought on April 1, 2007, that Mr. Murray had fired one shot at him and then put his own gun to his head and shot himself, and only later realized that Mr. Murray must have first fired two shots at him after seeing the physical evidence at the scene.  (ECF 198 at 109:18-110:10; ECF 254 at 131:2-21.)  Even if Officer Norton initially mistook the number of shots Mr. Murray fired at him, this mistake is not relevant and does not suggest that Officer Norton was lying.  Importantly, Officer Norton has always been candid about his confusion regarding the number of shots fired; he has never testified that Mr. Murray fired only one shot.  (*See* ECF 198 at 109:18-110:10; ECF 254 at 131:2-21.)  A reasonable inference would be that Officer Norton did not notice one of the shots fired at him while returning fire and withdrawing from his exposed position, provided his testimony is otherwise credible.

[21] Given the spoliation sanction imposed on the defendant for its negligent destruction of the .380 Hi-Point handgun, *Jones VI*, 2023 WL 2681819, at *21, the Court does not at this time rely on the firearm, other than noting its presence at the scene, for any findings; the reference here and elsewhere to the stovepiped or jammed round in the handgun merely notes what the officers observed when they arrived at Mr. Murray's location.

and secure Mr. Murray.  The scene of the shooting would have been secured by approximately 11:33 a.m.

### 2.      Officer Davis Returns to the Scene
### 11:29:38 a.m. – ~12:20 p.m.

Meanwhile, Officer Davis was returning to the intersection of Turkey Track Road and Seep Ridge Road.  He observed two police vehicles parked at the top of a small rise on Turkey Track Road and parked next to them.  (ECF 254 at 84:9-21.)  At this point, Officer Davis encountered Deputy Troy Slaugh by the vehicles, who told him that "it was all over."  (*Id.* at 84:22-85:2, 86:15-87:10.)  The record does not reflect when Deputy Slaugh arrived at the scene or how he knew anything about the shooting; Deputy Slaugh did not testify at trial.

Officer Davis exited his vehicle and proceeded on foot to the area where he had previously observed Officer Norton.  (Def. Ex. 132.)  Officer Davis "went over a rise" and saw Trooper Young and Deputy Byron from a couple of hundred yards away bent over the still-breathing Mr. Murray.  (ECF 254 at 85:6-23, 86:15-87:12, 88:15-89:10; Def. Ex. 132.)  Officer Davis did not recall seeing Officer Norton at that time and was unsure when he next saw Officer Norton.  (ECF 254 at 85:6-8, 94:14-95:5.)  According to Officer Norton, Deputy Slaugh encountered and spoke with him at the crest of the hill overlooking Mr. Murray's location.  (*Id.* at 135:21-136:8, 140:1-8.)  Officer Norton was uncertain whether Deputy Slaugh arrived at the scene of the shooting before or after Officer Davis.  (*Compare id.* at 135:21-236:8 (Officer Norton testifying "Deputy Slaugh arrived shortly after" Officer Davis), *with id.* at 140:1-14 (referring to Officer Davis coming "into the scene" after Deputy Slaugh.)

Officer Davis proceeded down the hill to Mr. Murray's location.  At that site, he observed a jammed handgun and two spent shell casings, which he stood by to protect until after the ambulance came and he was relieved.  (*Id.* at 90:6-16, 105:10-13, 109:18-20; Def. Ex. 132.)  Officer Davis did not touch or see anyone else touch the shell casings.  (ECF 254 at 105:14-18.)  Officer Davis estimated that he spent a total of 45 minutes at the scene by Mr. Murray.  (*Id.* at 105:10-13.)  After Mr. Murray was evacuated by ambulance, Officer Davis took GPS coordinates of where Mr. Murray had been lying, where the vehicle driven by Mr. Kurip had crashed, and the location at which he was told Officer Norton had been when Mr. Murray was shot.  (*Id.* at 109:18-111:1, 112:17-113:12; Def. Ex. 132.)

### 3.      Officer Norton Photographs the Scene
### ~11:33 a.m. – ~12:15 p.m.

After Mr. Murray was handcuffed, Officer Norton spoke briefly with Deputy Slaugh and possibly Officer Davis.  (ECF 254 at 135:21-136:8, 140:1-14.)  Officer Norton then went down to Mr. Murray's location to see what weapon Mr. Murray had allegedly used to shoot at him.  (*Id.* at 140:1-8.)  At this time, Officer Norton decided to photograph the scene before the ambulance arrived, because he thought the paramedics would possibly disturb evidence while treating and evacuating Mr. Murray.  (*Id.* at 140:15-25.)  Officer Norton returned to either the location of Deputy Slaugh or the site where Deputy Slaugh's vehicle was parked to retrieve Deputy Slaugh's digital camera to photograph the scene.  While he photographed, Officer

Norton walked within a few feet of Mr. Murray. (*Id.* at 140:15-141:20.) After Trooper Young and Deputy Byron arrived, however, Officer Norton was never alone with Mr. Murray. Officer Davis stood by the evidence near Mr. Murray until the ambulance arrived. (*Id.* at 90:6-16, 101:13-24, 109:12-21.) Deputy Byron also stayed with Mr. Murray until he was removed by paramedics. (ECF 255 at 247:18-250:3.) Officer Norton took photographs of the .380 Hi-Point handgun with a stovepiped round found near Mr. Murray, of the bullet casings near Mr. Murray, and of Mr. Murray himself. (ECF 254 at 141:24-142:14, 158:21-159:11.) Deputy Slaugh may also have taken some photographs. (*Id.* at 142:3-10; ECF 255 at 282:19-283:4.)

Thereafter, Officer Norton returned with Deputy Slaugh to the location on the hill from which he had allegedly exchanged gunfire with Mr. Murray to look for the shell casings from his .40 Glock handgun. (ECF 254 at 161:20-162:2.) They found two shell casings on the ground, approximately 113 yards away from Mr. Murray. (*Id.* at 162:17-24.) The shell casings from Officer Norton's .40 Glock were silver colored and visually distinct from the copper-colored shell casings located near the .380 Hi-Point found near Mr. Murray. (*Id.* at 156:21-157:4; *compare* Def. Ex. 34, Def. Ex. 91, *and* Def. Ex. 92 (pictures of .40 shell casings), *with* Def. Ex. 96, *and* Def. Ex. 97 (pictures of .380 shell casings).)

### 4.   Trooper Young Leaves the Scene of the Shooting for the Crash Scene 11:37:21 a.m. – ~12:45 p.m.

At 11:37:21 a.m., Trooper Young advised dispatch that Mr. Murray was unconscious but still breathing. (Def. Ex. 31 at 11; Def. Ex. 134 at 44:25-44:38.) At some point thereafter, but before the ambulance arrived, Trooper Young left the scene of the shooting and returned to the scene of the crashed vehicle to conduct an accident reconstruction, called "photogrammetry." Performing photogrammetry was standard practice at the time for vehicular police pursuits that ended in crashes. (ECF 255 at 210:6-212:11.) This process would typically take Trooper Young approximately one hour, although it could take more or less time. (*Id.* at 213:10-18.) Trooper Young was thereafter not involved with any of the documentation of the scene of the shooting. (*Id.* at 213:7-9.) Trooper Young does not recall where he went or what he did after completing the photogrammetry, but he eventually left the scene. (*Id.* at 213:19-25, 214:7-13.)

Crediting Trooper Young's testimony as to the accident reconstruction, it appears likely that Trooper Young completed the photogrammetry by approximately 12:45 p.m., and possibly even earlier based on the fact Trooper Young's incident report reflects that it was signed at 12:41 p.m. on April 1, 2007. (Def. Ex. 118 at 2.)[22]

---

[22] The timestamp for Trooper Young's signature may be wrong. His report notes that he had arrived at the scene at 11:32 a.m. (Def. Ex. 118 at 1.) Unless this timestamp refers approximately to when Mr. Murray was placed in handcuffs, this reference cannot be correct. As previously discussed, the dashcam footage and dispatch transcript show that Trooper Young must have arrived several minutes before 11:32 a.m. It therefore may be that the timestamp reflecting Trooper Young's completion of his report is also incorrect.

Although the record does not reflect when Trooper Young left the scene, there is no indication that Trooper Young saw or did anything of relevance after he completed the photogrammetry, other than prepare and sign his report.

### 5. The Ambulance Arrives and Deputy Byron Leaves the Scene ~11:56 a.m. – ~12:15 p.m.

An ambulance arrived at approximately 12:00 p.m., as it was reported to be a "couple minutes out" at 11:56:09 a.m.  (Def. Ex. 31 at 13; Def. Ex. 134 at 1:03:00-1:03:25.)  According to Deputy Byron, who helped evacuate Mr. Murray to the ambulance, when the ambulance crew arrived at Mr. Murray's location, no one moved or disturbed any of the objects at the scene. (ECF 255 at 248:22-249:6, 249:18-25.)  Officer Davis was also still present at the scene when the ambulance arrived.  (ECF 254 at 105:12-13.)

Deputy Byron then left the scene at the instruction of his sergeant, Bevan Watkins, who told him to escort the ambulance and to remain with Mr. Murray at the hospital.  (ECF 255 at 250:4-24.)  Sergeant Watkins's arrival and departure times from the scene are not noted in the record.  A "voice" reported at 12:10:52 p.m. that "we're going [to be] transporting the subject momentarily."  (Def. Ex. 31 at 14; Def. Ex. 134 at 1:18:05-1:18:18.)  There is no evidence as to when exactly the ambulance departed, but given the transmission, it is likely that Deputy Byron and Mr. Murray left the scene no later than 12:15 p.m.  Deputy Byron proceeded to escort the ambulance to Ashley Valley Medical Center.  (Def. Ex. 77; Def. Ex. 112.)

### G. The Investigation on April 1, 2007

#### 1. Agent Ashdown

On April 1, 2007, Rex Ashdown was a special agent of the FBI assigned to the Vernal Resident Agency out of the Salt Lake division.  His partner at the Vernal Resident Agency was Special Agent David Ryan.  Although Agent Ashdown began the investigation into the shooting and related events, he retired on May 31, 2007.  As a result, the investigation was completed by Agent Ryan.  (ECF 258 at 557:1-14, 579:14-15.)  The FBI had exclusive jurisdiction to investigate Mr. Murray's death because it occurred on the Ute Reservation, and it had been determined after Mr. Murray was shot that he was an enrolled member of the Ute Tribe.  (ECF 232 at ¶ 30.)

Agent Ashdown was the only FBI employee to arrive at the scene on April 1, 2007, and he did not arrive until after the shooting had occurred and Mr. Murray had been evacuated by ambulance.  (*Id.* at ¶ 31.)  Agent Ashdown arrived approximately 10 minutes after the ambulance transporting Mr. Murray had left the scene, meaning he arrived at approximately 12:25 p.m. (ECF 199 at 277:6-15.)

Upon arrival, Agent Ashdown spoke to the on-scene senior officers to get their "briefing of what had happened there at the scene."  (*Id.* at 277:16-278:5.)  He also spoke with Trooper Swenson.  (*Id.* at 278:14-279:1.)  After speaking with Trooper Swenson, Agent Ashdown proceeded to investigate the scene of the shooting, lay down his own evidence markers, and take

GPS coordinates of where "Officer Norton was reported to have shot towards Mr. Murray" and "where Mr. Murray's body had been." (*Id.* at 278:14-279:1, 281:5-11; ECF 232 at ¶ 32.) He also independently photographed the scene of the crash and the scene of the shooting, including photographing the blood spatter left on the ground by the gunshot wound to Mr. Murray's head. (ECF 199 at 280:8-22, 290:22-293:11; ECF 232 at ¶¶ 32-33.)

Agent Ashdown also spoke with Officer Norton, asking to set up an interview. Officer Norton pointed out where the .40 spent shell casings from his handgun were near him on the ground and told Agent Ashdown that he would want his attorney to be present for the interview. (ECF 199 at 282:13-17, 351:25-352:15.) According to Agent Ashdown, wanting an attorney present is "pretty typical in the law enforcement community that if you're involved in some sort of shooting, that it's recommended to have an attorney present with you." (*Id.* at 282:18-23.) During their conversation, Agent Ashdown observed that Officer Norton's clothing was "clean and pristine," and that it was not obvious that he had been "running or involved in any sort of altercation that was obvious from his clothes."[23] (*Id.* at 283:4-11.) In other words, "[t]here was nothing to raise any red flags just by looking at him." (*Id.*) After speaking with Officer Norton, Agent Ashdown moved to where Mr. Murray's body had been. (*Id.* at 290:11-14.)

Agent Ashdown collected the following physical evidence from the scene of the shooting: (a) a .380 Hi-Point handgun; (b) a magazine with five rounds of ammunition from the .380 Hi-Point handgun; (c) a shell casing from an expended round jammed, or "stovepiped," in the .380 handgun; (d) two .380-caliber shell casings; and (e) two .40-caliber shell casings. (ECF 199 at 299:16-301:15; ECF 232 at ¶ 34; ECF 258 at 591:19-592:6.) The serial number of the .380 Hi-Point was P849978.[24] (ECF 258 at 569:8-570:4.) The .380 Hi-Point handgun, jammed shell casing, and ejected .380 shell casings were collected from near where Mr. Murray had lain. (*Id.* at 560:5-17; Def. Ex. 93; Def. Ex. 96; Def. Ex. 97; Def. Ex. 110.) The .40-caliber shell casings were found where Agent Ashdown was told Officer Norton had been when he exchanged fire with Mr. Murray. Their location was approximately 113 yards away from where Mr. Murray had fallen. (ECF 199 at 300:22-301:4; ECF 258 at 560:5-7, 561:8-563:21; Def. Ex. 33; Def. Ex. 55; Def. Ex. 92.) The actual projectiles from the spent .380 and .40 shell casings were not found.

---

[23] The absence of blowback (*i.e.*, blood spatter) on Officer Norton's clothing suggests that Officer Norton was not close to Mr. Murray when Mr. Murray was shot. While the absence of blowback on Officer Norton's clothing is suggestive, it is not conclusive, as addressed in footnote 31, *infra*.

[24] Despite the spoliation sanction, the defendant was still permitted to "present physical evidence or testimony from witnesses . . . to provide evidence concerning the origin, ownership, and destruction of the weapon." 2023 WL 2681819, at *21. The sanction against the use of secondary evidence regarding the .380 Hi-Point therefore does not apply to its serial number, because the testimony and documentation about this physical evidence go to proving the origin and ownership of the handgun.

(ECF 199 at 289:25-290:10.)  Agent Ashdown did not see any signs that any evidence had been tampered with or moved.  (*Id.* at 295:6-12.)

## 2.      **Investigator Campbell**

On April 1, 2007, Investigator Keith Campbell was an investigator for the Utah medical examiner's office.  On that date, he also was employed by the Uintah County Sheriff's Office as the chief deputy.  He arrived at the scene to "investigate the cause and manner of" Mr. Murray's death.  (*Id.* at 218:22-219:9 (Investigator Campbell describing himself as "the research person basically" who assists the state medical examiner's office in determining cause and manner of death); ECF 255 at 271:7-17, 272:11-25, 279:10-280:2.)

Investigator Campbell first learned of the shooting from either a phone call from Officer Norton or dispatch.  (ECF 255 at 271:21-272:3.)  It is unclear when Officer Norton called Investigator Campbell.  Officer Norton testified that it was "way after" he called dispatch about the shooting, but also that it was when he was "just up on the hill milling around."  (ECF 254 at 137:9-19.)  It is likely that Officer Norton called Investigator Campbell after Mr. Murray had been placed in handcuffs, but it remains unclear whether Officer Norton made the call before or after he photographed the scene.  As previously noted, Officer Norton and Investigator Campbell are "good friends" who have known each other since junior high or high school.  (ECF 198 at 132:19-22; ECF 199 at 218:5-21; ECF 254 at 137:4-6; ECF 255 at 271:2-6.)

By the time Investigator Campbell arrived, Mr. Murray had already been evacuated by ambulance.  (ECF 255 at 273:25-274:2.)  Investigator Campbell briefly spoke with Officer Norton but claims he neither asked about nor discussed what had happened.  (ECF 199 at 233:15-234:19.)  Investigator Campbell spoke with Agent Ashdown and proceeded to where Mr. Murray had fallen.  (ECF 255 at 274:3-11, 278:21-279:9.)  He also examined the area on the hill where he understood Officer Norton to have been during the shooting, by the location of the .40 shell casings.  (*Id.* at 278:21-279:9; ECF 199 at 237:1-13, 241:25-242:4, 249:14-15, 249:21-23, 262:4-24.)

While on the scene, either the local Bureau of Indian Affairs ("BIA") chief of police, whose arrival is not noted in the record, or Agent Ashdown told Investigator Campbell that Mr. Murray had shot himself.  (ECF 255 at 280:25-281:10, 301:9-15.)  Investigator Campbell examined the scene for the directionality of the blood spatter.  (*Id.* at 285:1-13, 287:6-288:25.)  Based on his understanding of where Officer Norton had been at the time Mr. Murray and Officer Norton had reportedly exchanged fire, close to where the shell casings from the .40 Glock were found, Investigator Campbell wrote in his report to the medical examiner that the "[b]lood spatter at the scene was clearly at a right angle to the location of [Officer Norton], and consistent with a self[-]inflicted gun shot to the head."  (Def. Ex. 28 at 2; ECF 199 at 262:9-24.)  More specifically, Investigator Campbell testified that the blood spatter from the shot that went through Mr. Murray's head was traveling southeast, perpendicular to where the .40-caliber shell casings were located; these were in a northeast direction.  (ECF 255 at 294:1-297:9; Def. Ex. 28 at 2; Def. Ex. 137.)  As Investigator Campbell put it in his testimony during the spoliation proceedings, "once I knew where [Officer Norton] was when it occurred, it's literally impossible

for a round to have come at that direction and done what you could see in the blood spatter." (ECF 199 at 249:24-250:8.)

Investigator Campbell did not observe any blowback from the bullet that struck Mr. Murray at the scene.  (ECF 255 at 289:12-20, 290:13-24.)  He also did not collect any evidence. (ECF 199 at 219:20-22.)

### 3.    Chief Jensen

Chief Jensen, the Vernal City Chief of Police on April 1, 2007, arrived at the scene of the shooting after the ambulance had taken Mr. Murray to the hospital.  (ECF 232 at ¶¶ 7-8.)  At the scene, Chief Jensen spoke with Officer Norton and Agent Ashdown.  (ECF 255 at 307:18-22.) Based on what he had been told and had observed, Agent Ashdown gave Chief Jensen an explanation of his understanding of where the shooting had taken place, and where Mr. Murray and Officer Norton had been during the shooting but did not explain the source of this information.  (*Id.* at 309:1-23.)  Chief Jensen did not walk around the scene or investigate the shooting, leaving that to the FBI.  He did examine and then take Officer Norton's .40 Glock; in return, he gave Officer Norton his own handgun, which was an identical model.  (*Id.* at 309:18-20, 310:22-311:4, 311:13-25.)  No party asked Chief Jensen at trial to explain why he exchanged firearms with Officer Norton.

Chief Jensen had the opportunity to look closely at Officer Norton's firearm and his person.  According to Chief Jensen, Officer Norton's firearm was "pristine," without any observable blood on it.  (*Id.* at 314:12-25.)  Chief Jensen also did not see any blood on Officer Norton's clothing or body or any injuries on Officer Norton, although he did not specifically examine Officer Norton to try and find blood.  (*Id.* at 315:1-315:15, 317:23-318:12; *see also* Def. Ex. 103.)  "[H]aving been a critical care paramedic for 14 years," Chief Jensen testified that he would have been "relatively sensitive" to seeing even a small amount of blood on Officer Norton's person, especially given that Officer Norton was wearing blue/light-blue clothing. (ECF 255 at 315:6-9, 318:25-319:9; Def. Ex. 103.)  Chief Jensen did see that, even several hours after the shooting, Officer Norton was upset.  (ECF 255 at 315:10-15, 317:14-22.)

Chief Jensen took Officer Norton's handgun back to Vernal City.  It is unclear what happened with it thereafter, but it was not tested for any blood residue or other evidence that it might have been used in a contact shooting.  Chief Jensen eventually returned the handgun to Officer Norton.  (*Id.* at 312:6-21.)

### 4.    Mr. Murray's Body at the Hospital and Mortuary

At 1:17 p.m., Mr. Murray arrived at the Ashley Valley Medical Center.  He was pronounced dead shortly after arrival.  (Def. Ex. 77; Def. Ex. 112; *see also* ECF 255 at 250:25-251:8.)  The emergency department physician ordered a blood-alcohol test and a urine drug screen.  (Def. Ex. 112.)  The samples for these tests were collected that day at 1:53 p.m. and submitted for analysis.  (Def. Ex. 107 at 1.)  The analysis was performed on April 9, 2007.  (*Id.*) The results showed positive results for amphetamine, tetrahydrocannabinol (THC) (the principal psychoactive component of marijuana), and a blood-alcohol content of 234 mg/dL.  (*Id.* at 2-3.)

After Mr. Murray was pronounced dead, Deputy Byron and two other officers proceeded to photograph and "package" Mr. Murray's body, likely referring to bagging Mr. Murray's hands.  (Def. Ex. 64 at 3.)

At some point on April 1, 2007, Investigator Campbell arrived at the hospital and arranged for Mr. Murray's body to be transported to a mortuary.  (ECF 199 at 244:11-245:19, 251:25-252:9; ECF 255 at 274:14-275:3.)  Mr. Murray's body was transported that day to the Blackburn Mortuary by Colby DeCamp, an employee of the mortuary.  (ECF 199 at 307:7-9; Def. Ex. 64 at 3.)

Agent Ashdown went to the Blackburn Mortuary to look at Mr. Murray's body and attempt to determine entry and exit wounds.  (ECF 199 at 307:10-13.)  Several other state and/or local officers, including Investigator Campbell, were present at the mortuary when Agent Ashdown arrived.  (*Id.* at 307:14-20; ECF 251-1 at 48:19-49:6, 49:22-25, 56:7-9 (a deposition transcript of Colby DeCamp testifying that he recalled seeing Chief Jensen, Investigator Campbell, and Officer Norton "there," although the admitted portion of the transcript is vague as to what "there" is referencing); ECF 255 at 274:17-275:3 (Investigator Campbell testifying he "do[esn]'t think" he went to the mortuary but also testifying that he "honestly can't remember if [he] did go to the mortuary or not.").)  Officer Norton denied having gone to either the hospital or the mortuary (ECF 198 at 188:8-16; ECF 254 at 143:22-144:1), and Agent Ashdown did not recall seeing him there (ECF 199 at 307:14-20).  Neither Deputy Byron nor Trooper Young, the only two other officers who were asked if they went to mortuary, remembered going there, but Deputy Byron's recollection is faulty.[25]  (ECF 255 at 214:22-215:1 (Trooper Young testifying he did not recall if he went to the mortuary), 252:13-14 (Deputy Byron testifying that he did not go to the mortuary); Def. Ex. 64 at 3 (Deputy Byron writing in his report that he accompanied Mr. Murray's body to the mortuary).)

After observing Mr. Murray's wounds, Agent Ashdown was unable to distinguish the entry wound from the exit wound.  (ECF 199 at 307:21-25.)  Unprompted by Agent Ashdown,

---

[25] Agent Ashdown recalled that Deputy Byron was also present at the mortuary, although he erroneously referred to him as "another detective."  (ECF 199 at 307:14-20.)  Deputy Byron denies having gone to the mortuary (ECF 255 at 252:13-14), but his testimonial denial is contradicted by his written report.  (Def. Ex. 64 at 3.)  Deputy Byron's memory as to whether he was at the mortuary is faulty.  As for whether Officer Norton and Chief Jensen were at the mortuary, the Court makes no findings.  Having previously held that the plaintiffs' claims for any alleged crimes that occurred at the mortuary are off-reservation crimes that cannot give rise to liability under the "bad men" provision, *Jones IV*, 149 Fed. Cl. at 356-57, there is no need to resolve the parties' disagreements over who was or was not present at the mortuary on April 1, 2007.  To the extent the plaintiffs seek to undermine the credibility of Officer Norton and Chief Jensen by relying on evidence that they were at the mortuary despite their denials, the Court will rely on whether the entirety of the evidence supports or undercuts the parties' respective versions of the events and not on evidence going to one minor aspect of the events of the day.

Deputy Byron attempted to assist by examining the wounds for beveling with his gloved fingers. (*Id.* at 309:5-25, 310:2-14.)

At some point, an unknown officer or several officers tampered with Mr. Murray's body by cutting a small hole into Mr. Murray's neck and drawing blood from the hole. (ECF 198 at 16:21-17:6; ECF 199 at 245:7-14.) This action probably occurred before Agent Ashdown arrived, as he was offered "a couple of vials of blood" that were not drawn in Agent Ashdown's presence and which an officer claimed had been drawn while Mr. Murray was at the hospital emergency room. (ECF 199 at 313:10-15, 364:19-22.) Agent Ashdown refused to accept the vials because he had no chain-of-custody for them, and he lacked a means of storing the blood properly.[26] (*Id.* at 313:10-25.) Investigator Campbell testified that the tampering did not affect his investigation. (*Id.* at 257:22-258:10.) There is no evidence to suggest the improper actions by officers at the hospital and mortuary manipulated or altered evidence in a way that could mislead the medical examiner.

Agent Ashdown otherwise did not observe any injuries other than the bullet wound on Mr. Murray's body and did not recall seeing any blood on the body, although he did recall that Mr. Murray's hands had been put into "brown paper sacks" by an unknown person. (*Id.* at 312:14-313:6.) Agent Ashdown ultimately did not collect any evidence at the mortuary and left 30 to 40 minutes after his arrival. (*Id.* at 313:7-11.)

### H.   The Investigation after April 1, 2007

#### 1.   Interviewing Officer Norton

On May 3, 2007, Agent Ryan interviewed Officer Norton in the presence of Officer Norton's attorney. (ECF 232 at ¶ 42.) According to Agent Ryan, Officer Norton did not say anything suspicious, and Agent Ryan thought there was no basis to arrest Officer Norton or request a search warrant for his personal vehicle, his clothing, or his .40 Glock. (ECF 199 at 394:9-395:4.)

#### 2.   The Medical Examiner's Report

On April 1, 2007, Agent Ashdown requested that the Utah medical examiner perform an autopsy on Mr. Murray; he did not request any testing on Mr. Murray's clothes or request that his clothes be turned over to the FBI. (*Id.* at 318:2-4; ECF 232 at ¶¶ 35-38.) Within a few days of the request being made, Agent Ashdown received a courtesy call from the medical examiner's

---

[26] The actions of the officer(s) in cutting a hole in Mr. Murray's neck and drawing blood from it and of Deputy Byron in fingering the wounds in Mr. Murray's head were inappropriate. They served no legitimate law-enforcement interest, could not result in the collection of evidence, and ultimately reflected grossly unprofessional behavior. While these actions were egregious and offensive, for the reasons detailed in *Jones IV*, 149 Fed. Cl. at 354-57, they all occurred off the reservation and cannot form the basis for liability under the "bad men" provision. As a result, no further findings as to the lawfulness of the acts are necessary.

office informing him that "they were going to call this a self-inflicted wound, close-contact, self-inflicted wound, suicide." (ECF 199 at 321:3-16.) The report itself, however, was not completed until after he retired on May 31, 2007. (ECF 232 at ¶ 12; Def. Ex. 73 at 1.) Although Agent Ashdown could not close the case until he received the medical examiner's report or while the investigation into the origin of the .380 Hi-Point was ongoing, Agent Ashdown's opinion after talking to the medical examiner's office was that Mr. Murray had died by suicide, considering the matter a "settled issue." (ECF 199 at 326:6-18, 368:20-369:16, 370:6-19.)

Dr. Edward Leis of the Utah Office of the Medical Examiner completed his report into the cause of Mr. Murray's death in July 2007. (This report is in evidence as Def. Ex. 73 (also available as ECF 234-3) but certain portions of the report regarding toxicology were withdrawn by the defendant (ECF 258 at 526:14-527:9).) Rather than perform an autopsy, the report reflects that Dr. Leis conducted only an external examination. (ECF 232 at ¶ 36.) He decided not to perform a full autopsy given what he had learned from Investigator Campbell's report on the incident, the fact that "the significant injuries limited to the head," and "the lack of a retained projectile." (ECF 234-1 (transcript of Dr. Leis's deposition testimony) at 23:2-24, 35:3-36:12.)[27] As its name connotes, an external examination, unlike an autopsy, does not involve any invasive procedures. (*Id.* at 35:7-17.) In line with the usual practices of the medical examiner's office, Investigator Campbell never spoke to the medical examiner regarding Mr. Murray's death, only submitting his written report. (*Id.* at 23:2-12, 25:19-26:3.)

Dr. Leis concluded that the cause of Mr. Murray's death was a contact gunshot wound to the head and that the manner of death was suicide. (Def. Ex. 73 at 1; ECF 232 at ¶ 39.) The gunshot wound was noted as having an entrance "on the left scalp with an exit defect on the upper posterior right scalp." (Def. Ex. 73 at 2.)

More specifically, the entry wound was described as a "contact gunshot wound of entrance," which was located:

> 7 cm below the vertex of the head and 14 cm curvilinearly to the left of the anterior midline . . . . This large, stellate defect lies 8.5 cm. superior to the external auditory meatus on the left. The wound has a central 1.5 X 1.1 cm penetrating defect with triangular-shaped tears at the 12:00, 4:00, 5:00, 10:00, and 11:00 positions. The longest tear, at 12:00, measures up to 2.1 cm in length. There is abundant soot noted at the inferior margin on the defect and some marginal abrasion is noted at the inferior margin. Palpitation of the underlying skull is consistent with a sharp margin at the point of perforation of the skull.

---

[27] The page numbers of Dr. Leis's deposition transcript and the page numbers generated by the court's electronic filing system for the submitted exhibit do not match because of the cover page. For clarity, citations to Dr. Leis's deposition transcript are to the page numbers in the transcript itself, rather than the page numbers generated by the electronic filing system.

> Radiographic examination discloses no significant retained
> projectile fragments.

(*Id.* at 2-3.)

The exit wound was described as:

> Located on the upper posterior right scalp, 1 cm below the vertex of
> the head and 5 cm to the right of the posterior midline . . . . It consists
> of a few small lacerations intertwined and measuring up to 1 cm in
> greatest length.  The margins of the laceration readily appose.  No
> soot or stippling is associated with this defect.
>
> The projectile path is left to right, upward, and slightly front to back.

(*Id*. at 3.)

     Dr. Leis's report also described Mr. Murray's other injuries and notable features.  The cut
to Mr. Murray's neck was described as "[a] 6 cm incised wound, with a string protruding from
the defect, [ ] located on the lower midline of the neck, above the suprasternal notch."  (*Id.* at 2.)
Mr. Murray's hands were noted as having been "received bagged," with a clean left hand, and
"an abundance of caked blood on the posterior aspect of the right hand" which when cleaned
featured "a small, circular abrasion on the posterior aspect of the hand.  No soot was noted on
either hand."  (*Id.*; *see* ECF 234-1 at 44:14-24 (Dr. Leis explaining that he removed the bags and
examined Mr. Murray's hands).)  Dr. Leis's report otherwise noted a few other injuries
including: "an abrasion on the left bridge of the nose without palpable fracture of the nasal
bones"; "a large, light red-based abrasion on the posterior right elbow"; and "[a] small area of
bruising is noted on the anterior-medial aspect of the distal left thigh."  (Def. Ex. 73 at 3.)  Mr.
Murray's back had "no abrasions."  (*Id.*)

### 3.       Tracing the .380 Hi-Point

     On April 2, 2007, Agent Ashdown filed a request with the Bureau of Alcohol, Tobacco,
Firearms, and Explosives ("ATF") using the serial number of the .380 Hi-Point found at the
scene, P849978, to trace who had purchased the handgun and where it had been purchased.
(ECF 258 at 569:12-570:10, 571:16-572:4, 573:11-574:24; Def. Ex. 61.)  That same day, Agent
Ashdown received a response from ATF indicating that a weapon with that serial number had
been purchased as part of a multiple-handgun purchase on March 13, 2007, by Cody Allen
Shirley in Roosevelt, Utah.  (ECF 258 at 575:1-579:9; Def. Ex. 62 at 1-2.)[28]  Roosevelt is a town
on the Ute Reservation, not very far from the site of the shooting.  (Site Visit.)

---

[28] Although omitted by the court reporter from the November 13, 2023, transcript's list of
admitted exhibits (ECF 258 at 491, 628), Defense Exhibits 61 and 62 were admitted into

Because of Agent Ashdown's retirement on May 31, 2007, Agent Ryan would complete the investigation.  (ECF 258 at 579:10-15.)

As part of the investigation into the .380 Hi-Point, Agent Ryan later received a case report dated May 25, 2007, from the BIA Division of Law Enforcement Services regarding a March 19, 2007, incident involving Mr. Kurip.  (*Id.* at 598:3-599:17; Def. Ex. 141.)[29]  According to that report, Mr. Kurip was suspected of committing "Simple Assault ([Domestic Violence]), Aggravated Weapons Offense."  The report stemmed from an incident that occurred at Mr. Kurip's residence involving alleged threats to shoot several other people.  A consent search of the residence by a BIA officer found "a .380 Caliber white [g]un box, which the gun was sold in, along with a black hard plastic gun case.  Also located was a .380 caliber brass bullet casing . . . ."  (Def. Ex. 141 at 3.)  The BIA incident report noted that the investigating officers were not able to find the actual firearm, despite two witnesses claiming to have seen Mr. Kurip with one.  (*Id.*)  As of the report's date, the investigation was noted as pending with no charges yet filed against Mr. Kurip.  (*Id.* at 3-4.)

Agent Ryan's investigation would eventually lead to an indictment of Mr. Shirley for a straw-purchase offense.  Mr. Shirley pleaded guilty to that offense.  (ECF 258 at 592:16-22.)  In Mr. Shirley's "Statement by Defendant in Advance of Plea of Guilty," dated May 27, 2008, he acknowledged that on March 13, 2007, he had been "purchasing [ ] handguns for other people who gave me money to buy handguns for them."  (Def. Ex. 22 at 3.)[30]  The statement did not specifically identify who those persons were, but it did identify the handguns as a "Hi[-]Point 9mm handgun and a Hi[-]Point .380 handgun from" a store in Roosevelt, Utah on March 13, 2007.  (*Id.*)  That same store was noted on the firearms trace of the .380 Hi-Point found at the scene of the shooting as the store that sold that weapon to Mr. Shirley on March 13, 2007.  (Def. Ex. 62 at 2.)  In other words, Mr. Shirley's statement (Def. Ex. 22 at 3) indirectly acknowledged that he had purchased the .380 Hi-Point  found at the scene of the shooting.  (ECF 258 at 569:8-570:4.)

During an interview with Agent Ryan, Mr. Shirley also acknowledged that Mr. Kurip had asked him to acquire a gun for him.  (ECF 199 at 399:22-400:8.)  Mr. Shirley admitted that he had done so and had given Mr. Kurip the .380 Hi-Point that was later found next to Mr. Murray at the scene of the shooting.  (*See* id; ECF 258 at 596:14-21.)  Mr. Shirley's admission of acquiring the .380 Hi-Point handgun on March 13, 2007, for Mr. Kurip, especially when

---

evidence over the plaintiffs' objections (*id.* at 574:11-24 (Def. Ex. 61), 577:6-579:6 (Def. Ex. 62)).

[29] Defense Exhibit 141 consists of four pages of Plaintiffs' Exhibit 15, specifically the four pages marked JONES0018374-77.  (ECF 258 at 602:6-22.)

[30] Although omitted by the court reporter from the November 13, 2023, transcript's list of admitted exhibits (ECF 258 at 491, 628), Defense Exhibit 22 was admitted into evidence without objection (*id.* at 595:1-13).

combined with the firearms trace and his written statement, is more than enough evidence to tie the .380 Hi-Point purchased by Mr. Kurip through Mr. Shirley to the scene of Mr. Murray's shooting.

## I.     The Defendant Has Overcome the Adverse Inference

The factual findings made thus far have generally avoided any conclusions about who fired the shot that killed Mr. Murray. The findings have avoided the central issue in the case because the defendant has faced the burden of overcoming the evidentiary presumption that was imposed in *Jones VI* as a sanction for its negligent spoliation of the .380 Hi-Point handgun. The defendant's failure to overcome the evidentiary presumption would necessarily influence the effect of the evidence and testimony adduced at trial, especially Officer Norton's testimony.

Before the key issue in the case is reached, the impact of the spoliation sanction on the evidence must be addressed. The first step in resolving who shot Mr. Murray is to resolve whether the defendant has overcome the presumption imposed in *Jones VI*.

Because the defendant had negligently destroyed the .380 Hi-Point after the successful prosecution of Mr. Shirley, the spoliation decision in *Jones VI* imposed a "rebuttable adverse inference that the .380 Hi-Point did not have Mr. Murray's blood, tissue, fingerprints, or DNA on it." *Jones VI*, 2023 WL 2681819, at *21. The defendant was permitted to rebut this adverse inference, but "only with physical evidence or corroborating testimony from at least one witness other than Officer Norton. If the defendant rebuts this adverse inference, the question of what the .380 Hi-Point would have shown will be treated as unknowable." *Id.*

The analysis of whether the defendant has met its burden to overcome the adverse inference begins with a straightforward question: how did the .380 Hi-Point come to be found by Mr. Murray's body? If it was brought there by Mr. Murray, its presence at the scene would support Officer Norton's account. If it was brought by someone else, its presence at the scene would indicate that evidence had been manipulated, undercutting Officer Norton's account and the official version of the shooting.

There are four realistic scenarios by which the .380 Hi-Point and its shell casings could have been brought to the scene of the shooting on April 1, 2007. Three of these scenarios would preserve the adverse inference, and one would rebut it. The first three are: (1) Officer Norton brought the weapon himself and planted it at the scene; (2) another officer brought it to the scene and planted it; and (3) the .380 Hi-Point was left in the vehicle driven by Mr. Kurip at the time of the crash, and it was then planted at the scene by an officer. In these cases, Mr. Murray's DNA or blood may not have been found on the Hi-Point, in line with the adverse inference. The fourth scenario is that Mr. Murray himself brought it to the scene, in which case the .380 Hi-Point must have had Mr. Murray's DNA on it, which would rebut the presumption (although even if the presumption is rebutted, the sanction would still treat the existence of DNA or fingerprints on the .380 Hi-Point as unknowable).

The fourth scenario is most likely because there is substantial evidence connecting Mr. Murray through Mr. Kurip to the .380 Hi-Point found at the scene. This fact makes the first two

scenarios unlikely because there is no evidence that suggests either Officer Norton or one of the other officers owned or possessed any .380 Hi-Point, let alone the specific handgun connected to Mr. Kurip, found at the scene.

Specific to the first scenario, Officer Norton was off duty on April 1, 2007, and on his way to see his father. (ECF 254 at 121:11-12, 121:24-122:8.) Because he was not on duty and did not expect to be on duty on April 1, 2007, Officer Norton was not prepared for official duties that day. There is no evidence that, even when he was on duty, he routinely carried a second firearm, but even if he had, it is unlikely he would have done so on a day he did not expect to be on duty.

The shooting also occurred in a less-than-90 second window between the last time Mr. Murray was observed to have been unarmed and the time Officer Norton notified dispatch that Mr. Murray had been shot. (ECF 260 at ¶¶ 41-50; ECF 261 at 8; Def. Ex. 31 at 8; Def. Ex. 134 at 32:58-33:35.) Among the options as to how the .380 Hi-Point came to be at the scene, it is less likely that Officer Norton could have shot Mr. Murray with his .40 Glock, as the plaintiffs contend, and then manipulated the scene to plant a .380 Hi-Point, with a shell casing jammed in the action, along with two spent shell casings within that brief timeframe. Although Officer Norton could have manipulated the scene between when he reported the shooting to dispatch and when Deputy Byron and Trooper Young arrived at his location, any such effort to manipulate the evidence would have been extraordinarily risky. Once Officer Norton reported the shooting and requested that dispatch send the other officers to his location, he knew the other officers would appear at any moment and could observe his effort to alter the scene of the shooting. Reporting the shooting before the scene was prepared would have posed a grave risk to Officer Norton of being caught committing a crime. In fact, according to his report to dispatch, Deputy Byron and Trooper Young could see Officer Norton while he was reporting the shooting to dispatch, making it even less likely that Officer Norton could rush down and manipulate the scene without being observed and getting caught. (Def. Ex. 31 at 8.)

In addition, the recording of Officer Norton's call to dispatch reflects that he was in significant distress at the time he placed the call. (Def. Ex. 138 at file 2007-04-01-11-30-40-001.) It is unlikely that Officer Norton could have shot Mr. Murray, placed the call to dispatch, and in the brief time before other officers arrived at the scene, devised and effected a plan to cover up that shooting by planting the .380 Hi-Point and .380 shell casings near Mr. Murray while under such evident distress. Further, there is no evidence that connects Officer Norton with the .380 Hi-Point.

The second scenario is even less likely because it would require at least two officers to have conspired with Officer Norton, given that Deputy Byron and Trooper Young arrived at Officer Norton's location at the same time and went down to the scene to secure Mr. Murray together. (ECF 255 at 206:17-24, 243:22-244:9.) Most importantly, there is no evidence of a conspiracy among these officers. Although the plaintiffs alleged the existence of a conspiracy to violate Mr. Murray's civil rights, they presented no evidence of such a conspiracy and did not propose any factual findings concerning the existence of one. Such a conspiracy is unlikely. Deputy Byron, Trooper Young, and Officer Norton worked for three different law enforcement agencies. (ECF 232 at ¶¶ 6-7, 9.) While these officers knew each other, Deputy Byron and

Trooper Young were not friends with Officer Norton. (ECF 198 at 84:16-23.) To have assisted Officer Norton in manipulating evidence would have rendered these other officers liable for crimes; it is unlikely they would have put their careers at risk and incurred possible prison sentences by helping Officer Norton to cover up a homicide by planting the .380 Hi-Point handgun. In any event, there is no evidence to hint that these officers were complicit in a conspiracy to manipulate evidence at the scene.

The third scenario is also unlikely because it requires expanding the participants in the conspiracy implied by the scenario to include Trooper Swenson and Officer Davis; it would also require Mr. Kurip to remain silent. If the .380 Hi-Point was in the vehicle Mr. Kurip crashed but not taken by Mr. Murray when he fled, Trooper Swenson would have had to have been involved in the conspiracy as he remained in the area in view of the crashed vehicle. (ECF 254 at 65:24-67:7, 67:21-68:2 (Trooper Swenson explaining his investigation of the crash scene and reporting what he found without noting the presence of any weapons); *see also* Def. Ex. 31 at 10 (Trooper Swenson asking if the other officers "need my assistance where you're at" and Trooper Young replies "[n]egative").) Officer Davis arrived at the scene of the shooting shortly after Deputy Byron and Trooper Young and would have observed Trooper Swenson or another officer remove the .380 Hi-Point from the crashed vehicle to plant it as evidence to manipulate the scene. (ECF 254 at 84:9-85:22.) If the .380 Hi-Point had been left in the crashed vehicle when Mr. Murray and Mr. Kurip fled, Mr. Kurip would likely have been aware of this fact and could have testified that Mr. Murray never possessed the .380 Hi-Point. Mr. Kurip never offered such testimony, and it seems particularly unlikely Mr. Kurip would have remained silent for more than 17 years concerning any conspiracy about how his friend died if he knew it to have been based on a falsehood. (ECF 198 at 21:9-11 (Mr. Murray's mother testifying that he and Mr. Kurip were friends).)

Proving the accuracy of Occam's razor, the most likely explanation for how the .380 Hi-Point came to be found at the scene is the simplest: Mr. Murray brought the .380 Hi-Point himself. This scenario does not require Officer Norton to have been carrying an extra weapon on his day off or to have concocted and effected a plan to cover up a homicide soon after killing Mr. Murray while summoning other officers. Similarly, this scenario does not require a conspiracy among at least three law enforcement officers from three different agencies or Mr. Kurip's silence.

This scenario is also supported by the fact that the evidence connects the .380 Hi-Point found at the scene to only one person involved with the events on April 1, 2007: Mr. Kurip. (ECF 199 at 399:22-400:8; ECF 258 at 596:14-21.) Given this connection to Mr. Kurip, it is a reasonable inference that he could have given the .380 Hi-Point to his friend, Mr. Murray, or that Mr. Murray could have grabbed it out of the vehicle before fleeing the scene of the crash. Either version is substantially more likely than a conspiracy involving multiple officers, of which there

is no evidence.  If Mr. Murray had the .380 Hi-Point and carried it to the scene, his fingerprints and DNA likely would have been found on it if the handgun had been tested.[31]

The evidence reflects that the .380 Hi-Point was associated with Mr. Kurip.  Officer Norton had no connection to the weapon before April 1, 2007, and no evidence connects him to that weapon at the scene prior to Mr. Murray getting shot.  There is no evidence of a conspiracy among officers from different departments to manipulate the evidence at the scene by planting the .380 Hi-Point on Mr. Murray.  The most logical conclusion from these basic facts is that Mr. Murray had the .380 Hi-Point in his possession when he fled from the crash.  This conclusion is based on the testimony of multiple officers, the transcript of transmissions to and from dispatch, and Agent Ryan's investigation.  These testimonies and evidence constitute "physical evidence or corroborating testimony from at least one witness other than Officer Norton," as required by *Jones VI* to overcome the spoliation sanction.  2023 WL 2681819, at *21.

The Court therefore finds that the defendant has overcome the adverse inference imposed as a sanction because the evidence reflects that Mr. Murray brought the .380 Hi-Point to the

---

[31] The parties offered extensive testimony from several expert witnesses as to the likelihood of the presence of blowback (blood and viscera ejected out from the force of the penetrating bullet and back towards the muzzle of the weapon firing the bullet) on a handgun used in a contact shooting.  This testimony is the Hitchcockian MacGuffin of the case, being of limited relevance to resolving the question of whether the defendant has rebutted the presumption imposed as a spoliation sanction, even as the parties focused attention on the issue.  When blowback is present, it may not always be visible to the naked eye, and neither the .40 Glock nor the .380 Hi-Point was tested for traces of blowback.  (ECF 256 at 358:25-360:19.)  Blowback is not always present on a firearm used in a contact shooting or on the hands of the shooter.  (ECF 234-1 at 124:19-125:1 (Dr. Leis testifying that one would "[n]ot necessarily" find blood spatter on the hand of the person who fired a handgun in a contact shooting to the head); ECF 257 at 479:23-480:14 (according to the literature reviewed by Dr. Arden, around 50 percent of cases showed blowback on firearms used in contact shootings and about 75 percent of cases showed blowback on the hands); ECF 258 at 518:18-520:12, 522:4-523:6, 541:15-542:5 (Dr. Cohen discussing literature showing an absence of blowback on firearms in contact shootings in 23 to 33 percent of cases).)  As a result, the absence of blowback on either weapon may have been probative but not dispositive.  Of greater relevance to the issue of who fired the fatal shot would have been testing for fingerprints and DNA.  The .380 Hi-Point should have been tested for blowback and DNA by the FBI.  The scene reflected an officer-involved shooting.  The only surviving witness to the shooting was Officer Norton.  If the .380 Hi-Point had inflicted the fatal wound and did not have Officer Norton's fingerprints or DNA on it, then either the .40 Glock was used to shoot Mr. Murray or Mr. Murray shot himself.  Given the other evidence, it is likely the parties would have concluded early on that Mr. Murray shot himself.  Had the .380 Hi-Point been tested for blowback and DNA, Mr. Murray's family, Officer Norton, the other officers sued in the Utah district court, and the defendant here could have been spared many years of litigation and the attendant uncertainty and expense.

scene.  In accordance with the sanction set forth in *Jones VI*, the question of what would have been found on the .380 Hi-Point had it not been destroyed will be treated as unknowable.  *Id.*[32]

### J.      The Plaintiffs Have Failed to Prove Mr. Murray was Shot by Officer Norton

The plaintiffs, as previously noted, did not propose any findings as to how the shooting occurred, neglecting also to mention their best evidence: Mr. Murray was right-handed but died from a contact gunshot wound to the left lateral scalp.  (ECF 198 at 27:9-10; Def. Ex. 73 at 1-3.)  Instead, their case requires the inference that the events did not occur as Officer Norton testified.  During the hearing on January 18, 2024, they clarified their theory of events.  The plaintiffs contend that Officer Norton and Mr. Murray encountered each other on foot at a close distance after Mr. Murray had rounded a hill and that Officer Norton shot Mr. Murray using the .40 Glock.  While this scenario is physically possible, there is little evidence to support it.  Instead, it is more likely that Officer Norton was close to the crest of the hill, more than 100 yards away, when Mr. Murray shot himself, as the defendant argues.

To start, the plaintiffs' theory of the case does not explain why Officer Norton would shoot Mr. Murray unlawfully.  Indeed, the plaintiffs have all along failed to posit any explanation for Officer Norton's alleged acts.  Crucially, they have never sought to explain his motive, means, and opportunity, all elements that often go to explaining the commission of a homicide, for shooting Mr. Murray.[33]

Officer Norton had no motive to kill Mr. Murray on April 1, 2007.  Officer Norton was off duty on April 1, 2007, and had intended to visit his father.  (ECF 254 at 121:11-12, 121:24-122:8.)  There is no evidence that Officer Norton expected to be involved in a shooting.  The plaintiffs have offered no evidence that Officer Norton had any bias against tribal members or a

---

[32] The spoliation sanction restricted the types of evidence on which the defendant could rely to overcome the presumption but did not impose a heightened burden of proof.  *Jones VI*, 2023 WL 2681819, at *21.  Even though the defendant only had to overcome the sanction by preponderant evidence, the defendant would have overcome the presumption even under a heightened burden.  The defendant has presented clear and convincing evidence to rebut the adverse inference imposed as a spoliation sanction.

[33] "[M]otive is a factor which may be considered in connection with other evidence as tending to connect [an] accused with [a] crime."  *State v. Sinclair*, 389 P.2d 465, 468 n.7 (Utah 1964).  Although "not a necessary element in the offense of homicide," *In re Peterson*, 386 P.2d 726, 727 (Utah 1963), the existence or absence of motive may be considered by a finder of fact.  "'Evidence of motive is sometimes of assistance in removing doubt, and completing proof which might otherwise be unsatisfactory, and that motive may either be shown by positive evidence, or gleaned from the facts and surroundings of the act.  The motive then becomes a circumstance, but nothing more than a circumstance, to be considered by the jury, and its absence is equally a circumstance in favor of the accused, to be given such weight as it deems proper.'"  *State v. Woods*, 220 P. 215, 217 (Utah 1923) (quoting *People v. Durrant*, 48 P. 75, 82 (Cal. 1897)).

history of allegations of excessive force or civil rights abuses.  Although there are limitations on evidence to prove a person's propensity for violence, the plaintiffs have not presented any evidence to suggest Officer Norton had a violent or angry character.  In fact, the plaintiffs suggested the exact opposite during their closing remarks at trial, arguing that Officer Norton's actions "may be out of character with his other behaviors throughout his life" and calling his alleged shooting of Mr. Murray a "terrible mistake."  (ECF 259 at 636:18-22.)  There is no evidence that Officer Norton either knew or had a particular animus towards Mr. Murray.  The offense that prompted Officer Norton to become engaged in official duty that day, speeding and a resulting high-speed pursuit, was not one that would likely make an experienced officer angry, let alone angry enough to commit a homicide.  While the failure of Mr. Kurip to stop for Trooper Swenson and attempt to flee might have prompted suspicion of other possible criminal activity, speeding is a common offense, and ultimately no one was injured during the pursuit; Officer Norton had no reason to pursue Mr. Murray with the intent to do him harm.

As for means and opportunity, even if Officer Norton had been closer to Mr. Murray than the location at which his shell casings were found, the plaintiffs have not suggested any reason why Officer Norton would invent a story that he was more than a hundred yards away when Mr. Murray killed himself.  If Officer Norton did get close to Mr. Murray to kill him with a contact shot to his head, Officer Norton could have simply told the other officers that Mr. Murray had reached for Officer Norton's handgun or his own, or the two had been engaged in a struggle during which Mr. Murray was shot.  Given the finding that Mr. Murray is substantially more likely to have brought the .380 Hi-Point to the scene of the shooting, such a story would have been supported by the evidence at the scene.

Officer Norton inventing a story that he was more than 100 yards away when Mr. Murray shot himself makes little sense when such a story would have been so complicated to stage.  Staging this explanation would have required Officer Norton to plant spent shell casings on a hill more than 100 yards away from Mr. Murray while knowing there were other officers in the area searching for Mr. Murray.  If any of these other officers had observed Officer Norton running away from Mr. Murray's location to plant the shell casings, it would have exposed such a plan.  Such staging after Officer Norton had used his .40 Glock to shoot Mr. Murray would also have required Officer Norton to discharge Mr. Murray's firearm, the .380 Hi-Point, for the expended .380 shells to have been found at the scene, as there is little reason why a person would carry around expended shells from a weapon of a different caliber than his usual one.  Firing that weapon would have attracted the attention of the other officers, prompting questions as to why Officer Norton would fire a handgun three times, presumably into the distance as no projectiles were found near Mr. Murray (ECF 199 at 289:25-290:10), while standing over Mr. Murray's prone body.  Additionally, the recording of Officer Norton's call to dispatch reflects that Officer Norton was in emotional distress when he called dispatch to report that Mr. Murray had shot himself.  (Def. Ex. 138 at file 2007-04-01-11-30-40-001.)  An officer in such a mental state would be unlikely to invent and then implement a complicated story to explain the shooting in the limited time before other officers would arrive at the scene.  Such an officer would be more likely to explain the shooting by simply saying it was justified because the suspect either was reaching for a weapon or had attacked him.

Instead, the evidence shows that it is far more likely that the shooting occurred exactly as Officer Norton has consistently testified over many years it did. (ECF 198 at 93:5-96:15; ECF 254 at 130:9-134:16)  The evidence shows that he was more than 140 yards away from Mr. Murray when Mr. Murray shot himself. (ECF 198 at 93:19-94:3 (Officer Norton indicating he retreated 30 to 40 yards up the hill after exchanging fire with Mr. Murray); ECF 254 at 132:16-22 (Officer Norton indicating he retreated 40 yards up the hill after exchanging fire); Def. Ex. 137 (noting a distance of 113 yards between Officer Norton's shell casings and Mr. Murray)

To start, this scenario comports with the motives an off duty and apparently unbiased officer would have had when volunteering on his day off to assist in the pursuit of a suspect fleeing from the scene of a car crash after attempting to evade the police.  It does not require Officer Norton in the span of less than 90 seconds to invent and execute a complicated plan to manipulate evidence to explain his activities immediately preceding and during the shooting.

The physical evidence also corroborates Officer Norton's account.  The .40 spent shell casings were found more than 100 yards from Mr. Murray. (ECF at 254 at 130:2-8, 162:17-21; Def. Ex. 55; Def. Ex. 137.)  The blood spatter from the shot to Mr. Murray's head was at a right angle to where the .40 casings from Officer Norton's firearm were found.  (Def. Ex. 28 at 2; ECF 199 at 262:9-24.)  Agent Ashdown described Officer Norton's clothing as "clean and pristine" and Chief Jensen did not note any blood on Officer Norton's handgun. (ECF 199 at 283:4-11; ECF 255 at 314:19-315:15, 317:23-318:12; *see also* Def. Ex. 103.)  These facts are more consistent with Officer Norton being far away from Mr. Murray when he shot himself than with a scenario in which Officer Norton was close enough to Mr. Murray to inflict a contact gunshot wound to the head.  Finally, it is the most likely explanation for why two firearms were discharged at the scene.[34]

_____

[34] The plaintiffs have never advanced a theory that Mr. Murray fired at Officer Norton, Officer Norton fired back, and Mr. Murray then surrendered, allowing Officer Norton to approach Mr. Murray before shooting him at close range.  This alternative scenario would explain why two firearms were discharged at the scene, but it is difficult to fit into the less-than-90-seconds during which these events could have taken place.  (ECF 260 at ¶¶ 41-50; ECF 261 at 8; Def. Ex. 31 at 8; Def. Ex. 134 at 32:58-33:35.)  If Officer Norton was approximately 113 yards away when the two first exchanged gunfire, it would have taken him a considerable amount of time to approach Mr. Murray while keeping his gun pointed at him, shoot Mr. Murray at contact range, and then retreat onto the hill afterwards to report the shooting to dispatch.  (*See* ECF 255 at 240:21-241:6 (Deputy Byron testifying he saw Officer Norton on the hill on his phone).)  It is also unlikely that Officer Norton was closer than 113 yards to Mr. Murray when the two exchanged gunfire, and that Officer Norton then manipulated the evidence at the scene within 90 seconds.  If the two had been closer than 113 yards, it becomes less likely that both Officer Norton and Mr. Murray would miss each other with their shots, and it would make it less likely for Officer Norton to turn around and retreat from Mr. Murray, giving him an opportunity to surrender; instead, Officer Norton probably would have kept shooting to ensure Mr. Murray

Further, Agent Ashdown, who viewed the scene within hours of the shooting, did not see anything to suggest that evidence had been manipulated.  Instead, based on the evidence at the scene and the medical examiner's determination, Agent Ashdown believed that the question of whether Mr. Murray had shot himself was a "settled issue."  (ECF 199 at 295:6-12, 326:6-18, 370:6-19.)  As noted *supra* in footnote 31, however, Agent Ashdown should have had the .380 Hi-Point tested for any evidence that Officer Norton had touched it, even though FBI protocols did not require such testing.  (ECF 258 at 603:14-20, 605:17-606:5.)

The plaintiffs' best evidence that Mr. Murray did not shoot himself is the location of the entry wound on the left side of Mr. Murray's head, even though Mr. Murray was right-handed.  The expert testimony about whether the location of the shot was suspicious for a self-inflicted gunshot wound, however, was mixed and ultimately tilted against the plaintiffs.

Dr. Arden, the plaintiffs' expert on forensic pathology, testified the "totality of that gunshot wound is mostly uncommon or atypical for a suicidal gunshot wound to the head," except for the fact that it was a contact wound, which he testified is "common."  (ECF 257 at 463:24-464:7.)  Specifically, he testified that the location "above and behind the left ear is an atypical location," although he noted the "trajectory going across the head by itself is not . . . particularly typical or atypical."  (*Id.* at 464:8-20.)  On cross-examination, Dr. Arden was asked if he still agreed with his deposition testimony, in which he stated "'[c]ertainly one of the reasonable choices was this was a suicide.  The undetermined [*sic*] would have been a better way to certify it given the gaps in the evidence – in the investigation in the evidence."  He confirmed that he was still of the opinion that finding the manner of death to be undetermined would have been the best conclusion, but that the finding of suicide was reasonable.[35]  (*Id.* at 470:4-11.)  Further, when asked, Dr. Arden agreed that he would have marked Mr. Murray's manner of death as undetermined.  (*Id.* at 470:12-15.)  Notably, after having reviewed the facts surrounding Mr. Murray's death, including the lack of testing of the .380 Hi-Point, Dr. Arden did not testify that he would have certified the death as a "homicide," or that "homicide" would have been the appropriate manner of death to specify.  (*Id.* at 478:1-19.)  In other words, the location of the entry wound to Mr. Murray's head was not so atypical that Dr. Arden thought it made homicide the most likely manner of death, and that the determination of suicide was a reasonable choice.

Dr. Cohen, the defendant's expert on forensic pathology, testified that the location of the wound was "not atypical at all," and that the location of the entry wound was "within range of not atypical . . . .  It's a little bit higher and a little bit backward, but it is definitely within range.

---

was disabled.  This scenario is also problematic because it requires Officer Norton to collect his shell casings after shooting Mr. Murray and plant them a substantial distance away from Mr. Murray, all in a very short timeframe.

[35] Dr. Arden agreed that medical examiners use the term undetermined "when you either have insufficient evidence on which to base a conclusion or you have more than one choice that have such close probabilities that you can't reasonable rank order as much more probable than the other."  (ECF 470:23-471:7.)

It's not atypical." (ECF 258 at 518:5-17.)  He further opined that, based on the evidence he reviewed, the manner of Mr. Murray's death was suicide.  (*Id.* at 506:25-508:3.)

To be sure, Mr. Murray was right-handed (ECF 198 at 27:9-10) and was shot in the left side of the head, slightly behind the left ear.  Yet Dr. Cohen testified that, while it would be uncommon, it would not be rare for Mr. Murray, a right-handed person, to have used his right hand to inflict this wound to his left side of the head, contrary to Dr. Arden's opinion.  (ECF 258 at 539:7-18.)  Dr. Leis also testified that Mr. Murray using his right hand to inflict this wound would have been consistent with the trajectory of the injury, although he acknowledged it would be "very rare."  (ECF 234-1 at 129:11-130:13, 136:14-22.)[36]

The evidence does not reflect clearly whether Mr. Murray used his right or left hand to inflict the gunshot wound.  Officer Norton believed the .380 Hi-Point was in Mr. Murray's left hand but was unsure; he apparently based his recollection in part on his belief that the dashcam footage showed Mr. Murray holding a gun in his left hand.  (ECF 198 at 95:24-96:15.)  While this is a possible interpretation of the footage, it is by no means clear, as the quality of the footage is poor.  (Def. Ex. 134 at 27:40-28:03.)

Right-handed individuals can sometimes use their left hands to perform certain activities.  (*See* ECF 234-1 at 134:15-21 (Dr. Leis agreeing that "it's not written" that a right-handed person has to shoot himself with his right hand).)  Mr. Murray's mother, who attested that Mr. Murray was right-handed, had never seen him shoot a handgun and could not testify as to which hand he used for that activity.  (ECF 198 at 32:15-23.)  In addition, under the stress of being pursued by police following a car crash and given the high blood-alcohol level and the presence of other intoxicants in his system (*see* Def. Ex. 107 at 2-3), Mr. Murray may have been panicking and acting rashly, disregarding his favored hand in carrying the handgun.

While the expert testimony is conflicting on whether the location of the entry wound was atypical for a self-inflicted head wound, no expert testified that "homicide" would have been the best manner of death certification.  Even the plaintiffs' expert witness Dr. Arden opined that the manner of death should have been labeled as "undetermined," rather than homicide, but agreed that suicide was "reasonable."  (ECF 257 at 470:4-15, 478:1-19.)  In effect, the plaintiffs' own

---

[36] A question to Dr. Leis in this portion of the deposition transcript prompted an objection for lack of foundation from an attorney representing various localities and officers, who are not parties in this case, in the district court proceedings.  (ECF 234-1 at 136:14-22.)  The parties' stipulation concerning Dr. Leis's deposition testimony does not address how objections therein should be treated.  (ECF 232 at ¶ 44.)  The objection noted was made by counsel for a non-party here in response to questioning by plaintiffs' counsel.  Neither party renewed or requested a ruling on the objection.  Any objection by any party in this case to the question and to Dr. Leis's answer is considered to have been waived.  In any event, the objection would be overruled on the merits, as Dr. Leis was expressing a view based on his experience as a medical examiner.

expert opined that the plaintiffs are unable to satisfy their burden to prove that it was more likely than not that Officer Norton killed Mr. Murray.

As to why Mr. Murray shot himself and why he did so in an unusual location, there is substantial evidence to suggest that Mr. Murray was impaired on April 1, 2007. A blood test taken after Mr. Murray died showed the presence of alcohol, and a urine drug screen showed amphetamine and THC in Mr. Murray's system.[37] (Def. Ex. 107 at 2-3.) These impairments may have contributed to a purposeful decision to shoot himself or an unwitting, accidental shooting; Dr. Arden testified that such impairments could have caused Mr. Murray to shoot himself accidentally. (ECF 257 at 462:10-23, 471:8-20, 472:13-473:7.)

Although the plaintiffs raised the possibility that there were issues with the chain of custody with the blood sample, the plaintiffs never actually identified what those issues were. (ECF 232 at 9 n.3; ECF 257 at 465:7-466:19.) The plaintiffs cannot simply rely on vague suggestions of improprieties with the chain of custody, especially after stipulating to the admission of the relevant records. (ECF 232 at 9.) Admittedly, there is evidence of law enforcement officers improperly drawing blood from Mr. Murray. (ECF 199 at 313:10-15.) There is no evidence, however, that this improperly drawn blood was ever tested, and Agent Ashdown refused to accept the proffered vials with the blood. (*Id.* at 313:10-25.) If that blood was tested, the results of that testing are not in evidence.

On the other hand, there is no evidence to suggest that the blood or urine drawn at Ashley Valley Medical Center was tampered with or that the law enforcement officers injected Mr. Murray with drugs or alcohol. Such tampering seems particularly unlikely as Mr. Murray's urine and blood both returned positive results for different intoxicants. (Def. Ex. 107 at 2-3.) Trooper Swenson also found "some drug paraphernalia, . . . some marijuana, a BB gun, and some beer bottles" in the crashed vehicle, corroborating the results of the tests that Mr. Murray was under the influence of marijuana and alcohol on April 1, 2007. (ECF 254 at 67:21-68:2.)

Based on the testimony and the exhibits in evidence, the Court concludes that Officer Norton's account of the shooting was credible and supported by the available physical and audio evidence. It is most likely that Mr. Murray shot himself in the head while Officer Norton was more than 140 yards away. Because Officer Norton's testimony as to the events of the shooting otherwise aligns with the evidence, the Court also credits Mr. Norton's testimony that he only

---

[37] While the evidence concerning Mr. Murray's intoxication supports the finding, based on preponderant evidence, that Mr. Murray shot himself, it is not necessary to that finding. The evidence as to how the .380 Hi-Point was brought to the scene, the physical evidence at the scene, the dispatch transmissions, the testimony of the other officers, and the resulting timeline for the events leading up to the shooting are sufficient to show that it is more likely than not that Officer Norton did not shoot Mr. Murray. Therefore, even if the evidence concerning Mr. Murray's intoxication is disregarded, the conclusions reached in this opinion would remain the same.

fired at Mr. Murray in response to Mr. Murray first shooting at Officer Norton.  (ECF 198 at 93:3-94:3; ECF 254 at 131:11-21, 132:16-133:14, 153:7-2.)

## III.   DISCUSSION

### A.   Burden of Proof

The plaintiffs bring suit under the "bad men" clause of the Ute Treaty.  The plaintiffs have the burden of proving that they meet the elements required by the treaty to recover.  *See Hebah v. United States*, 456 F.2d 696, 704 (Ct. Cl. 1972) (noting that, under a substantively identical "bad men" provision of a different treaty between the United States and another tribe, "plaintiff has the burden of proving" the requisites for recovering under the treaty).  "To state a claim for relief under the bad men provision [of the Ute Treaty] requires the identification of particular 'bad men,' and an allegation that those men committed a wrong within the meaning of the treaty."  *Jones II*, 846 F.3d at 1352; *see also Hebah*, 456 F.2d at 703-04; *Elk v. United States*, 87 Fed. Cl. 70, 78 (2009).

### B.   Claims Abandoned by the Plaintiffs

The amended complaint never identified specific criminal statutes whose violation it alleged constituted wrongs against Mr. Murray, although it did use terms such as "murder," "assault," and "conspiracy."  (ECF 17 at ¶¶ 16-17, 67, 69.)  The *Jones IV* decision on the defendant's motion for summary judgment had to rely on the plaintiffs' response to one of the defendant's interrogatories to determine which criminal statutes the plaintiffs were alleging had been violated.  *Jones IV*, 149 Fed. Cl. at 346-48 (citing ECF 150-6 at 3-4).  The *Jones VI* opinion again relied on the same interrogatory response to identify the alleged crimes committed against Mr. Murray.  *Jones VI*, 2023 WL 2681819 at *36 n.23.

In response to an order (ECF 214), the plaintiffs filed a more definite statement (ECF 215) of the crimes they allege constituted the wrongs necessary to support recovery under the "bad men" provision of the Ute Treaty.  The plaintiffs identified several offenses, including, for the first time, claims under Ute law.  As explained *supra* footnote 2 and page 6, the Court instructed the parties on its view of the proper scope of claims that were still viable after the *Jones IV* summary judgment ruling and the Federal Circuit's partial reversal in *Jones V*.  Noting the plaintiffs' objections, the parties agreed to proceed to trial on a narrower list of crimes supporting potential "bad men" liability.  (ECF 219 at 1-3, 6-7.)  This list included:

- murder of Todd Murray, or negligent or reckless homicide, battery, and any lesser included offenses of these crimes: 18 U.S.C. §§ 13, 1111, 1112, 1117, 1152; Utah Criminal Code §§76-5-202 (e), (f), (k), (s); 76-5-201 76-5-205, 206, 209.

- Conspiracy against rights, 18 U.S.C. §§ 13, 1152, 241, 242.

- Assault, Utah Criminal Code §76-5-102.

- Obstruction of justice, 18 U.S.C. §§ 13, 1152, 1503, 1505, 1512, 1519.

53

- Making false statements to federal investigators, 18 U.S.C. §§ 13, 1001, 1152.

- Destruction of records or evidence, 18 U.S.C. §§ 13, 1152, 2071, 2232.

- Interference with public servant or peace officer, Utah Criminal Code §§76-8-301; 76-8-305.

- Official or unofficial misconduct, Utah Criminal Code §§76-8-201, 203.

- Obstruction of criminal investigation, Utah Criminal Code §76-8-306.

- Tampering with evidence, falsification or alter[a]tion of government record, Utah Criminal Code §§76-8-510.5, 511.

- False claims and conspiracy to defraud United States, 18 U.S.C. §§ 13, 1152, 287, 371.

(ECF 219 at 2-3.)

Despite including this lengthy list of crimes on which they intended to prove liability at trial, the plaintiffs' proposed findings of fact and conclusions of law do not address explicitly the elements required to prove any officer committed any of the above offenses. The failure to spell out in their proposed findings the elements of any offenses they intended to prove and how specific evidence proves those elements were met is consistent with the plaintiffs' failure to adduce evidence on almost all the offenses they had identified as potential bases for liability.

In their proposed conclusions of law, the plaintiffs focused almost entirely on the spoliation sanction that was imposed as the basis for imposing liability on the defendant. (ECF 261 at 15-20.) The sanction was an evidentiary one; it did not identify and does not support an effort to identify the specific offense on which liability could be imposed. At best, the evidentiary sanction imposed for spoliation could have on its own implicitly helped the plaintiffs show that Officer Norton committed homicide or assault against Mr. Murray, but the presumption has been successfully rebutted.

The only proposed finding or conclusion that addresses a possible basis for liability is the plaintiffs' last one, in which they propose that "[t]he United States is liable under the bad man clause for the death of Todd Murray." (*Id.* at 20.) That proposed finding limits the potential basis for liability to the crime of killing Mr. Murray.

Even the plaintiffs' closing argument at the end of trial was vague as to what crimes had been proven from the evidence to form the basis for liability under the "bad men" provision. At best, the plaintiffs argued in their closing rebuttal "that the Court must conclude that there is evidence of crimes that resulted in the death of Mr. Murray. Whether they are murder, whether they are homicide, what it would be, whether it's negligent homicide, any of those sorts of things." (ECF 259 at 660:10-14.) This quote is the *only* portion of the plaintiffs' closing

54

argument that even implicitly referenced any specific crimes committed by law enforcement; those crimes again are limited to homicide and perhaps assault, as a lesser included offense.

The plaintiffs have forfeited their claims based on all offenses aside from homicide and assault, as a lesser-included crime, by failing to argue or show how the evidence satisfies the required elements of any of the alleged offenses. *See Rodriguez v. Dep't of Veterans Affs.*, 8 F.4th 1290, 1305 (Fed. Cir. 2021) ("An issue that is merely alluded to and not developed as an argument in a party's brief is deemed waived."); *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1250 n.2 (Fed. Cir. 2008) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)) ("'A skeletal "argument", really nothing more than an assertion, does not preserve a claim.'"); *cf. Kistler Instrumente AG. v. United States*, 628 F.2d 1303, 1304 (Ct. Cl. 1980) (per curiam) (concluding that when a defendant had "asserted a host of defenses to the plaintiff's action" but "no findings of fact have been proposed with respect" to two of those defenses, that the "defendant is deemed to have abandoned these defenses"); *Jones v. Kirchner*, 835 F.3d 74, 83 (D.C. Cir. 2016) (cleaned up) ("We apply forfeiture to unarticulated legal and evidentiary theories not only because judges are not like pigs, hunting for truffles buried in briefs or the record, but also because such a rule ensures fairness to both parties."). This rule is particularly applicable to the alleged state offenses; it is not obvious that all the asserted violations of state law are incorporated by the Assimilative Crimes Act, 18 U.S.C. § 13. *See Jones IV*, 149 Fed. Cl. at 355-56 (discussing whether specific federal statutes preclude incorporation of state statutes under the Assimilative Crimes Act).

Even if the plaintiffs had not forfeited their claims by abandoning them, the evidence necessary to support a finding that any offenses, aside from homicide and assault, were committed is entirely lacking. Evidence that would support many of the offenses alleged at some time during the long history of this case was never presented at trial. For example, the record is devoid of any evidence to support the plaintiffs' alleged conspiracy offenses. No officer has been shown to have colluded in any way with Officer Norton either in connection with the shooting or with a cover-up. Similarly, the plaintiffs never identified what specific acts could constitute obstruction of justice, obstruction of a criminal investigation, or misconduct. There is no evidence to show which public records were tampered with or destroyed, aside from the only negligent, rather than bad faith or intentional, destruction of the .380 Hi-Point handgun, for which the defendant was sanctioned. For none of the crimes alleged, at one time or another by the plaintiffs as a basis for liability, is there evidence connecting specific officers to specific crimes. Thus, aside from Officer Norton, accused of killing Mr. Murray, none of the other officers has been accused of being a "bad man" under the Ute Treaty.

The plaintiffs were advised in *Jones VI* that it was each "party's responsibility to support its proposed findings of fact with relevant citations to the evidence in the record," and that a party's failure to do so could result in that party's proposed findings being disregarded in part or in full. *Jones VI*, 2023 WL 2681819, at *3 n.3. It is not the Court's job to invent the plaintiffs' arguments, and the plaintiffs have failed both to propose specific findings of criminal behavior on April 1, 2007, and to tie the evidence to their generic proposed findings. The plaintiffs' meager proposed findings are facially inadequate for every criminal act, aside from homicide and assault, they had intended at one point or another to prove.

The only bases for liability the plaintiffs have not forfeited by failing to propose adequate findings are those related to homicide of Mr. Murray, and any related assault on him, by Officer Norton. These offenses have always been at the heart of the plaintiffs' claims: that Officer Norton unlawfully killed Mr. Murray. The plaintiffs also indirectly asserted these offenses through their proposed conclusion of law that "[t]he United States is liable under the bad man clause for *the death* of Todd Murray." (ECF 261 at 20 (emphasis added).) The plaintiffs' claims based on these offenses are the only ones not forfeited, and they are addressed on the merits.

### C.     The Plaintiffs Failed to Prove that Officer Norton Committed Assault or Homicide

The plaintiffs have failed to meet their burden on their remaining claims that Mr. Murray was the victim of an assault or a homicide.

Officer Norton's actions constituted neither assault under federal or Utah law, as incorporated by the Assimilative Crimes Act, 18 U.S.C. § 13, nor any form of homicide under Utah or federal law. The evidence reflects that Mr. Murray fired two shots at Officer Norton in an unprovoked use of deadly force. Officer Norton fired two shots at Mr. Murray only in response to Mr. Murray's use of deadly force because he was in fear for his life.

Under Utah law, a person "is justified in using force against another person when and to the extent that the [person] reasonably believes that force is necessary to defend [himself] . . . against another person's imminent use of unlawful force." Model Utah Crim. Jury Instr. 2d § 530; *see also Ray v. Wal-Mart Stores, Inc.*, 359 P.3d 614, 621 (Utah 2015) ("The right of self-defense is enshrined in the Utah Constitution, Utah's self-defense statute, and our common law decisions."). A person "does not have a duty to retreat from another person's use or threatened use of unlawful force before using force to defend [himself] . . . as long as the [person] is in a place where [he] has lawfully entered or remained." Model Utah Crim. Jury Instr. 2d § 533. Officer Norton was lawfully present at the scene because he was a sworn law enforcement officer in hot pursuit of a person who he reasonably believed may have committed a criminal offense, namely fleeing from arrest.[38] *See* Utah Code §§ 76-8-305 (1990), 305.5 (2005). He therefore could enter private land in pursuit of Mr. Murray. *See* Utah Code §§ 76-6-201(3) (1973) (clarifying that privileged and licensed actors are lawfully present on land), 206(a)

---

[38] No evidence at trial undermines the conclusion reached in the *Jones VI* spoliation opinion that Officer Norton's actions did not constitute trespass and that his presence on the land was privileged under Utah law. *See Jones VI*, 2023 WL 2681819 at *40-41. Even if Officer Norton was a trespasser, he still likely would have had the right under Utah law to use deadly force to protect himself against the unprovoked use of deadly force. *See State v. Tuckett*, 13 P.3d 1060, 1061-62 (Utah App. 2000) (noting that, in a case in which a trespasser refused a request to leave but did not otherwise use force, the trespasser could "use force to defend himself against any use of force [ ] that would have caused death or serious bodily injury.")

(2006); Restatement (Second) of Torts § 204 (1965) (describing the privilege to enter private land to make an arrest); *Jones VI*, 2023 WL 2681819 at *41 n.31.

Under federal law, "[a] person may resort to self-defense if he reasonably believes that he is in imminent danger of death or great bodily harm, thus necessitating an in-kind response. Self-defense thus requires both (1) a perception of danger that is objectively reasonable, even if inaccurate; and (2) a necessary response that is proportional to the perceived danger." *United States v. Kepler*, 74 F.4th 1292, 1313 (10th Cir. 2023) (cleaned up).

Officer Norton drew his handgun only after he spotted Mr. Murray with what appeared to be a handgun in his hand and kept his gun in the low-ready position, pointed towards, but not directly at Mr. Murray. (ECF 198 at 89:13-21, 93:3-14; ECF 254 at 153:7-154:2.) Officer Norton had identified himself as a police officer to Mr. Murray, yelling "Police, get on the ground[!]" (ECF 198 at 89:15-21.) Mr. Murray should have heard those commands. (Site Visit.) Mr. Murray continued to approach Officer Norton with a gun in hand and then fired at Officer Norton without provocation before Officer Norton returned fire. (ECF 198 at 93:3-94:10; ECF 254 at 131:11-132:15.) In such circumstances, Officer Norton's conduct cannot constitute assault. Officer Norton drawing his weapon in the face of an approaching person having an unholstered weapon was a reasonable response, and Officer Norton had the right to use deadly force in response to Mr. Murray's own, unprovoked use of deadly force. *See Kepler*, 74 F. 4th at 1313; Model Utah Crim. Jury Instr. 2d §§ 530-533.

As for homicide, there is no evidence that Officer Norton possessed the necessary *mens rea* to commit any degree of homicide. Even presuming, contrary to the evidence, that Officer Norton did possess a required *mens rea*, his actions could not have constituted homicide. Officer Norton's shots did not hit Mr. Murray. (ECF 198 at 170:4-8; ECF 254 at 132:2-8.) Mr. Murray was fatally wounded by a contact gunshot wound that was fired by Mr. Murray while Officer Norton was approximately 140 yards away.

The evidence shows that it is more likely than not that Mr. Murray fired the fatal shot.[39] Officer Norton's actions did not constitute any form of homicide under Utah or federal law because he did not kill Mr. Murray, and any attempt to do so was only part of Officer Norton's lawful use of force in self-defense.

## IV.   CONCLUSION

As noted at the outset, civil trials do not prove what really occurred. They can only prove what the evidence reflects is most likely to have happened. The shortcomings of any trial are magnified when so much time has elapsed between the event and the trial. The plaintiffs are to

---

[39] Although Mr. Murray fired the fatal shot, there is no proof of the medical examiner's conclusion that Mr. Murray died by suicide. It is very possible, as Dr. Arden acknowledged, that the self-inflicted wound was accidental, given the stress Mr. Murray was under and his impairment by alcohol and drugs. (ECF 257 at 462:10-23, 471:8-20, 472:13-473:7.)

be commended for their tenacity in bringing and pursuing their claims and marshaling the record in the face of these difficulties.

Nevertheless, the plaintiffs have not shown by preponderant evidence that Officer Norton's use of deadly force to defend himself against Mr. Murray's use of deadly force was unlawful; therefore, Officer Norton did not unlawfully assault Mr. Murray. The plaintiffs have failed to prove by preponderant evidence that Officer Norton fired the fatal shot or otherwise killed Mr. Murray on April 1, 2007. The plaintiffs have failed to prove that Officer Norton committed homicide or assault on April 1, 2007. The evidence fails to show that Officer Norton committed any crimes against Mr. Murray on April 1, 2007, and, therefore, the plaintiffs have failed to prove the elements necessary to impose liability against the defendant under the "bad men" provision of the Ute Treaty for Officer Norton's actions.

In addition, the plaintiffs have forfeited any other possible basis they have at one time or another advanced as a basis for imposing liability on the defendant under the "bad men" provision of the Ute Treaty for the acts that took place during the pursuit of the crashed vehicle or on the reservation following the pursuit on April 1, 2007. And for the reasons previously provided in *Jones IV*, the offenses alleged to have occurred at the hospital and the mortuary on April 1, 2007, cannot support the imposition of liability against the defendant.

All the plaintiffs' claims fail either for insufficient evidence or as a matter of law. A separate order filed concurrently with this opinion will direct the entry of judgment in favor of the defendant.

s/ Richard A. Hertling
**Richard A. Hertling**
**Judge**